**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

FASTCASE, INC.

      Plaintiff,

v.

ALEXI TECHNOLOGIES INC.

      Defendant.

</td><td>

C.A. No. 1:25-CV-04159-RJL

</td></tr>
</table>

## PLAINTIFF FASTCASE, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................3

    A.    The Parties. ..................................................................................................3

    B.    Negotiations and the Narrow, Budget-Driven Scope of the Data License. ............4

    C.    Alexi's Post-Execution Representations Confirmed Its Continued Internal, Memo-Based Use. ......................................................................6

    D.    Recent Public Demonstrations Show Alexi's Transition from Memo Preparation to a Self-Service Legal Research Platform Built on Fastcase Data. ......................................................................9

    E.    Alexi Admits It Uses Fastcase Data as "Training Data" for Its Consumer-Facing Legal-Research Product, But Refuses to Cure the Breach........................12

LEGAL STANDARD..........................................................................................................13

ARGUMENT ......................................................................................................................14

I.    ALEXI CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS. ...........14

    A.    The Agreement's Plain Language Forecloses Alexi's "Memo Service" Theory and Establishes Material Breach. ..............................................16

        1.    Alexi Uses Fastcase Data Externally—Not for "Internal Research Purposes." ......................................................................16

        2.    Alexi Uses Fastcase Data Commercially and in Direct Competition with Fastcase. ......................................................................17

    B.    Alexi's Extrinsic Evidence Does Not Create Ambiguity and, in Any Event, Confirms the License Remained Narrow. ..............................................18

    C.    Alexi's Trade Secret and Trademark Arguments Do Not Affect the Merits of Its Injunction Request. ......................................................................20

II.    ALEXI HAS NOT ESTABLISHED IRREPARABLE HARM. .......................................21

    A.    Alexi Created the Alleged Irreparable Harm It Now Claims. ..............................22

    B.    Alexi's Alleged Irreparable Harm Is Primarily Economic and Not Enterprise-Ending. ......................................................................24

1.    Alexi's Alleged Harm Is a Cost Problem, Not an Irreparable Injury. ...........................................................................25

2.    Alexi's Claimed Lost Profits Are Unquantified and Not Enterprise-Ending. ..........................................................................26

C.    Alexi's Alleged Reputational and Competitive Harm Is Speculative and Insufficient. .............................................................26

III.    THE EQUITIES AND PUBLIC POLICY DO NOT FAVOR INJUNCTIVE RELIEF...29

A.    The Balance of Equities Disfavors an Injunction. .................................................29

B.    Public Policy Also Disfavors an Injunction. ........................................................30

CONCLUSION ...............................................................................................................31

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

*1305 R.I. Ave. NW, LLC v. Mussells*,
  292 A.3d 212 (D.C. 2022) ...................................................................................15, 18

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................14

*Air. Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012)..........................................................................24, 29

*AmSurg EC Wash., Inc. v. MGG Grp. Co., Inc.*,
  2024 WL 2405822 (D.D.C. Apr. 26, 2024)......................................................................24

*Anthenex Inc. v. Azar*,
  2019 WL 4316139 (D.D.C. Sep. 6, 2019) ...........................................................22, 24, 26

*Ardelyx, Inc. v. Becerra*,
  2024 WL 5186613 (D.D.C. Dec. 20, 2024)................................................................29, 30

*Atlas Air, Inc. v. Int'l Bhd. Of Teamsters*,
  280 F. Supp. 3d 89 (D.D.C. 2017)..................................................................................21

*Beacon Associates, Inc. v. Apprio, Inc.*,
  308 F. Supp. 3d 277 (D.D.C. 2018) ................................................................................27

*Brodie v. United States HHS*,
  715 F. Supp. 2d 74 (D.D.C. 2010) ..................................................................................27

*Cal. Valley Miwok Tribe v. Haaland*,
  2023 WL 8005033 (D.D.C. Nov. 17, 2023) .....................................................................21

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
  68 F.3d 828 (3d Cir. 1995)..............................................................................................22

*Clevinger v. Advoc. Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2025).....................................................................................21

*Clevinger v. Advocacy Holdings, Inc.*,
  2023 WL 4560839 (D.D.C. July 15, 2023).......................................................................28

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ........................................................................................13

*Conseil Alain Aboudaram, S.A. v. De Groote*,
  460 F.3d 46 (D.C. Cir. 2006) ...............................................................................15, 18, 19

*Council on Am.-Islamic Rels. v. Gaubatz*,
    667 F. Supp. 2d 67 (D.D.C. 2009) .................................................................31

*Debnam v. Crane Co.*,
    976 A.2d 193 (D.C. 2009) ............................................................................15

*Des Longchamps v. Allstate Prop. & Cas. Ins. Co.*,
    102 F. Supp. 3d 299 (D.D.C. 2015) ..............................................................30

*Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*,
    40 F.3d 1474 (5th Cir. 1995) .......................................................................19

*Fort Myer Constr. Corp. v. Shrensky*,
    2024 WL 181075 (D.D.C. Jan. 17, 2024) .....................................................27

*Gordon v. Holder*,
    632 F.3d 722 (D.C. Cir. 2011) .....................................................................13

*Jacobson v. Hofgard*,
    168 F. Supp. 3d 187 (D.D.C. 2016) ..............................................................15

*Jones v. District of Columbia*,
    177 F. Supp. 3d 542 (D.D.C. 2016) ........................................................26, 27

*Mead Johnson Pharm. Grp. v. Bowen*,
    655 F. Supp. 53 (D.D.C. 1986) .....................................................................26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*,
    298 F. Supp. 2d 27 (D.D.C. 2002) ................................................................31

*Mott Thoroughbred Stables, Inc. v. Rodriguez*,
    87 F. Supp. 3d 237 (D.D.C. 2015) ................................................................27

*Padgett v. Vilsack*,
    2024 WL 5283897 (D.D.C. 2024) .................................................................22

*Safari Club Int'l v. Jewell*,
    47 F. Supp. 3d 29 (D.D.C. 2014) ......................................................21, 29, 30

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ..............................................................22

*Salt Lake Tribune Publ. Co. v. At&T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) ....................................................................22

*Save Jobs USA v. United States Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108 (D.D.C. 2015) ..............................................................24

*SEIU Local 32BJ v. Preeminent Protective Servs.*,
    2020 WL 2308583 (D.D.C. May 8, 2020) ........................................................20

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ..........................................................................22

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) ................................................................28

*Trump v. Thompson*,
    573 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................30

*United States v. Abrego*,
    788 F. Supp. 3d 937 (M.D. Tenn. 2025) ......................................................22

*Varicon Int'l v. Office of Pers. Mgmt.*,
    934 F. Supp. 440 (D.D.C. 1996) ...................................................................24

*Whaleco Inc. v. Shein Tech. LLC*,
    2025 WL 445187 (D.D.C. 2025) ..................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................13, 29, 30, 31

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1984) ...........................................................21, 24, 25

## STATUTES

Miss. Code Ann. § 75-2-209(4) ................................................................19

U.C.C. § 2-209(4) ..................................................................................19

## RULES

Fed. R. Civ. P. 65 ..................................................................................13

Plaintiff Fastcase, Inc. ("Fastcase") submits this opposition to Defendant Alexi Technologies Inc.'s ("Alexi") Motion for Temporary Restraining Order and Preliminary Injunction ("Motion" or "Mot.").

## **INTRODUCTION**

This case turns on a simple but dispositive fact: Alexi is no longer the "memo-writing" service it repeatedly claims to be. Although Alexi may have begun as a service that delivered lawyer-prepared research memoranda, it has since transformed—as shown in its own public demonstrations—into a customer-facing, self-service legal research platform. Today, Alexi's end users themselves conduct legal research through an interactive AI interface powered by Fastcase's proprietary and licensed data. That transformation is flatly prohibited by the parties' Data License Agreement (the "Agreement").

The plain language of the Agreement permitted Alexi to use Fastcase data only for "internal research purposes" and expressly prohibited any use that was "commercial" or "competitive with Fastcase." Agreement § 1.7. Those limitations were not incidental. They were central to the deal Fastcase struck with a cash-constrained startup seeking a low-cost license to support an internal memo-production workflow. Fastcase did not license its data so Alexi could build a public-facing legal research platform, train or operate a consumer AI research tool, or compete directly with Fastcase itself. Yet that is exactly what Alexi now does.

When Fastcase discovered Alexi's evolved product in 2025—one that allows customers to ask legal questions, retrieve results from the Fastcase data, click through full opinions, and conduct iterative research in real time—Fastcase provided written notice of material breach on October 27, 2025. Alexi did not deny the conduct. It did not propose a cure consistent with the Agreement. It did not renegotiate for broader rights. ████████████████████████

█████████████████████████████ Instead, it simply continued operating the same customer-facing research platform built on Fastcase's licensed data. After the contractually required 30-day cure period expired, ████████████████████████

████████████████████████████████████████

██████████████████████████████████

         ████████████████████████████████

████████████████ Put differently, Alexi seeks an injunction compelling Fastcase to continue ████████████████████████████—at the bargain-basement price of an "internal research" license—despite an express contractual prohibition on commercial and competitive use; an injunction allowing its continuing breach. Nothing in equity or contract law supports that result.

Alexi's Motion hinges on a single premise: that its business model has not pivoted, rather its product has always been, and remains, a memo-writing service. The record disproves that premise. Alexi's own public demonstrations show that end users now perform legal research themselves through Alexi's platform, using Fastcase data in real time. That use is not "internal." It is commercial. And it is directly competitive with Fastcase. Each of those facts independently establishes a material breach of Section 1.7.

The Motion collapses when considered against the Agreement's plain language and Alexi's undisputed product evolution. Alexi cannot show a likelihood of success on the merits because Fastcase was entitled to terminate the Agreement. It cannot show irreparable harm because any alleged injury flows from its own decision to build a product it was not licensed to operate and failure to change course when notified of its breach. And it cannot show that equity or public

policy favors ████████████████████████████████████████████████
██████

The extraordinary relief Alexi seeks, which is generally reserved for only the most extreme of cases, would rewrite the parties' bargain and reward a clear breach. Alexi has not met any of the four factors necessary for injunctive relief, let alone all four. The Court should deny the Motion.[1]

## **FACTUAL BACKGROUND**

### A.    The Parties.

Fastcase is a legal-technology company founded in 1999 that operates an online legal-research platform. Walters Decl. ¶ 2 (attached as Ex. A). It provides comprehensive access to primary-law materials—including case law, statutes, regulations, court rules, and constitutions—through an integrated, searchable legal-research system designed to generate structured, reliable legal research outputs for users. *Id.* ¶ 3. Fastcase's platform offers multiple research modalities (natural-language search, Boolean search, and citation lookup), jurisdiction- and content-type filtering, and proprietary research-enhancement tools such as Authority Check and Cert Citator (for citations analysis and negative treatment), data-visualization tools like the Interactive Timeline, and analytics designed to assess relevance and interpretive strength. *Id.*; *see also Frequently Asked Questions*, Fastcase, https://www.fastcase.com/faq/. As early as 2018, Fastcase

---

[1] Alexi attempts to divert attention from its unlicensed use of Fastcase's data by invoking the Agreement's separate option provision, which concerns a potential future purchase of the Fastcase "backfile" under specified conditions. That provision is irrelevant here. The existence or enforceability of any option has no bearing on whether Alexi breached the Agreement's use restrictions, whether Fastcase was entitled to terminate for cause, or whether Alexi can satisfy the elements for injunctive relief. ████████████████████████████████████████████████████████
██████

has also offered the AI Sandbox, through which it works with law firms to use AI and Fastcase Data to create new products. Walters Decl. ¶ 3. Fastcase also maintains a curated, metadata-enriched legal-content database containing more than 15 million judicial opinions, which Fastcase has spent decades developing and which it updates daily and licenses to third-party partners under negotiated agreements. *Id.* ¶ 4.

Alexi (formerly "Alexsei") is a Canadian legal technology company founded in 2017. When Fastcase and Alexi first began discussions in 2019, Alexi described its business as a legal memorandum drafting service: customers submitted a legal research question, and Alexi lawyers—using retrieval-based AI tools internally—prepared and delivered a written research memorandum as the end product. *Id.* ¶¶ 4–5; Jack Decl. ¶¶ 10–12 (attached as Ex. B).

**B.    Negotiations and the Narrow, Budget-Driven Scope of the Data License.**

In 2019, Alexi's CEO Mark Doble approached Fastcase founder and then-CEO Ed Walters about a potential ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*; Jack. Decl. ¶ 4.

Negotiations resumed in 2021. Walters Decl. ¶ 8; Jack Decl. ¶ 5. Fastcase's data licenses are negotiated, priced, and structured based on the licensee's intended use case and the scope of data delivered. Jack Decl. ¶¶ 10–13. Alexi's financial constraints therefore drove a deliberately narrow arrangement. On December 6, 2021, the parties executed a bare-bones Data License Agreement. *See* ECF No. 1-1 ("Agreement"). The Agreement described Alexi as a "research institution" and stated that its object was to provide Alexi with Fastcase's "database of primary law for Alexsei's legal memos." *Id.* at 1.

To match Alexi's modest budget and use proposition, the license was limited in multiple respects. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████     Jack Decl. ¶ 5; Boorugu Decl. ¶ 4 (attached as Ex. C); *see also* ECF No. 15-4 (Mot. Ex. 2) at 4, 10.

Just as important as the limited data scope, the Agreement narrowly limited permitted use. Section 1.7 defines the "limited purpose for which Alexsei may use the Fastcase Data" as "***for internal research purposes***" only, and expressly provides that "***[i]n no event can the data be used for commercial purposes or for any purpose which is competitive with Fastcase***." Agreement § 1.7 (emphases added).  Those prohibitions were specifically negotiated and included because Alexi was receiving access to Fastcase's primary-law database at a discounted price tied to a narrow internal-use case.  *See* Jack Decl. ¶¶ 6–7; Walters Decl. ¶¶ 8–9.  Had Alexi sought the right to use Fastcase's data to build or operate a customer-facing, commercial, or competitive legal-research product, Fastcase would have required materially different commercial terms, including much higher pricing—or would not have licensed the data at all.  Jack Decl. ¶ 6–7.

Consistent with that structure, the Agreement imposed additional safeguards.  Alexi agreed it would "not use the Fastcase Data at any time in any way which is inconsistent with the Purpose," and would not "sell, license, publish, copy, or otherwise distribute any part of the Fastcase Data … without written consent from Fastcase."  Agreement § 2.2.

These restrictions reflected both Alexi's representations and Fastcase's understanding at the time of contracting: Alexi's output was written memoranda created internally by Alexi attorneys, not a user-facing legal research product.  Fastcase understood that Alexi needed access

to raw case law data so Alexi's human lawyers could conduct research internally and then synthesize results into memoranda. *See* Walters Decl. ¶¶ 9–10; Jack Decl. ¶¶ 10–13.

The Agreement also included termination and post-termination obligations. Either party could terminate for cause after 30 days' written notice of a material breach that was not cured within that period. Agreement § 5.2. If Fastcase terminated for cause because of Alexi's breach, Alexi was required to cease all use and "promptly delete or return all copies of the Fastcase Data." *Id.*

### C.    Alexi's Post-Execution Representations Confirmed Its Continued Internal, Memo-Based Use.

Following execution of the Agreement, Fastcase had no reason to believe Alexi was using the Fastcase data outside the Agreement's narrow scope. Alexi's public marketing in the period immediately after execution continued to describe a memo creation service—not a customer-facing legal research platform.

For example, in a YouTube video posted March 8, 2022, titled "Alexsei Product Demo – US," Alexi described itself as "the AI platform that provides high quality answers to your legal questions in memo format on demand," and described a workflow where a user submits a research question and receives a completed memorandum within 24 hours—typically "10 to 20 pages." *See* https://perma.cc/N4R2-33JC (@Alexsei, "Alexsei Product Demo – US," YouTube, Mar. 8, 2022 (Alexi demo)). Below is a screenshot from the demo video showing a completed memorandum having been sent via email to the customer as the end product:



*Id.* at 00:50. That description is consistent with the Agreement's internal-research, memo-delivery

model—where the Fastcase data is used only internally by Alexi's lawyers and the deliverable to

the customer is a lawyer-written memorandum, not a self-service research interface.

Nothing in the parties' subsequent communications cited in Alexi's Motion (*see* Mot. at 7)

suggested that Alexi's business model had changed. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ ECF No. 15-7 (Mot. Ex. 6) at

1-5. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ ECF No. 15-8 (Mot. Ex. 7) at 2—

██████████████████████████████████████████████ *See* Jack Decl.

¶¶ 15–16. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ ECF No. 15-6 (Mot.

Ex. 5) at 4.  None of these exchanges suggested that Alexi was operating—or planning to operate—

a customer-facing legal-research platform using Fastcase data.

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*See* Ex. E (Apr. 18, 2023 email from F.  Jalali) at 2. ████████████████████████

████████████████████████████████ Boorugu  Decl.  ¶¶ 9–10.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ *Id.*

████████████████████████████████████████████████████

████████████████████████████████ ; Boorugu  Decl. ¶ 10. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Boorugu Decl. ¶ 11.

**D.    Recent Public Demonstrations Show Alexi's Hard Pivot from Memo Preparation to a Commercial, Competing, Self-Service Legal Research Platform Built on Fastcase Data.**

After the recent emergence of Large Language Models ("LLMs"), Alexi pivoted from the memo-preparation service contemplated by the Agreement into an interactive, customer-facing legal research platform.  In March 2024, CEO Mark Doble posted on LinkedIn that "Alexi is increasingly a legitimate alternative to incumbent legal research providers & traditional product ideologies."  *See* Ex. F.  Alexi's own subsequent public demonstrations document that pivot.

In an October 15, 2024 public presentation, Alexi's Director of Revenue Daniel Diamond demonstrated a newly released self-service "question and answer system" that lawyers can use interactively—"treat it like an AI colleague"—to ask "rapid fire questions about the law" and iteratively refine their research in real time.  *See* https://perma.cc/8FFH-66LN (@HeyCounsel, "Alexi Demo (HeyCounsel Demo Day)," YouTube, Oct. 15, 2024) at 03:37–05:14.  Within that same chat-based interface, Diamond explained that users could also "request a research memo," which the system would then generate as a separate output.  *Id.* at 05:14–06:18.  Diamond further stated that users could click citations to reach "the full text of the decision," and publicly confirmed that Alexi "license[s] [its] content from Fastcase" and that the data is "updated daily."  *Id.* at 08:04–08:18; 08:57–09:06.

By December 2024, Alexi's CEO Mark Doble publicly signaled the company's pivot away from a memo-only model.  In a December 16, 2024 podcast interview, Doble described Alexi as a litigation-focused AI workflow platform designed not only to generate research memos, but also to help litigators "understand the evidence," "understand the law," and "strategize" through an "interactive" chat-style interface supporting quick answers, drafting, and analysis of case-file documents.  *See* https://perma.cc/78J4-HSH8 (@thegeekinreview, "Harnessing AI for Litigation: Mark Doble on Alexi's Next Evolution," Dec. 16, 2024 (Doble interview)) at 09:48–13:23.  Doble

further explained that Alexi had now moved from "human lawyers in the loop" to "fully automate[d]" memo generation and repeatedly foreshadowed a "big announcement" of "new capabilities" coming "early next year." *Id.* at 10:56–12:03; 21:08–24:43; 35:15–39:02.

By May 2025, Alexi's public demonstrations reflected that the company had changed its business model completely. In a May 1, 2025 video demonstration, Diamond described Alexi as "an AI platform for lawyers" centered on a "simple, … user-friendly question and answer system" for "common legal tasks whether it's legal research, document review, general brainstorming and strategy," emphasizing that the "entire platform" is centralized into "one simple question and answer chat platform." *See* https://perma.cc/EZQ6-QGKA (@LawSites_HowItWorks, "LawNext Product Demo of Alexi Key Features," YouTube, May 1, 2025 (Alexi demo)) at 00:41–01:11; 02:10–03:02; 09:39–09:43.

In that demonstration, Diamond showed database-like legal research functionality delivered directly to end users, including interactive queries that return case law with citations and hyperlinks so users can "trust but verify," and the ability to click through to the "full text of the decision." *Id.* at 03:38–04:49; 10:42–11:01. When asked where the case law came from, Diamond confirmed it was licensed from Fastcase—not pulled from the open web: "We license our case law from Fastcase." *Id.* at 05:21–05:35. The same demo showed Alexi offering a broad suite of customer-facing workflows, including large-scale document review, strategy and defense brainstorming based on case law and user-uploaded documents, deposition preparation, and automated identification of inconsistencies across transcripts and evidence. *Id.* at 06:02–13:56.

For example, Diamond demonstrated a live chat interaction in which he asked the system to "provide me with caselaw" in which a particular expert "has testified," and the platform immediately generated a list of cases:



*Id.* at 04:34 (red boxes added).  Diamond then clicked on one of those results—*Cordts v. Fiege*, a

New York state court decision—opening a page displaying the full-text opinion.  *Id.* at 04:46.  As

shown during the demo and in the screenshot below, the page stated: "This case was cited in an

Alexi research memo.  View this document on Fastcase."



*Id.* (red box added).  In other words, Alexi was now delivering instantaneous, chatbot-generated

legal research results directly to end users, built on Fastcase data and linking back to and providing

customers with Fastcase content, while labeling those outputs as "research memos."

By May 2025, therefore, Alexi's own public demonstrations show it was no longer using Fastcase data solely "for internal research purposes" as Section 1.7 of the Agreement requires. Instead, Alexi changed its business model without notifying its key data supplier. Alexi then began using Fastcase data to power a customer-facing, self-service legal research platform that competes directly with Fastcase by allowing external end users themselves to conduct legal research and interact directly with Fastcase data—precisely the "commercial" and "competitive" uses that Section 1.7 expressly prohibits.

**E.    Alexi Admits It Uses Fastcase Data as "Training Data" for Its Consumer-Facing Legal-Research Product, But Refuses to Cure the Breach.**

In October 2025, after Fastcase learned of Alexi's completely new business model, featuring customer-facing use of Fastcase Data, ███████████████████████████████ ███████████████████████████████████ *See* ECF No. 15-9 (Mot. Ex. 9) (Oct. 27, 2025 letter). ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████. *Id.*

████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████. *See* ECF No. 15-10 (Mot. Ex. 11) (Nov. 3, 2025 response) at 1. ████████████████████████████████

███████████. *Id.*

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



*Id.*

*See* ECF No. 15-11 (Mot. Ex. 11) ( ).

*See* Agreement § 5.2.  Alexi did not do so.

and then sought emergency injunctive relief to

## LEGAL STANDARD

Injunctive relief is an "extraordinary remedy" that may be granted only when the movant makes a "***clear showing***" that such relief is warranted.  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (emphasis added).  To obtain a temporary restraining order or preliminary injunction under Rule 65, the moving party bears the burden of establishing: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  These factors apply equally to motions for temporary restraining orders and preliminary injunctions.  *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011).

## ARGUMENT

Alexi cannot satisfy the demanding requirements for a temporary restraining order or preliminary injunction.  As shown below, Alexi is unlikely to succeed on the merits because ███████████████████████████████████████████████████████████████ ████████  Alexi likewise cannot establish irreparable harm, as any alleged injury is self-inflicted and, at most, economic.  And the balance of equities and the public interest strongly favor enforcing the parties' negotiated license restrictions— ██████████████████████████████ ███████████████████████████████

## I.    ALEXI CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.

Likelihood of success on the merits is the "most important factor" in the injunction analysis.  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Alexi therefore must show it is likely to prevail on the only merits issue that matters here: that Fastcase lacked the contractual right to terminate the parties' Data License Agreement for Alexi's uncured material breach on November 26, 2025.  It cannot do so.

This case does not require a deep dive into AI engineering or competing narratives about Alexi's business "identity."  The Agreement answers the merits question in plain language.  It granted Alexi a narrow license to use Fastcase data ***only*** for "internal research purposes" and, "[i]n no event," for any purpose that is "commercial" or "competitive with Fastcase."  Agreement § 1.7.  Alexi's post-pivot product—as shown in its own public demonstrations—does the opposite: it is a customer-facing, self-service legal research platform that uses Fastcase data in real time for external users, in commerce, in direct competition with Fastcase.  That is a material breach of Section 1.7 and an independent breach of each of its three prohibitions.  Once Alexi refused to cure after notice, Fastcase was entitled to terminate.  *Id.* § 5.2.

The Agreement also makes clear what follows from termination: ████████████ ████████████████████████████████ *id.* § 3.1, and upon ██████████████ █████████████████████████████████████████. Alexi's request for an injunction █████████████████████████████████, by emergency equitable relief, what the contract expressly forbids: ██████████████████ ████████████████████

District of Columbia law reinforces the straightforwardness of this analysis. Contract interpretation begins—and often ends—with the text. *1305 R.I. Ave. NW, LLC v. Mussells*, 292 A.3d 212, 219 (D.C. 2022). If the contract provision at issue is unambiguous, the Court enforces its plain language as the best objective evidence of intent. *Debnam v. Crane Co.*, 976 A.2d 193, 197–98 (D.C. 2009). Extrinsic evidence is not admissible to rewrite clear terms. *Conseil Alain Aboudaram, S.A. v. De Groote*, 460 F.3d 46, 50 (D.C. Cir. 2006). Here, the operative restrictions are neither technical nor ambiguous; they are categorical. And Alexi's motion depends on expanding "internal research" into effectively "any use Alexi chooses so long as it eventually outputs something called a 'memo,' even if it is not really a memo." The Agreement does not permit that maneuver.[2]

_____

[2] Alexi attempts to evade the Agreement's plain language by asserting that extrinsic evidence is admissible whenever a contract lacks an integration clause, even if the contract is facially unambiguous. That is incorrect. The sole case Alexi cites does not support that proposition and does not address ambiguity at all. *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 201 (D.D.C. 2016), held only that the absence of an integration clause did not bar consideration of extra-contractual representations for purposes of evaluating a *fraud* claim at the motion to dismiss stage. It did not relax the parol evidence rule for purposes of contract interpretation (much less in the context of a high injunction standard) and expressly reaffirmed the general principle that "when the parties to a contract have reduced their entire agreement to writing, the court will disregard or treat as legally inoperative parol evidence." *Id.* at 201–02 (citations omitted). Under settled D.C. law, extrinsic evidence is inadmissible to interpret a contract unless the text is ambiguous—regardless of whether the contract contains an integration clause. *Mussells*, 292 A.3d at 219.

A.    **The Agreement's Plain Language Forecloses Alexi's "Memo Service" Theory and Establishes Material Breach.**

Alexi's motion is built on a single premise: that it "has only ever" operated a memo-writing service and that its use of Fastcase data has therefore always been "internal." Mot. at 11–12. That framing is merits dispositive—because it is false.

The Agreement's structure reflects a narrow, budget-driven license for an internal memo-production workflow. The recitals describe Alexi as a "research institution" seeking access to Fastcase's database "for Alexsei's legal memos." Agreement at 1. Section 1.7 then defines the "Purpose" with three bright-line limitations: Alexi may use Fastcase data only for "internal research," and "[i]n no event" for "commercial" or "competitive" purposes. *Id.* § 1.7. Section 2.1 makes that limitation controlling by granting a license "expressly limited to the Purpose." *Id.* § 2.1. Read together, the Agreement draws a hard boundary between (i) internal research in support of memo preparation and (ii) externally facing, commercial, competitive legal research functionality.

Alexi crosses that boundary in at least two independently sufficient ways—each rooted in Alexi's own public product demonstrations.

1.    *Alexi Uses Fastcase Data Externally—Not for "Internal Research Purposes."*

"Internal" means internal. The Agreement does not permit Alexi to expose Fastcase data to end users through a customer-facing research interface, even if Alexi later creatively labels some output a "memo." Yet that is precisely what Alexi now does. Alexi's public demos show a self-service AI interface in which customers ask iterative legal questions, receive answers and case citations instantly, and click through to the full text of judicial decisions. *See, e.g.*, https://perma.cc/8FFH-66LN (@HeyCounsel, "Alexi Demo (HeyCounsel Demo Day),"

YouTube, Oct. 15, 2024).  That is not internal research supporting memo drafting; it is external legal research performed by customers themselves.

Alexi tries to avoid this conclusion by describing its system in abstractions—"█████ ████████████████████████████████████████████████ ████████████████████████████████████████ Mot. at 4, 12.  But the Agreement regulates permitted **use**, not server architecture.  When Alexi's end users interact with a research tool powered by Fastcase data—receiving answers, citations, and full opinions on demand—Fastcase data is being used for a customer-facing commercial service.  Calling that "internal research" would erase Section 1.7 from the contract.

And the record makes the breach unmistakable.  In public product demonstrations, Alexi displays the full text of judicial opinions retrieved through its user interface.  That is not "internal research"; it is external distribution and public-facing use—conduct squarely prohibited by the Agreement's internal-use limitation and by the separate bar on distributing Fastcase data without Fastcase's written consent.  Agreement § 2.2.  If Alexi possessed the expansive rights it now claims—the right to create derivative products, repurpose Fastcase's data into new commercial offerings, or use it to power a customer-facing AI research system—those rights would be spelled out in the Agreement.  They are not.  The Agreement grants only a narrow license for internal research in support of memo preparation, not a license to build, market, and sell an AI-driven legal research platform fueled by Fastcase's proprietary data compilation.

> **2.      Alexi Uses Fastcase Data Commercially and in Direct Competition with Fastcase.**

Even if Alexi could somehow rebrand customer-facing legal research as "internal" (it cannot), Section 1.7 independently prohibits any use that is commercial or competitive with Fastcase.  Alexi's current product is both.

Alexi's platform now performs the core functions of a legal research service: users enter queries; the system returns lists of relevant authorities; users can open and review full opinions; and the system supports iterative research in real time. That is the essence of a research platform—and it is precisely what Fastcase sells. Alexi's CEO has said so explicitly in marketing communications, positioning Alexi as an "alternative to incumbent legal research providers." Ex. F. The Agreement forbids using Fastcase data to compete with Fastcase. Alexi does it anyway, while paying for only a discounted internal-use license.

Those facts establish material breach as a matter of plain language. And because Fastcase provided notice and an opportunity to cure—and Alexi refused—Fastcase was entitled to terminate. Agreement § 5.2. Alexi therefore cannot show a likelihood of success on the merits, and its motion fails at the threshold.

### B. Alexi's Extrinsic Evidence Does Not Create Ambiguity and, in Any Event, Confirms the License Remained Narrow.

Unable to square its present product with Section 1.7, Alexi relies on pre-contract emails and a purported course of performance to argue that "internal research" actually meant something broader. That argument fails twice.

*First*, it is legally improper. Where the contract is unambiguous, the Court may not admit extrinsic evidence to change its meaning. *Conseil Alain Aboudaram, S.A.*, 460 F.3d at 50; *Mussells*, 292 A.3d at 219. Alexi's attempt to manufacture ambiguity by pointing to scattered negotiation and post-execution emails cannot overcome the Agreement's categorical language: "for internal research purposes" and "[i]n no event" for "commercial" or "competitive" uses. Agreement § 1.7.

*Second*, even if considered, the emails do not do what Alexi claims. The pre-contract communications reflect routine negotiations over scope and price for a budget-constrained memo

workflow—not a license to build a public-facing research platform. *See* ECF No. 15-4 (Mot. Ex. 2) ████████████████████████████████████████████████████ ECF No. 15-6 (Mot. Ex. 4) ████████████████████████████████████████████

████████████████████████████████████████

Alexi's cited post-execution communications likewise show the opposite of implied expansion.[3] ████████████████████████████████████████████ ██████████████████████████████████████████████ ECF No. 15-8 (Mot. Ex. 6). ███████████████████████████

██████████████████████████████████████████████

█████████████████████████████████ *Id.* at 1.

██████████████████████████████████████████████

██████████████████████████████████████████████

ECF No. 15-7 (Mot. Ex. 5).

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████ at 1. Consistent

---

[3] Alexi relies on *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*, 40 F.3d 1474 (5th Cir. 1995), to argue that because the Agreement lacks an integration or non-waiver clause, Fastcase's post-execution conduct could waive express contractual limitations. That reliance is misplaced. *Exxon* does not address integration clauses at all, and the language Alexi cites is not a general principle of contract interpretation; it is a quotation from Mississippi's statutory adoption of the Uniform Commercial Code governing contracts for the sale of goods. *See id.* at 1490-92 (quoting Miss. Code Ann. § 75-2-209(4)); *cf.* U.C.C. § 2-209(4). The Agreement here is a data-license contract governed by District of Columbia law—not a U.C.C. sale-of-goods contract—and the U.C.C.'s course-of-performance waiver doctrine has no application. In any event, under D.C. law, extrinsic evidence—including course-of-performance evidence—cannot be used to alter or con-tradict unambiguous contractual terms. *Conseil Alain Aboudaram, S.A.*, 460 F.3d at 50; *see also supra* at § I.A.

with the parties' course of dealing, Fastcase witnesses uniformly attest that Alexi represented—and behaved as though—its use of Fastcase data remained limited to internal memo generation or quality-assurance workflows.  *See* Jack Decl. ¶ 13; Walters Decl. ¶¶ 10–11; Boorugu Decl. ¶ 10; Watson Decl. ¶ 8 (attached as Ex. D).

In short, Alexi's extrinsic materials do not reveal hidden authorization for a consumer-facing legal research product.  They confirm a narrow, price-sensitive license—until Alexi unilaterally repurposed the data for a forbidden, commercially competitive product.

### C. Alexi's Trade Secret and Trademark Arguments Do Not Affect the Merits of Its Injunction Request.

Alexi devotes substantial space to attacking Fastcase's trade secret and trademark claims.  Those arguments are beside the point for this motion.  Alexi must show a likelihood of success on the issue that determines whether Fastcase was obligated to continue performance: whether Fastcase lacked the right to terminate for Alexi's material breach of the Agreement's express use restrictions.  It cannot.

And even if the Court were to consider Alexi's defenses to other claims, they do not salvage Alexi's motion.  The contract did not grant trademark rights, and a licensee that exceeds the scope of its authorization cannot convert that overreach into lawful use by labeling it "citation" or "attribution."  Likewise, Alexi's admitted inability to replicate Fastcase's compilation only underscores why licensing restrictions matter and why equity should not be used to compel continued supply to a breaching competitor.

But the Court need not reach any of that.  The plain language of Section 1.7, coupled with Alexi's own product demonstrations, establishes material breach and validates Fastcase's termination.  Alexi therefore cannot show a likelihood of success on the merits, and its request for extraordinary relief should be denied.

## II.    ALEXI HAS NOT ESTABLISHED IRREPARABLE HARM.

Irreparable harm is a "critical" prerequisite to injunctive relief, and Alexi bears a heavy burden to show it. *SEIU Local 32BJ v. Preeminent Protective Servs.*, 2020 WL 2308583, at *3 (D.D.C. May 8, 2020) (describing likelihood of success and irreparable harm as the "two most important" factors). In the D.C. Circuit, the standard is exacting: the alleged injury must be "both certain and great," "actual and not theoretical," and "beyond remediation by money damages." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1984) (cleaned up); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (describing a "high standard for irreparable injury") (citation omitted). Speculative, conclusory, or unsupported assertions are insufficient. *Atlas Air, Inc. v. Int'l Bhd. Of Teamsters*, 280 F. Supp. 3d 89, 104 (D.D.C. 2017).

Alexi cannot meet this standard.[4] The harms it claims are (1) self-inflicted and (2) economic and reputational in nature—neither of which supports injunctive relief as a matter of law. Alexi's alleged injury flows directly from its own decision to illegally build and operate a commercial, customer-facing AI product using Fastcase data licensed solely for internal research purposes. When a party's asserted harm is the predictable result of its own unauthorized conduct, it is not irreparable. *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 33 (D.D.C. 2014).

Nor has Alexi identified any harm that cannot be remedied through monetary damages.  Such harms are paradigmatically compensable

_____

[4] Alexi devotes nearly three pages of its opening brief to merits arguments unrelated to the relief sought, yet addresses irreparable harm in only a few cursory paragraphs, largely repeating parroting unsupported assertions from the Doble Declaration. *See* Mot. at 15–27; *cf. id.* at 17–19. This imbalance is telling. A movant's failure to meaningfully develop or substantiate an irreparable harm showing is itself grounds to deny injunctive relief. *See Cal. Valley Miwok Tribe v. Haaland*, 2023 WL 8005033, at *5 (D.D.C. Nov. 17, 2023) (denying preliminary relief where movant offered only generalized, unsupported assertions of irreparable harm).

and therefore insufficient under *Wisconsin Gas*.  Because Alexi fails to show an injury that is certain, imminent, and beyond remediation, its request for extraordinary injunctive relief fails on this element alone.

### A.    Alexi Created the Alleged Irreparable Harm It Now Claims.

A fundamental principle of equity is that the harm supporting injunctive relief must not be self-inflicted.  *See, e.g.*, *Padgett v. Vilsack*, 2024 WL 5283897, at *4 (D.D.C. 2024) ("It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.") (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)); *Anthenex Inc. v. Azar*, 2019 WL 4316139, at *1 (D.D.C. Sep. 6, 2019) (harm that is "self-imposed" cannot justify equitable relief)[5].  Granting injunctive relief to save a movant from an alleged injury that is "completely of its own making … [would] contravene[] basic legal understanding[s] of what constitutes 'irreparable' harm."  *United States v. Abrego*, 788 F. Supp. 3d 937, 948 (M.D. Tenn. 2025) (citation omitted).  That principle alone defeats Alexi's Motion.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████: any such harm flows directly from Alexi's own voluntary business decisions.

Alexi chose to design, market, and monetize a consumer-facing AI product around data licensed only for narrow "internal research" use.  In doing so, Alexi knowingly assumed the risk

██████████████████████████████████████████████████████

---

[5] *See also Salt Lake Tribune Publ. Co. v. At&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable"); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (same); *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (holding "self-inflicted" injuries "do not count").

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ *See* Mot. at 18–19 ("███████████████████████████

████████████████ Those are business judgments—not irreparable harms.

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ *See* Watson Decl.

¶ 8 ████████████████████████████████████████████

████████████████████████████████. That reality further underscores the inequity

of Alexi's request: Alexi is attempting to leverage a deeply discounted license, negotiated

expressly for limited "internal" use, to support expansive, external commercial uses—namely,

training and operating a public-facing competitive generative-AI legal research product—that

would command a materially higher price under any commercially reasonable licensing

arrangement. *See* Jack Decl. ¶ 9 (explaining that any broader use would have required a

significantly higher license fee and different terms).

█████████████████████████████████████████████████

████████████████████████ The Agreement expressly provides a 30-day cure period precisely to

allow a breaching party to cease unauthorized conduct, transition to compliant alternatives, or

negotiate a lawful path forward. ████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ Instead, Alexi continued operating its

product unchanged and now asks this Court to compel Fastcase █████████████████████

████████████████████████████████████████████████████████████████████████████████

███████ uses the Agreement expressly forbids.

Equity does not exist to rescue parties from the foreseeable consequences of their own contractual breaches or their own poor business decisions. Alexi treated Fastcase's proprietary dataset as an entitlement rather than a limited license, ignored clear contractual boundaries, and declined opportunities to mitigate its exposure. Any disruption Alexi now faces is the product of those choices. Because the alleged harm is self-inflicted, it cannot support injunctive relief, and the Motion should be denied on this basis alone.

### B.    Alexi's Alleged Irreparable Harm Is Primarily Economic and Not Enterprise-Ending.

It is well settled that economic harm, standing alone, does not constitute irreparable injury for purposes of injunctive relief. *See e.g.*, *AmSurg EC Wash., Inc. v. MGG Grp. Co., Inc.*, 2024 WL 2405822, at *2 (D.D.C. Apr. 26, 2024); *Varicon Int'l v. Office of Pers. Mgmt.*, 934 F. Supp. 440, 447 (D.D.C. 1996); *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). The reason is straightforward: economic losses are ordinarily compensable through monetary relief. *Wis. Gas*, 758 F.2d at 674.

To rise to the level of irreparable harm, economic injury must be both adequately described and quantified and must threaten the very existence of the movant's business, not merely reflect a diminution of profits or competitive position. *Save Jobs USA v. United States Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015); *Air. Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012); *see also Anthenex*, 2019 WL 4316139, at *1 ("the potential loss of revenue" does not constitute irreparable harm).

Alexi's asserted harms fall far short of this demanding standard for two independent reasons.

### 1.    *Alexi's Alleged Harm Is a Cost Problem, Not an Irreparable Injury.*

Alexi's primary theory of irreparable harm is that ███████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████. *See* Mot. at 18; Doble Decl.

¶ 19. ████████████████████████████████████████████████████████████████

Mot. at 18–19.

That premise is false.

As Fastcase's declarants explain, █████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████  *See* Watson Decl. ¶¶ 7–8.  Indeed,

LexisNexis has publicly announced that it licenses its primary-law content to Harvey, a generative-AI legal-technology company—precisely the type of competitor Alexi invokes.  *Id.* ¶ 7.[6]

████████████████████████████████████████████████  but that they are more

expensive.  On that point, Fastcase agrees.  *See id.* ¶ 8.  No provider—including Fastcase—would license broad, commercial, generative-AI use rights at the bargain-basement price Alexi paid for a narrow, internal-research license.  That pricing reality is not irreparable harm; it is the inevitable consequence of Alexi having negotiated—and paid for—limited rights.

---

[6] *See also* LexisNexis, "LexisNexis and Harvey Announce Strategic Alliance to Integrate Trusted, High-Quality AI Technology and Legal Content and Develop Advanced Workflows" (June 18, 2025), *available at* https://www.lexisnexis.com/community/press-room/b/news/posts/lexisnexis-and-harvey-announce-strategic-alliance-to-integrate-trusted-high-quality-ai-technology-and-legal-content-and-develop-advanced-workflows.

Put simply, inability to afford a lawful alternative does not transform a business problem into irreparable injury.  Courts routinely reject injunctions where the alleged harm is merely that compliance with contractual or legal limits would be costly.  *See Wis. Gas*, 758 F.2d at 674.

**2.** ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ *See*

Doble Decl. ¶ 18.  That showing is plainly insufficient.

Courts in this District routinely hold that lost profits, even significant ones, do not constitute irreparable harm absent evidence that the losses threaten the company's survival.  *See Mead Johnson Pharm. Grp. v. Bowen*, 655 F. Supp. 53, 56 (D.D.C. 1986) (loss of 20 to 30% of market share insufficient); *Anthenex*, 2019 WL 4316139, at *1.  Alexi cites no authority holding otherwise.

Nor does Alexi attempt to demonstrate that the alleged losses are unmeasurable, unrecoverable, or existential.  At most, Alexi alleges ordinary commercial disruption—exactly the type of harm that courts deem remediable through damages.

### C.    Alexi's Alleged Reputational and Competitive Harm Is Speculative and Insufficient.

Alleged harms to reputation, goodwill, customer relationships, competitiveness, or market share do not constitute irreparable injury absent a showing that they threaten the movant's very existence.  *Whaleco Inc. v. Shein Tech.  LLC*, 2025 WL 445187, at *8 (D.D.C. 2025).  To carry its burden, a movant must present evidence that such harm is "concrete and corroborated, not merely speculative."  *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016).  Alexi fails that standard.

Alexi generally asserts, based on a single, self-serving declaration from its CEO, ██████

████████████████████████████████████████████████████████████████████

███████████████████████████████ Doble Decl. ¶ 18.  But this claim rests almost

entirely on speculation.  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Courts in this District

routinely reject such vague and unqualified assertions as insufficient.  *See, e.g.*, *Mott Thorough-*

*bred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 247 (D.D.C. 2015); *Fort Myer Constr. Corp.*

*v. Shrensky*, 2024 WL 181075, at *5 (D.D.C.  Jan. 17, 2024); *Brodie v. United States HHS*, 715 F.

Supp. 2d 74, 84 (D.D.C.  2010).

Alexi's claim of reputational harm is further undermined by its own public statements.  On

December 4, 2025—after this dispute had become public—Alexi's CEO and declarant Mark Do-

ble posted on LinkedIn that "bad press can increase sales by 45%!"  Mark Doble, LinkedIn (Dec.

4, 2025), *available at* https://perma.cc/ZCE3-FHCJ.  While Alexi now suggests reputational injury

serious enough to warrant emergency relief, its CEO publicly represented to the market that pub-

licity surrounding this dispute was commercially beneficial.  Alexi cannot plausibly maintain, on

the same record, that its reputation is simultaneously suffering irreparable harm.

Even setting that inconsistency aside, Alexi's allegations remain legally deficient.  Specu-

lation that customers ***might*** leave in the future does not satisfy the irreparable-harm standard.

*Jones*, 177 F. Supp. 3d at 547.  Nor does the loss of a small number of customers—without evi-

dence of broader market impact—approach the quantified showing required to justify extraordi-

nary relief.

Alexi's reliance on *Beacon Associates, Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018), is misplaced. *Beacon* involved extraordinary facts not remotely present here: a termination for default that stigmatized the plaintiff in the government-contracting market; employee poaching that crippled its ability to compete in an imminent federal rebid; and a contract that expressly barred recovery of consequential damages and lost profits. *Id.* at 287–90. Because monetary relief was contractually unavailable, reputational harm there was truly irreparable. *Id.* at 289.

No comparable circumstances exist here. There has been no default designation, no government procurement cycle, no workforce raid, and no evidence of reputational stigma. And unlike in *Beacon*, the Agreement here does not bar damages. Any lost customers or profits Alexi alleges would be fully compensable with money, assuming its contract positions proved to be legitimate. *See Clevinger v. Advocacy Holdings, Inc.*, 2023 WL 4560839, at *8 (D.D.C. July 15, 2023).

Alexi's invocation of *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020), fares no better. *TikTok* involved a federal ban that would have entirely shut down one of the largest social-media platforms in the country, supported by unrebutted evidence of mass user flight and permanent loss of creators. *Id.* at 113. Here, by contrast, Fastcase has not shut down Alexi's business. Alexi's platform remains operational; ███████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████ Alexi offers no evidence of mass customer migration, permanent loss of goodwill, unavailability of alternative sources, or existential threat. *TikTok* thus underscores—rather than supports—the insufficiency of Alexi's showing.

In short, Alexi's claimed reputational and competitive harms amount to little more than conjecture supported by a single declaration ███████████████████████████

████████  That is not irreparable harm.  It is ordinary commercial risk, fully remediable through damages, and far below the threshold required for emergency injunctive relief.

For these reasons, Alexi has failed to establish irreparable harm, and its Motion should be denied.

## III.    THE EQUITIES AND PUBLIC POLICY DO NOT FAVOR INJUNCTIVE RELIEF.

Alexi gives only cursory treatment to the final *Winter* factors, despite bearing the burden of proving each one with competent evidence.  *Winter*, 555 U.S. at 20.  That failure alone is also sufficient to deny relief.  Courts in this District emphasize that, before granting the extraordinary remedy of an injunction, courts of equity must "'pay particular regard for the public consequences.'"  *Air Transp. Ass'n of Am.*, 840 F. Supp. 2d at 340 (quoting *Winter*, 555 U.S. at 24).  Even setting aside Alexi's failure to establish likelihood of success or irreparable harm, the balance of equities and the public interest independently foreclose injunctive relief here.

### A.    The Balance of Equities Disfavors an Injunction.

The balance of equities decisively favors Fastcase.  A party that has violated the core restrictions of a license agreement cannot ask a court to preserve the benefits of its own breach by freezing the status quo.  Here, Alexi negotiated a limited-use license and then later pivoted its business model, ultimately using its access to Fastcase's data to build a competitive business.  But this decision to pivot its business and then breach the Agreement was Alexi's own, and courts routinely reject injunction requests where the alleged harm is "self-inflicted" and flows from the movant's own decisions.  *Ardelyx, Inc. v. Becerra*, 2024 WL 5186613, at *11 (D.D.C. Dec. 20, 2024); *Safari Club Int'l*, 47 F. Supp. 3d at 36.

Alexi's equitable claim is straightforward—and untenable.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ What Alexi seeks is not

preservation of the bargain the parties struck, but judicial imposition of a bargain they never made.

Courts do not use injunctions to rewrite contracts. *Des Longchamps v. Allstate Prop. & Cas. Ins.

Co.*, 102 F. Supp. 3d 299, 305 (D.D.C. 2015).

The "harms" Alexi asserts are simply the foreseeable consequences of its own choices.

Alexi elected to build, market, and monetize a customer-facing legal research platform using data

licensed solely for "internal research purposes." It is that unilateral business decision—not

Fastcase's contractually authorized termination—that caused the disruption Alexi now

characterizes as irreparable. Equity does not reward parties who expand beyond the scope of a

limited license and then seek judicial protection for the resulting consequences. *See e.g. Ardelyx*,

2024 WL 5186613, at *11; *Safari Club Int'l*, 47 F. Supp. 3d at 33.

By contrast, Fastcase would suffer concrete and immediate harm if an injunction issued:

loss of control over its proprietary dataset, erosion of negotiated licensing restrictions, compelled

subsidization of a direct competitor, and significant impairment of its ability to enforce similar

limitations across its licensing portfolio. The equities are not close. They run entirely against the

extraordinary relief Alexi seeks.

### B.    Public Policy Also Disfavors an Injunction.

Alexi fares no better on the public-interest factor. It largely ignores the issue, recycling its

private hardship arguments. That is insufficient. The public-interest inquiry is distinct from the

balance of equities and must be independently satisfied. *Winter*, 555 U.S. at 24. At minimum,

Alexi has not carried its burden. *Trump v. Thompson*, 573 F. Supp. 3d 1, 12 (D.D.C. 2021).

Public policy favors enforcing data-licensing agreements as written. Fastcase deliberately

negotiated narrow, internal-use restrictions to prevent precisely the kind of competitive misuse

Alexi engaged in.  Allowing a breaching licensee to compel ███████████████ would destabilize commercial licensing markets, incentivize breach-first strategies, and force licensors to subsidize competitors' business models.  Courts consistently recognize that "the public interest is served by protecting confidential business information and trade secrets, and enforcing valid contractual provisions, to which parties have voluntarily entered." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002).

Preventing Alexi from continuing its barred uses does not restrain lawful conduct; it simply holds Alexi to the obligations it voluntarily assumed.  *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 79 (D.D.C. 2009).  This case presents no broader policy concerns.  It is a straightforward contract dispute between sophisticated commercial parties in a competitive market, and any alleged harm is fully compensable through damages.  The public interest is not advanced by converting such disputes into emergency injunction proceedings or by compelling ongoing access to proprietary data after a material breach.

In short, the public interest—like the equities—cuts decisively against the extraordinary relief Alexi seeks.  *Winter*, 555 U.S. at 24.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Alexi's motion for a temporary restraining order and preliminary injunctive relief.

DATED: December 15, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/Jess M. Krannich*
Paul N. Harold (D.C. Bar No. 1032578)
1700 K. Street NW, Fifth Floor
Washington, DC 20006-3814
Telephone: (202) 973-8800
PHarold@wsgr.com

Jess M. Krannich (*pro hac vice*)
Paul J. Sampson (D.C. Bar No. 1010457)
Rebecca J. Nelson (*pro hac vice*)
Andrew P. Follett (*pro hac vice*)
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
JKrannich@wsgr.com
PSampson@wsgr.com
RNelson@wsgr.com
AFollett@wsgr.com

*Counsel for Plaintiff Fastcase Inc.*