# EXHIBIT B
# FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC. <br><br> Plaintiff, <br><br> v. <br><br> ALEXI TECHNOLOGIES INC. <br><br> Defendant. | C.A. No. 1:25-CV-04159-RJL |

**DECLARATION OF CHRISTINA STEINBRECKER JACK IN SUPPORT OF PLAINTIFF FASTCASE, INC.'S OPPOSITION TO DEFENDANT'S MOTION FOR TEMPRORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Christina Steinbrecker Jack, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I submit this Declaration in support of Plaintiff Fastcase, Inc.'s ("Fastcase") opposition to the Motion for Temporary Restraining Order and Preliminary Injunction filed by Defendant Alexi Technologies Inc. ("Alexi"). I am over 18 years of age and make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently to the facts set forth herein.

*Background and Role at Fastcase*

2. I have worked at Fastcase for approximately 17 years. During the period relevant to the negotiations with Alexi (2019–2021), I served as VP, Product and Content. After that, I served as CPO from 2021–2023. As VP of Product and Content, I was responsible for Fastcase's product strategy and worked closely with our content and licensing teams. I advised on the structure and scope of data feeds, the frequency and nature of updates, the metadata included, and how these factors affected both the value of the license to the customer and the price Fastcase would charge.

3. I was not the primary negotiator of the December 6, 2021 Data License Agreement ("Agreement") with Alexi. That role was handled by my colleague Joe Patz Vineyard, who, like me, reported to Fastcase's Chief Operating Officer, Steve Errick. However, I was consulted on technical and product issues, was copied on many of the relevant emails, and had a general understanding of the negotiations.

*Negotiations, Pricing, and Restrictions for the Alexi Agreement*

4. My earliest recollection of Alexi is from around 2019, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

5. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

6. Other data license agreements that I had involvement with did not generally prohibit licensees from using data for commercial or competitive purposes. ███████████████████████████████████████████████████████████████████████████████████████

7. By contrast, the Alexi agreement was deliberately narrow. Section 1.7 of the Agreement states that the "limited purpose for which Alexsei may use the Fastcase Data" is "for internal research purposes" only, and that, "[i]n no event can the data be used for commercial purposes or for any purpose which is competitive with Fastcase."

8. These restrictions were driven by two realities: ███████████████████ ███████████████████████████████████████ and (b) Fastcase had already experienced the downside of licensing data to companies that could become direct competitors.

9. In other words, the Alexi agreement was priced and structured on the assumption that Alexi's use of the data would be strictly limited to internal research and would not involve any commercial, customer-facing, or competitive use. Any broader use—particularly any use that would have allowed Alexi to build a self-service research platform or other consumer-facing legal-research product—would have required a much higher license price and different terms.

***Alexi's Stated Use Case and Absence of Any Self-Service Research Platform or LLM***

10. Throughout the 2019–2021 timeframe, Alexi consistently described itself to us as a memo-writing service. The concept was that Alexi would combine: attorneys or human researchers, and technology that could assist them in drafting legal research memoranda for lawyers.

11. Alexi emphasized that the output of its system was these memos delivered to attorneys—not a search engine or research interface for end users. My understanding was that Alexi needed access to the raw case law data so that its team could perform research internally and then synthesize the results into written memoranda.

12. Alexi did refer in a general way to using "AI" or machine-learning concepts to help speed up or improve the memo-writing process. This was before the rise of widely available

systems like ChatGPT, and the references to "AI" were high-level and somewhat vague. I understood that Alexi hoped, over time, to reduce the amount of human effort required to produce the memos, while still delivering the same memo-based product. At no point in those negotiations or discussions do I recall Alexi stating or suggesting that it intended to use Fast case data to power any self-service research platform that end users would interact with directly.

13.     My understanding during that period was that Alexi's use of Fastcase Data would be entirely internal and directed toward producing memos, not toward creating a new, customer-facing legal-research product that would compete with Fastcase. This understanding was fully consistent with the express limitations in Section 1.7 of the Agreement, which restricted Alexi's use of the data to "internal research purposes" only and prohibited any "commercial purposes" or any purpose "competitive with Fastcase."

*Post-Execution Interactions with Alexi and Acquisition Outreach*

14.     After the Agreement was executed in December 2021, the engineering and content teams handled most day-to-day aspects of delivering and maintaining the data feed. I was occasionally consulted on technical questions about the data or how components of the feed functioned, but I did not lead ongoing communications with Alexi. In all of the communications I recall seeing, nothing indicated that Alexi was using the Fastcase Data for anything other than the limited, internal memo-writing service described during negotiations.

15.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

16. I do not recall those discussions ever involving any proposal to relax or change the core restrictions in the Alexi data license. I do not recall any suggestion that Fastcase would permit Alexi to use the Fastcase corpus to build or power a self-service research platform, or any other competitive, customer-facing legal research product.

***Awareness of Alexi's Shift to a Legal-Research Tool and Lack of Prior Knowledge***

17. Until around May 2025, I did not view Alexi as a competitor to Fastcase. I understood Alexi to be operating the same memo-writing service it had described during our negotiations.

18. In or around May 2025, after Fastcase was acquired by vLex, a colleague at vLex forwarded me materials showing that Alexi was marketing itself as a legal research company. I reviewed Alexi's website and saw references to legal research capabilities that were inconsistent with my prior understanding of its business. The website content I viewed described something much closer to a self-service research platform—a user-facing research tool—rather than an internal memo-writing service. That content was later removed after vLex sent Alexi a notice of breach.

19. This was the first time I became aware that Alexi was presenting itself as a legal-research provider in a way that appeared to go beyond the internal, memo-focused use case we had been told about during the 2019–2021 timeframe.

20. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 15, 2025 in Grafton, Wisconsin.

*[signature]*

Christina Steinbrecker Jack