**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC. | C.A. No. 1:25-CV-04159-RJL |
|     Plaintiff, | |
|     v. | Hon. Richard J. Leon |
| ALEXI TECHNOLOGIES INC. | |
|     Defendant. | |
| ALEXI TECHNOLOGIES INC. | |
|     Counter-Plaintiff, | |
|     v. | |
| FASTCASE, INC., VLEX, LLC and THEMIS SOLUTIONS INC. | |
|     Counter-Defendants. | |

**COUNTER-DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF RENEWED PARTIAL MOTION TO DISMISS ALEXI'S REVISED
<u>AMENDED COUNTERCLAIMS</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

     A.     The Parties ................................................................................................3

     B.     The Data License Agreement..................................................................4

     C.     This Dispute ............................................................................................5

PROCEDURAL BACKGROUND......................................................................................6

LEGAL STANDARD.........................................................................................................7

ARGUMENT......................................................................................................................8

I.     ALEXI'S ANTITRUST COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT DOES NOT PLAUSIBLY ALLEGE THAT CLIO'S ACQUISITION OF VLEX WILL LIKELY RESULT IN A SUBSTANTIAL LESSENING OF COMPETITION IN ANY RELEVANT MARKET................................................................................................9

     A.     Clayton Act § 7 Requires Plausible Allegations of Relevant Markets and of a Likelihood of a Substantial Lessening of Competition..........................................11

     B.     Alexi's Failure to Allege Facially Plausible Relevant Antitrust Markets Dooms Its Clayton Act Claim. ...............................................................................................13

           1.     Alexi's Proffered Upstream "Programmatically Licensable Comprehensive Legal Database Market" Is Facially Implausible.............14

           2.     Alexi's Proffered Downstream "AI Legal-Analysis Services Market" Is Facially Implausible....................................................................................19

     C.     Alexi Fails to Plausibly Allege that the Transaction Substantially Lessens Competition.......................................................................................................21

           1.     Alexi Fails to Plausibly Allege that Clio Has Any Ability to Foreclose. ..22

           2.     Alexi Fails to Plausibly Allege Clio Has Any Incentive to Foreclose.......25

           3.     Alexi Fails to Plausibly Allege that the Transaction Results in a Substantial Lessening of Competition. ......................................................27

           4.     Alexi's Invocation of Alleged Coordinated Effects Confirms the Merger's Procompetitive Benefits.........................................................................28

D.      Alexi's Nonsensical Allegations Regarding the 2023 vLex-Fastcase Transaction Should Be Wholesale Disregarded. ........................................................30

E.      Even the Most Cursory Diligence Reveals that Alexi's Factual Allegations are Untrue and its Legal Theory Implausible. ...........................................32

II.     ALEXI'S BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING COUNTERCLAIM FAILS...........................................................................35

A.      Alexi Fails to Plead Bad Faith Related to Fastcase's Termination of the Agreement..............................................................................................35

B.      Alexi's Implied-Duty Claim Is Entirely Duplicative of Its Other Counterclaims. ....................................................................................36

C.      Alexi Fails to Plead "Deprived Fruits of the Contract" Related to Its "False" Interpretation Allegations. ....................................................................37

III.    ALEXI FAILS TO STATE COUNTERCLAIMS FOR TORTIOUS INTERFERENCE WITH CURRENT OR PROSPECTIVE BUSINESS RELATIONS. ...............................39

A.      Counterclaim Four Fails Because a Party Cannot Tortiously Interfere with Its Own Contract. ....................................................................................40

B.      Counterclaim Five Fails Because Alexi Has Not Identified or Sufficiently Pled the Specific Business Relationships or Expectancies at Issue....................................42

1.      Alexi fails to adequately specify the prospective business relations at issue...........................................................................................42

2.      Alexi fails to plead a reasonable expectancy of future business relations......................................................................................44

CONCLUSION................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abreu v. Howard Univ.*,
  2022 WL 2191695 (D.D.C. June 17, 2022) ................................................................... 36

*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*,
  33 F.3d 194 (3d Cir. 1994) ......................................................................................... 18

*Allworth v. Howard Univ.*,
  890 A.2d 194 (D.C. 2006) ..................................................................................... 35, 39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 3, 7, 14, 43

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................... 7

*Brink v. Xe Holding, LLC*,
  2022 WL 3334503 (D.D.C. May 19, 2022) .................................................................. 39

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .............................................................................................. *passim*

*Brown v. Carr*,
  503 A.2d 1241 (D.C. 1986) ......................................................................................... 40

*Brown v. Trinity Washington Univ.*,
  2023 WL 2571729 (D.D.C. Mar. 20, 2023) ......................................................... 2, 36, 37

*Buccaneer Energy (USA) v. Gunnison Energy Corp.*,
  846 F.3d 1297 (10th Cir. 2017) .................................................................................. 19

*Bus. Equip. Ctr., Ltd. v. De Jur-Amsco, Corp.*,
  465 F. Supp. 775 (D.D.C. 1978) ................................................................................. 41

*C & E Servs., Inc. v. Ashland Inc.*,
  601 F. Supp. 2d 262 (D.D.C. 2009) ............................................................................ 35

*Close It! Title Servs., Inc. v. Nadel*,
  248 A.3d 132 (D.C. 2021) ........................................................................................... 45

*Concord Assocs., L.P. v. Entm't Props. Trust*,
  817 F.3d 46 (2d Cir. 2016) ............................................................................... 13, 14, 19

*CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*,
  325 A.3d 1235 (D.C. 2024) ......................................................................................... 36

*DC2NY, Inc. v. Acad. Bus, LLC*,
  2020 WL 1536219 (D.D.C. Mar. 31, 2020) ................................................................. 44

*Donahoe v. Watt*,
    546 F. Supp. 753 (D.D.C. 1982)......................................................................................41

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001)............................................................................................15

*Fairbanks v. Roller*,
    314 F. Supp. 3d 85 (D.D.C. 2018) .............................................................................33, 34

*Farah v. Esquire Magazine, Inc.*,
    863 F. Supp. 2d 29 (D.D.C. 2012) ..................................................................................34

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ........................................................................................11

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................................13

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 3d 34 (D.D.C. 1998) ....................................................................................13

*FTC v. Microsoft Corp.*,
    681 F. Supp. 3d 1069 (N.D. Cal. 2023),
    *aff'd*, 136 F.4th 954 (9th Cir. 2025)................................................................22, 26, 27, 28

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................................................13

*FTC v. Tempur Sealy Int'l, Inc.*,
    768 F. Supp. 3d 787 (S.D. Tex. 2025) ....................................................................... *passim*

*Hais v. Smith*,
    547 A.2d 986 (D.C. 1988) ..............................................................................................38

*hiQ Labs, Inc. v. LinkedIn, Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..........................................................................18

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ...............................................................................19, 22, 25, 26

*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*,
    753 F. Supp. 2d 141 (D.D.C. 2010) ................................................................................40

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ..........................................................................................20

*Jacobsen v. Oliver*,
    201 F. Supp. 2d 93 (D.D.C. 2002) ..................................................................................36

*Jankovic v. Int'l Crisis Grp.*,
    593 F.3d 22 (D.C. Cir. 2010) ..........................................................................................40

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) ..........................................................................................7

*Kansas v. Colorado*,
    514 U.S. 673 (1995) ................................................................................................31

*Koker v. Aurora Loan Servicing*,
    915 F. Supp. 2d 51 (D.D.C. 2013) .........................................................................41

*Los Angeles Land Co. v. Brunswick Co.*,
    6 F.3d 1422 (9th Cir. 1993) ...................................................................................23

*Meijer, Inc. v. Barr Pharms., Inc.*,
    572 F. Supp. 2d 38 (D.D.C. 2008) .........................................................................13

*Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*,
    979 F. Supp. 2d 26 (D.D.C. 2013), *aff'd*, 774 F.3d 18 (D.C. Cir. 2014) ...........................38

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
    791 F. Supp. 2d 33 (D.D.C. 2011) ...................................................................44, 45

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
    957 A.2d 890 (D.C. 2008) .....................................................................................40

*Neumann v. Reinforced Earth Co.*,
    786 F.2d 424 (D.C. Cir. 1986) ..............................................................................15

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023) ...........................31

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ..........................................................................31, 32

*Ohio v. Am. Express*,
    585 U.S. 529 (2018) ..............................................................................................11

*Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*,
    415 F. Supp. 3d 113 (D.D.C. 2019) ...............................................................3, 42, 44

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ...........................................................................13, 17, 18

*Raskauskas v. Temple Realty Co.*,
    589 A.2d 17 (D.C. 1991) .......................................................................................41

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................19

*Rivera v. Rosenberg & Assocs., LLC*,
    142 F. Supp. 3d 149 (D.D.C. 2015) ......................................................................30

*Robertson v. Cartinhour*,
    867 F. Supp. 2d 37 (D.D.C. 2012) .........................................................................44

*Rodriguez v. Lab'y Corp. of AmericaHoldings*,
    13 F. Supp. 3d 121 (D.D.C. 2014) ........................................................................35

*Ruiz v. Millennium Square Residential Ass'n*,
  2022 WL 296200 (D.D.C. Feb. 1, 2022) ..........................................................................37

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*,
  820 F. Supp. 2d 62 (D.D.C. 2011) ..................................................................................45

*Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*,
  140 F. Supp. 3d 405 (E.D. Pa. 2015) ..............................................................................15

*Sharpe v. Am. Acad. of Actuaries*,
  285 F. Supp. 3d 285 (D.D.C. 2018) ................................................................................44

*Sibley v. St. Albans Sch.*,
  134 A.3d 789 (D.C. 2016) ...............................................................................................38

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
  947 F. Supp. 2d 88 (D.D.C. 2013) ............................................................13, 19, 30, 31

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) .........................................................................................................27

*Sundberg v. TTR Realty, LLC*,
  109 A.3d 1123 (D.C. 2015) ........................................................................................35, 38

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) ...........................................................................................................7

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ...............................................................................21, 22

*United States v. AT&T, Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018),
  *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) .................................................................12, 13, 27

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ...................................................................................21, 22

*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957) .....................................................................................................11, 13, 17

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) .........................................................................................................23

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
  382 U.S. 172 (1965) .........................................................................................................11

*Weatherly v. Second Nw. Coop. Homes Ass'n, Inc.*,
  304 A.3d 590 (D.C. 2023) ..........................................................................................36, 39

*Williams v. Fed. Nat'l Mortg. Ass'n*,
  2006 WL 1774252 (D.D.C. June 26, 2006) ....................................................................43

*Wright v. Howard Univ.*,
  60 A.3d 749 (D.C. 2013) ..................................................................................................39

*Xereas v. Heiss*,
933 F. Supp. 2d 1 (D.D.C. 2013) .................................................................................40, 43

## STATUTES

15 U.S.C. § 18..............................................................................................................................11

## RULES

Fed. R. Civ. P 12(b)(6)................................................................................................1, 7, 8, 43

## MISCELLANEOUS

Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Mergers:
A Post-Chicago Approach*, 63 Antitrust L.J. 513 (1995) ....................................................13

2 Phillip E. Areeda & Donald F. Turner, *Antitrust Law* (1978) ......................................................23

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* (5th ed. 2025) .........................................................12, 24

Phillip E. Areeda & Herbert Hovenkamp, 4A *Antitrust Law* (5th ed. 2022)...........................22, 23

W. Prosser & W.P. Keeton, *Prosser on Torts* (5th ed. 1984).........................................................41

## INTRODUCTION

At bottom, this case is a contract dispute. Plaintiff/Counter-Defendant Fastcase, Inc. ("Fastcase") alleges that Defendant/Counterclaimant Alexi Technologies Inc. ("Alexi") exceeded the scope of a written Data License Agreement that limited use of Fastcase data to "internal research purposes" and expressly prohibited commercial or competitive uses. *See* Data License Agreement ("Agreement"), ECF No. 1-1 § 1.7. Alexi disputes that interpretation and brings its own claim for breach of the contract (first cause of action), contending that the parties' course of dealing modified or broadened those contractual limitations. *E.g.*, ECF No. 82-1 ("Revised Amended Counterclaims" or "Rev. Am. Counterclaims"), ¶¶ 120, 212; ECF No. 14-1 at 14. That disagreement presents a straightforward question of contract interpretation and performance—one this Court has already placed on an expedited path. *See* February 17, 2026 Minute Order.

Rather than confining the case to that dispute, however, Alexi seeks to duplicate its claims and expand the case through the inclusion of counterclaims against Fastcase and two related entities, Themis Solutions, Inc. d/b/a Clio and vLex, LLC ("vLex") (together with Fastcase, Inc., "Fastcase"), for violation of the Clayton Act (third cause of action), breach of the covenant of good faith and fair dealing (second cause of action), and tortious interference with current and prospective business relations (fourth and fifth causes of action). Those claims repackage the same contract disagreement in separate legal theories that fail as a matter of law. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Fastcase moves to dismiss counts two through five of Alexi's Revised Amended Counterclaims.

*First*, Alexi's Clayton Act claim fails because the Revised Amended Counterclaims do not plausibly allege a substantial lessening of competition in any relevant market resulting from Clio's acquisition of Fastcase, which closed several months ago, or vLex's merger with Fastcase, which

closed three years ago. The Clayton Act claim depends on implausible and inconsistent market definitions that exclude acknowledged substitutes and contradict Alexi's own allegations. Even accepting Alexi's pleaded markets, the Revised Amended Counterclaims do not plausibly allege that Clio has the ability or incentive to foreclose rivals, or that any alleged foreclosure would harm competition rather than a single competitor. And, even if the Court were to indulge both Alexi's pleaded markets and the plausibility of *some* ability and incentive to engage in foreclosure, Alexi does not and cannot allege that this would result in a substantial lessening of competition rather than disadvantaging a single competitor.

These fatal defects stem from Alexi's core claim that caselaw is only available from Fastcase—an untenable proposition—and they permeate through Alexi's failure to account for the substantial entry imminent in any of its relevant markets or the acknowledged increase in competition that will result from Clio's ability to position itself as an alternative to market leaders Westlaw and Lexis. Clayton Act § 7 protects competition, not individual firms, and Alexi's allegations negate any possibility of harm to competition. Therefore, Alexi's second attempt at alleging an antitrust counterclaim fails as a matter of law.

***Second***, Alexi's claim for breach of the covenant of good faith and fair dealing is entirely duplicative of its other claims. Courts in this District consistently hold that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action." *Brown v. Trinity Washington Univ.*, 2023 WL 2571729, at *10 (D.D.C. Mar. 20, 2023) (cleaned up). Alexi identifies no independent conduct separate from the contract and tort claims, and its implied-duty claim cannot proceed. Alexi's new allegations in the Revised Amended Counterclaims do not cure this fault—indeed, Alexi's new allegations fail to identify any indecent, unfair, or unreasonable acts by Fastcase that deprived

Alexi of any fruits of the Data License Agreement it was entitled to in the first place.

*Finally*, Alexi's tortious interference claims fail for a number of reasons—chief among them being that the Revised Amended Counterclaims do not identify the specific customers, contracts, or prospective acquirers with which Fastcase allegedly interfered, nor do they plead facts showing breach of an existing contract or a reasonably certain future transaction.  Generalized allegations of interference with "hundreds" of customers or unnamed "prospective acquirers" are insufficient under well-settled District of Columbia law.  *See Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 124 (D.D.C. 2019) (collecting cases).  Even where Alexi attempts to add particulars ███████████████████████████████ Alexi's allegations remain vague and speculative.

Because Alexi's Revised Amended Counterclaims do not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the Court should dismiss counts two through five and allow the parties to litigate the contract dispute that actually exists.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

<u>**BACKGROUND**</u>

**A.    The Parties**

*Fastcase, Inc.*  Fastcase is a legal publisher that provides access to legal research materials through its database of "primary law, treatises, legal blogs, analytics, workflow tools, and legal news."[1]  Fastcase licenses access to third parties under negotiated agreements.  Rev. Am. Counterclaims ¶¶ 5, 50, 92.  In 2023, vLex merged with Fastcase.  *Id.* ¶ 21.

---

[1] *Casemaker and Fastcase Merge to Become the Leader in Legal Research and Analytics*, Fastcase (Jan. 5, 2021), https://www.fastcase.com/blog/fastcase-casemaker-merge/ (cited in Rev. Am. Counterclaims ¶ 46 n.2).

***Themis Solutions, Inc. (d/b/a Clio).*** Clio is a legal technology company that offers "software designed to help lawyers manage their legal practices more efficiently by centralizing functions like client intake, case and document management, and payments."[2] In June 2025, Clio announced an agreement to acquire vLex, *see id.* ¶ 23, a combination designed to allow the merged firm to compete more aggressively "against larger, more established legal software players like" Westlaw and Lexis.[3] The acquisition, which closed in November 2025, combined Clio's practice-management software business with Fastcase's legal research database business.[4] *Id.* ¶¶ 23, 95.

***Alexi Technologies Inc.*** Alexi (formerly "Alexsei") is a Canadian legal technology company founded in 2017. Answer ¶ 2; Rev. Am. Counterclaims ¶ 18. When Fastcase and Alexi began their relationship in 2021, Alexi described its offering as a legal memorandum drafting service: customers submitted legal research questions, and research employees of Alexi delivered written research memoranda in response. Rev. Am. Counterclaims ¶ 34.

### B.    The Data License Agreement

This dispute arises from a December 6, 2021 Data License Agreement, *see* Agreement, between Fastcase and Alexi. The Agreement is referenced in the Revised Amended Counterclaims and incorporated by reference therein. *E.g.*, Rev. Am. Counterclaims ¶¶ 5, 10, 54, 59–74.

---

[2] Josh Scott, *Clio Secures $500-million USD Series G as it Completes vLex Acquisition*, Beta Kit (Nov. 10, 2025), https://perma.cc/U8BP-D7U9 (cited in Rev. Am. Counterclaims ¶ 45 n.1); *see also* ECF No. 48 ("Counterclaims") ¶ 83.

[3] *See* Josh Scott, *Clio Secures $500-million USD Series G as it Completes vLex Acquisition*, Beta Kit (Nov. 10, 2025), https://perma.cc/U8BP-D7U9 (cited in Rev. Am. Counterclaims ¶ 45 n.1).

[4] vLex Team, *vLex Joins Clio in Landmark $1B Acquisition*, vLex (Nov. 10, 2025), https://perma.cc/7L9Q-LWNN (cited in Rev. Am. Counterclaims ¶ 100 n.11); *see also id.* (stating that the combined firm will "anchor a new era of enterprise innovation").

The Agreement granted Alexi a license to access certain Fastcase data for its research and writing team to prepare memoranda. *See* Agreement §§ 1.1, 1.7, 2.2. It described Alexi as a "research institution" and stated that its purpose was to provide Alexi with Fastcase's "database of primary law for Alexsei's legal memos." *Id.* at 1. Section 1.7 limited Alexi's use of the Fastcase Data "for internal research purposes" and provided that "[i]n no event can the data be used for commercial purposes or for any purpose which is competitive with Fastcase." *Id.* § 1.7.

The Agreement also includes a "Survival" provision stating its use restrictions "survive the termination of [the] Agreement and extend to any successors, licensees, distributors, and assigns." *Id.* § 12.1. Section 12.3 addresses the effect of an acquisition or change of control of Alexi.

### C.    This Dispute

In October 2025, Fastcase provided Alexi written notice asserting that Alexi's then-current use of Fastcase data exceeded the scope of the license granted in Section 1.7. *See* ECF No. 15-9. After providing notice and an opportunity to cure, Alexi took no action to cure, and Fastcase then notified Alexi that the Agreement was terminated pursuant to Section 5.2. *See* ECF No. 15-11.

On November 26, 2025, following the notice and cure period in the contract, Fastcase filed this action asserting claims for breach of contract and related claims arising from Alexi's alleged use of Fastcase data beyond the scope of the Agreement. *See* ECF No. 1. Alexi denies Fastcase's interpretation of the Agreement and contends that its use of the data was authorized, claiming the parties' course of conduct implicitly amended the Agreement. *See* Rev. Am. Counterclaims ¶¶ 11, 119, 212. Alexi's Revised Amended Counterclaims include a claim for breach of contract against Fastcase reflecting that competing interpretation. *See id.* ¶¶ 201–06. In addition to its contract-based claim, however, Alexi asserts counterclaims for violation of Section 7 of the Clayton Act (*id.* ¶¶ 214–19), breach of the covenant of good faith and fair dealing (*id.* ¶¶ 207–13), and two claims for tortious interference (with current and prospective business relations) (*id.* ¶¶ 220–230).

A central theme of Alexi's Revised Amended Counterclaims concerns the Agreement's so-called "backfile" option.  Alexi falsely alleges that the Agreement would have permitted a purchaser of Alexi to acquire a historical "backfile" of Fastcase data without use restrictions, and that Fastcase filed this action to prevent a potential acquirer from obtaining that data.  *See id.* ¶¶ 72–73, 136.  The Agreement, however, distinguishes between the purchase of any backfile via an acquisition event and the permitted use of Fastcase data, and makes clear that the limitations on use of Fastcase data apply in all events.  Specifically, while the Agreement contains a term addressing circumstances under which a historical backfile may be purchased, the Agreement's use restrictions—including the limitation to "internal research purposes" and the prohibition on commercial or competitive use—apply to all use of the Fastcase Data and expressly extend to Alexi's successors and assigns.  *See* Agreement §§ 1.7, 12.1, 12.3.  Alexi misstates both the scope of the backfile provision and the Agreement's continuing restrictions on use, and this issue is part of the parties' broader contractual dispute.

The present motion does not ask the Court to resolve that contractual disagreement.  Instead, it seeks dismissal of Alexi's additional counterclaims, which go beyond the contract dispute and fail as a matter of law.

## PROCEDURAL BACKGROUND

Alexi first filed its Counterclaims on January 16, 2026.  ECF No. 47 ("Counterclaims").  Fastcase moved to dismiss those Counterclaims on March 6, 2026.  ECF No. 72-1 ("Mot. to Dismiss").  Evidently recognizing the strength of that Motion to Dismiss, Alexi chose not to oppose that motion and instead filed Amended Counterclaims, followed shortly by Revised Amended Counterclaims.  *See* ECF No. 80; April 16, 2026 Minute Order; ECF No. 82-1.

Alexi's Revised Amended Counterclaims largely do not cure the myriad defects in Alexi's original Counterclaims. Instead, Alexi has somehow dragged its claim even further from plausible, adding new contradictory allegations and misleading quotations from produced documents[5] in a futile effort to resuscitate its claims. Although Alexi had the benefit of Fastcase's first Motion to Dismiss, it has still failed to plausibly allege Clayton Act, breach of the covenant of good faith and fair dealing, or tortious interference claims.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). A claim is plausible only when the factual allegations permit the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Although the Court accepts well-pleaded factual allegations as true, it does not accept legal conclusions couched as factual allegations, nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*; *see also Twombly*, 550 U.S. at 555. Where the pleaded facts are "merely consistent with" liability or rely on speculation rather than factual enhancement, dismissal is required. *Iqbal*, 556 U.S. at 678–79.

In evaluating this Rule 12(b)(6) motion, the Court may consider the Revised Amended Counterclaims, documents incorporated by reference or integral to the Revised Amended Counterclaims, and matters of which judicial notice may be taken. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

---

[5] Alexi quotes, but does not cite, certain documents produced in the ongoing expedited discovery phase for some claims in this litigation. Alexi's quotes are taken out of context, and when those documents are reviewed in full, they in fact undermine or negate Alexi's allegations.

## ARGUMENT

Alexi's Revised Amended Counterclaims illustrate why Rule 12(b)(6) exists. The centerpiece of this case is—and always has been—a straightforward dispute over what the Agreement permits and whether Alexi breached it, a dispute already set on an expedited track. Instead of litigating that contract question on the merits, Alexi attempts to escalate leverage by recasting this bilateral licensing dispute as an antitrust case challenging Clio's long-closed, vertical acquisition of Fastcase—an extraordinary theory that collapses under Alexi's own allegations at every step, from market definition to foreclosure to competitive harm.[6] And Alexi's remaining non-contract counterclaims fare no better: the implied-covenant claim is wholly duplicative of its contract theory, and the tortious-interference claims rest on generalized, non-specific accusations that do not identify a single customer, contract, or reasonably likely expectancy.

Alexi implicitly acknowledged these critical defects after Fastcase filed its first Motion to Dismiss, as instead of responding to that Motion to Dismiss, Alexi filed its Amended Counterclaims (shortly followed by its Revised Amended Counterclaims). Yet Alexi's Revised Amended Counterclaims are a paradox: apart from resolving a glaring pleading deficiency regarding geographic market definition, the Revised Amended Counterclaims repeat and even amplify the failures of the original Counterclaims. The Court should dismiss these claims and allow the parties to proceed promptly on the contract dispute that actually exists.

---

[6] In the Revised Amended Counterclaims, Alexi scattered a few conclusory allegations that vLex's 2023 merger with Fastcase also violates Clayton Act § 7, but Alexi does not challenge that transaction as a separate count. This Renewed Motion to Dismiss focuses largely on Clio's acquisition of Fastcase, as that is the thrust of Alexi's Revised Amended Counterclaims. Section 1.D, *infra*, addresses the many reasons why Alexi's allegations regarding the 2023 transaction fail.

I.     **ALEXI'S ANTITRUST COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT DOES NOT PLAUSIBLY ALLEGE THAT CLIO'S ACQUISITION OF VLEX WILL LIKELY RESULT IN A SUBSTANTIAL LESSENING OF COMPETITION IN ANY RELEVANT MARKET.**

Confronted with its contractual breaches and misappropriation of Fastcase Data, Alexi attempts—for the second time—to cram a commercial dispute into the antitrust laws. Alexi challenges a consummated, purely vertical transaction between AI technology services provider Clio and legal publishing and research technology company Fastcase. Alexi contends that Fastcase is "legal-analysis AI providers' *only* source for the critical input of access to a comprehensive primary-law database," Rev. Am. Counterclaims ¶ 156 (emphasis added), and that the transaction results in "the actual foreclosure of rivals from a critical input necessary to compete," *id.* ¶ 217. But to conjure these allegations, Alexi spins an incredible tale rife with inconsistencies and internal contradiction that should be summarily rejected.

While Alexi's original Counterclaims were implausible and insufficient to survive a motion to dismiss, Alexi's amended Clayton Act claim is, remarkably, *more* implausible than its original claim. Like before, Alexi first attempts to gerrymander the upstream and downstream product markets such that the former includes only Fastcase and the latter includes only the AI legal service providers who rely on Fastcase. And to do so, Alexi alleges different market definitions in different paragraphs, depending on the point it needs to make. The constant shifting underscores the infirmity of Alexi's position. For instance, Alexi defines the upstream market as including all comprehensive legal databases, *id.* ¶¶ 146–47, but then attempts to exclude Westlaw and Lexis's comprehensive legal databases by narrowing the market to only databases "available for programmatic licensing," *id.* ¶¶ 149, 151.

Alexi further contends that it suffers "actual foreclosure," *id.* ¶ 217, despite simultaneously acknowledging that the judicial decisions and opinions it wants from the "comprehensive primary-

law databases" are "part of the public domain," *id.* ¶ 71.  Indeed, Alexi concedes that a firm could recreate this database "from a hodgepodge of courthouses, jurisdictions, and sources," and points only to the time and investment such an endeavor would involve in attempting to claim infeasibility (an endeavor that Fastcase itself notably undertook), to say nothing of Alexi's ability to secure a license from an established caselaw provider on commercially reasonable terms.  *Id.* ¶ 72.  What's more, Alexi acknowledges robust competition in its downstream "AI Legal-Analysis Services Market," which includes Harvey, Legora, and C.S. Disco, but offers no allegation that these competitors have suffered *any* harm in the four months since the acquisition closed.  *See id.* ¶ 169.

Alexi has also littered the Revised Amended Counterclaims with new, wholly unsupported allegations in an effort to resuscitate its antitrust claim.  For example, Alexi now claims that vLex's merger with Fastcase *three years ago* also violated the Clayton Act—an allegation lacking any of the elements of this claim, completely contradicted by Alexi's other allegations, and plainly false given the lack of any competitive harm in the years since that transaction closed.  Alexi also added a one-paragraph allegation that the transaction will enable coordinated effects between vertically integrated firms, but in doing so Alexi acknowledges that the transaction *increases* competition by positioning Clio as a stronger competitive threat to Westlaw and Lexis.

In short, Alexi's renewed antitrust claim fares no better than the original effort.  Alexi's Clayton Act claim fails at every step, including for three primary reasons.  *First*, Alexi's proposed relevant product markets are implausible on their face and impossible within the constructs of Alexi's own allegations; this failure to plead plausible relevant markets is independently fatal to Alexi's claim.  *Second*, Alexi fails to plausibly allege that Clio would have either the "incentive" or the "ability" to foreclose Alexi or anyone else, a failure that requires dismissal of any challenge to a vertical merger.  *Third*, even if Alexi could plausibly allege some form of foreclosure as to

*Alexi* (it cannot), such foreclosure could still not plausibly amount to a substantial lessening of *competition* in this dynamic, fiercely competitive industry. As this is Alexi's second, woefully insufficient attempt to allege this claim, it should be dismissed with prejudice. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (stating that "repeated failure to cure deficiencies by [previous] amendments" warrants denying leave to amend).

**A. Clayton Act § 7 Requires Plausible Allegations of Relevant Markets and of a Likelihood of a Substantial Lessening of Competition.**

Under Section 7 of the Clayton Act, a claimant must establish that "the effect of [the merger] may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. "[T]he Clayton Act does not render unlawful all [] vertical [mergers], but forbids only those whose effect 'may be substantially to lessen competition, or to tend to create a monopoly' 'in any line of commerce in any section of the country.'" *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (citation omitted). This necessarily requires determining the relevant market in which to assess the alleged competitive effects. *Id.* at 368 (identifying the relevant market is a "'necessary predicate'" to finding a Clayton Act violation (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)) (Harlan, J., dissenting). "'Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'" *Ohio v. Am. Express*, 585 U.S. 529, 543 (2018) (alterations in original) (quoting *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965)). And the statute requires more than "ephemeral possibilities" of harm to competition; instead, the question is whether the merger has "a probable anticompetitive effect." *Brown Shoe*, 370 U.S. at 323.

Here, Alexi challenges Clio's acquisition of Fastcase under a vertical theory: The transaction combined an "upstream (input)" market participant (Fastcase) with a "downstream

-11-

(output) market participant[]" (Clio).  Rev. Am. Counterclaims ¶ 187.[7]  According to Alexi, there exists a downstream market for "AI Legal-Analysis Services" which includes at least Clio, Alexi, Westlaw, Lexis, Harvey, C.S. Disco, and Legora.  *Id.* ¶¶ 167–79.  These numerous downstream competitors allegedly require access to a key upstream input: "[p]rogrammatic access to a comprehensive legal data database."  *Id.* ¶ 177.  By effectively limiting this proposed upstream market to only those databases "available for programmatic licensing," Alexi has artificially reduced the upstream market to Fastcase and *only Fastcase*.  *Id.* ¶¶ 149–51, 177.  The merger, under Alexi's theory, purports to empower Clio with the ability and incentive to foreclose Clio's many downstream AI Legal-Analysis Services rivals from "the key input" enabling them to compete.  *Id.* ¶¶ 187–90.  This theory turns on the proposition that Fastcase's database is both essential to—and the only available option for—Clio's rivals.

The Court need look no further than the Revised Amended Counterclaims themselves to conclude that these allegations are facially implausible and fail as a matter of law.  Alexi's allegations negate the very existence of the markets it alleges, contravene its theory of competitive harm, and reinforce that the merger will in fact *enhance* competition and allow the combined entity to compete with the vertically integrated market leaders, Westlaw and Lexis.  Alexi's vertical challenge thus runs headlong into "the recognition among academics, courts, and antitrust enforcement authorities alike that 'many vertical mergers create vertical integration efficiencies between purchasers and sellers.'"  *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C.

---

[7] A horizontal merger involves the acquisition "of a firm producing an identical product or close substitute and selling it in the same geographic market."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 900 (5th ed. 2025) ("Areeda & Hovenkamp").  A vertical merger, in contrast, is the acquisition "of a firm that buys the product sold by the acquirer or that sells a product bought by the acquirer."  *Id.*

2018) (Leon, J.), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019), (quoting Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Mergers: A Post-Chicago Approach*, 63 Antitrust L.J. 513, 519 (1995)).

B.    **Alexi's Failure to Allege Facially Plausible Relevant Antitrust Markets Dooms Its Clayton Act Claim.**

A Clayton Act challenger must allege a substantial lessening of competition in an antitrust market.  *Brown Shoe*, 370 U.S. at 324.  This remains true in vertical cases, where "'[m]erger analysis starts with defining the relevant market' in which to assess the alleged anticompetitive harms." *AT&T*, 310 F. Supp. 3d at 195 (alteration in original) (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 24 (D.D.C. 2015)).  "The relevant market comprises two parts: a product market and a geographic market."  *Id.*    A product market includes "all commodities reasonably interchangeable by consumers for the same purposes." *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 56 (D.D.C. 2008) (quoting *E.I. du Pont de Nemours & Co.*, 353 U.S. at 395).  "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it.'"  *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013) (quoting *Brown Shoe Co.*, 370 U.S. at 325); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) ("Where the plaintiff . . . alleges a proposed relevant market clearly that does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").  A geographic market is the "'region in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004) (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 3d 34, 49 (D.D.C. 1998)).

When a claimant fails to marshal allegations sufficient to plausibly establish relevant markets—as Alexi has failed here—the claim must be dismissed.  *Concord Assocs., L.P. v. Entm't*

*Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016) ("Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market.").

### 1.    Alexi's Proffered Upstream "Programmatically Licensable Comprehensive Legal Database Market" Is Facially Implausible.

Alexi alleges an upstream "market for comprehensive legal databases, featuring U.S. caselaw ('Programmatically Licensable Comprehensive Legal Database Market')."  Rev. Am. Counterclaims ¶ 146.[8]  According to Alexi, the upstream market is a critical input into the alleged downstream AI Legal-Analysis Services Market.  *Id.* ¶ 177.  This allegedly critical input is, essentially, caselaw.  *See id.* ¶ 146.

Of course, the idea that caselaw is walled off behind Fastcase's database does not withstand scrutiny under even passing "judicial experience and common sense."  *Iqbal*, 556 U.S. at 679. Caselaw is obviously "part of the public domain," Rev. Am. Counterclaims ¶ 71,[9] and it is available from a "hodgepodge" of sources, including courthouses, *id.* ¶ 72; CourtListener and Harvard's Caselaw Access Project ("HCAP"), *id.* ¶¶ 161–63; and Westlaw and Lexis, *see, e.g.*, *id.* ¶ 44.  Alexi itself has other sources of caselaw, and even "deduplicate[s] the caselaw [received from Fastcase] against other versions already in its system and from other sources . . . ."  *Id.* ¶ 61.

Faced with the many providers of this allegedly critical input, Alexi contorts itself to gerrymander an upstream market that omits the various options that AI Legal-Analysis Services

---

[8] Alexi pleads this market in the alternative—one with and one without Westlaw and Lexis, *see* Rev. Am. Counterclaims ¶¶ 159–60—and confusingly alleges that the analysis does not change regardless of whether these two giants are in the market.

[9] Materials in the public domain "are not protected by intellectual-property rights and are therefore available for anyone to use without charge."  *Public Domain*, Black's Law Dictionary (12th ed. 2024).

providers have for the caselaw they allegedly need to support their products. Alexi's efforts to overcome the defects detailed in Fastcase's original Motion to Dismiss are counterproductive. *First*, Alexi (inconsistently) excludes the largest providers of legal databases—Westlaw and Lexis—from the market "[b]ecause neither . . . license[s] their database for programmatic use," *id.* ¶ 156, but this claim is contradicted by Alexi's concession that at least Lexis licenses its database to Harvey, one of Alexi's competitors, *id.* ¶ 153. *Second*, Alexi excludes from the market at least two free caselaw providers—CourtListener and HCAP—because they allegedly do not "offer a *comprehensive* database that is sufficient" for AI legal service providers' needs, a distinction negated by Alexi's own allegations. *Id.* ¶ 161. The result is a facially implausible and incoherent upstream market that effectively includes only Fastcase.

Antitrust law, however, heavily disfavors such "markets of one." *See, e.g.*, *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429–30 (D.C. Cir. 1986) (affirming judgment for defendant notwithstanding the verdict where the market was "arbitrarily circumscribed" and "exaggerate[d] [the defendant's] position"); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001) ("By defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic."); *Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 419–20 (E.D. Pa. 2015) (collecting cases). Alexi's allegations epitomize the reason for this suspicion of single-firm markets: a market drawn solely around the defendant is likely reverse-engineered to suit only the claimant's bespoke litigation needs.

*Databases "Available for Programmatic Licensing."* Alexi first defines the upstream market as the "market for comprehensive legal databases, featuring U.S. caselaw." Rev. Am. Counterclaims ¶ 146. Alexi alleges that Westlaw and Lexis each offer a "comprehensive database" to which providers of AI legal services can turn for their caselaw needs. *Id.* ¶ 4 (acknowledging

"three comprehensive, historical primary-law databases": Westlaw, Lexis, and Fastcase); *id.* ¶¶ 44, 56, 147.  Necessarily, then, Westlaw and Lexis are in Alexi's upstream market.  Recognizing that this dooms its claim, Alexi elsewhere smudges the boundaries of its Programmatically Licensable Comprehensive Legal Database Market by limiting the market to only comprehensive legal databases *available* for programmatic licensing—*i.e.*, just Fastcase.  *Id.* ¶¶ 149–53, 156.[10]

To the extent Alexi excludes Westlaw and Lexis because they are allegedly not "available for programmatic licensing," *id.* ¶ 151, this distinction is contradicted by Alexi's own allegations.  Alexi asserts Lexis "does not license its database for programmatic use," but it concedes in the same paragraph that Lexis *did* enter a "strategic partnership"—including caselaw access—with Harvey, an AI legal services provider.  *Id.* ¶ 153.  And, while Alexi maintains that Westlaw and Lexis both "declined" to enter licensing agreements or strategic partnerships with Alexi, the counterclaims neither state why Alexi's negotiation attempts failed nor allege that Westlaw and Lexis outright refused to license their databases to Alexi, making an allegation of "actual foreclosure" incoherent.  *Id.* ¶¶ 154–55, 217.  ███████████████████████████████████████████████████████████████████████████████████████████.[11]

Moreover, under Alexi's own allegations, it is impossible that Westlaw's and Lexis's upstream databases would be unavailable to Westlaw and Lexis as downstream AI Legal-Analysis

---

[10] Notably, Alexi fails to consistently define the upstream market.  Some paragraphs refer to the "Programmatically Licensable Comprehensive Legal Database Market."  *See, e.g.*, Rev. Am. Counterclaims ¶ 146.  Others refer to the "Comprehensive Legal Database Market."  *Id.* ¶ 144.

[11] Nor does Alexi actually allege that Fastcase's database is not available, whether to Alexi or Alexi's competitors.  To the contrary, Alexi alleges that its competitor C.S. Disco has a license to Fastcase's database and offers no allegation that this license has been interrupted since the merger.  *See* Rev. Am. Counterclaims ¶ 150.

Services providers.  *See id.* ¶ 173.  Thus, these available and comprehensive databases must be included in the upstream market for at least three downstream participants: Westlaw, Lexis, and Harvey.[12]  This highlights a fundamental flaw with limiting the upstream market to "available" databases: The market varies from the perspective of each downstream participant.  *See Queen City Pizza*, 124 F.3d at 438 ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" (quoting *E.I. du Pont de Nemours & Co.*, 353 U.S. at 395)).

*"Comprehensive" Databases.*  Alexi alleges that to be in the upstream market, a database must be "comprehensive."  Rev. Am. Counterclaims ¶ 146.  Alexi concedes that a database does not need to contain more than caselaw in order to be comprehensive.  *See id.* ("While these [comprehensive] databases also include headnotes, statutes, rules, regulations, and other legal materials and authorities, these features are often add-ons that are helpful but not critical for programmatic users of these databases.").  In fact, Alexi's license has always been "limited to U.S. cases and not including secondary sources, statutes, or legislative history materials," *id.* ¶ 60, and "Alexi's engineers do not receive Fastcase's headnotes or annotations[,]" *id.* ¶ 61.  With just caselaw, Alexi was able to offer what it claims are "the legal tech industry's highest-quality AI memos."  *Id.* ¶ 172.  Simply put, nothing more than caselaw is required.[13]

This places CourtListener and HCAP, which each contain millions of cases, squarely

---

[12] Alexi alleges that as part of the licensing arrangement, "Lexis acquired an equity ownership stake in Harvey."  Rev. Am. Counterclaims ¶ 153.  Taking this allegation as true, it is even more clear that Lexis's database is and will remain available to downstream provider Harvey.  *Id.* ¶ 169.

[13] Alexi sprinkles throughout its Revised Amended Counterclaims suggestions that what matters is access to "primary" law.  *See, e.g.*, Rev. Am. Counterclaims ¶¶ 3–4, 44, 47, 50, 56, 147. If the undefined term "primary" law include more than just caselaw, Alexi's other allegations establish that the allegedly critical input is just caselaw, not statutes, rules, or regulations.

within Alexi's proposed upstream market. *See id.* ¶¶ 162–63. Yet Alexi tries to exclude CourtListener from the market because it "has no statutes, rules, regulations, or other legal documents[.]" *Id.* ¶ 162. This cannot provide a basis for excluding CourtListener, as the allegedly critical input offered by upstream market participants is nothing more than caselaw.

Alexi also claims that CourtListener, HCAP, and other databases are not substitutes because they do not contain complete "coverage from the pre-digital era[.]" *Id.* ¶¶ 148, 162–63. And yet elsewhere, Alexi alleges that **current**, "up-to-date data is essential," and that lawyers and law firms do not want work product relying on older, "stale" caselaw. *Id.* ¶ 137. Alexi further acknowledges that "judicial decisions from the pre-digital era" are available from "courthouses, jurisdictions, and [other] sources." *Id.* ¶ 72. While Alexi may not want to put in the work to combine caselaw across multiple sources, that does not exclude those sources from the market. *See Queen City Pizza*, 124 F.3d at 437 ("'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for one over the other, either would work effectively.'" (quoting *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 206 (3d Cir. 1994))); *hiQ Labs, Inc. v. LinkedIn, Corp.*, 485 F. Supp. 3d 1137, 1148–49 (N.D. Cal. 2020).[14]

---

[14] In *hiQ Labs*, the Court granted a motion to dismiss hiQ's Sherman Act claims, in part because hiQ failed to allege a relevant product market. 485 F. Supp. 3d at 1149. hiQ alleged that there existed a relevant market for "people analytics"—"a new type of predictive data analytics aimed at providing employers in-depth predictive insights into their workforce." *Id.* at 1148. hiQ's market did not include either companies' internal employee data or publicly available data sources such as Google and Facebook. The Court rejected this market as implausibly vague and narrow. Although hiQ maintained that, "*as a practical matter*, the only place to get publicly available data is LinkedIn," the Court found it implausible that "useful publicly available information cannot be gleaned from other sources such as Google and Facebook or other industry directories and sources." *Id.* at 1148–49 (emphasis in original). The same is true here—Alexi has implausibly excluded publicly available sources such as CourtListener and HCAP, even though the caselaw data that Alexi maintains is critical can be "gleaned" from those sources. *See id.*

It makes sense why Alexi tries to exclude CourtListener, HCAP, and other sources from the market. If they are in the market, then any AI Legal-Analysis Services rivals whom Clio attempts to "foreclose" can simply turn to them instead. Alexi self-servingly and "arbitrarily excis[es] those alternative options" from the market, and in doing so exempts itself "from the requirement of defining the market according to the rules of interchangeability and cross-elasticity" and thus "undermine[s] the plausibility of [its] antitrust" claim. *Concord Assocs.*, 817 F.3d at 55 (citations and quotation marks omitted); *see also Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) ("A plaintiff cannot ignore economic reality and 'arbitrarily choose the product market relevant to its claims' . . . ." (quoting *Buccaneer Energy (USA) v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017))). Alexi's own allegations reveal that its proffered upstream market is incoherent and implausible on its face, and its Clayton Act claim must be dismissed.[15] *See Sky Angel U.S.*, 947 F. Supp. 2d at 102–04.

### 2.   *Alexi's Proffered Downstream "AI Legal-Analysis Services Market" Is Facially Implausible.*

Alexi's downstream product market of AI Legal-Analysis Services further exposes how its Revised Amended Counterclaims are grounded in logical and factual inconsistencies.

*First*, Alexi contends that the AI Legal-Analysis Services Market includes at least seven competitors: Clio, Lexis, Westlaw, Harvey, and "a few independent players like Alexi, DISCO,

---

[15] The result remains the same under either "the '*Brown Shoe*' methodology, which looks to certain 'practical indicia' of market demarcation," *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1049 (5th Cir. 2023), or the hypothetical monopolist test, which tests whether "a single firm that controlled the entire market . . . could profitably impose a price increase—as opposed to losing so much business in response that the increase would be unprofitable," *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 826 (S.D. Tex. 2025). The *Brown Shoe* practical indicia focus on the "commercial realities of the industry." *Brown Shoe*, 370 U.S. at 336. These commercial realities are laid bare in Alexi's Revised Amended Counterclaims, and they negate the plausibility of Alexi's proposed upstream market. Additionally, for the reasons set forth below, Alexi's allegations regarding the hypothetical monopolist test are contradictory and implausible. *See infra* Section I.C.1.

and Legora." Rev. Am. Counterclaims ¶ 169. Elsewhere, however, Alexi defines the market differently, and more narrowly. In some paragraphs, Alexi includes in the downstream market only those providers which allegedly lack access to an upstream comprehensive legal database. *See id.* ¶ 181 (indicating that Clio's AI rivals are those that Clio "has foreclosed"); *see also id.* ¶ 179 (contending that "[r]ivals (or would-be rivals) in the AI Legal-Analysis Services Market simply cannot compete without access to the comprehensive U.S. caselaw data now controlled by Clio.") And at one point, Alexi appears to limit the downstream rivals to only those who "are not vertically integrated with a comprehensive database," an awkward attempt to exclude downstream participants who have access to Westlaw and Lexis's databases. *Id.* ¶ 181.

Alexi muddles the market definition in order to limit the downstream market to only those rivals who *rely on* Fastcase, as Alexi must—but cannot—allege that the lack of access to Fastcase's database harms *competition* in the downstream market. *See infra* Section 1.C. Yet this attempt to limit the downstream market collapses in the face of Alexi's other allegations. *See* Rev. Am. Counterclaims ¶ 179. Alexi includes Westlaw, Lexis, Harvey, and C.S. Disco in the downstream market. *See id.* ¶ 169. These players, according to Alexi, have access to databases *other* than Fastcase: Westlaw and Lexis compete using their own vertically integrated caselaw data; Harvey competes using Lexis's caselaw data; and C.S. Disco competes using Fastcase's caselaw data. *See id.* ¶¶ 50, 150, 153, 169. Alexi is pleading a contrived market "plainly designed to bolster" its claims "by artificially exaggerating [the defendant's] market power and shrinking the scope of" alternatives. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681, 683 (4th Cir. 2016).

*Second*, in an effort to bolster its deficient claim, Alexi peppered its Revised Amended Counterclaims with citations to sources that ultimately undermine its theories, including its alleged downstream market. Alexi claims that "[g]eneral purpose AI chatbots (like ChatGPT and Google

Gemini) are not a constraint on competition in the AI Legal-Analysis Services Market." Rev. Am. Counterclaims ¶ 174. However, one of Alexi's cited sources states that "the market is entering a new era, one of rapid innovation and cutthroat competition between foundation model providers such as OpenAI and Anthropic, AI-native legal toolmakers like Counsel AI Corp. (Harvey) and one-stop platforms such as Clio."[16] The same source also references "Anthropic's new legal AI tools," which "validate the market." *Id.* Alexi makes no attempt to rebut—or even address—these statements, which Alexi itself incorporated into its Revised Amended Counterclaims.

### C.  Alexi Fails to Plausibly Allege that the Transaction Substantially Lessens Competition.

The contrivances and shortcomings of Alexi's alleged relevant markets are not trivial. To the contrary, they reveal the antitrust counterclaims for what they truly are: a repurposing of a bilateral business dispute into a spectacle to detract from Alexi's wrongdoing. Alexi effectively alleges that Fastcase is the only entity in the upstream market (as other obvious substitutes are alleged to be either unavailable or noncomprehensive), and that Alexi is the only entity in the alleged downstream market (as other obvious substitutes are vertically integrated or otherwise do not lack access to a comprehensive database). *See supra* Sections I.B.1–2. Alexi might believe that the Fastcase-Clio merger was disadvantageous to *Alexi's* own business interests, but its Revised Amended Counterclaims glaringly lack any plausible allegations that the merger has or could result in a substantial lessening of *competition* in any legally salient way. Importantly, "[t]he Clayton Act protects 'competition,' *rather than any particular competitor*." *United States v.*

---

[16] Yvonna Lau, *How a Vancouver legal-tech pioneer is fending off the AI giants and pressure to move to the U.S.* (Mar. 19, 2026), https://financialpost.com/feature/how-clio-fends-off-ai-giants-pressure-to-move-u-s (cited in Rev. Am. Counterclaims ¶ 190 n.18).

*Aetna Inc.*, 240 F. Supp. 3d 1, 18 (D.D.C. 2017) (quoting *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 n.12 (D.C. Cir. 1990)) (emphasis added).

Alexi alleges that post-merger, Clio has "the ability and incentive" to foreclose its AI Legal-Analysis Services rivals from access to Programmatically Licensable Comprehensive Legal Databases. *See* Rev. Am. Counterclaims ¶¶ 187–89; *see also Illumina*, 88 F.4th at 1051 (the ability and incentive test "asks whether the merged firm will have both the ability and the incentive to foreclose its rivals"); U.S. Dep't of Justice and the Fed. Trade Comm'n Merger Guidelines § 2.5.A.1 (2023) ("2023 Merger Guidelines"). Even accepting Alexi's proposed markets, Alexi has not plausibly alleged an ability or incentive, or if any such ability and incentive did exist, that it would manifest such that the merger would ***substantially*** lessen competition. *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025).[17]

### 1. Alexi Fails to Plausibly Allege that Clio Has Any Ability to Foreclose.

Alexi must allege that Clio has the ability to foreclose its rivals from the critical input. This foreclosure must be more than *de minimis*. *Brown Shoe*, 370 U.S. at 329 ("[F]oreclosure of a *de minimis* share of the market will not tend 'substantially to lessen competition'"); *Tempur Sealy Int'l*, 768 F. Supp. 3d at 848 ("In evaluating customer-foreclosure cases, courts look first to the percentage of the market being foreclosed . . . . And as stated in a respected treatise, 'It cannot be

---

[17] In *Microsoft*, the Northern District of California denied the FTC's motion to preliminarily enjoin Microsoft's acquisition of Activision. 681 F. Supp. 3d at 1075. The Court rejected the FTC's vertical foreclosure theory which alleged, in part, that the combined firm would have the ability and incentive to foreclose Microsoft's rivals from access to Activision's popular *Call of Duty* video game. *See id.* at 1090–99. The Court emphasized that the FTC had to do more than show "[t]hat the combined firm has more of an incentive than an independent Activision," as that "says nothing about whether the combination will 'substantially' lessen competition." *Id.* at 1090. Instead, the FTC had to show that "the combined firm (1) has the ability to withhold *Call of Duty*, (2) has the incentive to withhold *Call of Duty* from its rivals, and (3) competition would probably be substantially lessened as a result of the withholding." *Id.*

emphasized too strongly that "small" foreclosures cannot impair competition.'" (quoting Phillip E. Areeda & Herbert Hovenkamp, 4A *Antitrust Law*, ¶ 1004f at 172 (5th ed. 2022))).  As explained above, the allegedly critical input is available from many sources—including Westlaw, Lexis, CourtListener, and HCAP.  *See supra* Section I.B.1.  Still, even applying Alexi's proposed relevant markets, Clio does not have the ability to foreclose access to the allegedly critical input.

*First*, any attempt by Clio to foreclose access to comprehensive legal databases would be undermined by the entry of additional competitors into the upstream market.  Alexi claims that the market features high barriers to entry because it "would require many years of effort and a huge capital investment" to build a competing database, Rev. Am. Counterclaims ¶ 164, but "[t]he mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry[.]'"[18]  *Los Angeles Land Co. v. Brunswick Co.*, 6 F.3d 1422, 1428 (9th Cir. 1993) (quoting 2 Phillip E. Areeda & Donald F. Turner, *Antitrust Law*, ¶ 409e at 303 (1978)).  Assuming a compilation of caselaw is as "hugely valuable" as Alexi contends, *see* Rev. Am. Counterclaims ¶ 70, basic economics instructs that this potential value would encourage entry even if it requires large capital expenditures, and that the mere threat of this potential entry has a disciplining effect on competition.  *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–33 (1973) (finding the district court erred as a matter of law because it did not consider whether "a potential competitor . . . was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market").

---

[18] In attempting to construct entry barriers, Alexi unearths a key fact: "Fastcase . . . spent decades building its primary-law database."  Rev. Am. Counterclaims ¶ 165.  Alexi now asks the Court to hand access to that database to Alexi, despite Fastcase's investments in building and improving that database, and despite Alexi's egregious abuse of its prior access to that database.  This is not the purpose of antitrust law, which fosters and rewards innovation.

Alexi claims that a hypothetical monopolist in the alleged Programmatically Licensable Comprehensive Legal Database Market could profitably raise prices or reduce quality. *See* Rev. Am. Counterclaims ¶ 166. Alexi also alleges that Fastcase has been the only "available" competitor—*i.e.*, a monopolist—in that market since ***before*** the merger. *See id.* ¶¶ 56, 149, 156. Yet Alexi does not allege that Fastcase profitably imposed a price increase or quality reduction. Alexi makes no effort to explain this discrepancy, but basic antitrust principles do: the threat of entry by additional players exerted competitive pressure on this so-called monopolist. *See* Areeda & Hovenkamp ¶ 941a ("[W]ith low or negligible barriers to entry, significant monopolistic pricing will be of relatively limited duration, either because new entry will erode it or because sellers may price near competitive levels to deter entry.").

***Second***, Alexi's own allegations establish that Fastcase cannot foreclose at least three AI Legal-Analysis Services providers from access to comprehensive legal databases. The alleged AI Legal-Analysis Services Market includes "the AI legal analysis services offered by" Westlaw, Lexis, and Harvey. Rev. Am. Counterclaims ¶ 169. Alexi does not, and cannot, allege that Clio can foreclose Westlaw and Lexis from accessing their own comprehensive legal databases. *See id.* ¶¶ 169, 173. Additionally, Alexi concedes that Harvey has a strategic partnership with Lexis to use Lexis's data, and therefore Alexi cannot allege that Clio has any ability to foreclose Harvey's access to a comprehensive legal database. *See id.* ¶ 153. Thus, any foreclosure which can be inferred from Alexi's allegations is, at most, *de minimis* and plainly insufficient.

### 2.     *Alexi Fails to Plausibly Allege Clio Has Any Incentive to Foreclose.*

Alexi's only support for the claim that Clio has "every incentive" to foreclose its rivals consists of quotes from Clio executives which do not speak to such incentives.  *See id.* ¶ 190.[19] Nor does Alexi address the basic economic proposition that Clio may find it more profitable to continue licensing the Fastcase database to AI Legal-Analysis Service providers than it would to pursue a foreclosure strategy for an input found in the public domain.  Here, Alexi ignores the mandate that the "incentives" prong of the test requires "balanc[ing] all of the combined firm's post-transaction incentives to determine whether foreclosure is likely."  *Tempur Sealy Int'l*, 768 F. Supp. 3d at 837.

According to Alexi, all of the following are true: (1) the downstream market that relies on the critical input includes numerous competitors, including Westlaw, Lexis, Harvey, Alexi, C.S. Disco, and Legora, Rev. Am. Counterclaims ¶ 169; (2) Fastcase licenses its database to multiple of these competitors, *id.* ¶¶ 92, 150; and (3) Fastcase's agreement with Alexi was profitable, *see id.* ¶ 192.  Alexi does not allege that Fastcase's other licensing agreements are less profitable than its agreement with Alexi.  Taking these allegations together, it is plausible, unacknowledged, and unrebutted that Clio would have strong economic incentives to continue profitably licensing the Fastcase database to downstream providers willing to provide appropriate compensation.  *See*

---

[19] Alexi misleadingly cites an article that quotes Clio's CEO for the proposition that Clio has a "data moat."  *See* Rev. Am. Counterclaims ¶ 190 n.18.  However, the CEO was ***not*** primarily discussing caselaw data, the only data which is allegedly a critical input.  *See* Section I.B.1; Yvonna Lau, *How a Vancouver legal-tech pioneer is fending off the AI giants and pressure to move to the U.S.* (Mar. 19, 2026), https://financialpost.com/feature/how-clio-fends-off-ai-giants-pressure-to-move-u-s (cited in Rev. Am. Counterclaims ¶ 190 n.18).  According to the article, the CEO stated: "This is all about data, and Clio has more data than anyone else in the world ***as it relates to practice areas, specific matters, as well as actual case law and primary legal data***."  *Id.* (emphasis added).  Caselaw data is not the "moat" purportedly referenced in this article.

*Illumina*, 88 F.4th at 1052[20]; *Tempur Sealy Int'l*, 768 F. Supp. 3d at 834 (emphasizing the focus "on whether it would be profitable for the combined firm to foreclose competition").

Finally, to the extent Alexi claims that foreclosure is already occurring, Alexi points only to Fastcase's decision to stop providing its data to Alexi when it learned Alexi was breaching the parties' licensing agreement and violating Fastcase's intellectual property rights. Alexi concedes that Fastcase has "licensed its database to multiple other legal AI providers," Rev. Am. Counterclaims ¶ 50, yet Alexi does ***not*** allege that Clio has foreclosed, reduced, or otherwise changed their access to Fastcase's database. Under Alexi's theory, Clio would have "every incentive" to shut off those rivals' access to the database. This has not played out, however, despite the merger closing ***over four months*** prior to Alexi filing its Revised Amended Counterclaims.[21]

---

[20] In *Illumina*, the Fifth Circuit explained that "the degree to which Illumina has an incentive to foreclose Grail's rivals depends upon the balance of two competing interests": the merged firm's "interest in maximizing its profits in the downstream market" and its "interest in maximizing its profits in the upstream market." 88 F.4th at 1052; *see also Microsoft*, 681 F. Supp. 3d at 1091–92 (finding that Microsoft had no incentive to foreclose rivals' access to Activision's *Call of Duty* video game in part because "*Call of Duty's* cross-platform play is critical to its financial success"). Here, Alexi fails to even acknowledge these competing interests, thus rendering its allegations regarding the combined firm's "incentive" to foreclose implausible.

[21] Alexi's faulty vertical foreclosure theory is grounded in the "ability and incentive" test. Rev. Am. Counterclaims ¶¶ 186–90. Some courts have also applied a "different but overlapping standard[] for evaluating the likely effect of a vertical transaction": the *Brown Shoe* functional liability factors. *See Illumina*, 88 F.4th at 1051; *see also Microsoft*, 681 F. Supp. 3d at 1089. Alexi has not alleged such a theory, but regardless, it would fail for the reasons set forth herein. The degree of foreclosure can be, at most, *de minimis*. *See Brown Shoe*, 370 U.S. at 329. The "nature and purpose of the transaction" is to create a stronger competitor to exert more competitive pressure on the dominant Westlaw and Lexis. *See infra* Sections I.C.3–4; *Brown Shoe*, 370 U.S. at 329. The upstream market does not trend toward concentration, as there are many providers of the critical input and barriers to entry are low. *See supra* Sections I.B.1, I.C.1. Nor does the downstream market plausibly trend toward concentration, as Alexi concedes that the downstream market features at least seven competitors, including several "independent" players. Rev. Am. Counterclaims ¶¶ 169–70. ████████

### 3.    *Alexi Fails to Plausibly Allege that the Transaction Results in a Substantial Lessening of Competition.*

It would not be enough for Alexi to plausibly allege that the merged firm has some ability or incentive to foreclose Clio's downstream rivals.  This is because "the question is not whether [Clio] following the merger is more likely to engage in foreclosure than an independent" Fastcase. *Microsoft*, 681 F. Supp. 3d at 1097.  Instead, "[t]he question is whether 'the proposed merger is likely to substantially lessen competition, which encompasses a concept of reasonable probability.'"  *Id.* (quoting *AT&T*, 916 F.3d at 1032).

Importantly, the concern here is not with harm to **competitors**, but with harm to **competition**.  *See Brown Shoe*, 370 U.S. at 320.  Alexi alleges **at most** harm to Alexi itself as a self-styled competitor.  The merger closed over four months before Alexi filed its Revised Amended Counterclaims, yet Alexi does not allege "actual foreclosure" of any licensee other than Alexi, and Clio plainly cannot foreclose many of its downstream rivals from the allegedly critical input.  *See supra* Section I.C.1.  Fierce competition will therefore continue in the downstream market regardless of any attempted foreclosure by Clio.  Alexi's complaints about losing customers to its competitors and losing the interest of potential acquirers are not the concern of antitrust laws.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (explaining, in a Sherman Act case, that antitrust law is borne "not out of solicitude for private concerns but out of concern for the public interest").

Moreover, and as discussed further in Section I.C.4, *infra*, Alexi's own allegations demonstrate that the merger will only make the AI Legal-Analysis Services market **more** competitive.  This alleged market already features at least seven competitors, including Westlaw

and Lexis, two vertically integrated players which charge "often-exorbitant fees." Rev. Am. Counterclaims ¶ 173. Together, Clio and Fastcase present a vertically integrated competitor which can exert more pressure on these Goliaths.[22] *See id.* ¶ 200 (asserting that "[l]aw firms depend on robust competition between AI legal service providers to deliver the highest-quality AI-powered legal services at the lowest cost"); *see also Tempur Sealy Int'l*, 768 F. Supp. 3d at 811 ("'[V]ertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets.'" (quoting *Microsoft*, 681 F. Supp. 3d at 1088)). Alexi attempts to sweep away any possibility of procompetitive benefits with a single paragraph, Rev. Am. Counterclaims ¶ 219, while simultaneously failing to address the specific benefits which can be inferred from Alexi's own allegations.

### 4.    *Alexi's Invocation of Alleged Coordinated Effects Confirms the Merger's Procompetitive Benefits.*

Alexi's Revised Amended Counterclaims add a new, single-sentence paragraph that alleges, without any context or explanation, that Clio's acquisition of Fastcase "will enable coordinated effects between the three firms that control access to comprehensive caselaw data, raising costs, stifling innovation, and reducing output." *Id.* ¶ 182. According to Alexi, this results from the transaction "moving the downstream market towards only three vertically integrated companies . . . ." *Id.*

The idea of a market of vertically integrated competitors is slipped into the Revised Amended Counterclaims without ever being explicitly or consistently defined. *See, e.g.*, *id.* ¶ 159

---

[22] In announcing the completion of the acquisition, Clio's Chief Financial Officer said Clio "expects to be competing against larger, more established legal software players like Toronto-based Thomson Reuters and New York's LexisNexis . . . ." Josh Scott, *Clio Secures $500-million USD Series G as it Completes vLex Acquisition*, Beta Kit (Nov. 10, 2025), https://perma.cc/U8BP-D7U9 (cited in Rev. Am. Counterclaims ¶ 45 n.1).

(discussing incentives of Westlaw and Lexis as "vertically integrated AI legal services providers"); *id.* ¶ 181 (distinguishing "competitors in the AI Legal-Analysis Services Market that are not vertically integrated with a comprehensive database"). In this quasi-alleged market, Clio's acquisition of Fastcase is paradigmatically procompetitive: it expands the market from two to three players. *See id.* ¶ 173 ("Westlaw and Lexis (and now Clio after the Fastcase acquisition) are vertically integrated with their own AI tools . . . ."). The transaction thus could only have made this market *less* concentrated, and Alexi's theory that the transaction will enable coordinated effects collapses. *See* 2023 Merger Guidelines § 2.3.A ("By reducing the number of firms in a market, a merger increases the risk of coordination."). By claiming that the transaction will enable coordinated effects between the three vertically integrated firms, Alexi concedes that the combined Clio-Fastcase entity has become a vertically integrated competitor to Westlaw and Lexis. This necessarily increased competition.

Even setting that critical point aside, however, Alexi has not plausibly alleged the possibility of coordinated effects. Alexi does not make any allegations regarding the relevant factors in assessing potential coordinated effects, and those factors negate any possibility of coordinated effects here. *See id.* § 2.3 (identifying the relevant factors). The three primary factors are: (1) whether the market is highly concentrated, (2) whether there is evidence of prior attempts at coordination, and (3) whether the transaction eliminates a maverick. *See id.* § 2.3.A. Alexi's alleged vertically integrated market is less concentrated as a result of the transaction, there is no suggestion of prior coordination, and no maverick was eliminated.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ *See Rivera v. Rosenberg & Assocs., LLC*, 142 F. Supp. 3d 149, 161 (D.D.C. 2015) ("Where . . . the complaint's factual allegations are contradicted by exhibits incorporated by reference in the complaint and of which the Court may take judicial notice, the Court need no longer accept as true plaintiff's version of events.").

The vertical integration of Clio and Fastcase does not increase concentration in any market, and instead positions the combined entity to put competitive pressure on Westlaw and Lexis. Rather than plausibly alleging any likelihood of substantial harm to competition, Alexi's allegations regarding coordinated effects in fact establish the transaction's procompetitive benefits.

**D.      Alexi's Nonsensical Allegations Regarding the 2023 vLex-Fastcase Transaction Should Be Wholesale Disregarded.**

Alexi's Revised Amended Counterclaims insert wholly unsupported allegations that "vLex's 2023 acquisition of Fastcase"—which closed three years ago—"was anticompetitive and violated Section 7 of the Clayton Act in its own right." Rev. Am. Counterclaims ¶¶ 195–96. Alexi chose not to allege this supposed violation of the Clayton Act as a separate count, *see id.* ¶¶ 214–19, and instead attempts to bootstrap this assertion to its claim challenging Clio's acquisition of vLex. Alexi's allegations here fail for numerous reasons.

At the outset, Alexi fails to allege any of the necessary elements of a Clayton Act § 7 claim. Alexi does not allege relevant market(s), antitrust injury, or a likelihood that the transaction will substantially harm competition. *See id.* ¶¶ 195–96, 215–18. The failure to define relevant markets

-30-

alone is fatal to Alexi's challenge.  *See Sky Angel U.S.*, 947 F. Supp. 2d at 102–04.[23]  Additionally, although the transaction closed ***three years*** prior to Alexi filing the Revised Amended Counterclaims, Alexi points to no potential or actual harm to Alexi or to competition stemming from that transaction.  In fact, Alexi concedes that after the transaction closed, vLex (1) continued licensing the Fastcase U.S. caselaw data to Alexi without any changes, Rev. Am. Counterclaims ¶¶ 8, 74–75, 87, 119; and (2) began licensing Fastcase data to C.S. Disco pursuant to a new agreement, *id.* ¶¶ 92, 195.  Plainly, the vLex-Fastcase entity did not have the ability or incentive to foreclose access to the Fastcase data, and did not engage in any such foreclosure.

Finally, Alexi's claim should be rejected under "the doctrine of laches, which precludes relief for those who sleep on their rights."  *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 13 (D.D.C. 2021) (Boasberg, Chief J.), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023).  "The defense of laches 'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"  *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 295 (D.C. Cir. 2023) (quoting *Kansas v. Colorado*, 514 U.S. 673, 687 (1995)).  Here, Alexi does not explain why it waited three years to challenge the transaction, which was public knowledge by at least April 2023.[24]  *See Facebook*, 549 F. Supp. 3d at 35 ("[C]ourts frequently find a divestiture remedy clearly unfair and unwarranted after delays in filing much shorter than four years —

---

[23] If Alexi simply seeks to port over its defective markets from its challenge to the Clio-Fastcase transaction, this attempt would similarly fail.  Alexi did not allege that those same markets apply.  Moreover, Alexi has made no effort to allege why the markets would be the same from 2023 to 2025 in such dynamic industries.  *See* Rev. Am. Counterclaims ¶ 3 (describing the "fast-developing world of generative AI").

[24] *See* vLex Team, *Legal Tech Disruptors vLex and Fastcase Merge to Form World's Largest Global Law Library* (Apr. 4, 2023), https://perma.cc/XCE3-VW2V (cited in Rev. Am. Counterclaims ¶ 47 n.3).  vLex's launch of Vincent, allegedly vLex's "downstream AI service," was also public.  *See id.*

sometimes only months or even days after the merger's announcement.").[25]  This delay prejudices

Fastcase, as Alexi seeks to go on a fishing expedition into the 2023 transaction if Alexi's antitrust

claim ever proceeds to discovery (which it should not, given its numerous and fatal deficiencies).

Alexi is wasting both Fastcase's and the Court's resources by shoehorning this threadbare,

contradictory, and inexcusably late claim into its Revised Amended Counterclaims.

### E.      Even the Most Cursory Diligence Reveals that Alexi's Factual Allegations are Untrue and its Legal Theory Implausible.

Alexi acknowledges both "the fast-developing world of generative AI," Rev. Am.

Counterclaims ¶ 3, and that Clio operates "in the nascent market for legal AI services," *id.* ¶ 50.

In fact, Alexi credits itself for having "AI technology [that] has rapidly advanced." *Id.* ¶ 41.  Yet

Alexi asks the Court to accept the premise that none of the many companies operating in this space

have made similar advancements, and instead asserts a market frozen in Alexi's perception of the

past. *See id.* ¶ 50.  These allegations are imbued with an inherent lack of factual diligence, and the

Court has no obligation to entertain Alexi's insistence on burying its head in the sand.

Midpage's caselaw database exemplifies Alexi's strategic omissions.[26]  In February 2026,

Midpage announced a relationship with Claude, which combines Midpage's "comprehensive, up-

to-date dataset of case law" with Claude's AI capabilities.[27]  As Claude advertises, this integration

---

[25] Alexi does not state what remedies it seeks for this alleged violation, and it does broadly request "[a]ny such further relief as the Court deems just and proper."  Rev. Am. Counterclaims at 72.  If Alexi seeks to unwind the transaction, it would be highly costly and difficult to separate vLex and Fastcase, as they combined three years ago. *See Meta Platforms*, 66 F.4th at 300–01.

[26] Midpage contains all federal case law, case law from 50 states and D.C., and unpublished opinions, with "[n]ew cases appear[ing] within hours." *Coverage*, midpage, https://www.mid-page.ai/data-for-lawyers (last visited Apr. 23, 2026).  Midpage collects this data "directly from authoritative sources like PACER, state court websites, and government publishers[.]" *Id.*, *FAQ*.

[27] *Release: Midpage MCP Integration for Claude*, Accordingly by midpage (Feb. 2, 2026), https://blog.midpage.ai/p/release-midpage-mcp-integration-for.     Alexi's    Revised    Amended

"[c]onnect[s] Claude to a database of case law," which allows Claude to "conduct complex legal research, review opinions, and craft high quality work product."[28]  Midpage's website indicates that similar functionality is coming soon to ChatGPT and Perplexity.[29]

Alexi knew or should have known the facts that contradict its allegations.  It would strain credulity to suggest that Alexi is not actively monitoring potential competition from Claude, ChatGPT, and Perplexity.  And Alexi's CEO Mark Doble discussed this very litigation with Clio in an article detailing the emergence of Midpage and Descrybe, another legal research startup.[30] Alexi's willful ignorance (or intentional omission) of this information is inexcusable, and it reflects Alexi's desperation to conjure an antitrust claim.

Midpage's very existence and its relationship with Claude decimate the foundation of Alexi's Clayton Act claim: it shows that even startups can assemble case law databases, that licensed access exists that is sufficient for stalwarts such as Claude, ChatGPT and Perplexity, and that these larger players are moving towards servicing legal markets.  As a result, the antitrust allegations are not plausible because they are premised on demonstrably false information.  The Court should take judicial notice of the existence of this public information, as its mere existence makes clear that Alexi refused to engage with reality in crafting its absurd Clayton Act claim.  *See*

---

Counterclaims include allegations regarding █████████████████████████████
██████████████████████████████

[28] *Midpage Legal Research*, Claude, https://claude.com/connectors/midpage (last visited Apr. 23, 2026).

[29] Midpage, https://www.midpage.ai/ (last visited Apr. 23, 2026).

[30] Rhys Dipshan, *The Legal Research Renaissance: What's Behind the Explosion of New Startups?*, Law.com (Apr. 20, 2026), https://www.law.com/legaltechnews/2026/04/20/the-legal-research-renaissance-whats-behind-the-explosion-of-new-startups/; *see also* Descrybe, https://de-scrybe.com/ (last visited Apr. 23, 2026).

*Fairbanks v. Roller*, 314 F. Supp. 3d 85, 88 n.1 (D.D.C. 2018) ("On a motion to dismiss for failure to state a claim, a court may take judicial notice of statements made on the internet when a party relies on them 'not for their truth, but merely to show that those statements were made.'" (quoting *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012))).  Alexi's refusal to conduct a minimal inquiry into publicly known information renders Alexi's allegations baseless.[31]

*    *    *

Necessarily, for all of the reasons set forth above, this simply is not an antitrust case, and Alexi cannot make it one.  Alexi brought this merger challenge as a hostile attempt to regain access to the data.  Alexi lost access to this data not because of any allegedly anticompetitive merger, but because Alexi blatantly violated the terms of the Agreement.  This is not the province of antitrust law, and Alexi's Clayton Act counterclaim should be dismissed.  And since this is Alexi's second failed attempt to plausibly allege this claim, it should be dismissed with prejudice.

---

[31] The "fast-developing world of generative AI," Rev. Am. Counterclaims ¶ 3, has changed dramatically even over the course of the three months in which Alexi filed the various iterations of its counterclaims.  For example, Lexis and Luminance recently "announced a strategic alliance" which allows "customers to leverage LexisNexis legal AI technology powered by LexisNexis® Protégé™, delivering insights grounded in authoritative legal content and *Shephard's*® citations directly within the Luminance platform." *LexisNexis and Luminance Announce Strategic Alliance to Extend Authoritative Legal AI Content and Technology into Enterprise Contract Workflows*, LexisNexis (Apr. 21, 2026), https://www.lexisnexis.com/community/pressroom/b/news/posts/lexisnexis-and-luminance-announce-strategic-alliance-to-extend-authoritative-legal-ai-content-and-technology-into-enterprise-contract-workflows.  Luminance offers an "AI natural-language assistant" within which customers can now "ask Protégé legal questions and receive insights grounded in LexisNexis industry-leading legal content and linked citations." *Id.*  Additionally, Free Law Project—which runs CourtListener—announced that it is "scanning and digitizing thousands of books" containing caselaw in order to ensure "that the CourtListener collection is, *and remains*, comprehensive." William E. Palin, *Free Law Project is Scanning America's Case Law*, Free Law Project (Apr. 16, 2026), https://free.law/2026/04/16/scanning-americas-case-law/.  Alexi's portrayal of competition wholesale ignores these developments, which are publicly known and speak to the core of Alexi's fundamentally flawed theory.

## II.    ALEXI'S BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING COUNTERCLAIM FAILS.

Alexi also asserts a counterclaim against Fastcase for breach of the implied duty of good faith and fair dealing.  *See* Rev. Am. Counterclaims ¶¶ 207–13.  In this District, "all contracts contain an implied duty of good faith and fair dealing," which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006)).  The "fruits" of a contract can only be determined by first understanding the specific rights and obligations that arise under the contract—that is, the Court must "review the terms of the contract at issue in order to determine whether [a party] violated the duty of good faith and fair dealing."  *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015).

"Liability lies for breach of the duty," in turn, "if a party (1) evades the spirit of the contract, (2) willfully renders imperfect performance, or (3) interferes with performance by the other party."  *C & E Servs.*, 601 F. Supp. 2d at 276.  To survive a motion to dismiss, a party "must allege either bad faith or conduct that is arbitrary and capricious."  *Rodriguez v. Lab'y Corp. of AmericaHoldings*, 13 F. Supp. 3d 121, 134 (D.D.C. 2014) (citation and quotation marks omitted).  Here, because Alexi fails to sufficiently plead bad faith, asserts allegations entirely duplicative of its other claims, and fails to plead any "deprived fruits of the contract," Alexi's implied-duty claim should be dismissed.

### A.    Alexi Fails to Plead Bad Faith Related to Fastcase's Termination of the Agreement.

Alexi's primary allegation of bad faith is that Fastcase terminated the Agreement related to Alexi's unauthorized use of the Fastcase data in order to actually "eliminate the backfile right" in the parties' contract.  Rev. Am. Counterclaims ¶ 13.  In other words, Alexi attempts to frame

Fastcase's termination of the Agreement, done because of Alexi's unauthorized use of the Fastcase Data, as bad faith simply because Alexi alleges Fastcase was "motivated by reasons unrelated to cause." *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1247 (D.C. 2024) (citation and quotation marks omitted). Even taken as true, such allegations are deficient. A showing of "purposeful sabotage" is required to establish an implied duty claim tied to for-cause termination. *Id.* (citation and quotation marks omitted). But since Alexi does not—and cannot— allege that Fastcase "sabotage[d]" the agreement by "compell[ing]" Alexi's violation of the Agreement, its bad faith theory fails. *See id.* (quotation omitted); *see also Weatherly v. Second Nw. Coop. Homes Ass'n, Inc.*, 304 A.3d 590, 596 (D.C. 2023) (conduct "entirely consistent with [a party's] rights under the contract[]" is not an implied-duty violation).

**B.      Alexi's Implied-Duty Claim Is Entirely Duplicative of Its Other Counterclaims.**

Separately, "[c]ourts in this District have concluded that 'a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action.'" *Brown*, 2023 WL 2571729, at *10 (quoting *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002)); *accord Abreu v. Howard Univ.*, 2022 WL 2191695, at *2 (D.D.C. June 17, 2022) (a party cannot "shoehorn" independent claims into "a claim for violating the covenant of good faith and fair dealing"). That is, courts in this District are wary of pure bootstrap claims that needlessly multiply litigation.

Alexi's theory of bad-faith conduct related to Fastcase's termination of the Agreement, in addition to being facially deficient, is also impermissibly duplicative of the conduct alleged in its breach of contract and tortious interference claims. For example, Alexi makes only the cursory, conclusory allegation that "Fastcase has breached its duty of good faith and fair dealing to Alexi by acting in bad faith, arbitrarily and capriciously, to evade the bargain it made with Alexi," including "purporting to terminate the Agreement for cause under false pretenses, accusing Alexi

of breaching the contract and suing Alexi for breach and other violations of law in an objectively baseless lawsuit." Rev. Am. Counterclaims ¶¶ 211–12.

The very same allegations are already alleged elsewhere in Alexi's counterclaims. *Cf.*, *e.g.*, *id*. ¶ 228 ("Counterclaim Defendants intentionally interfered with those prospective business relationships through improper means, including by directing the filing of Fastcase's objectively baseless litigation; violating the covenant of good faith and fair dealing; breaching its obligations under the Agreement to provide Alexi with daily caselaw updates; and, disparaging Alexi to potential acquirers and investors and leveraging this litigation in the market by expressly stating ███████████████████████████████████████████████████████.").

Likewise, after its first attempt to plead implied-duty failed, Alexi included a new theory of bad faith in its amended pleading—that Fastcase ████████████████████████ ████████████████████████████████████████████████████████ This theory ████████████████████████████████████████████████████████ ████████████████████—the ***entire basis*** of Alexi's fifth claim (for tortious interference with prospective business relations). *Cf. id.* ¶ 228. As with its initial theory, mere duplication of claims cannot sustain an implied-duty theory of liability. *Brown*, 2023 WL 2571729, at *10. To hold otherwise would waste judicial resources by allowing Alexi to needlessly "restate" existing claims. *Ruiz v. Millennium Square Residential Ass'n*, 2022 WL 296200, at *8 (D.D.C. Feb. 1, 2022).

### C. Alexi Fails to Plead "Deprived Fruits of the Contract" Related to Its "False" Interpretation Allegations.

As noted above, in an effort to salvage its implied-duty claim, Alexi's Revised Amended Counterclaims ████████████████████████████████████████████████████████ ████████████████████████████████████ and therefore a violation of Fastcase's implied-duty obligations. Rev. Am. Counterclaims ¶¶ 139–40, 211. In making such

allegations, however, Alexi fails to allege such conduct deprived Alexi of the "fruits of the contract"—a requisite condition for a successful implied-duty claim. *E.g.*, *Sundberg*, 109 A.3d at 1133; *accord Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████     The problem?     █████████████████████████  is not a fruit of the parties' Agreement. Tellingly, Alexi does not even attempt to identify the particular "fruits" it "contracted to receive" under the Agreement. *See Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 979 F. Supp. 2d 26, 32 (D.D.C. 2013), *aff'd*, 774 F.3d 18 (D.C. Cir. 2014).

Merely the existence of a contract between Alexi and Fastcase does not mean that ***any*** dispute between the parties amounts to a violation of the implied duty of good faith and fair dealing under that contract. Simply put, the Agreement promised some fruits but not others. But "[t]he implied duty of good faith . . . does not require a party to waive or rewrite the terms of the contract," *Sibley v. St. Albans Sch.*, 134 A.3d 789, 806 (D.C. 2016), and Alexi's repeated attempts to reframe corollary commercial disputes between the parties is unavailing.

Moreover, even taken as true at this stage, █████████████████████████████

███████████████████████████████████████████     The "backfile" purchase option—an undefined term in the Agreement—does ***not*** mean what Alexi says it does, does ***not*** give an acquirer the ability to use the Fastcase Data without restrictions in the way that Alexi suggests, and does ***not*** give "Alexsei, its Employees, or any third party to this Agreement any rights or claims to any portion of the Fastcase Data." Agreement § 2.3. Accordingly, ████████████████[32]

---

[32] ██████████████████████████████████████████████████████

███████████ as Alexi alleges, *see* Rev. Am. Counterclaims ¶¶ 139–40, 211–12, Alexi's vague and

██████████████████████████████████████████████████████████████. *E.g.*, *Abdelrhman v. Ackerman*, 76 A.3d 883, 892 (D.C. 2013) ("A truthful representation regarding the meaning of the contract could not frustrate [a party's] enjoyment of the benefits of the contract, nor could it fairly be characterized as arbitrary or capricious or made in bad faith."); *accord Weatherly*, 304 A.3d at 596.

And although Alexi disagrees with Fastcase's interpretation of the backfile purchase option, it remains true that communicating an objectionable interpretation of a contested contractual provision does not violate "community standards of decency, fairness or reasonableness." *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013); *accord Allworth*, 890 A.2d at 202 (quotation omitted); Restatement (Second) of Contracts § 205 cmt. a (1981).

At bottom, because Alexi's allegations fail to plead bad faith, are duplicative of its other claims, and fail to establish any interference by Fastcase with Alexi's ability to enjoy the fruits of the parties' Agreement, Alexi's implied-duty counterclaim should be dismissed.

## III. ALEXI FAILS TO STATE COUNTERCLAIMS FOR TORTIOUS INTERFERENCE WITH CURRENT OR PROSPECTIVE BUSINESS RELATIONS.

Finally, Alexi asserts two counterclaims for tortious interference with current and prospective business relations (counts four and five). Because the elements of tortious interference with current and prospective business relations are largely overlapping, they are analyzed in

---

conclusory allegations *still* do not establish bad faith or a "corrupt motive." *Brink v. Xe Holding, LLC*, 2022 WL 3334503, at *6 (D.D.C. May 19, 2022) (requiring "corrupt motive" or "malevolent intent" to sustain implied-duty claim). ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████, and acting arbitrarily, in ***bad faith***, and with corrupt motive and malevolent intent on the other. ████████████████████████ ██████████████████████████████████████████████████████████████████████

tandem.[33]  Under District of Columbia law, a claim for tortious interference requires: "'(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.'" *Xereas v. Heiss*, 933 F. Supp. 2d 1, 11 (D.D.C. 2013) (quoting *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.C. Cir. 2010)); *see NCRIC* 957 A.2d at 900 (outlining the same elements for interference with current business relations).

Alexi seeks to pad its Revised Amended Counterclaims with additional claims but is either unable or unwilling to plead facts plausibly supporting any of the required elements for its interference claims.  Counts four and five should also be dismissed.

### A.    Counterclaim Four Fails Because a Party Cannot Tortiously Interfere with Its Own Contract.

Alexi's fourth counterclaim is yet another impermissible attempt to repackage its breach-of-contract allegations as tortious interference.  Taking the counterclaims on their own terms, Alexi alleges that Clio and vLex—entities it repeatedly treats as interchangeable with Fastcase and as standing in Fastcase's shoes, *e.g.*, Rev. Am. Counterclaims ¶¶ 4, 73, 116, 121, 126, 129, 147, 215—"interfered" with Fastcase's contractual performance by, among other things,

---

[33] *See NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 n.16 (D.C. 2008) ("The elements of tortious interference with prospective business advantage mirror those of interference with contract."); *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986) (explaining that the elements for intentional interference with a prospective business advantage runs parallel); *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 163 (D.D.C. 2010) ("A claim for tortious interference with a prospective transaction … resembles a tortious interference with a contract claim, 'except that the plaintiff must demonstrate the existence, knowledge, and intentional procurement of a breach of a prospective advantageous business transaction instead of meeting those elements as to a contract.'") (citations omitted).

"withhold[ing]" Fastcase data and otherwise "breach[ing]" the Agreement.  *Id.* ¶ 223; *see also id.*
¶¶ 116, 121.

That theory fails as a matter of law.  It is a "hornbook rule that '[a] defendant's breach of
his own contract with the plaintiff is of course not a basis for the tort of interference.'" *Raskauskas
v. Temple Realty Co.*, 589 A.2d 17, 26 (D.C. 1991) (quoting W. Prosser & W.P. Keeton, *Prosser
on Torts*, § 129 at 990 (5th ed. 1984)).  The rule reflects the "common sense notion that a plaintiff
should not be allowed to convert a breach of contract claim into a claim for tortious interference."
*Id.*; *accord Donahoe v. Watt*, 546 F. Supp. 753, 757 (D.D.C. 1982) (a defendant's conduct under
its own contract "may or may not rise to the level of a breach," but "it cannot support an action for
interference with it"); *Bus. Equip. Ctr., Ltd. v. De Jur-Amsco, Corp.*, 465 F. Supp. 775, 788 (D.D.C.
1978); *Koker v. Aurora Loan Servicing*, 915 F. Supp. 2d 51, 65 (D.D.C. 2013).

Because Alexi's fourth claim rests on the same alleged nonperformance that underlies
Alexi's contract claim—and seeks to impose tort liability for that same conduct on parties that
Alexi itself treats as interchangeable with Fastcase—it "fails as a matter of law" and should be
dismissed.[34]  *Koker*, 915 F. Supp. 2d at 65.

---

[34] Alexi's Revised Amended Counterclaims attempt to salvage this claim by briefly calling
vLex and Clio "third parties to the Alexi-Fastcase contract."  *See* Rev. Am. Counterclaims ¶ 223.
That vLex and Clio are formally third parties to the Agreement has never been in dispute, however.
Instead, the more basic issue—as addressed here and in Fastcase's Motion to Dismiss Alexi's
original Counterclaims—is that Alexi's complaint repeatedly and specifically acknowledges that
vLex and Clio have stepped into Fastcase's shoes, making Alexi's tortious interference claim
simply a thin repackaging of its existing breach-of-contract claim and ***still*** a substantive violation
of standard tortious interference principles.  *E.g.*, *id.* ¶¶ 4, 73, 116, 121, 126, 129, 147, 215.

**B.**    **Counterclaim Five Fails Because Alexi Has Not Identified or Sufficiently Pled the Specific Business Relationships or Expectancies at Issue.**

As with count four, Alexi's fifth counterclaim—for tortious interference with prospective business relations—is facially deficient because Alexi has not identified the suite of prospective business relations at issue *or* alleged a reasonably probable expectancy or likelihood of contract.

### 1.    *Alexi fails to adequately specify the prospective business relations at issue.*

At base, Alexi does not adequately identify the customers, contracts, or prospective acquirers with which Fastcase allegedly interfered. "Courts applying District law have regarded allegations of interference with 'unspecified relationships' . . . or with 'hypothetical categories of business relationships' as inadequate to plead the existence of a business relationship or expectancy." *Precision Contracting Sols.*, 415 F. Supp. 3d at 124 (citations omitted). This failure is fatal to Alexi's fifth counterclaim.[35]

Apparently recognizing this defect in its original Counterclaims, Alexi has already pruned one of its tortious interference claims from its Revised Amended Counterclaims, *compare* ECF No. 47-1 ¶¶ 187–91 *with* Rev. Am. Counterclaims ¶¶ 220–24 (striking previously pleaded fourth counterclaim), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This amendment fails to solve the root issue with Alexi's fifth counterclaim, however, which continues to rest primarily on hypothetical business relations and naked speculation.

---

[35] The Court has already identified the same defect in Alexi's allegations. In denying Alexi's request for emergency relief, the Court held that Alexi's asserted harm was "too speculative" and "not sufficiently corroborated to merit emergency relief." ECF No. 28 at 2. Alexi's Counterclaims rely on the same speculative assertions of lost customers and stalled acquisition discussions, again without identifying any specific business relationship or expectancy that was disrupted. That pleading deficiency independently warrants dismissal.

As a threshold matter, Alexi tries to sustain its prospective relations counterclaim on two theories: relations with "prospective clients" and relations with "prospective acquirers." Rev. Am. Counterclaims ¶ 226. But as to the first category, Alexi *still* fails to identify *any* of the "prospective *clients* who were interested in purchasing Alexi's services for AI legal analysis." *Id.* (emphasis added). Even in the absence of the requisite specificity, Alexi nevertheless seeks to support its tortious interference claim on "prospective clients" and "client contracts" whose interest was allegedly affected by the cessation of "daily caselaw updates." *Id.* ¶¶ 226–30. Threadbare allegations that "customers have cancelled," *id.* ¶ 14, fail to plead any facts establishing causation—precisely the sort of conclusory assertions that Rule 12(b)(6) does not permit. *See Iqbal*, 556 U.S. at 678; *see also Williams v. Fed. Nat'l Mortg. Ass'n*, 2006 WL 1774252, at *8 (D.D.C. June 26, 2006) (explaining that, where a plaintiff failed to specifically name the parties with whom the plaintiff had a business expectancy, a claim of interference could not stand).

As to the second category, Alexi's Revised Amended Counterclaims respond to Fastcase's first Motion to Dismiss by identifying two alleged prospective acquirers— ██████████ ███████████████████████████████████████ ██████████████████████████ absent more, also does not fix its claim's deficiencies. For example, Alexi's Revised Amended Counterclaims continue to omit requisite identifying details—such as the stage of acquisition negotiations, the timing of cancellation or cessation of acquisition discussions relative to any alleged interference by Fastcase, or the terms of any alleged letter of intent—to support its claim. *See, e.g.*, *id.* ¶¶ 136, 139–40.

Courts in this District routinely reject such cursory tortious interference allegations. *See, e.g.*, *Xereas*, 933 F. Supp. 2d at 11 (dismissing claim where plaintiff "does not allege any specific future business relations or expectancies and only provides general references to potential

opportunities"); *Sharpe v. Am. Acad. of Actuaries*, 285 F. Supp. 3d 285, 292 (D.D.C. 2018) (dismissing claim for failure to plead "specific contracts or expectancies"); *DC2NY, Inc. v. Acad. Bus, LLC*, 2020 WL 1536219, at *9 (D.D.C. Mar. 31, 2020) (dismissing claim for failure to plead "specific identifying information" or any "facts related to future contracts compromised"); *see also Precision Contracting Sols.*, 415 F. Supp. 3d at 124 ("generic allegations about the existing … business relations affected are insufficient").



Rev. Am. Counterclaims ¶¶ 136, 139. But this is, of course, *post hoc ergo propter hoc*—Alexi alleges only that one event followed the other.

### 2.    *Alexi fails to plead a reasonable expectancy of future business relations.*

Setting aside the foundational defects identified above, Alexi's fifth counterclaim also fails because Alexi does not plead facts sufficient to support any inference that Alexi's alleged prospective business relations or expectancies at issue were reasonably probable.

To state a claim for interference with prospective business relations, a plaintiff must allege "a **probability** of future contractual or economic relationship and **not a mere possibility**." *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012) (citation and quotation marks omitted) (emphasis added); *see also Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56 (D.D.C. 2011) ("reasonable likelihood" is required, and "[m]ere speculative contractual expectations or hope are insufficient") (citations and quotation marks omitted).

Alexi alleges only a mere possibility of prospective business relations. For "prospective clients," Alexi offers only the vague allegation that such parties "were interested in purchasing Alexi's services" or were "seriously considering" acquiring Alexi. Rev. Am. Counterclaims ¶¶ 13, 226. This fails to allege (1) facts showing a reasonably likely future transaction; and (2) any facts demonstrating that Fastcase knew of and intentionally disrupted a specific, identifiable expectancy. *See Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 141 (D.C. 2021).

Likewise, regarding Alexi's allegations as to "prospective acquirers," Alexi alleges only what it included in its original Counterclaims—that, "[o]n information and belief," ▮▮▮▮ (which was previously unidentified) "had secured internal approvals to execute a letter of intent to acquire Alexi, pending a full board vote." Rev. Am. Counterclaims ¶ 136. But just as before, such allegations amount to only the attenuated "hope" that ▮▮▮▮ board would have voted to approve a letter of intent to acquire Alexi—not a ***probability*** that ▮▮▮▮ was going to acquire Alexi.

This simply is not enough to show a commercially reasonable business expectancy; mere speculation that ▮▮▮▮ (or any of the scores of unspecified customers or acquirers that Alexi also attempts to bring to issue) might have entered into a future contract cannot alone sustain Alexi's counterclaim. *See Veolia Transp. Servs.*, 791 F. Supp. 2d at 56; *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*, 820 F. Supp. 2d 62, 77 (D.D.C. 2011).

Ultimately, as with Alexi's first attempt, its amended tortious interference with prospective relations claim continues to be facially deficient and should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Alexi's second, third, fourth, and fifth counterclaims should be dismissed with prejudice.

DATED: April 27, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Paul J. Sampson*
Paul N. Harold (D.C. Bar No. 1032578)
Brendan J. Coffman (D.C. Bar No. 988370)
1700 K. Street NW, Fifth Floor
Washington, DC 20006-3814
Telephone: (202) 973-8800
PHarold@wsgr.com
BCoffman@wsgr.com

Jess M. Krannich (*pro hac vice*)
Paul J. Sampson (D.C. Bar No. 1010457)
Rebecca J. Nelson (*pro hac vice*)
Andrew P. Follett (*pro hac vice*)
Isabella Ang (*pro hac vice*)
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
JKrannich@wsgr.com
PSampson@wsgr.com
RNelson@wsgr.com
AFollett@wsgr.com
IAng@wsgr.com

*Counsel for Plaintiff Fastcase Inc. and Counter-Defendants Fastcase Inc., vLex, LLC, and Themis Solutions Inc.*

-46-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2026, the foregoing was electronically filed through this

Court's CM/ECF system and additionally all counsel of record were served via electronic mail.


Respectfully submitted,

*/s/ Jessica Johnsen*
Executive Assistant