**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ALEXI TECHNOLOGIES INC.,<br><br>Defendant. | C.A. No. 1:25-CV-04159-RJL |
| ALEXI TECHNOLOGIES INC.<br><br>Counterclaim Plaintiff,<br>v.<br><br>FASTCASE, INC., VLEX, LLC, &<br>THEMIS SOLUTIONS INC.,<br><br>Counterclaim Defendants. | |

**ALEXI TECHNOLOGIES INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **4**

A. Alexi and Fastcase Offer Fundamentally Different Services .......... 4

B. Alexi Licenses Fastcase Data For Its AI-Powered Legal Analysis .......... 6

C. Fastcase Has Long Known About Alexi's AI-Focused Service .......... 8

D. Alexi's Narrative Outputs And Use Of The Fastcase Data Remain Unchanged Alongside Its Technological Improvements .......... 10

E. Alexi's Linking to Fastcase Cases in Memos .......... 13

F. [redacted]

G. vLex Sends Breach Letter and Clio Directs this Litigation .......... 18

H. Mr. Walters Tells Potential Acquirers They Will Not Get Access to Fastcase Data .......... 20

**LEGAL STANDARD** .......... **20**

**ARGUMENT** .......... **21**

I. FASTCASE'S BREACH OF CONTRACT CLAIM (COMPLAINT COUNT I) FAILS AS A MATTER OF LAW .......... 21

A. Alexi's Use of The Fastcase Data Complied With Section 1.7 .......... 22

**i. Alexi uses the Fastcase data for "internal research purposes."** .......... 22

**ii. Alexi has not used the data for impermissible "commercial purposes."** .......... 25

**iii. Alexi has never offered a product that is "competitive with Fastcase"** .......... 26

B. Fastcase's Other Breach Theories Likewise Fail .......... 29

i. Alexi is not limited to "memo" outputs to customers .......... 29

ii. Alexi did not distribute or improperly display Fastcase cases .......... 30

C. Fastcase's Breach Claim Is Foreclosed By The Parties' Four-Year Course Of Conduct .......... 32

II. FASTCASE INDEPENDENTLY BREACHED THE AGREEMENT (COUNTERCLAIM COUNT I) ....35

A. Fastcase Breached The Agreement By Wrongfully Terminating Without Providing Alexi The Required Notice and Opportunity To Cure ....35

B. Fastcase Breached The Agreement By Ceasing The Required Daily Data Updates ....39

III. FASTCASE BREACHED OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (COUNTERCLAIM COUNT II) ....40

IV. ALEXI IS ENTITLED TO SUMMARY JUDGMENT ON ITS TORTIOUS INTERFERENCE WITH CURRENT BUSINESS RELATIONS CLAIM (COUNTERCLAIM COUNT IV) ....43

CONCLUSION ....45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*240 W. 37th LLC v. BOA Fashion, Inc.*,
899 N.Y.S.2d 63, 2009 WL 2603146 (App. Term 2009) ....................38

*In re 4Kids Ent., Inc.*,
463 B.R. 610 (Bankr. S.D.N.Y. 2011) ....................40

*Allworth v. Howard Univ.*,
890 A.2d 194 (D.C. 2006) ....................41, 43

*Am. First Inv. Corp. v. Goland*,
925 F.2d 1518 (D.C. Cir. 1991) .................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................21

*Aziken v. D.C.*,
70 A.3d 213 (D.C. 2013) ....................24

*B & H Nat. Place, Inc. v. Beresford*,
850 F. Supp. 2d 251 (D.D.C. 2012) ....................21, 40

*Bausch & Lomb Inc. v. Bressler*,
977 F.2d 720 (2d Cir. 1992) ....................40

*Beacon Assocs., Inc. v. Apprio, Inc.*,
308 F. Supp. 3d 277 (D.D.C. 2018) ....................40

*C & E Servs., Inc. v. Ashland Inc.*,
601 F. Supp. 2d 262 (D.D.C. 2009) ....................41

*Cain Rest. Co. v. Carrols Corp.*,
273 F. App'x 430 (6th Cir. 2008) ....................30

*Cedar Rapids Television Co. v. MCC Iowa LLC*,
524 F. Supp. 2d 1127 (N.D. Iowa 2007) ....................36, 38

*Clark v. Bank of Am., N.A.*,
561 F. Supp. 3d 542 (D. Md. 2021) ....................32

*Close It! Title Servs., Inc. v. Nadel*,
248 A.3d 132 (D.C. Cir. 2021) ....................44

*Columbia Hosp. for Women & Lying-In Asylum v. U.S. Fid. & Guar. Co.*,
188 F.2d 654 (D.C. Cir. 1951) ....................................................................................23

*CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*,
325 A.3d 1235 (D.C. 2024) .........................................................................................30

*Crowell v. Gould*,
96 F.2d 569 (D.C. Cir. 1938) ......................................................................................31

*Debnam v. Crane Co.*,
976 A.2d 193 (D.C. 2009) .....................................................................................21, 22

*Deffenbaugh Industries, Inc. v. Unified Government of Wyandotte County*,
2023 WL 4363439 (10th Cir. July 6, 2023) ................................................................39

*Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*,
109 F. Supp. 3d 179 (D.D.C. 2015) ...........................................................................33

*Dyer v. Bilaal*,
983 A.2d 349 (D.C. Cir. 2009) ...................................................................................22

*Farmland Indus., Inc. v. Grain Bd. of Iraq*,
904 F.2d 732 (D.C. Cir. 1990) ....................................................................................21

*Fed. Trade Comm'n v. Surescripts, LLC*,
665 F. Supp. 3d 14 (D.D.C. 2023) .............................................................................44

*Fed. Trade Comm'n v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) .......................................................................27

*Florence Urgent Care v. Healthspan, Inc.*,
445 F. Supp. 2d 871 (S.D. Ohio 2006) .......................................................................42

*Hart v. Vermont Inv. Ltd. P'ship*,
667 A.2d 578 (D.C. 1995) ..........................................................................................23

*Henok v. Chase Home Fin*,
922 F. Supp. 2d 110 (D.D.C. 2013) ...........................................................................36

*Holland v. Freeman United Coal Mining Co*.,
574 F. Supp. 2d 116 (D.D.C. 2008) ...........................................................................21

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
24 F. Supp. 3d 32 (D.D.C. 2014) ...............................................................................44

*IP Global Investments America, Inc. v. Body Glove IP Holdings, LP*,
2018 WL 5983550 (C.D. Cal. Nov. 14, 2018) .......................................................38, 39

*Keepseagle v. Perdue*,
856 F.3d 1039 (D.C. Cir. 2017) ....................26

*Landmark Health Sols., LLC v. Not For Profit Hosp. Corp.*,
950 F. Supp. 2d 130 (D.D.C. 2013) ....................41

*LanQuest Corp. v. McManus & Darden LLP*,
796 F. Supp. 2d 98 (D.D.C. 2011) ....................34

*Legion Sys., LLC v. Valiant Glob. Def. Servs., Inc.*,
2021 WL 3633592 (M.D. Fla. Aug. 17, 2021) ....................42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................21

*Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.*,
284 F. Supp. 2d 964 (N.D. Ill. 2003) ....................36

*Nest & Totah Venture, LLC v. Deutsch*,
31 A.3d 1211 (D.C. 2011) ....................33

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*,
298 F. Supp. 2d 81 (D.D.C. 2004) ....................34, 35

*Ramsey v. United States Parole Comm'n*,
840 F.3d 853 (D.C. Cir. 2016) ....................33

*Retail Clerks Int'l Ass'n Loc. No. 455, AFL-CIO v. N. L. R. B.*,
510 F.2d 802 (D.C. Cir. 1975) ....................26

*SJ Enterprises, LLC v. Quander*,
207 A.3d 1179 (D.C. 2019) ....................35

*Taub v. World Financial Network Bank*,
950 F. Supp. 2d 698 (S.D.N.Y. 2013) ....................32

*Ulla-Maija, Inc. v. Kivimaki*,
2005 WL 2429490 (S.D.N.Y. Sept. 30, 2005) ....................38

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ....................27, 43

*United States v. West*,
392 F.3d 450 (D.C. Cir. 2004) ....................28

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) ....................24

*Utils. & Indus. Corp. v. Palisades Interstate Park Comm'n*,
258 N.Y.S. 2d 700 (N.Y. Sup.Ct. 1965) .......... 30

*Wharf, Inc. v. D.C. Wharf Horizontal Reit Leaseholder LLC*,
2021 WL 1198143 (D.D.C. Mar. 30, 2021) .......... 21, 27

*Whitt v. Am. Prop. Constr., P.C.*,
157 A.3d 196 (D.C. Cir. 2017) .......... 44

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
288 F. Supp. 3d 176 (D.D.C. 2018) .......... 42

*Wright v. Eugene & Agnes E. Meyer Found.*,
68 F.4th 612 (D.C. Cir. 2023) .......... 22

*Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*,
2011 WL 307617 (N.D. Ill. Jan. 28, 2011) .......... 30

**Other Authorities**

17B C.J.S. Contracts § 446 (2002) .......... 36

*Distribute*, Black's Law Dictionary (12th ed. 2024) .......... 32

Fed. R. Civ. P. 30(b)(6) .......... 8, 13, 19, 25

Merriam Webster, *Internal*, www.merriam-webster.com/dictionary/internal .......... 23

*Publish*, Black's Law Dictionary (12th ed. 2024) .......... 31

Restatement (Second) of Contracts § 202(4) (1981) .......... 33

Restatement (Second) of Contracts § 202 cmt. b (1981) .......... 28

Restatement (Second) of Torts § 8A, 776 cmt. .......... 44

## INTRODUCTION

This case does not arise from a bona fide dispute over a contract, but rather from Plaintiff Fastcase's desire to placate an acquiror [redacted] It is undisputed that Fastcase and counterclaim defendant Themis Solutions, Inc. (d/b/a "Clio") entered into a merger agreement [redacted].

That left Fastcase and vLex with only one viable path [redacted] as the undisputed evidence shows, they immediately manufactured a pretextual breach of contract claim (which they *still* haven't clearly articulated), gave Alexi no reasonable notice or opportunity to cure, and then filed this lawsuit. Although Fastcase never had any good faith basis for its claims, this litigation *itself* was always the point: [redacted] but the lawsuit torpedoed Alexi's business, gave Fastcase the fig leaf it needed to tortiously destroy a transformative merger opportunity for Alexi, and now threatens to permanently remove a potential competitor of Clio's from the chessboard. The Court should grant summary judgment against Fastcase on its breach claim and in favor of Alexi on its contract-related claims.

The Agreement itself is straightforward and short. It unambiguously permits Alexi to use Fastcase's caselaw database for its AI-driven legal memo service. It bars Alexi from replicating Fastcase's business model and commercializing its data on a platform similar and competitive to the one Fastcase offers (which allows a user to search directly for cases and authority using Boolean terms). And it plainly and explicitly gives any acquirer of Alexi the option to purchase Fastcase's entire caselaw backfile for [redacted] "with no restrictions."

It was this later provision which triggered the series of events giving rise to this lawsuit. Soon after Clio agreed to pay $1 billion to acquire the vLex/Fastcase primary-law database that

Fastcase's founder and former CEO, Ed Walters, called the "most comprehensive law library in the history of the world, maybe in the history of universe," it learned of the backfile option and sprang into action. After all, Clio could not allow the Fastcase U.S. dataset of some 15 million cases—coupled with Alexi's "[redacted]" technology, as Mr. Walters described it—to fall into the hands of a competitor for a mere [redacted]

Specifically, in late June 2025, with the high-stakes merger agreement just days away, [redacted] vLex's top executives immediately began strategizing whether [redacted] namely, to concoct a claim that Alexi breached the Agreement. And vLex did just that: when Alexi refused to surrender its contractual rights to the backfile for nothing in return, Fastcase manufactured a vague and inscrutable breach claim ostensibly based upon use cases it had known about (and publicly celebrated) for years, and then used that "breach" to terminate the Agreement for cause.

The pretextual nature of Fastcase's breach claim is beyond dispute. For nearly four years, Alexi used the Fastcase data exactly as the parties understood and intended—to power its AI legal research memo product, which it then sold to legal consumers. Fastcase not only knew all along about Alexi's core mission to use AI to "fully automat[e] the production of legal research memoranda," Ex. 1, FC-0000014241 at 244, Fastcase actively supported that mission—even honoring Alexi's CEO and co-founder Mark Doble as a "Fastcase 50 Honoree" in 2023 for Alexi's technological achievements. Yet with the Clio acquisition on the line, Fastcase turned on a dime (10 billion dimes, if we're counting) and suddenly asserted—for the first time—that Alexi's longstanding technology and business model (providing AI-generated, narrative-style legal memos in response to users' legal research questions) breached the Agreement.

Simply put, this was not a good faith allegation: as the undisputed evidence unequivocally demonstrates (and as vLex and Fastcase knew well at the time), Alexi had always complied with

the letter and spirit of the Agreement. Indeed, [redacted] Alexi only ever used the Fastcase caselaw data for "internal research purposes" consistent with the Agreement, and never sold or sublicensed Fastcase data or offered anything resembling a traditional legal research platform that competed against Fastcase. On the contrary, Alexi has used the Fastcase data as an internal input for the proprietary, narrative-style legal memos that Alexi has created and provided to its customers since the very first day the Agreement was in place. Using the Fastcase caselaw data to power Alexi's AI analysis services does not breach the Agreement; it is the entire reason that Alexi licensed the data in the first place.

In its mad rush to eliminate Alexi's backfile purchase option, Fastcase itself breached the Agreement and its implied covenant of good faith and fair dealing. Fastcase improperly terminated the Agreement based on a fabricated and generalized breach claim that failed to give Alexi the contractually required notice and opportunity to cure. Indeed, as discovery has now shown, vLex's breach letter was vague by design. Indeed, one of its senior executives admitted in an ordinary-course chat that its strategy was to claim breach and [redacted] After all if vLex couldn't find a way to terminate, vLex would be [redacted] The ineffective breach notice provides an independent basis, standing alone, to find that Fastcase breached the contract as a matter of law.

Piling injury on top of injury, Fastcase then stopped providing Alexi the daily caselaw updates that it was contractually obligated to provide—thus hamstringing Alexi's flagship legal analysis service, which depends on comprehensive and up-to-date caselaw, and causing it severe and accumulating harm.

Clio and vLex have also committed tortious interference by the clear terms of their acquisition agreement, [redacted] They knew of the Agreement, intentionally required Fastcase to terminate it and sought to discuss

that termination with Alexi's potential acquirers—and knew that by doing so, the termination certain or substantially certain to interfere with Alexi's business. This is Tortious Interference 101.

The Court should grant summary judgment against Fastcase and dismiss its breach claim (Complaint Count I) as a matter of law. And the Court should enter summary judgment in favor of Alexi on its contract-related claims, because Fastcase breached the Agreement (Counterclaim Count I); Fastcase breached the implied covenant of good faith and fair dealing (Counterclaim Count II); and vLex and Clio wrongfully induced Fastcase to breach the Agreement (Counterclaim Count IV).

## BACKGROUND

### A. Alexi and Fastcase Offer Fundamentally Different Services

Alexi is a Toronto-based AI company that has consistently described its mission as fully automating legal memo drafting through AI models. *See* Alexi's Statement of Undisputed Material Facts ("SUMF") ¶¶ 1-2, 27. Since 2019, Alexi has publicly described its service as "Legal Mem¶os. On Demand," touting an "advanced artificial intelligence platform" that "reviews and synthesizes millions of documents" to deliver "affordable and high-quality answers to legal questions in memo format." Ex. 4, Legal Memos. On Demand., Alexi, https://perma.cc/6H5Y-FGA7; Ex. 5, Alexsei,[1] Creative Destruction Lab (Dec. 1, 2021), https://web.archive.org/web/20211201122900/https://creativedestructionlab.com/companies/alexsei/; *see* SUMF ¶ 2.

Fastcase operates one of three comprehensive primary-law databases in the United States (along with Westlaw and LexisNexis), [redacted]. *See* SUMF ¶¶ 9, 10. Fastcase not only sold credentials for lawyers to access its legal research platform for direct legal

[1] Alexi changed its name from Alexsei in 2023. Ex. 2, Doble Tr. 63:17-64:10.

research, it also licensed its raw caselaw data feeds to legal tech companies and other third parties. *Id.* ¶ 12.

Fastcase considered licensing its caselaw data to legal tech innovators like Alexi to be part of the company's [redacted] and entered [redacted] of such deals with legal tech upstarts over the years. Ex. 13, Walters Tr. 48:19–49:1; *see also* SUMF ¶¶ 14-15. Indeed, [redacted] *Id.* ¶ 13.

Alexi and Fastcase offer fundamentally different services. In response to user legal research questions, Alexi harnesses AI technology to provide narrative-style legal answers in memo format. Ex. 7, ALEXI_0417684 (2022 sample memo); Ex. 8, ALEXI_0417859 (2026 sample memo). Alexi's narrative answers reflect its own selection and analysis of the most relevant cases to a user's legal question; Alexi users cannot conduct their own caselaw searches through the Alexi platform. *See* SUMF ¶¶ 3-7. Fastcase, by contrast, offers a traditional legal database where users conduct direct Boolean searches of the Fastcase database and receive, in response, links to cases that they can read and analyze on their own. [redacted] *Id.* ¶ 21.[2] Indeed, Fastcase documents confirm that Alexi "[redacted]" Ex. 41, FC-0000014545; *see also* SUMF ¶ 96. As Mr. Patz Vineyard said at his deposition, [redacted] Ex. 3, Patz Tr. 234:32-236:5; *see also* SUMF ¶ 64; Ex. 27 FC-0000014656 at 657 (Fastcase document noting that Alexi's business [redacted]

---

[2] vLex and Clio both have built generative AI features, which provide users with AI-generated narrative responses to legal research questions. But neither vLex nor Clio was a party to the Data License Agreement, and both mergers occurred years after the Agreement was signed. Accordingly, Fastcase is not arguing (and nor could it) that Alexi breached the Agreement by competing with vLex or Clio's AI analysis products. Ex. 13, Walters Tr. 140:15-21.

During expedited discovery, Fastcase could not identify a single customer of its traditional legal database that it lost to competition from Alexi. SUMF ¶ 97. On the contrary, Mr. Walters—who has taught a course on AI and legal ethics at Georgetown Law for more than a decade—testified tha[redacted] Ex. 13, Walters Tr. 68:5-71:11, 72:11-73:3.

### B. Alexi Licenses Fastcase Data For Its AI-Powered Legal Analysis

As a Toronto-based company, Alexi first launched its service in Canada. By 2019, Alexi began to consider entering the U.S. market and had discussions with Fastcase about purchasing or licensing caselaw data. After Fastcase CEO Ed Walters reached out to Mr. Doble on LinkedIn in November 2019, Mr. Doble responded by describing Alexi as a "legal research AI startup based in Toronto and currently planning a launch in the US Market." Ex. 19, Linkedin Message. Mr. Walters was enthusiastic about the potential partnership. Ex. 13, Walters Tr. 205:22-206:1; *see also* Ex. 47, FC-000002584 (replying to Ms. Jack: [redacted]).

By 2021, Alexi was seriously pursuing U.S. expansion but needed access to a primary law database to do so. Mr. Doble again reached out to Fastcase, explaining "[redacted]" Ex. 22, FC-0000002737 at 737. In October 2021, Mr. Doble wrote to Mr. Walters that Alexi was "an ***AI company fully automating the production of legal research memoranda***." Ex. 1, FC-0000014241 at 244 (emphasis added). Mr. Walters replied that Fastcase was [redacted]," noting that "[s]upporting the legal tech ecosystem is an important part of what we are." Ex. 23, FC-0000002537; Ex. 13 Walters Tr. 205:2-10. Internally, Fastcase was enthusiastic about the prospect of a licensing deal with another AI startup. As Fastcase COO Steve Errick put it: [redacted] Ex. 1, FC-0000014241.

On December 6, 2021, Fastcase and Alexi entered into the Data License Agreement at the heart of this case.

Fastcase drafted the Agreement, SUMF ¶ 30, [redacted] *Id.* ¶ 32. Fastcase drafted every term, and Alexi signed without modification. *Id.* ¶ 31.[3]

Under the Agreement, Fastcase licensed its U.S. caselaw data and agreed to provide daily updates of new federal and state judicial opinions as they were decided. Ex. 10, Agreement § 3.1. The Agreement's recitals state that "Fastcase desires to license to Alexsei substantial portions of its database of primary law for Alexsei's legal memos." *Id.*, Agreement at 1.

**Section 1.7 of the Agreement** defines the "Purpose" for which Alexi may use the Fastcase caselaw data as follows:

> "Purpose" means the limited purpose for which Alexsei may use the Fastcase Data, namely for internal research purposes. In no event can the data be used for commercial purposes or for any purpose which is competitive with Fastcase.

Fastcase's Mr. Patz Vineyard—who wrote the Agreement—described the "[l]icense restrictions" as prohibiting the "bulk sale" of Fastcase data and ensuring that "content cannot be made available through traditional legal research product like Fastcase." Ex. 26, FC-0000002532 at 532; accord Ex. 1, FC-0000014241 at 243; see also SUMF ¶¶ 38-39; Ex. 44, FC-0000000793 [redacted] Ex. 3, Patz Tr. 123:5-10 [redacted]

[3] Although the second "Whereas" clause in the Agreement refers to Alexi [redacted] *See* SUMF ¶ 32-33 It is undisputed that Fastcase knew Alexi was a for-profit startup looking to sell legal memos, on a commercial basis, to U.S. lawyers and law firms. *Id.* ¶ 34. Indeed, Fastcase removed other references to [redacted] *Id.* ¶ 35.

Importantly, the Agreement also contained a provision that allowed an acquirer of Alexi to purchase the Fastcase caselaw "backfile" "with no restrictions" for [redacted] **Section 12.3** states in pertinent part:

> [redacted] Upon an instance of acquisition or change of control of Alexsei, the acquiring party will have the option to purchase the Fastcase backfile with no restrictions for [redacted]

Ex. 10, Agreement § 12.3.

In the negotiations preceding the December 2021 Agreement, Fastcase understood the post-acquisition backfile purchase option was valuable to Alexi. SUMF ¶ 59. As Mr. Walters (testifying as Fastcase's Rule 30(b)(6) corporate representative) said, [redacted] [4] Ex. 13, Walters Tr. 220:2-23; SUMF ¶ 60.

### C. Fastcase Has Long Known About Alexi's AI-Focused Service

For nearly four years after the Data License Agreement was signed in December 2021, Alexi and Fastcase enjoyed a mutually beneficial partnership—with Fastcase never raising any concern over Alexi's use of the Fastcase data to power its AI-generated legal analysis. Ex. 13, Walters Tr. 355:11-16. Alexi has paid Fastcase nearly [redacted] in licensing fees over the course of the Agreement and, at the time of Fastcase's merger with vLex in April 2023, [redacted] Ex. 42, FC-0000015846 at 847.

---

[4] Although the term "backfile" is undefined in the Agreement, Fastcase's corporate designee, Mr. Walters, testified that [redacted] Ex. 13, Walters Tr. 290; *see also* Patz Tr. 60:15-61:5, 68:2-16.

Fastcase's communications confirm ongoing awareness of—and support for—Alexi's business. Ms. Jack [redacted]. Ex. 43, FC-0000002570 at 570. Fastcase COO Steve Errick [redacted] *Id.* In January 2023, Ms. Jack [redacted] Ex. 12, Jack Tr. 130:20-131:23; Ex. 47, FC-0000002584 at 585. And in early 2023, Fastcase executives discussed whether Alexi was [redacted]—to which Mr. Patz Vineyard responded: [redacted] [x. 45, FC-00000014480. Classroom materials kept by Fastcase CEO Mr. Walters, for his "Law of Robots" course, used Alexi as an example of a [redacted] that [redacted] Ex. 49, FC-0000008088.

After vLex acquired Fastcase in April 2023, Mr. Doble emailed vLex CEO Lluis Faus to congratulate him, explaining: "[redacted] once again disclosing and underscoring Alexi's laser-focus on AI technology. Ex. 53, FC-0000003533 (emphasis added); Ex. 18, Faus Tr. 94:9–14. In September 2023, vLex executives tested for themselves Alexi's AI-generated memo functionality: Global Head of Product Robin Chesterman signed up for a trial subscription and received a 29-page, AI-generated memo within a few hours. SUMF ¶¶ 135-36. In an email chain with nine other executives discussing the Alexi memo, vLex's Tom Atkinson noted Alexi's improving technology: "[redacted]

[redacted] Ex. 54, FC-0000027291 at 93.[5]

Far from objecting to Alexi's AI technology, Fastcase celebrated it. In Fall 2023, Fastcase honored Alexi's CEO as a "Fastcase 50 Honoree"—an award that Mr. Walters created more than a decade ago to highlight legal tech innovators through a merit-based selection process that it is not "[redacted]," like many legal industry awards. Ex. 13, Walters Tr. 259:18-261:10. A committee at vLex and Fastcase selected Mr. Doble as an award winner, *id.*, citing his work in creating an AI tool "trained on an extensive dataset of more than 30 million pairs of legal questions and answers" that "swiftly delivers answers in a clear, concise memo format." Ex. 50, FC-0000012250 at 255-56; SUMF ¶ 111.[6] Mr. Patz Vineyard emailed Mr. Doble to congratulate him [redacted] Ex. 51, ALEXI_0006528; SUMF ¶ 112.

**D. Alexi's Narrative Outputs And Use Of The Fastcase Data Remain Unchanged Alongside Its Technological Improvements**

Since launching in the U.S. in 2022, Alexi's technology has rapidly improved alongside the rise of large language models, or LLMs, such as ChatGPT. *See* SUMF ¶¶ 64-80. But importantly, the output that Alexi provides to its users in response to legal research questions (a narrative-style memo) and Alexi's use of the Fastcase data to produce those memos (internal programmatic research) have remained the same. *Id.* ¶¶ 93-94.

---

[5] At the time Mr. Chesterman signed up for the trial subscription to Alexi, vLex was poised to launch an update to its Vincent AI legal assistant, which allowed it to conduct legal analysis. *See* SUMF ¶¶ 139-40. As noted, Fastcase does not argue that Alexi breached the Agreement by competing with Vincent.

[6] As of May 29, 2026, the vLex-Clio website still features Mr. Doble as a member of the Fastcase 50 with this exact language, also noting that "Mark trained an AI tool to have an understanding of the law so that it could answer research questions more efficiently and accurately—thus founding Alexi." *See* vLex, *2023 vLex Fastcase 50 Honorees*, https://perma.cc/C4N4-MKKP; SUMF ¶ 112.

From the start, Alexi developed a proprietary passage-retrieval AI system (or "research agent") that used vector-based search techniques[7] to identify and retrieve the most relevant and authoritative cases in response to a user's legal question. SUMF ¶ 66. To develop this system, Alexi used pairs of questions and "answers," via relevant passages of caselaw. Ex. 28, Abramson Tr. 99:7-100:4. Each pair included a "[redacted]" *Id.*, Abramson 91:24-92:2. Alexi's September 2022 company overview described this Q&A mapping as "[redacted]" Ex. 6, ALEXI_0083467 at 477-78.

In 2022, at the outset of the Data License Agreement, Alexi's technology was not advanced enough to provide fully automated, reliable legal memos. Alexi thus employed a [redacted] Ex. 29, Sharp Tr. 16:6-16. Before Alexi memos were sent to clients, [redacted] SUMF ¶ 70. After receiving a memo, users could ask additional questions and request as many follow-up memos [redacted] Ex. 9, King Tr. 24:10-14; *see* SUMF ¶ 7.

In October 2023, Alexi released its "Instant Memos" product—realizing its goal to fully automate legal memos—with an accompanying public rollout. SUMF ¶¶ 72, 73.[8] Instant Memos

---

[7] Alexi's vector-based model [redacted]. SUMF ¶ 66 n.1. These models would not retrieve cases directly but retrieved mathematical representations of passages that answered the user's question and then mapped them back onto cases. Ex. 28, Abramson 99:7-21.

[8] Tyler Shepherd, *Alexi, An Advanced AI Platform, Is Set To Revolutionize The Legal Industry*, USA Today (Dec. 3, 2023) ("Alexi offers two categories of memos: 'Instant Memos' and 'Pro Memos.' Instant Memos are entirely AI-drafted and can be produced within 5 minutes, a significant advancement in the legal industry."), www.usatoday.com/story/special/contributor-content/2023/12/07/alexi-an-advanced-ai-platform-is-set-to-revolutionize-the-legal-industry/71837972007/.

tied together [redacted] Ex. 28, Abramson Tr. 117:11-123:3; *see* SUMF ¶ 74. Whereas Alexi's human-reviewed memos typically took several hours to complete, Ex. 2, Doble Tr. 14:14-22, Instant Memos generally were delivered to customers within 200 seconds, SUMF ¶ 76. After the rollout of Instant Memos, users who still wanted a human-reviewed memo could request a "Pro Memo." *See* SUMF ¶ 76.

Although the speed and capability of Alexi's technology rapidly improved, Alexi's use of Fastcase data remained unchanged. With Instant Memos, [redacted] SUMF ¶ 74; Ex. 28, Abramson Tr. 124:14-18, 125:12-15, and customers still received a narrative-style memo, reflecting Alexi's proprietary analysis, that looked no different than the previous memos that included individualized human review. *Compare* Ex. 7, ALEXI_0417676 (Feb. 2022 Pro Memo) *with* Ex. 8, ALEXI_0417830 (Sept. 2025 Instant Memo). Likewise, the consumer interface remained the same before and after the launch of Instant Memos—with the only change that customers had the option to select an "Instant Memo" or a "Pro Memo" by selecting a button in the user interface. Ex 52, ALEXI_0000463 at 464; Ex. 28, Abramson Tr. 124:2-125:15.

In February 2024, Alexi launched its first "Chat" product, followed by Alexi's Advanced Legal Reasoning ("ALR") platform in January 2025. With ALR, Alexi created a streamlined interface where users enter queries into a single search bar. SUMF ¶¶ 82-83. ALR has [redacted] *Id.* ¶ 84-86. If a user asks a question that does not require caselaw research—such as the weather in Washington, D.C.—ALR will [redacted] without accessing or reviewing any primary caselaw. *Id.* ¶ 84. By contrast, if a user asks a legal research question—such as the leading cases on antitrust standing in the D.C. Circuit—ALR will provide a narrative memo response featuring Alexi's proprietary analysis of the most relevant cases, just as Alexi has done since the beginning

of the Agreement. *Id.* ¶ 86. The memo output is populated in the chat interface, where users can download the memo (as a Word document or PDF); forward the memo via email; or ask follow-up questions. Users cannot directly search the Fastcase database—such as by running direct Boolean or natural language searches for cases, as they can with a traditional legal database service—through ALR. *See* SUMF ¶ 95.

**E. Alexi's Linking to Fastcase Cases in Memos**

Since the beginning of the Agreement, Alexi has provided links to Fastcase cases so that Alexi users can read and verify the cases cited in Alexi's memos.

At first, Alexi used Fastcase's public linking feature, *see* SUMF ¶ 117, which directed users to the free public version (i.e., non-paywalled version) of Fastcase cases on the Fastcase website. Fastcase did not object to Alexi's use of public linking. *Id.* ¶ 118. But the links expired after 90 days, resulting in a poor user experience for customers looking to review prior memos. *Id.* ¶ 119. To fix this user-experience issue, in 2022, Alexi began to display the text of Fastcase cases, cited in Alexi's memos, within the Fastcase platform. *Id.* ¶¶ 125-27.

Before enabling the display feature, Mr. Doble sought permission from Fastcase's Nina Steinbrecker Jack. On a phone call between Mr. Doble and Ms. Jack, Ms. Jack said that Fastcase had no problem with Alexi displaying the text of Fastcase cases cited in Alexi's memos in this way. *Id.* ¶¶ 121-24. In their depositions, both Ms. Steinbrecker Jack and Fastcase's Rule 30(b)(6) witness did not [redacted] *Id.* ¶ 123.

When vLex signed up for a trial subscription to the Alexi platform in September 2023, *see supra* Background C, it saw for itself that "[redacted]," Ex. 54, FC-0000027291; *see* SUMF ¶¶ 135-36, and raised no objections to the display of Fastcase cases for more than two years afterwards. SUMF ¶ 128. On the contrary, vLex's Mr. Chesterman observed

that Alexi providing links to the Fastcase website was "[redacted]" to Fastcase. Ex. 54, FC-0000027291 at 292; *see* SUMF ¶ 138.

[redacted]

On June 30, 2025, Clio entered into a merger agreement to acquire vLex (which included Fastcase as its wholly owned subsidiary) for $1 billion. SUMF ¶¶ 18, 142. Clio is a leading provider of cloud-based practice management software for law firms and, like many tech companies, has aggressively pivoted toward AI. Ex. 11, Newton Tr. 249:22–250:22; Ex. 80. Mr. Newton told *The Financial Post* that AI "was the catalyst" for the vLex acquisition, which positioned Clio "as an AI-first company with an unrivalled 'data moat,'" (Ex. 80) by giving it control over the vLex-Fastcase primary-law database, Ex. 13, Walters Tr. 257 (calling the vLex-Fastcase database "the most broad, deepest, most comprehensive law library in the history of the world, maybe in the history of universe."). Consistent with Clio's objective to build a "data moat" around its legal AI offerings, Clio has no intention to license the Fastcase caselaw data to legal-tech competitors, as Fastcase had done for many years. Ex. 14, FC-000000012813 (Clio COO Ronnie Gurrion: [redacted]; Ex. 11, Newton Dep Tr. 272:12-19 (testifying that [redacted]

During due diligence before the merger agreement was signed, Clio discovered the Data License Agreement's backfile purchase option—allowing an Alexi acquirer to purchase the Fastcase backfile "with no restrictions" for [redacted]—and immediately raised alarm bells. SUF ¶¶ 147-48. On June 27, 2025, Mr. Newton wrote to vLex CEO Mr. Faus that this option was [redacted] Ex. 56, FC-0000027848 at 848. With the $1 billion acquisition just days away, Mr. Faus messaged other executives at vLex that Clio had flagged the [redacted]

[redacted] Ex. 57, FC-0000027457 at 457.[9] vLex's Chief Commercial Officer James McCallion responded: "[redacted]" *Id.* (emphasis added). At his deposition, Mr. Faus conceded that [redacted] Ex. 18, Faus Dep Tr. 216:17-21. In the same chat exchange, Mr. McCallion suggested that vLex should claim that Alexi breached the Agreement and [redacted]—or else vLex would be [redacted] (i.e., if Alexi cured the alleged breach and prevented Fastcase from terminating). Ex. 57, FC-0000027457 at 457.

[redacted]

Ex. 17, FC-0000011469. [redacted]. *Id.*).

Clio's CEO Mr. Newton testified that [redacted] Ex. 11, Newton Tr.

---

[9] At the time Clio signed the merger agreement, Mr. Newton believed [redacted] Ex. 11, Newton Tr. 128:5–7, although [redacted]

117:9–17; *id.* at 118-11-13 [redacted] Mr. Newton testified that the provision obligated vLex [redacted] Newton Tr. 132:6-15; *id.* 133:9-15.

Indeed, in a later Slack conversation (dated August 22, 2025), Mr. Newton wrote to this COO and #2 executive, Ronnie Gurrion, that [redacted]—referring to the backfile purchase option—and confirmed Clio's intent to force termination of the Agreement. Ex. 59, FC-0000000266 at 266 (Mr. Gurrion asking whether to [redacted]—to which Mr. Newton responded: [redacted]

Consistent with its obligation under the merger agreement, as the closing date (November 10, 2025) approached, vLex/Fastcase pressured Alexi to surrender its backfile purchase right. *See* SUMF ¶¶ 160-65. Mr. Newton encouraged a [redacted] conversation between Mr. Walters (Fastcase co-founder) and Mr. Doble (Alexi co-founder) to this end. SUMF ¶ 160.

On June 30—the day the merger agreement between Clio and vLex was signed and announced—Mr. Walters emailed Mr. Doble to [redacted] and assure him that there [redacted] in Fastcase's caselaw data delivery and that [redacted] Ex. 81, FC-0000003414; *see* SUMF ¶¶ 156-57. Mr. Walters made no mention of any breach allegation or concern over how Alexi was using the Fastcase data. *Id*. Mr. Doble reached back out to Mr. Walters in July to schedule a follow-up meeting. Ex. 58, FC-0000003426. Mr. Walters replied two months later—on October 15, 2025—to schedule a phone call (again making no mention of any breach allegation). Ex. 58, FC-0000003426.

On October 20, 2025, Mr. Walters and Mr. Doble had their phone call. Mr. Walters asked Mr. Doble to amend the Agreement to remove the backfile purchase option for nothing in return. SUMF ¶¶ 161-65. On the call, Mr. Doble asked Mr. Walters why Alexi would agree to remove the purchase option for no consideration—which Mr. Walters conceded was a good point. Ex. 13,

Walters Tr. 329:5-11. Mr. Doble then asked what would happen if Alexi did not agree to remove the backfile purchase option. SUMF ¶ 162. Mr. Walters responded that there "would be trouble." Ex. 13, Walters Tr. 329:20; *see* SUMF ¶ 163.[10] [redacted]. Ex. 13, Walters Tr. 328:5-328:7. That evening, Mr. Walters sent Mr. Doble a draft amendment to the Agreement to remove the backfile purchase option with no other changes to the contract. SUMF ¶ 165.

On October 27, 2025, [redacted] Ex. 62, FC-0000003448. Within two minutes, Mr. Doble responded that Alexi was [redacted] *Id.* With no further communications, vLex's general counsel then sent Alexi a "Notice of Material Breach" a few hours later, vaguely claiming that Alexi violated the contract by offering a commercial product that competed against Fastcase (as described further below).

The October 27, 2025 breach letter marked the first time anyone at Fastcase or vLex ever raised any concerns with Alexi's use of the Fastcase data or suggested that Alexi had breached the Agreement. *See* Ex. 67, FC-0000002511; Ex. 13, Walters Tr. 355:11–22; Ex. 12, Jack Tr. 148:5–148:18]. Notably, Fastcase has produced ***no*** documentary evidence showing its executives ever discussed any breach by Alexi regarding its products or use of the Fastcase data before Clio raised the concern over the backfile purchase option. [redacted]

---

[10] Remarkably, two days later on October 22, 2025, [redacted] (even though vLex had already purportedly determined that Alexi's technology violated the Agreement and was just five days away from sending a breach letter). *See* SUMF ¶¶ 166-67. On October 24, 2025, Mr. Doble and Mr. Datta then discussed a potential partnership or acquisition—after which [redacted] Ex. 79, FC-0000000361.

[redacted] but Clio's counsel confirmed by email after that deposition that the specific chat exchange never occurred.

**G. vLex Sends Breach Letter and Clio Directs this Litigation**

The breach letter asserted that Alexi had violated the contract by [redacted] Ex. 67, FC-0000002511 at 512–13. The letter said Alexi was [redacted] *Id.* It also claimed Alexi was [redacted] that its AI was [redacted][11]—the same technological feat that Fastcase and vLex had celebrated two years earlier in giving Mr. Doble the "Fastcase 50" award. *Id.*; *see* SUF ¶¶ 110-11.

The breach letter does not mention any of the specific grounds that Fastcase has now cited, in this litigation, as the basis for its breach claim—including Alexi's full automation of legal memos (e.g., removing human manual review); its introduction of a chat interface and functionality; or its display of the text of Fastcase cases in Alexi's memos. SUMF ¶¶ 178-81. Even though the Agreement provides for a [redacted], *see* Ex. 10, Agreement § 5.2, vLex's breach letter demanded that [redacted] that it had already taken to cure the breach (while again providing no specifics on what those corrective actions should entail), *see* SUMF ¶ 181.

On November 26, 2025, Fastcase sent another letter purporting to terminate the Agreement and filed this lawsuit. *See* SUMF ¶¶ 187-88; Dkt. 1. [redacted]

[11] *But see* note 3, *supra* (vLex's Fastcase 50 website currently touting that Alexi is a "legal research platform [] trained on an extensive dataset of more than 30 million pairs of legal questions and answers").

[redacted] SUMF ¶ 188. The complaint added new theories never mentioned in the October 27 breach letter, including "displaying Fastcase-sourced case law to Alexi's end users" Dkt. 1 ¶ 84(c); *see* SUMF ¶¶ 206-07. On December 3, 2025, Fastcase stopped providing daily updates to Alexi, Dkt. 84, as it was required to do under the Agreement.

Since sending its breach letter, Fastcase's breach theory has been an ever-moving target. In depositions, Fastcase, vLex, and Clio witnesses offered changing and often contradictory accounts of Fastcase's breach theory in this case. For example, [redacted] Ex. 13, Walters Tr. 271:4–13. [redacted] SUMF ¶ 50. And amazingly, on June 1, 2026—two days before summary judgment motions were due—Fastcase added two more breach theories by amending its interrogatory responses. *See* Ex. 71, Am. Rog. Responses at 1, 5-6; *see also* SUMF ¶¶ 210-11.

One Clio document produced in expedited discovery—fittingly featuring AI-powered analysis—illustrates the reason for this litigation. In March 2026, two senior executives at Clio were discussing the [redacted] that Alexi experienced in December 2025 on the heels of Fastcase's lawsuit. Nathan Mesher (Corporate Development Manager) noted that the [redacted] of Alexi's losses. Ex. 77, FC-0000000049. Mr. Datta (VP for Corporate Development) then asked [redacted] *Id.* Among other things, [redacted] *Id.* Claude's [redacted] was that Alexi's [redacted]

[redacted]" *Id.* Mr. Mesher immediately endorsed [redacted] *Id.*

### H. Mr. Walters Tells Potential Acquirers They Will Not Get Access to Fastcase Data

As of October 2025, Alexi was pursuing acquisition discussions with multiple parties at a valuation over $100 million. *See* SUMF ¶¶ 213-20. Alexi entered NDAs with several potential acquirers in 2025, [redacted]. *Id.* ¶¶ 214-18.

On December 8, 2025, days after the lawsuit was filed and became publicly known, Mr. Walters had a conversation with [redacted]. In a chat exchange with Mr. Newton, Mr. Walters reported telling [redacted] that [redacted] Ex. 75, FC-0000000381—even though Fastcase now admits [redacted] In response to Mr. Walters's note, Mr. Newton responded: "[redacted]," and Mr. Walters suggested "[redacted]" *Id.* Mr. Walters then connected with [redacted] at an industry event. After that meeting, Mr. Walters again [redacted] Ex. 76, FC-0000000382 at 386. Mr. Walters reported that [redacted] seemed "[redacted]" by the conversation. *Id.*

## LEGAL STANDARD

The Court should grant summary judgment "when the movant demonstrates that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law." *B & H Nat. Place, Inc. v. Beresford*, 850 F. Supp. 2d 251, 256 (D.D.C. 2012) (Leon, J.) (citing Fed. R. Civ. P. 56(a)). The party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Whether a contract's terms are ambiguous is a question for the Court. *Wharf, Inc. v. D.C. Wharf Horizontal Reit Leaseholder LLC*, 2021 WL 1198143, at *10 (D.D.C. Mar. 30, 2021). In making that determination, the Court "examine[s] the document on its face, giving the language used its plain meaning," finding ambiguity only when the contract is susceptible to different interpretations. *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009). And even if some contract terms are ambiguous, summary judgment is still appropriate "if extrinsic evidence demonstrates that only one view of the contract is reasonable." *Holland v. Freeman United Coal Mining Co.*, 574 F. Supp. 2d 116, 130–31 (D.D.C. 2008) (citation modified) (quoting *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990)).

## ARGUMENT

### I. FASTCASE'S BREACH OF CONTRACT CLAIM (COMPLAINT COUNT I) FAILS AS A MATTER OF LAW

The Agreement's plain text and the undisputed evidence compel summary judgment against Fastcase's breach claim and in favor of Alexi on its contract-related counterclaims. Alexi used the Fastcase caselaw data for "internal research purposes" to power the AI-generated legal memos that it has sold to U.S. lawyers and law firms. Nothing in Fastcase's post-hoc, shifting breach theories—and, more to the point on summary judgment, nothing in the record—contradicts that *fact*.

"The first step in interpreting a contract is to determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Debnam*, 976 A.2d at 197. Court analyze this question based on "what a reasonable person in the position of the parties would have thought the disputed language meant," *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. Cir.

2009), armed with "all the circumstances surrounding the contract's making," *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The Agreement "must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made." *Debnam*, 976 A.2d at 197 (citation modified).

**A. Alexi's Use of The Fastcase Data Complied With Section 1.7**

Fastcase's shifting breach theories must be rejected as a matter of law under the plain terms of the Agreement and based on the undisputed evidence. Consistent with Section 1.7 of the Agreement, Ex. 10, Agreement § 1.7, Alexi (1) only used the Fastcase caselaw data for "internal research purposes" to power the AI-generated outputs it sold to customers from the outset of the contract; (2) never made "commercial" use of the Fastcase data, which the parties plainly understood to mean selling or sublicensing that data; and (3) did not use the caselaw data to provide a traditional legal database service that would be "competitive with" Fastcase's offering.

***i. Alexi uses the Fastcase data for "internal research purposes."***

Under Section 1.7 of the Agreement, Alexi "may use the Fastcase Data . . . for internal research purposes." Ex. 10, Agreement § 1.7. Alexi has complied with this requirement at all times. Specifically, when an Alexi subscriber poses a legal research question requiring analysis of U.S. caselaw, Alexi's passage-retrieval system or "research agent"—which is a purely internal tool—researches the Fastcase caselaw data and identifies the most relevant cases. That caselaw research is then an *input* into the product that Alexi provides to its customers—a narrative-style legal memo reflecting Alexi's proprietary analysis. Alexi's research of the Fastcase dataset is thus quintessentially "internal" under the plain meaning of that team. Merriam Webster, *Internal*, www.merriam-webster.com/dictionary/internal (defining "internal" as "occurring on the inside of an organized structure"). Alexi users have ***never*** had direct access to the Fastcase caselaw data. And although Alexi includes links to the cases cited in its memoranda (more on that below), its

customers have also ***never*** been able to directly access or query the Fastcase database for themselves. *See* SUMF ¶ 95.

Since this litigation commenced (tellingly, never before), Fastcase has offered two arguments as to why Alexi has nonetheless breached Section 1.7. First, it contends that the "internal research" must be conducted at least in part by human lawyers. Second, it equates Alexi's chat interface with "external" search access to Fastcase's platform. Both of these arguments are facially implausible based on the plain language of the Agreement, and both are directly contradicted by undisputed and contemporaneous record evidence.

***First***, Fastcase's argument that Alexi's "internal research" must be performed by humans—not computers or software—fails under the plain language of the Agreement. The analysis begins (and ends) with the bedrock proposition that courts may not add words to a contract. *E.g., Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 584 (D.C. 1995) ("[W]e know of no legal authority permitting the court to rewrite the contract by inserting a limitation which does not appear therein."); *Columbia Hosp. for Women & Lying-In Asylum v. U.S. Fid. & Guar. Co.*, 188 F.2d 654, 659 (D.C. Cir. 1951) ("[C]ourts are not free to rewrite a commercial contract entered into at arm's length by fully competent parties"). Here, the Agreement restricts Alexi to "internal research purposes"—it does not say that that internal research must be conducted by humans rather than software and, indeed, does not mention the word "human" (or any analogue) at all. Fastcase, which drafted the Agreement, certainly cannot create an after-the-fact limitation that is "plainly not there" in the Agreement. *Aziken v. D.C.*, 70 A.3d 213, 220 (D.C. 2013).

Moreover, limiting Alexi to internal human use would result in a nonsensical and absurd interpretation of the contract, which also compels judgment in Alexi's favor. *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996) (avoiding interpretation of contract that "would be absurd"); *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (avoiding interpretation that would "produce an absurd result"). Alexi licensed caselaw data from Fastcase—[redacted]—that was designed for

programmatic use by software, not for human use. *See* SUMF ¶ 49. Indeed, Fastcase provided Alexi's human lawyers separate login credentials to the Fastcase website—so they could run traditional Boolean searches for quality-control purposes—which would have made no sense if the human lawyers were required to research the raw text files that Alexi licensed from Fastcase in the first place. *See* SUMF ¶ 63.[12]

In addition, the record evidence and the parties' course of conduct also irrefutably supports Alexi's position on this score. From the onset of the relationship, Fastcase understood that Alexi would use AI to analyze the Fastcase data and power Alexi's fully automated legal memos. *See, e.g.*, SUMF ¶¶ 1, 26-28, 40, 134, 137. Indeed, vLex and Fastcase executives [redacted] *See* SUMF ¶¶ 49-50; *see also* Ex. 18, Faus Tr. 297:17-22 (Mr. Faus: [redacted]).[13] No wonder, then, that Fastcase's Rule 30(b)(6) witness essentially took the Fifth when he was deposed on the topic, [redacted] under the terms of the Agreement. Ex. 13, Walters Tr. 232:17-233:23.

***Second***, Fastcase's argument that Alexi no longer used the data for "internal research purposes" when it released a "chatbot" user interface fares no better. Alexi's executives provided unrebutted testimony that—both before and after Alexi introduced a chat interface in early 2024—

[12] Nor would Alexi have paid nearly [redacted] to license the Fastcase data over the last four-plus years if that data was meant to be used by a small team of human lawyers who could have each purchased Fastcase login credentials for $95 a month. Ex. 13, Walters Tr. 43:25-44:4.

[13] Mr. Faus—who authored the October 27, 2025 breach letter—initially attempted to offer *post hoc*, self-serving testimony that some degree of human oversight was required before backtracking during his deposition. SUMF ¶ 50. Needless to say, there is no contemporaneous record of him, or anyone else at Fastcase or vLex, taking such a position before this lawsuit was filed, while there is plenty of evidence of Fastcase executives discussing Alexi as an AI company (and thus implicitly one which didn't rely specifically). *See, e.g.*, SUMF ¶¶ 132-33.

only Alexi's internal "research agent" had access to the Fastcase caselaw data. Thus, while the chat interface provided users with a streamlined interface to enter their legal research questions, that chat interface changed nothing with respect to how Alexi's internal systems researched the Fastcase caselaw data in producing narrative-style legal memos to customers. That the chatbot interface was introduced eighteen months *before* Alexi was "notified" that it had breached the Agreement, and that it was discussed internally by Fastcase executives with approval, also exposes the emptiness of Fastcase's position.

***ii. Alexi has not used the data for impermissible "commercial purposes."***

Section 1.7 also provides that Alexi cannot use the Fastcase data for "commercial purposes or for any purpose which is competitive with Fastcase." Taking "commercial purposes" first, Fastcase's theory that Alexi violated that term by offering an impermissibly "commercial" offering is also contradicted by both the Agreement and the undisputed record evidence.

As an initial matter, it is unclear what—if anything—is left of Fastcase's argument on this score. Specifically, Fastcase has now disclaimed the core assertion in its October 27, 2025, breach letter that Alexi was prohibited from offering ***any*** commercial product that incorporated or used Fastcase data. Ex. 68 at -513 (claiming that Alexi breached the Agreement by "commercially offering a legal research product" that uses Fastcase data). Clio's CEO Mr. Newton, for example, [redacted] Ex. 11, Newton Tr. 66:22-67:7 (emphasis added).

This isn't at all surprising: Fastcase has known since its first conversation with Alexi—well before drafting and inking the Agreement—that Alexi was a for-profit company looking to sell its services to U.S. lawyers and law firms. The Agreement would have served no purpose at all if it barred Alexi from offering commercial products using the caselaw data that it paid Fastcase $240,000 a year to license. *Retail Clerks Int'l Ass'n Loc. No. 455, AFL-CIO v. NLRB*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless.") (collecting

cases). The legal analysis services that Alexi sold to U.S. customers after mid-2025 (when Fastcase says Alexi began breaching the Agreement) were no more "commercial" in nature than the services that Alexi sold to U.S. customers before mid-2025. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1047 (D.C. Cir. 2017) (rejecting argument that would "yield absurd results"). To be sure, Alexi's technology improved and its user interface evolved with the times, but Alexi has always used Fastcase's data to create products for commercial sale.

What the restriction on "commercial use" indisputably *does* do is prevent Alexi from ***commercializing the Fastcase data***—e.g., by selling or sublicensing that data. As Mr. Patz Vineyard—the author of the Agreement—testified at his deposition, [redacted] Ex. 3, Patz Tr. 78:9-12. In contemporaneous, ordinary-course communications, Fastcase executives described this restriction in exactly the same way: as prohibiting Alexi from engaging in "bulk sale" of the Fastcase data, *see supra* Background B, such as by selling or sublicensing access to the database itself. SUMF ¶ 39; s*ee, e.g.*, Ex. 26, FC-0000002532 at 532; Ex. 10, Agreement at 243 ("License restrictions include bulk sale, content cannot be made available through traditional legal research product like Fastcase"). Such evidence—which, again, is completely uncontroverted—weighs powerfully in support of summary judgment. *See, e.g.*, *Fed. Trade Comm'n v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 830 (S.D. Tex. 2025) (contemporaneous business documents are "among the strongest evidence" of the parties' understanding); *United States v. Google LLC*, 747 F. Supp. 3d 1, 77 n.2 (D.D.C. 2024) ("[T]he court gives greater weight to the contemporaneous statements contained in the company's internal records" than self-serving, inconsistent statements made during litigation).

***iii. Alexi has never offered a product that is "competitive with Fastcase"***

Fastcase's argument under Section 1.7 that Alexi has offered a product that is "competitive with Fastcase" fails for similar reasons. Again, the whole purpose of the Agreement—from day

one—was for Alexi to license the Fastcase data for use with Alexi's AI-generated legal memos. It would be nonsensical to read the Agreement as self-defeating by prohibiting Alexi from offering AI-generated legal memos because they are impermissibly "competitive with Fastcase." *E.g., Wharf*, 2021 WL 1198143 at *28.

Instead, the undisputed evidence—gleaned from Fastcase's own ordinary-course documents and deposition testimony—shows that the prohibition on competitive use was designed by Fastcase to prevent Alexi from offering a ***traditional legal database service*** like Fastcase. As a 2022 document authored by Mr. Patz Vineyard put it: [redacted] SUMF ¶ 113; Ex. 44, FC-0000000793; Ex. 3, Patz Tr. 123:5-10 [redacted]

Alexi has never offered such a traditional legal database service. Fastcase subscribers can directly search Fastcase's entire database, review all potentially relevant cases, and identify additional or subsequent authority cited in or to those cases. Alexi, by contrast, offers none of those features. SUMF ¶ 95; Ex. 37, Diamond Tr. 19:15-18 (Alexi's customers have no ability "to search or browse or filter a database of caselaw"). And on the flip side, Fastcase never offered generative AI capabilities, nor has it ever offered legal memos (or other narrative-style outputs) in response to user research questions, like Alexi does. *See* SUMF ¶¶ 20-21. That is true today, and it was certainly true in December 2021 when Alexi and Fastcase signed the Agreement. *United States v. West*, 392 F.3d 450, 460 (D.C. Cir. 2004) ("In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position they occupied at the time the contract was made." (quoting Restatement (Second) of Contracts § 202 cmt. b (1981)).

Accordingly, and as Mr. Patz Vineyard confirmed under oath, Alexi and Fastcase have simply never been competitors, meaning that this provision of Section 1.7 also cannot serve as the

predicate for Fastcase's claim of breach. Ex. 3, Patz Tr. 235:3-12 (testifying that in his [redacted]

That Fastcase and Alexi weren't competitors at the time of contract formation is plain from the face of the Agreement. The Agreement's recitals describe Fastcase as a "legal publishing company that provides an advanced online legal research system for research over a comprehensive multi-million dollar federal and state database of primary law," which wished to license its data "for Alexei's legal memos." *See* SUMF ¶ 8; Ex. 10, Agreement at 1. If those two products were "competitive"— such that Alexi's AI memos were prohibited by the Agreement— the contract that Fastcase drafted would have been at war with itself from the beginning. And Fastcase and Alexi still aren't competitors today. Indeed, Fastcase has failed to identify even a *single* subscriber it lost due to purported competition from Alexi (even after Alexi introduced a chat interface). SUMF ¶ 97. Indeed, Mr. Walters [redacted] *See* SUMF ¶ 98.

In a desperate attempt to conjure up some dispute of fact on this point, Fastcase now contends that Alexi became "competitive with Fastcase" when it introduced the chat interface in early 2024. But this post hoc rationalization is also wholly unsupported by the record. It is undisputed that Fastcase has never offered *any* generative AI or chat functionality, and Fastcase hasn't offered any evidence that Alexi's chat feature actually led to competition with Fastcase.

There is literally no evidence in the record that the chat functionality in the ALR platform transformed Alexi's otherwise non-competitive product into a competitive product (or transformed a non-commercial product into a commercial product). Users still cannot directly search for Fastcase cases as they would with a traditional database service, so Alexi's ALR platform is no more "competitive with Fastcase" under Section 1.7 than Alexi's previous user interfaces (which

similarly did not provide traditional legal database capabilities).[14] Moreover, no later than 2023, Alexi repeatedly disclosed—and Fastcase discussed internally—that Alexi was developing chatbot technology, so Fastcase knew about Alexi's plan to release a chat feature (which it then released in early 2024) ***for years*** without objecting until Clio came onto the scene, *see infra* Part I.C (discussing waiver and estoppel). SUMF ¶ 105.

### B. Fastcase's Other Breach Theories Likewise Fail

Fastcase's other arguments that Alexi breached the Agreement fare no better than those premised on Section 1.7. Specifically, (i) Alexi is not limited to providing outputs to users in a formal "memo" format, because the Agreement contains no such limitation; and (ii) Alexi did not improperly distribute or display Fastcase cases in Alexi's legal memos.

#### *i. Alexi is not limited to "memo" outputs to customers*

Fastcase's apparent argument that Alexi is limited to a "memo" format—and that any other type of output is banned by the Agreement—fails as a matter of law. To be sure, the Agreement's recitals state that Fastcase wished to license the Agreement to Alexi "for Alexei's legal memos." SUMF ¶44; Ex. 10, Agreement at 1. But nothing in the Agreement says that Alexi is ***limited*** to using the Fastcase caselaw data for memos. As the drafter of the Agreement, Fastcase could have included (or bargained for) such a limitation, but it did not. It cannot now insert that limitation into the contract years after the fact. *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1250 (D.C. 2024) ("Had Carey desired a broader [contract term,] it could have contracted for exactly that.").

[14] Nor is the "iterative" capability to ask follow-up questions new. Alexi's unrebutted testimony shows that it always offered "iterative" functionality from the beginning—e.g., users could receive a memo and ask as many follow-up questions, within the Alexi platform, as their [redacted] [Ex. 2, Doble Tr. 111:9–17) [redacted]

Moreover, Section 1.7 is the operative clause setting out the limitations on Alexi's use of the Fastcase data and, as described above, it says nothing about the format of the output that Alexi ultimately provides to its customers. "[C]ourts give recitals less weight than operative parts of the contract," *Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*, 2011 WL 307617, at *6 (N.D. Ill. Jan. 28, 2011), especially where, as here, the operative provision specifically provides the relevant use limitations, *Utils. & Indus. Corp. v. Palisades Interstate Park Comm'n,* 258 N.Y.S. 2d 700, 711–712 (N.Y. Sup.Ct. 1965) ("Where both the recitals and the operative clauses are clear, though inconsistent with each other, the operative part must control since it is the most important."); *Cain Rest. Co. v. Carrols Corp.*, 273 F. App'x 430, 434 (6th Cir. 2008) ("[P]reambles in a contract generally serve to introduce the contract's subject matter rather than set forth the specific rights and obligations of the parties.").

Indeed, the Agreement is utterly silent as to the definition of the word "memo," and imposes [redacted] SUMF ¶ 45; Ex. 3, Patz Tr. 262:7-22. In response to user queries, Alexi's system can produce answers in slightly varied narrative formats, such as a chart, letter, or summary of potential arguments, but the outputs are always presented as a narrative reflecting Alexi's proprietary answers to legal questions. SUMF ¶ 94. Given that Section 1.7 includes no "memo" limitation whatsoever, the single, non-specific reference to memos in the recitals cannot be read as a substantive limitation on the precise format of the analysis that Alexi provides to its customers. *Crowell v. Gould*, 96 F.2d 569, 573 (D.C. Cir. 1938) ("Where recitals contained in a contract are ambiguous and the operative part is free from doubt, as in the present case, the operative part must prevail.").

*ii. Alexi did not distribute or improperly display Fastcase cases*

Finally, Fastcase's claim that Alexi breached the Agreement by displaying the text of Fastcase cases—in Alexi's legal memos—is also contradicted by the Agreement (and has in any event been waived).

Here, too, the evolving nature of Fastcase's claims is telling. When it first filed this lawsuit, Fastcase insisted that the mere provision of a hyperlink to the Fastcase website in an Alexi memo breached the parties' Agreement. Given that such hyperlinks—which allowed users to navigate to the Fastcase platform itself to view a cited authority—had been present in Alexi's service since the inception of the parties' relationship, Fastcase has now backed away from that claim. SUMF ¶¶ 114-118. Instead, in yet another made-for-litigation confection, Fastcase now contends that Alexi's display of the text of Fastcase cases cited in Alexi's memos, within the Alexi platform, violated the Agreement. As before, Fastcase's position is wrong and finds no support in the record.

As an initial matter, the Agreement provides that Alexi "may not . . . publish . . . or otherwise distribute any part of the Fastcase Data." *See* SUMF ¶¶ 51; Ex. 10, Agreement § 2.2. "Publishing" requires "distribut[ing] copies (of a work) to the public," *see Publish*, Black's Law Dictionary (12th ed. 2024), and "distributing" would require Alexi to "deliver" or "disperse" the data, *Distribute*, Black's Law Dictionary (12th ed. 2024). Alexi hasn't done either of these things: it has only displayed the (non-copyrightable) raw text of Fastcase cases within the Alexi platform, to Alexi subscribers, in the context of an Alexi legal memo.

Fastcase's internal display argument fails for multiple other reasons as well.

***First***, vLex conspicuously did not raise any concern with Alexi's display or linking in its October 27, 2025, breach letter (or at any time before filing its Complaint). If vLex had done so, Alexi could have easily cured by, for example, returning to the Fastcase public links that Alexi had previously used. Under the Agreement, Fastcase cannot terminate the contract based on a case display feature over which it gave Alexi no notice or opportunity to cure. *See infra* Section II.A; *Clark v. Bank of Am., N.A.*, 561 F. Supp. 3d 542, 550 (D. Md. 2021) ("When claims arise from actions taken pursuant to the contract or agreement at issue, a valid notice and cure provision is a precondition to the suit." (quoting *Taub v. World Financial Network Bank*, 950 F. Supp. 2d 698, 702 (S.D.N.Y. 2013)).

***Second***, Fastcase has been well aware of this display feature since 2022, and never raised any concerns that it violated the Agreement. Indeed, when Mr. Patz was drafting a license agreement for another party in August 2022, he approvingly cited Alexi's agreement as a model of a partner that [redacted] Ex. 41, FC-0000014545 at 545. Then in 2023, vLex signed up for an Alexi trial subscription—where it saw for itself Alexi's linking to Fastcase cases, noted this feature was [redacted] to Fastcase, and raised no objections (whether internally or to Alexi). SUMF ¶ 140. Consistent with this ordinary-course evidence, Mr. Patz [redacted] Ex. 3, Patz Tr. 267:12-20. To take the opposite position in this litigation is, in a word, disingenuous. Fastcase's theory of breach based on Alexi's internal displays has been waived and is nevertheless directly contradicted by Fastcase's ordinary-course documents and the deposition testimony of its executives.

### C. Fastcase's Breach Claim Is Foreclosed By The Parties' Four-Year Course Of Conduct

For the reasons described above, Alexi did not breach the Agreement under its plain terms and based on the undisputed evidence. But even if some ambiguity existed as to the terms of the Agreement (and it does not), the parties' years-long course of performance independently forecloses a finding of any breach.

"Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*, 109 F. Supp. 3d 179, 198 (D.D.C. 2015) (quoting Restatement (Second) of Contracts § 202(4) (1981)); *Ramsey v. United States Parole Comm'n*, 840 F.3d 853, 860 (D.C. Cir. 2016) ("[T]he parties' conduct in carrying out the agreement, can aid in discerning what the parties meant by the words they used.").

The course of performance here is long-running and undisputed. From the start of the Agreement through late 2025, Alexi and Fastcase performed under the Agreement without dispute about Alexi's service or its use of the Fastcase data. Alexi paid its license fees, received daily caselaw updates, and used the data the same way—to power its AI-driven analysis. For its part, Fastcase delivered the daily data updates, accepted Alexi's nearly [redacted] payments, and at no point raised any concern with Alexi's services [redacted] And the parties' communications beginning back in 2019 likewise affirm that Fastcase understood and endorsEed Alexi's use of the Fastcase data in connection with its AI-powered legal analysis. SUMF ¶¶ 23-24; *Nest & Totah Venture, LLC v. Deutsch*, 31 A.3d 1211, 1227 (D.C. 2011) (emails between parties qualifying definition were relevant in deciding "what meaning a reasonable person in the position of [the parties] would have given").

Fastcase's breach claim is also independently barred by waiver and equitable estoppel. For years, before claiming Alexi breached the Agreement under pressure from Clio, Fastcase knew about, acquiesced in, and actively endorsed and encouraged the same conduct by Alexi that it now claims breached the Agreement.

***First***, Fastcase has waived any breach claim about Alexi's AI technology, because it has known about and endorsed Alexi's business model for years. "[A] party's course of conduct can constitute a waiver of specific contractual provisions and be relied upon by the parties as a modification of any enforceable contract that exists between the parties." *LanQuest Corp. v. McManus & Darden LLP*, 796 F. Supp. 2d 98, 103 (D.D.C. 2011). "[I]ntent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right." *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004).

Here, Fastcase had actual knowledge that Alexi had long used the Fastcase data to power the AI-generated technology that it now challenges, as evidenced through a slew of undisputed

evidence including: (1) Alexi's repeated statements to Fastcase about its AI functionality and ambitions; (2) Fastcase and vLex's internal communications discussing Alexi's AI technology; (3) Fastcase's encouragement of Alexi's technology, including by awarding Mr. Doble the 2023 "Fastcase 50" award; (4) and vLex's personal testing of Alexi's AI-generated memo technology, among others. SUMF ¶¶ 26, 28, 104-05, 110, 135-36. And even beyond this wealth of actual notice, Fastcase was on additional inquiry notice: Alexi publicly announced every product development that Fastcase now challenges—from its Instant Memo rollout in October 2023 to the ALR platform in January 2025. Amid this extensive course of dealing, Fastcase never raised a word of objection until the Clio acquisition. In light of this unbroken course of dealing, if there is any doubt as to whether the plain language of the Agreement permitted Alexi to use the Fastcase data in its AI-generated memos (and there is not), Fastcase's breach claim was long ago waived in any event.

Fastcase cannot credibly argue that the course of dealing changed because of Alexi's supposed "pivot" in mid-2025. Alexi rolled out its fully automated Instant Memos in October 2023—more than ***two years*** before vLex sent its breach letter. And the chat interface that Alexi introduced in early 2024—followed by its ALR platform in January 2025—is a straw man: Neither the consumer output (narrative-style analysis reflecting Alexi's proprietary work product) nor Alexi's use of the licensed Fastcase data (solely by its internal "research agent" software) changed.

***Second***, equitable estoppel similarly bars Fastcase's belated breach claim. Equitable estoppel bars a party from (1) asserting a position inconsistent with its prior conduct (2) where another party reasonably relied on that conduct (3) to its detriment. *SJ Enterprises, LLC v. Quander*, 207 A.3d 1179, 1184 (D.C. 2019). All three elements are satisfied here on the undisputed record.

Fastcase made repeated representations inconsistent with its current breach claim, as described above. The undisputed record described above shows that Alexi had every reason to rely on Fastcase's acquiescence to its technology and use of the data, as Fastcase continued to

encourage Alexi's development and never objected before sending the breach letter on October 27, 2025. Indeed, even after the merger announcement and continuing up until the eve of the breach letter, Mr. Walters continued to send Mr. Doble encouraging messages about the Fastcase-Alexi partnership and Alexi's [redacted] technology. SUMF ¶¶ 157, 167. And it is beyond dispute that Alexi has suffered (and would suffer) devastating prejudice—having built its entire U.S. business around the Fastcase data—if Fastcase were now permitted to reverse course and claim that its AI technology breached the Agreement all along. SUMF ¶¶ 227-32; *see Nortel Networks*, 298 F. Supp. 2d at 88 ("Weighed against the $20 million loss at stake . . . the Court concludes that insisting upon [the condition] would result in a disproportionate forfeiture").

## II. FASTCASE INDEPENDENTLY BREACHED THE AGREEMENT (COUNTERCLAIM COUNT I)

Alexi is entitled to summary judgment on its breach of contract claim (Count I) on two separate and independently dispositive bases. ***First***, Fastcase breached the Agreement by wrongfully terminating the contract after failing to provide the required notice and opportunity to cure. This defect alone requires entry of summary judgment in Alexi's favor, regardless of the other issues presented during this expedited discovery phase. ***Second***, Fastcase breached the Agreement because it unilaterally stopped providing the required daily caselaw updates after sending its defective breach notice and bringing this baseless lawsuit.

### A. Fastcase Breached The Agreement By Wrongfully Terminating Without Providing Alexi The Required Notice and Opportunity To Cure

The Agreement's notice-and-cure provision requires that before either party can terminate, it must provide "30 days written notice to the other party of a material breach of any term or condition" and allow the other party an opportunity to cure within that 30-day period. *See* SUMF ¶ 53; Ex. 10, Agreement § 5.2. Here, Fastcase strategically refused to identify ***any*** specific conduct by Alexi that it alleged breached the Agreement. The vague notice made it impossible for Alexi to cure, giving Fastcase the cover it needed to terminate the Agreement and fulfill its obligation

under its merger agreement with Clio. The Court should enter summary judgment—and find that Fastcase breached the Agreement—on this basis alone.

A notice of breach must provide the recipient with a "viable opportunity" to understand how it could "take action to" cure the alleged breach. *Henok v. Chase Home Fin*, 922 F. Supp. 2d 110, 118-19 (D.D.C. 2013); *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003) (The general rule is that, to be effective, a notice terminating a contract must be clear and unequivocal." (quoting 17B C.J.S. Contracts § 446 (2002)); *Cedar Rapids Television Co. v. MCC Iowa LLC*, 524 F. Supp. 2d 1127, 1136 (N.D. Iowa 2007) ("A clear and unambiguous notice, timely given, and in the form prescribed by the contract is essential to the exercise of an option to terminate the contract.") (cleaned up).

vLex's October 27, 2025, breach letter provided no details about the Alexi features that purportedly breached the contract. Nor did it provide any opportunity to cure. Instead, the breach letter stated vaguely that Alexi had breached the Agreement by [redacted] *See* SUMF ¶ 180; Ex. 67, FC-0000002511 at 512–13; *id.* [redacted] But as noted earlier, Alexi has [redacted] using Fastcase data since the start of the Agreement—that was the whole point of the licensing deal—and Fastcase has since disclaimed this theory of liability. Alexi cannot cure something that is not a breach (offering a commercial product using Fastcase data), and the breach letter said nothing about what changes to the Alexi product made it suddenly "commercial" in nature or how Alexi could address them. Nor did the letter identify any features or changes in Alexi's product since 2022 that transformed it into a Fastcase competitor. The October 27 letter wasn't a notice; it was a one-way ticket to litigation.

Since sending the breach letter, Fastcase has purported to identify an (ever-changing) number of Alexi features it now asserts as the basis for this lawsuit, including its automation of

memos (without human review); its chat interface; and its display of the text of Fastcase cases cited in Alexi's memos. But tellingly, *none* of these breach theories appear in the notice. Indeed, Fastcase just revised its breach list *again*, in supplemental interrogatory answers served just two nights ago. *See* SUMF ¶ 210-211; Ex. 71, Am. Rog. Responses at 1, 5-6. Alexi had no valid or reasonable opportunity to cure breaches that Fastcase did not disclose until after it launched this lawsuit.

More egregious is Fastcase's clear violation of the Agreement's provision that Alexi be provided a 30-day period to cure any purported breach. *See* SUMF ¶¶ 53, 181; Ex. 10, Agreement § 5.2. In addition to providing no factual basis for the breach, and thus no indication of how to cure it, the Agreement demanded that Alexi "[redacted]" such undescribed conduct and requested "[redacted]" Ex. X02 at -13. Although the breach determination had taken, even under Counterclaim Defendants' estimation, months to formulate, vLex unilaterally shortened the period for Alexi to comply to a mere matter of days. *Cedar Rapids Television*, 524 F. Supp. 2d at 1136 ("If a party who has the power of termination fails to give notice in the form and the time required by his reservation, it is ineffective as a termination.").

vLex's vague and non-compliant breach notice was no accident. In discussing the [redacted] option against Alexi—[redacted]—vLex Chief Commercial Officer James McCallion outlined a strategy in which vLex would claim breach and [redacted] or else vLex would be [redacted] *See* SUMF ¶ 151. Ex. 57, FC-0000027457 at 457.

Following this playbook, Mr. Walters reached out to Mr. Doble and pressured him to remove the valuable purchase option for nothing in return—warning that "there would be trouble" if Alexi did not agree. *See supra* Background F. And then seven days later, vLex issued its inscrutable breach notice without warning. *See id.* This episode is not only a flagrant example of

bad-faith conduct by the Counterclaim Defendants, *see infra* Section III, it breached the Agreement. *Ulla-Maija, Inc. v. Kivimaki*, 2005 WL 2429490, at *4 (S.D.N.Y. Sept. 30, 2005) ("It is settled law . . . that the notice must be specific enough so as to give the other party a reasonable opportunity to cure the breach if this can be done."); *240 W. 37th LLC v. BOA Fashion, Inc.*, 899 N.Y.S.2d 63, 2009 WL 2603146, at *1 (App. Term 2009) ("[I]t is imperative that the cure notice particularize the nature of the default(s) with clarity and factual basis.").

The facts here closely track *IP Global Investments America, Inc. v. Body Glove IP Holdings, LP*, 2018 WL 5983550 (C.D. Cal. Nov. 14, 2018). There, following an acquisition, the new brand owner claimed to have learned the licensee had breached the agreement, pressured the licensee to accept unfavorable amendments, and when the licensee refused, the licensor declared the licensee in default and purported to terminate—what the licensor described as its "nuclear option." *Id.* at *2. The licensor sent a notice of default stating only that the licensee had "fail[ed] to adhere to the product approval process," but without identifying which products, which uses, or which instances of noncompliance constituted the alleged breach. *Id.* at *5-6. The court granted summary judgment to the licensee, holding that the notice "fail[ed] to identify the specific breach" and that "such vague notice would defeat the purpose to provide an opportunity to cure." *Id.* at *6. Because the licensee "had no way to begin to attempt to cure the breach," the purported termination was ineffective. *Id.* The analogy to Fastcase's wholly deficient breach notice is exact, down to the [redacted] characterization of the breach notice.

*Deffenbaugh Industries, Inc. v. Unified Government of Wyandotte County*, 2023 WL 4363439 (10th Cir. July 6, 2023), is to the same effect. There, a contractor's notice of default recited several categories of alleged breach—improper penalties, failure to pay, failure to adjust unit counts—without ever specifying which conduct was deficient or what corrective action was required. *Id.* at *5. The Tenth Circuit noted that this "conclusory notice" listed defaults in "only the most general terms" and was "not reasonably calculated to allow for a cure," *id.* at *7, and ultimately found that failure to provide "adequate notice of a default and a reasonable opportunity

to cure" meant that the notice did not comply with the notice provision "as a matter of law, and the contract remains in effect," *id.* at *21. Cure provisions, the court held, "contain an implicit requirement to give enough detail to allow cure" because without it, the opposing party is left to play a "meaningless guessing game." *Id.* at *19-20. vLex's breach letter suffers from the same defects and should suffer the same fate.

In short, vLex's breach notice was a calculated strategic gambit designed to leave Alexi in the dark and preclude any possibility that Alexi could cure entirely undisclosed purported breaches, violating Section 5.2 of the Agreement. Fastcase breached the Agreement on this basis alone. *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 286 (D.D.C. 2018) (finding the "grounds for termination were thin and pretextual" and so "the termination itself violated the subcontract"); *In re 4Kids Ent., Inc.*, 463 B.R. 610, 683 (Bankr. S.D.N.Y. 2011) ("[T]erminating a contract without complying with the notice and cure provisions therein is itself a material breach.") (citing *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992)).

**B. Fastcase Breached The Agreement By Ceasing The Required Daily Data Updates**

Under the Agreement, Fastcase's core obligation was to provide Alexi with daily data updates of new judicial opinions as they are decided in federal and state courts around the United States. *See* SUMF ¶ 52. Ex. 10, Agreement §§ 1.4, 5.1. By unilaterally deciding to stop providing those updates after bringing this lawsuit—even though Alexi has complied with the Agreement, for the reasons described above in Section I—Fastcase breached the Agreement.

Section 3.1 of the Agreement sets forth Fastcase's obligation to provide daily caselaw updates:

[redacted]

That language is unambiguous. *Beresford*, 850 F. Supp. at 257 (where the language "is unambiguous, its interpretation is a question of law for the court."). And the Agreement runs from

January 1, 2022, through December 31, 2026 (followed by automatic one-year renewals in the absence of an effective termination), *see* Ex. 10, Agreement §§ 1.4, 5.1, and so Fastcase was, and is, obligated to provide daily updates through at least the end of 2026.

There is no dispute that Fastcase stopped providing these updates on December 3, 2025. *See* Alexi's SUMF ¶ 189; *see also* Dkt. 84 ¶ 131 ("Fastcase admits that it ceased providing Alexi with daily U.S. caselaw data updates on or about December 3, 2025"). And it is similarly beyond dispute that the daily caselaw updates were a material (indeed, the central) obligation of Fastcase under the Agreement. *See* Alexi's SUMF ¶ 52. Indeed, Clio executives agreed that [redacted] Ex. 77, FC-0000000049 at 052-53.; *e.g.*, *Landmark Health Sols., LLC v. Not For Profit Hosp. Corp.*, 950 F. Supp. 2d 130, 137 (D.D.C. 2013) (material breach "is a failure to do something that is so fundamental to a contract, that not performing that obligation defeats the essential purpose of the contract").

The Court should grant summary judgment in favor of Alexi and find that Fastcase breached the Agreement by failing to provide the required daily caselaw updates.

## III. FASTCASE BREACHED OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (COUNTERCLAIM COUNT II)

"All contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (citation modified). The implied covenant "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (citation omitted). A party breaches this duty when it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id.* (citation omitted); *see also C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009). "[B]ad faith

may be overt or may consist of inaction, and fair dealing may require more than honesty." *Allworth*, 890 A.2d at 202.

Fastcase breached the covenant of good faith and fair dealing in at least three independent and mutually reinforcing ways: (1) by manufacturing this breach allegation and lawsuit; (2) sending Alexi a vague breach letter that deprived Alexi of its opportunity to cure; and (3), after the lawsuit was filed, making false and misleading representations to prospective acquirers about Alexi's contractual rights. Whether taken separately or together, Fastcase's conduct was designed to prevent Alexi from enjoying the full expectations and fruits of its bargain despite its four-year course of dealing prior to the Clio acquisition.

***First***, the undisputed record evidence shows that Fastcase manufactured this lawsuit to [redacted] *See* SUMF ¶¶ 153-54. Even considering the evidence in the light most favorable to Fastcase, it is undisputed that [redacted]

Moreover, the record is replete with evidence that Mr. Newton and Clio's alarm over the backfile purchase option in Section 12.3 was the motivating force for this lawsuit, not any genuine dispute between Fastcase and Alexi about Alexi's use of the caselaw data. *Id.* ¶¶ 147-51. That is also evident from Fastcase's business records and the parties' course of dealing before Clio entered the picture. Alexi and Fastcase enjoyed a long and mutually beneficial course of dealing, with no ordinary-course documents showing any objection to Alexi's use of the data prior to Clio raising the red flag over the backfile purchase option. And there is no dispute that it was Clio and vLex attorneys who reached the conclusion that Alexi had breached the Agreement. SUMF ¶ ¶184-185 192. Manufacturing a lawsuit under false pretenses is a textbook violation of the covenant of good

faith and fair dealing. *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 288 F. Supp. 3d 176, 188 (D.D.C. 2018) (wrongful notice of default basis for breach of good faith and fair dealing); *Legion Sys., LLC v. Valiant Glob. Def. Servs., Inc.*, 2021 WL 3633592, at *6 (M.D. Fla. Aug. 17, 2021) (good faith and fair dealing claim based an improper contract termination invoked as a "pretext"); *accord Florence Urgent Care v. Healthspan, Inc.*, 445 F. Supp. 2d 871, 880 (S.D. Ohio 2006).

***Second***, Fastcase (through its parent company vLex) violated the duty of good faith and fair dealing by willfully sending a vague breach letter that was impossible for Alexi to cure. For the reasons stated in Section II.A, Fastcase's wrongful termination of the Agreement—without providing valid notice and an opportunity to cure—breached the Agreement. In the alternative, should the Court determine that such conduct did not violate the express terms of the Agreement, it should nevertheless find that Fastcase's breach notice violated the duty of good faith and fair dealing by failing to provide, under the spirit of the Agreement, fair notice of the purported breach(es) and an opportunity to cure a breach within the allotted 30-day period. *See supra* Section II.A.

***Third***, Fastcase violated the duty of good faith and fair dealing by making false statements directly to prospective acquirers of Alexi after sending the breach letter and filing this lawsuit. Mr. Walters reported to Clio's CEO making demonstrably false assertions to both [redacted] that Alexi did not have any rights to Fastcase caselaw data under the contract—even though Fastcase now concedes that the backfile purchase option survives termination (so that an Alexi acquirer could obtain the Fastcase backfile for $[redacted] "with no restrictions").[15]

---

[15] At his deposition, Mr. Walters [redacted] But Fastcase cannot evade summary judgment by denying the words in its own ordinary-course documents. *United States v. Google*, 747 F. Supp. 3d at 77 n.3 ("the court gives greater weight to the contemporaneous statements contained in the company's internal records" than later inconsistent statements during litigation).

Fabricating a breach claim as a pretext to tell prospective acquirers that a bargained-for right no longer exists is precisely the kind of "subterfuge and evasion" that the implied covenant prohibits. *Allworth*, 890 A.2d at 201-02. This scheme was designed to prevent Alexi from receiving the "fruits of the contract"—namely, the value of the backfile purchase right, which was a bargained-for provision that enhanced Alexi's enterprise value and attractiveness to acquirers. *See* SUMF ¶¶ 59-60 ([redacted]). Mr. Walter's affirmative discussions, regardless of how he later attempts to recharacterize them, was designed to "claw back the benefits" that the counterparty expected to receive by preventing Alexi from selling that Backfile Provision as part of an acquisition negotiation—a clear breach of the implied covenant. *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 45 (D.D.C. 2014).

## IV. ALEXI IS ENTITLED TO SUMMARY JUDGMENT ON ITS TORTIOUS INTERFERENCE WITH CURRENT BUSINESS RELATIONS CLAIM (COUNTERCLAIM COUNT IV)

Clio and vLex tortiously interfered with Alexi's contractual rights under the Agreement, because they induced Fastcase to terminate (and thereby breach) the Agreement with Alexi.[16]

Tortious interference with business relations requires: (1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages.[17] *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. Cir. 2017).

---

[16] The original Phased and Expedited Discovery Schedule, entered by this Court on February 17, lists this as Count Five, *see* Dkt. No. 56-1¶ 1(c), based on Alexi's January 16, 2026 Answer and Counterclaims, *see* Dkt. 48 ¶¶192–96. After Alexi amended and revised its answer and counterclaims in April, this claim is now Count Four. *See* Dkt. 83 ¶¶ 220–24.

[17] The Expedited Discovery Phase did not encompass questions of damages, *see* Dkt. 81-1 ¶ 1.d, and so Alexi will address the issue of its damages at a later stage. That does not have any impact on the Court's ability to grant summary judgment to Alexi on the other elements of its claim. *See Fed. Trade Comm'n v. Surescripts, LLC*, 665 F. Supp. 3d 14, 36-38 (D.D.C. 2023).

Interference is "intentional" if the defendant "knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Whitt*, 157 A.3d at 203 (citing Restatement (Second) of Torts § 8A, 776 cmt. j). This element does not require a plaintiff to show the defendant acted wrongfully or maliciously. *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 141 n. 28 (D.C. Cir. 2021).

The first two elements are readily satisfied here. Neither party disputes that the Agreement between Alexi and Fastcase existed and was valid, at least until Fastcase purported to terminate it on November 26, 2025. And vLex and Clio knew about Alexi's agreement with Fastcase, as evidenced by the many pre-merger communications about that Agreement and the backfile purchase option it contained. *See* SUMF ¶¶ 147-55, 158-59.

As to intentional interference, there is similarly no serious dispute. In their June 30, 2025, merger agreement, vLex and Clio agreed—when they were still separate companies—to force Fastcase's termination of the Agreement unless Mr. Doble and Alexi voluntarily gave up the valuable backfile purchase option for nothing in return. *See* SUMF ¶¶ 160-65. And Clio and vLex orchestrated that wrongful contract termination at every step. [redacted]

All of these facts are undisputed, and all are drawn from Clio's and vLex's own documents and testimony. Together, they conclusively establish that Clio and vLex intentionally induced Fastcase to terminate the Agreement. Alexi is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment against Fastcase's breach of contract claim (Count I), and summary judgment in favor of Alexi on Alexis' breach of the covenant of good faith and fair dealing counterclaim (Counterclaim Count II), and Alexi's breach of contract claim (Counterclaim Count I), and Alexi's tortious interference with current business relations counterclaim (Counterclaim Count IV).

Dated: June 3, 2026

**WINSTON TAYLOR LLP**

By: */s/ Johanna Rae Hudgens*
Johanna Rae Hudgens (*pro hac vice*)
George Mastoris (*pro hac vice* forthcoming)
WINSTON TAYLOR LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
johanna.hudgens@winstontaylor.com
george.mastoris@winstontaylor.com

Benjamin L. Rudofsky (DC Bar No. 1029844)
Allie A. Dodd (*pro hac vice*)
Melissa A. Iannuzzi (*pro hac vice*)
WINSTON TAYLOR LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 282-5017
Fax: (202) 282-5100
ben.rudofsky@winstontaylor.com
allie.dodd@winstontaylor.com
melissa.iannuzzi@winstontaylor.com

Joshua Hafenbrack (D.C. Bar No. 1017128)
HAFENBRACK LAW
818 18th Street NW, Suite 810
Washington, DC 20006
jhafenbrack@hafenbracklaw.com

*Counsel for Defendant and Counterclaim-Plaintiff Alexi Technologies Inc.*