**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC.<br><br>Plaintiff,<br><br>v.<br><br>ALEXI TECHNOLOGIES INC.<br><br>Defendant. | C.A. No. 1:25-CV-04159-RJL<br><br>Hon. Richard J. Leon<br><br>**(REDACTED VERSION)** |
| ALEXI TECHNOLOGIES INC.<br><br>Counter-Plaintiff,<br><br>v.<br><br>FASTCASE, INC., VLEX, LLC and THEMIS SOLUTIONS INC.<br><br>Counter-Defendants. | |

**COUNTER-DEFENDANTS' OPPOSITION TO ALEXI TECHNOLOGIES INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACT-RELATED COUNTERCLAIMS**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

A. The Parties and Their Services. ....................................................................4

B. The Negotiation and Execution of the Data License Agreement. ..........................5

C. Alexi's Under-the-Radar Pivot. ....................................................................6

D. Alexi's Copying, Publication, and Distribution of the Fastcase Data. ....................9

E. This Litigation.......................................................................................10

LEGAL STANDARD..........................................................................................................12

ARGUMENT.....................................................................................................................14

I. ALEXI BREACHED SECTION 1.7 BY USING FASTCASE DATA OUTSIDE THE AGREEMENT'S LIMITED PURPOSE. ................................................................14

A. The Agreement Authorized Internal Research for Alexi Legal Memos, Not a Customer-Facing Research Platform. ..........................................................15

B. Calling ALR's Backend a "Research Agent" Does Not Make Customer-Facing Research "Internal." ....................................................................................17

C. ALR Uses Fastcase Data for Outputs that Are Not Legal Memos. ........................20

D. ALR Uses Fastcase Data for Commercial Purposes...........................................23

E. ALR Uses Fastcase Data for a Purpose Competitive with Fastcase. ......................24

F. Alexi's Waiver, Acquiescence, and Course-of-Dealing Arguments Fail. .............27

II. THE UNDISPUTED EVIDENCE SUPPORTS FASTCASE'S BREACH-OF-CONTRACT CLAIM UNDER SECTION 2.2. ...............................................................30

A. Alexi Copied, Published, and Distributed Fastcase Data Without Written Consent. ......................................................................................................30

B. Alexi's Section 2.2 Waiver and Acquiescence Arguments Fail. ..........................31

C. Section 10 and Alexi's Removal of Fastcase Links Confirm the Practical Effect of Alexi's Conduct. ...................................................................................33

III. ALEXI'S CONTRACT COUNTERCLAIM FAILS AS A MATTER OF LAW. ............34

A. Alexi's Uncured Material Breach Excused Fastcase's Performance and Authorized Termination.............................................................................34

B. Fastcase's Notice Was Adequate and Alexi Refused to Cure. .............................35

IV. ALEXI'S BAD FAITH COUNTERCLAIM FAILS AS A MATTER OF LAW. ............36

V. ALEXI'S TORTIOUS-INTERFERENCE COUNTERCLAIM FAILS AS A MATTER OF LAW. ....................................................................................................................41

CONCLUSION....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*2301 M St. Coop. Ass'n v. Chromium LLC*,
209 A.3d 82 (D.C. 2019) ....................27

*Abdelrhman v. Ackerman*,
76 A.3d 883 (D.C. 2013) ....................40

* *Africare, Inc. v. Xerox Complete Document Sols. Md., LLC*,
436 F. Supp. 3d 17 (D.D.C. 2020) ....................36

*Allworth v. Howard University*,
890 A.2d 194 (D.C. 2006) ....................38

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................12, 38, 40

*Ayissi-Etoh v. Fannie Mae*,
712 F.3d 572 (D.C. Cir. 2013) ....................40

*Billups v. Lab'y Corp. of Am.*,
233 F. Supp. 3d 20 (D.D.C. 2017) ....................36

*C & E Services, Inc. v. Ashland Inc.*,
601 F. Supp. 2d 262 (D.D.C. 2009) ....................38

*Cain Rest Co. v. Carrols Corp.*,
273 F. App'x 430 (6th Cir. 2008) ....................22

*Capital River Enters., LLC v. Abod*,
301 A.3d 1234 (D.C. 2023) ....................27

*Carome v. Carome*,
293 A.3d 1122 (D.C. 2023) ....................13, 15

*CEI Wash. Bureau, Inc. v. DOJ*,
469 F.3d 126 (D.C. Cir. 2006) ....................13

*Chandler v. Berlin*,
998 F.3d 965 (D.C. Cir. 2021) ....................28

* *CorpCar Services Houston, Ltd. v. Carey Licensing, Inc.*,
325 A.3d 1235 (D.C. 2024) ....................1, 34, 36, 37

*Crowel v. Gould*,
96 F.2d 569 (D.C. Cir. 1938) ....................21

*Deffenbaugh Industries, Inc. v. Unified Government of Wyandotte County*,
2023 WL 4363439 (10th Cir. July 6, 2023) ....................35

*District of Columbia v. Young*,
39 A.3d 36 (D.C. 2012) ....................20

*Donohoe v. Watt*,
546 F. Supp. 753 (D.D.C. 1982),
*aff'd*, 713 F.2d 864 (D.C. Cir. 1983) ....................44

*Dresser v. Sunderland Apartment Tenants Ass'n*,
465 A.2d 835 (D.C. 1983) ....................43

* *Dyer v. Bilaal*,
983 A.2d 349 (D.C. 2009) ....................13, 15

*FDIC v. Bank of Am., N.A.*,
783 F. Supp. 3d 1 (D.D.C. 2025) ....................28

*Florence Urgent Care v. Healthspan, Inc.*,
445 F. Supp. 2d 871 (S.D. Ohio 2006) ....................38

* *Havilah Real Prop. Servs., LLC v. VLK, LLC*,
108 A.3d 334 (D.C. 2015) ....................42

*Himmelstein v. Comcast of the Dist., L.L.C.*,
908 F. Supp. 2d 49 (D.D.C. 2012) ....................38

* *Hto7, LLC v. Elevate, LLC*,
319 A.3d 368 (D.C. 2024) ....................34

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
24 F. Supp. 3d 32 (D.D.C. 2014) ....................38

*IP Global Investments America, Inc. v. Body Glove IP Holdings, LP*,
2018 WL 5983550 (C.D. Cal. Nov. 14, 2018) ....................35

*James G. Davis Constr. Corp. v. HRGM Corp.*,
147 A.3d 332 (D.C. 2016) ....................13

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*,
908 F.2d 1351 (7th Cir. 1990) ....................1

*Legion Sys., LLC v. Valiant Glob. Def. Servs., Inc.*,
2021 WL 3633592 (M.D. Fla. Aug. 17, 2021) ....................38

*Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,
826 F.3d 492 (2016) ....................13

*Murray v. Wells Fargo Home Mortg.*,
953 A.2d 308 (D.C. 2008) ....................41

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
957 A.2d 890 (D.C. 2008) ....................42

*Press v. Howard Univ.*,
540 A.2d 733 (D.C. 1988) ....................44

*Raskauskas v. Temple Realty Co.*,
589 A.2d 17 (D.C. 1991) ....................42

*Robertson v. Cartinhour*,
867 F. Supp. 2d 37 (D.D.C. 2012) ....................44

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*,
857 F. Supp. 2d 97 (D.D.C. 2012) ....................13

*SJ Enters., LLC v. Quander*,
207 A.3d 1179 (D.C. 2019) ....................29

*Steele Foundations, Inc. v. Clark Constr. Grp., Inc.*,
937 A.2d 148 (D.C. 2007) ....................20

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025) ....................18

*Title Services, Inc. v. Nadel*,
248 A.3d 132 (D.C. 2021) ....................43

*Tolan v. Cotton*,
572 U.S. 650 (2014) ....................13

* *Trilon Plaza, Inc. v. Comptroller of State of New York*,
788 A.2d 146 (D.C. 2001) ....................20

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ....................40

*Utilities & Industry Corp v. Palisades Interstate Park Commission*,
258 N.Y.S.2d 700 (N.Y. Sup. Ct. 1965) ....................22

*Weatherly v. Second Nw. Coop. Homes Ass'n, Inc.*,
304 A.3d 590 (D.C. 2023) ....................36, 40

*Whitt v. Am. Prop. Constr., P.C.*,
157 A.3d 196 (D.C. 2017) ....................41

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
288 F. Supp. 3d 176 (D.D.C. 2018) ....................38

*Yellow Cab Affiliation, Inc. v. New Hampshire Insurance Co.*,
2011 WL 307617 (N.D. Ill. Jan. 28, 2011) ....................21

**RULES**

Fed. R. Civ. P. 56(a) ....................12

**INTRODUCTION**

Alexi's Motion for Partial Summary Judgment (the "Motion") asks the Court to decide the wrong case. Alexi devotes most of its energy to an imagined Clio-driven plot to eliminate Alexi's backfile purchase option. That assertion is disputed and, in any event, irrelevant, as the question to be decided at this stage is simpler: Did Alexi materially breach the Agreement and fail to cure after notice? If so, Fastcase had cause to terminate under Section 5.2, and Alexi's motive-and-pretext narrative is a sideshow.

There is no plot here, but D.C. law makes that question irrelevant. In *CorpCar Services Houston, Ltd. v. Carey Licensing, Inc.*, the D.C. Court of Appeals held that a party's material breach gave the counterparty "sufficient cause" to invoke a contractual termination provision, even if the counterparty allegedly invoked the breach as a pretext for other business reasons. 325 A.3d 1235, 1246–47 (D.C. 2024). The court explained that, "[a]bsent … purposeful sabotage," a termination for cause does not breach the implied covenant "even if motivated by reasons unrelated to cause." *Id.* at 1247 (citation omitted). And it held that the defendant had the right to invoke the breach "as cause to terminate … even if that invocation was pretextual." *Id.* That rule controls here. Fastcase did not cause Alexi's breach. Alexi chose to use the Fastcase data outside the license, chose not to seek a broader license, chose not to disclose the full scope of its conduct, and chose not to cure when Fastcase gave notice. Once Alexi materially breached and refused to cure, Fastcase was entitled to enforce the Agreement. *See also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) (Easterbrook, J.) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'").

The Agreement's limits were clear. Fastcase negotiated with Alexi a heavily discounted

license to Fastcase's primary law database exclusively for "internal research purposes" supporting Alexi's legal memos. Agreement §§ 1.7, 2.2. The Agreement prohibited Alexi from using the data for commercial purposes or for any purpose competitive with Fastcase. *Id.* § 1.7. It also prohibited Alexi from selling, licensing, publishing, copying, or otherwise distributing any part of the Fastcase data without written consent. *Id.* § 2.2. Those provisions fit the product Alexi sold in 2021: a human-reviewed legal research memorandum prepared by Alexi researchers for customers who submitted discrete questions. Counterstatement to Alexi's Statement of Undisputed Material Facts ("Counterstatement") ¶¶ 1, 4, 7, 70.

Without notifying Fastcase, Alexi later pivoted to a materially different use of the licensed data. It transformed itself from a memo service into a customer-facing, subscription legal research platform. Customers no longer merely received fixed memoranda. They could conduct legal research directly in Alexi's platform, receive real-time caselaw answers, ask follow-up questions, generate lists, charts, arguments, and other non-memo outputs, and read full-text Fastcase opinions hosted on Alexi's own systems. *Id.* ¶¶ 90, 93, 95, 116, 126, 201, 208. Alexi marketed that platform as legal research software and eventually stopped linking users to Fastcase because the new Alexi considered Fastcase's parent vLex to be "a competitor." *Id.* ¶¶ 39, 95, 127. Alexi's secret pivot and unauthorized use created the product Fastcase challenged in this suit.

None of this is a matter of inference: [redacted]

Alexi's contrary arguments depend on rewriting the Agreement. It says its use remained "internal" because software agents ran the searches inside Alexi's systems, even though Alexi's paying customers initiated, directed, performed, and reviewed the research. It says any output can be called a "memo," even though ALR generates chat answers, clauses, chronologies, charts, lists of cases, letters, and argument summaries. It says its product is not commercial or competitive, even though it undisputedly sells subscriptions to legal research software and described Fastcase's corporate family as a competitor. And it says it only linked to public law, even though Alexi undisputedly copied Fastcase cases, hosted them on Alexi systems, and displayed full-text opinions to end users without written consent. Those readings would leave the Agreement's core restrictions with no work to do.

Alexi's counterclaims fail for the same reason. Its contract counterclaim fails because Alexi materially breached the Agreement and upon notice refused to cure. Fastcase was well within its rights to terminate the contract for breach. Alexi's implied-covenant claim fails because the covenant cannot override Fastcase's express termination right, and *CorpCar* forecloses Alexi's effort to turn alleged pretext into liability where there was an uncured material breach. And Alexi's tortious-interference claim fails because there was no wrongful termination for vLex or Clio to induce. Alexi's backfile narrative, at most, asks the Court to credit Alexi's motive theory over contrary evidence and draw inferences in Alexi's favor. That is exactly what Rule 56 forbids.

Alexi's Motion should be denied.

## **FACTUAL BACKGROUND**

Alexi's Motion depends on a story the record does not tell. Alexi portrays itself as the victim of a billion-dollar conspiracy and asks the Court to overlook the central facts: Alexi changed its business, used the Fastcase data well beyond the Agreement's limits, copied and hosted

Fastcase cases on the internet, and then tried to keep Fastcase from discovering the scope of its conduct. The record—much of it Alexi's own documents and witnesses—shows that Fastcase had cause to terminate and that Alexi is not entitled to summary judgment.

**A. The Parties and Their Services.**

Fastcase is "a legal publishing company that provides an advanced online legal research system" over a comprehensive, multi-million-record database of federal and state primary law. Counterstatement ¶ 8. Fastcase makes money in two ways: it sells subscriptions to its online legal-research platform, and it licenses caselaw data feeds to legal-technology companies and other third parties. *Id.* ¶ 12.

Alexi's original product was a memo. When the parties contracted in 2021, Alexi offered a single product: a human-reviewed legal-research memorandum. *Id.* ¶¶ 1, 4. A customer would submit a legal question; an Alexi researcher—"involved at every step"—would research the question, select cases, and prepare legal analysis; and Alexi would deliver a self-contained memorandum. *Id.* ¶ 70. Alexi's own Motion concedes the point. Alexi Mot. at 4, 11.

Fastcase's product was different. Fastcase offered an iterative, self-serve research platform on which users could search a database of authorities and pull cases to read and analyze on their own. Counterstatement ¶¶ 8, 12. Alexi, by contrast, offered discrete memoranda answering particular questions. Its memos were "generally[ ] non-iterative," and a customer who wanted more had to submit—and pay for—a new memo. *Id.* ¶ 7. Put simply, Fastcase ran a research platform; Alexi ran a research service in which researchers prepared and wrote memos at a user's request.[1]

[1] [redacted].

Understanding that distinction is critical to analyzing this case. [redacted]

**B. The Negotiation and Execution of the Data License Agreement.**

The deal was always about memos. Alexi first approached Fastcase in 2019, but the parties did not reach terms. [redacted]

Alexi accepted the license as written. [redacted]

[redacted]

The price reflected the limited use case. [redacted]

The Agreement's text matched the deal. Section 1.7 defines "Purpose" as "the limited purpose for which Alexsei may use the Fastcase Data, namely for internal research purposes," and provides "[i]n no event can the data be used for commercial purposes or for any purpose which is competitive with Fastcase." Agreement § 1.7. Section 2.2 provides that Alexi "may not sell, license, publish, copy, or otherwise distribute any part of the Fastcase Data" without Fastcase's written consent, and "will not use the Fastcase Data … in a way which is inconsistent with the Purpose." *Id.* § 2.2. And the recitals confirm what all this was for: Fastcase agreed to license its database "for Alexsei's legal memos." *Id.*, Recital 3. Nevertheless, Alexi changed its business model, and the way it used the data it licensed from Fastcase, to violate each one of these license restrictions.

### C. Alexi's Under-the-Radar Pivot.

#### *1. Alexi's Business Did Not Change—Until It Did.*

For roughly two years, Alexi's core product remained the product Fastcase understood it was licensing: human-produced legal memoranda, using Alexi's internal-only AI research tool, powered by Fastcase data. [redacted]

[redacted][2] The service grew more efficient over time, but it did not change in kind. Customers still posed discrete questions and received self-contained memos.[3]

Then the ground shifted. As large-language-model technology matured—[redacted]

Alexi cites a 2023 sample memo and the "Fastcase 50" award to suggest Fastcase blessed its transformation. That argument conflates different products at different times. In 2023, Alexi still sold the product it sold at signing: human-created legal memos. [redacted]

[2] Alexi asserts it built a "research agent" "[f]rom the start." Alexi Mot. at 11. That is anachronistic. [redacted]

[3] Even at its fastest, Alexi's human-reviewed memo service was not the same as ALR. [redacted]

### *2. The Pivot Transformed Both Alexi's Product and Its Use of the Fastcase Data.*

Everything changed after that. [redacted]

Fastcase data was not incidental to that transformation. [redacted] Alexi did not merely consult the Fastcase data. It used the Fastcase data to build and power the product at issue.

The transformation in how Alexi used the Fastcase data is profound. Where customers once received a fixed memo, [redacted]

Alexi's underlying technology changed too. [redacted]

[redacted]

**D. Alexi's Copying, Publication, and Distribution of the Fastcase Data.**

Alexi's exploitation of the Fastcase data was not limited to how it performed research. Not long after the Agreement was executed, Alexi began displaying the full text of Fastcase cases to its customers—conduct Fastcase neither knew of nor endorsed. *Id.* ¶¶ 118, 125. [redacted][4]

That conduct grew more significant over time. Far from merely linking to the Fastcase platform—as Alexi's Motion suggests—[redacted]

The practical effect was that Alexi made itself the source. Just as a traditional research platform lets users find and read cases "on their own," Alexi Mot. at 5, [redacted]

4 [redacted]

[redacted].[5] [redacted] The new Alexi software also did not comply with the Agreement's requirement that [redacted]

Alexi eventually cut Fastcase out of the equation altogether. [redacted]

**E. This Litigation.**

Fastcase discovered the breach through the market. In spring 2025—not long after Alexi's pivot was cemented through ALR—former Fastcase employee Nina Jack began hearing from an outbound sales team, which was calling on solo and small-firm lawyers, that Alexi "was trading on the Fastcase name in the market" and that Alexi's representatives were telling prospects Alexi was "backed by the Fastcase database." *Id.* ¶¶ 97, 193. Ms. Jack reviewed Alexi's website and social-media materials, learned of the pivot, and moved toward enforcement. *Id.* ¶¶ 99, 192. By May 2025, Fastcase personnel were describing Alexi as "very obviously in breach." *Id.* ¶ 176.

[redacted]

[5] Alexi suggests the dispositive distinction is whether a user can run a "Boolean" search. Alexi Mot. at 5. That distinction does not appear in the Agreement, is unsupported by the record, and is beside the point. ALR provides natural-language search over the Fastcase data, and Alexi's materials tout a "[SaaS] platform to lawyers that provides AI legal research … in an entirely natural language, chat format." *Id.* ¶ 95.

[redacted]

Two concerns were addressed in one transaction. That does not make the breach any less real. Section 5.18(c) of the stock purchase agreement contemplated amending the Agreement to address Alexi's breach and the backfile provision or, failing that, terminating—"provided always" no "payment in cash or in kind" would be required. *Id.* ¶¶ 153–54. But Fastcase independently discovered Alexi's conduct through its sales team and review of Alexi's public materials. *Id.* ¶¶ 150, 192. Alexi's evidence may show that Fastcase, vLex, and Clio were discussing both the breach and the backfile. It does not show the breach was fabricated.

Fastcase followed the Agreement's process. On October 27, 2025, Fastcase sent a Notice of Material Breach identifying Alexi's pivot to a competitive legal-research platform powered by Fastcase data and citing Sections 1.7 and 2.2. *Id.* ¶¶ 175, 180. The Agreement provides a 30-day cure period. Agreement § 5.2. Alexi did not cure. Instead, it denied breach and asserted that "Alexi's commercial offering has always been known to Fastcase." Counterstatement ¶ 186. The record forecloses that assertion: when the parties contracted, Alexi's product was a human-in-the-loop memo, and Alexi's later "pure AI" offerings did not exist. *Id.* When Alexi failed to cure within the contractual period, Fastcase terminated for cause. *Id.* ¶¶ 53, 187.

Alexi now tries to move the center of gravity to Section 12.3, the backfile purchase provision. But Alexi's own framing reveals the strategy: it wants to treat the backfile option as

an acquisition asset and turn this liability phase into an advisory proceeding about the value and scope of that provision. [redacted]

[redacted]

*     *     *     *     *

Alexi asks the Court to focus on motive because the contract and facts point the other way. Fastcase enforced the Agreement after discovering that Alexi had used Fastcase data to build and operate a customer-facing legal research platform, had copied and hosted Fastcase cases on its own systems, and had decided to [redacted] The record does not support Alexi's request for summary judgment. It defeats it.

**<u>LEGAL STANDARD</u>**

Summary judgment is appropriate only where the movant shows "there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A dispute is material if it "might affect the outcome of the suit under the governing law," and genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On summary judgment, the Court must view the record in the light most favorable to the nonmovant, draw all reasonable inferences in that party's favor, and refrain from weighing evidence or making credibility determinations. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam); *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (2016).

That standard applies with equal force to Alexi's Motion, even though the parties filed cross-motions. Cross-motions do not permit the Court to resolve factual disputes in favor of either movant. Each motion must be evaluated on its own record, with the nonmovant receiving the benefit of all reasonable inferences. *See CEI Wash. Bureau, Inc. v. DOJ*, 469 F.3d 126, 129 (D.C. Cir. 2006). Thus, to prevail on its Motion, Alexi must show not merely that it has evidence supporting its interpretation of the Agreement or its narrative of the parties' conduct, but that the undisputed record entitles Alexi to judgment as a matter of law on Fastcase's breach claim and on Alexi's own contract-related counterclaims.

The parties' dispute also turns on contract interpretation. Under District of Columbia law, the Court interprets contractual language by asking "what a reasonable person in the position of the parties would have thought the disputed language meant." *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (citation omitted). In doing so, the Court looks to "the entire language of the agreement, not merely a portion thereof," and gives contractual terms their "customary, ordinary and accepted meaning." *Carome v. Carome*, 293 A.3d 1122, 1127 (D.C. 2023) (quoting *James G. Davis Constr. Corp. v. HRGM Corp.*, 147 A.3d 332, 340 (D.C. 2016)). Where, as here, the contract is unambiguous, interpretation is a question of law for the Court. *Sabre Int'l Sec. v. Torres*

*Advanced Enter. Sols., Inc.*, 857 F. Supp. 2d 97, 102 (D.D.C. 2012). And although Fastcase has separately shown that the undisputed record entitles it to judgment, Alexi's Motion must be denied unless Alexi can establish that the Agreement unambiguously permits its conduct and that no material fact or competing inference defeats its own claims.

**ARGUMENT**

Alexi's Motion fails for a straightforward reason: the undisputed record establishes that Alexi materially breached the Agreement. Section 1.7 limited Alexi's use of Fastcase data to "internal research purposes" and prohibited use "for commercial purposes" or "for any purpose which is competitive with Fastcase." Agreement § 1.7. Section 2.2 separately prohibited Alexi from "sell[ing], licens[ing], publish[ing], copy[ing], or otherwise distribut[ing] any part of the Fastcase Data" without Fastcase's written consent. *Id.* § 2.2.

Alexi violated both provisions. It used Fastcase data to power a customer-facing, subscription legal research platform, and it copied, hosted, and displayed Fastcase cases through its own systems without written consent. Those breaches defeat Alexi's Motion on Fastcase's contract claim. They also defeat Alexi's counterclaims: Fastcase had cause to terminate after Alexi failed to cure, the implied covenant cannot override that express termination right, and there was no wrongful termination for vLex or Clio to induce.

## I. ALEXI BREACHED SECTION 1.7 BY USING FASTCASE DATA OUTSIDE THE AGREEMENT'S LIMITED PURPOSE.

Alexi's Motion should be denied for the same reason Fastcase's motion should be granted: the undisputed record establishes that Alexi breached Section 1.7. The Agreement granted Alexi a limited license to use Fastcase data only for a defined "Purpose": "the limited purpose for which Alexsei may use the Fastcase Data, namely for internal research purposes." Agreement § 1.7. Section 1.7 then imposed two further restrictions: "In no event can the data be used for commercial

purposes or for any purpose which is competitive with Fastcase." *Id.* And Recital 3 confirms the specific use the parties contemplated: Fastcase licensed its primary law database "for Alexsei's legal memos." *Id.*, Recital 3.

Alexi's Motion depends on a false continuity premise. According to Alexi, its use of Fastcase data remained materially the same because an "internal research agent" accessed the Fastcase data both before and after Alexi launched its chat-based products. The record shows otherwise. The Agreement was negotiated and priced for Alexi's original memo service, in which customers submitted legal questions, Alexi researchers used internal tools to conduct research, and Alexi returned a finished legal memorandum. Alexi later pivoted to a customer-facing, subscription legal research platform that lets users ask legal research questions directly, receive real-time caselaw answers, ask follow-up questions, generate lists of cases, charts, arguments, letters, and contract language, and click through to full-text Fastcase opinions displayed inside Alexi's own platform.

That use exceeds Section 1.7's limited Purpose. Alexi was no longer using Fastcase data only for internal research supporting legal memos; it was using the data to sell a customer-facing legal research platform that competed with Fastcase.

### A. The Agreement Authorized Internal Research for Alexi Legal Memos, Not a Customer-Facing Research Platform.

The Agreement's text is straightforward. Fastcase licensed data to Alexi for "internal research purposes," Agreement § 1.7, and the recitals identify the contemplated product as Alexi's "legal memos," *id.*, Recital 3. D.C. law requires the Court to interpret that language by asking what "a reasonable person in the position of the parties would have thought the disputed language meant," *Dyer*, 983 A.2d at 355 (citation omitted), while looking to "the entire language of the agreement" and the "customary, ordinary and accepted meaning of the language used," *Carome*,

293 A.3d at 1127 (citation omitted). Read that way, Section 1.7 permitted Alexi to use Fastcase data inside Alexi to support the legal memo product the parties discussed. It did not authorize Alexi to expose Fastcase data through a self-serve legal research platform used directly by Alexi's customers.

That meaning is confirmed by the record. Alexi's original product was a legal research memo service. [redacted]

Alexi's own admissions and Fastcase's contemporaneous understanding align with the same reading. [redacted]

Alexi's Advanced Legal Reasoning ("ALR") product was something different entirely. [redacted]

[redacted] No Alexi researcher stands between the user and the legal-research process. The user drives the research.

Alexi's contrary interpretation would erase the word "internal." Under Alexi's reading, any use of Fastcase data remains "internal" so long as some software operation occurs on Alexi's servers. But the Agreement did not authorize any automated, programmatic, or software-mediated use Alexi might later develop. It authorized use for "internal research purposes." Agreement § 1.7. Automation does not convert customer-facing research into internal research.

### B. Calling ALR's Backend a "Research Agent" Does Not Make Customer-Facing Research "Internal."

Alexi tries to avoid Section 1.7 by re-labeling the relevant actor. It argues that users are not really conducting research because Alexi's internal "research agent" is the component that queries Fastcase data. Alexi Mot. at 11, 19, 22–23. But the Agreement regulates Alexi's use of Fastcase data; it does not turn on the label Alexi assigns to a backend software component.

Alexi leans heavily on the fact that the Agreement does not use the word "human." It says the Agreement "does not say that [the] internal research must be conducted by humans rather than software" and "does not mention the word 'human' … at all." *Id.* at 23. It then argues that the relevant research is "internal" because Alexi's "passage-retrieval system or 'research agent'—which is a purely internal tool—researches the Fastcase caselaw data and identifies the most relevant cases." *Id.* at 22–23. That reframes the wrong question. Fastcase has never argued that Alexi could not use software, AI, or automation. Alexi's original memo service used internal technology, and Fastcase understood that. The contractual line is different: Fastcase data could

be used internally by Alexi to support Alexi's memo service, but it could not be deployed externally through a customer-facing legal research platform.

The absence of "human" does not help Alexi. The Agreement did not specify that "internal research" had to be performed by humans because the parties were contracting against Alexi's product: a human-in-the-loop memo service in which Alexi researchers used internal tools to help prepare legal memoranda. Counterstatement ¶¶ 1, 48–49, 70. Alexi's current theory would turn that silence into a blank check—because Alexi used some AI in 2021, it supposedly could later use any AI, in any capacity, for any product, so long as some software component on Alexi's servers touched the data first. That is not a reasonable reading of Section 1.7.

Nor can Alexi make its software the relevant contractual actor. Software is not a contracting party, a licensee, or an end user. It is a tool. *Cf. Thaler v. Perlmutter*, 130 F.4th 1039, 1046–48 (D.C. Cir. 2025) (explaining, in the copyright context, that "[m]achines lack minds and do not intend anything," and that "machines are tools, not authors"). Section 1.7 therefore does not ask whether a software component on Alexi's servers touches the data before the customer sees the output. It asks whether Alexi used Fastcase data for the limited internal research purpose the Agreement allows: supporting Alexi's preparation of legal memos. Alexi instead deployed Fastcase data through a customer-facing legal research platform driven by external users.

The chronology is critical. [redacted]

Alexi crossed that contractual line. [redacted]

[redacted]

That distinction matters because Alexi's Motion collapses distinct products and technologies into a single generic [redacted]

[redacted]

[redacted] That is customer-facing legal research, even if it does not look exactly like a traditional online research platform.

**C. ALR Uses Fastcase Data for Outputs that Are Not Legal Memos.**

Alexi also breached Section 1.7 because its current use of Fastcase data is not limited to the legal memo use the Agreement identifies. Recital 3 states that Fastcase licensed primary law data for Alexi's "legal memos." Agreement, Recital 3. That language is not surplusage. It confirms the specific product and use case reflected in the operative "Purpose" limitation: "internal research purposes." *Id.* § 1.7. Under D.C. law, contracts must be read as a whole, and courts must give "reasonable effect" to all parts of an agreement while avoiding interpretations that render contractual language "meaningless or incompatible with the contract as a whole." *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012); *see also Steele Foundations, Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 154 (D.C. 2007) (same).

That rule applies with particular force here because Recital 3 and Section 1.7 point in the same direction. Section 1.7 limits Alexi to "internal research purposes." Recital 3 identifies the licensed product for which that internal research would be performed: Alexi's "legal memos." Reading those provisions together gives effect to both. Reading Section 1.7 as though Recital 3 did not exist would erase the Agreement's express statement of why Fastcase licensed the data in the first place.

The D.C. Court of Appeals' decision in *Trilon Plaza, Inc. v. Comptroller of State of New York* confirms that recitals should be used this way. There, the plaintiff argued that a "whereas"

recital should be ignored as a "mere historical reference." 788 A.2d 146, 150–51 (D.C. 2001). The court rejected that argument, explaining that a recital "can indeed be considered as evidence of the parties' intent" when it is consistent with the rest of the contract. *Id.* at 151. Recital 3 serves the same function here by identifying the product the parties had in mind when they defined Alexi's limited Purpose: legal memos.

Alexi does not say otherwise, but instead acknowledges that the "whole purpose of the Agreement—from day one—was for Alexi to license the Fastcase data for use with Alexi's AI-generated legal memos." Alexi Mot. at 26–27. But Alexi then asks the Court to ignore that same purpose when it becomes inconvenient, insisting that "nothing in the Agreement says that Alexi is limited to using the Fastcase caselaw data for memos." *Id.* at 29; *cf. id.* at 29–30. Alexi cannot have it both ways. The Court should not treat the Agreement's "legal memos" language as central when Alexi invokes the parties' purpose, but meaningless when Fastcase invokes the same contractual text as a limitation.

Alexi's handful of cases on recitals can readily be dispensed with. Its only in-jurisdiction authority, *Crowel v. Gould*, involved a set of writings that were "equivocal and uncertain," "inconsistent," and "ambiguous." 96 F.2d 569, 572 (D.C. Cir. 1938). On those facts, the court applied the ordinary rule that "[w]here recitals contained in a contract are ambiguous and the operative part is free from doubt, … the operative part must prevail." *Id.* at 573. That rule has no application here because Alexi identifies no conflict between Recital 3 and Section 1.7. The two provisions work together: Recital 3 identifies the legal memo product for which Section 1.7 allowed internal research.

Alexi's out-of-jurisdiction cases say the same thing, and no more. *See* Alexi Mot. at 30. *Yellow Cab Affiliation, Inc. v. New Hampshire Insurance Co.* held that "isolated, introductory

recitals" could not overcome the agreement as a whole, the parties' signatures, and operative provisions imposing obligations. 2011 WL 307617, at *6 (N.D. Ill. Jan. 28, 2011). *Utilities & Industry Corp v. Palisades Interstate Park Commission* likewise applied the rule that operative provisions control when recitals and operative clauses are "clear, though inconsistent with each other." 258 N.Y.S.2d 700, 711–12 (N.Y. Sup. Ct. 1965). And *Cain Rest Co. v. Carrols Corp.* merely observed that preambles generally introduce the contract's subject matter rather than create standalone obligations. 273 F. App'x 430, 434 (6th Cir. 2008). Those cases address inconsistent recitals or attempts to create obligations from prefatory language. Recital 3 does neither; it supplies context consistent with Section 1.7 and the Agreement as a whole.

Alexi also cannot manufacture ambiguity by stretching "legal memos" to mean any written output. [redacted]

The distinction is practical, not formalistic. A legal research chatbot is not a memo simply because it sometimes produces prose. A list of cases is not a memo. A comparison chart is not a memo. A rewritten indemnification clause is not a memo. A user-driven chat thread is not a memo. And a platform that lets users iterate through legal-research questions until satisfied is not the same product as a finished memorandum delivered by Alexi. [redacted]

Fastcase does not ask the Court to take this on faith. [redacted]

### D. ALR Uses Fastcase Data for Commercial Purposes.

Alexi separately breached Section 1.7's commercial-use restriction. [redacted]

That is commercial use. The Agreement contemplated one revenue-generating use of Fastcase data: Alexi could use the data internally to produce legal memos for paying customers. [redacted]

Alexi's contrary reading collapses the commercial use restriction into a much narrower prohibition on "bulk sale" or sublicensing. Alexi Mot. at 25–26. But the parties did not write such a narrow restriction. Pre-contract correspondence described restrictions that "include" bulk sale and making content available through a traditional legal research product like Fastcase. Counterstatement ¶¶ 38–39. "Include" identifies examples; it does not establish the outer

boundary of the restriction. And the operative Agreement goes further: Section 1.7 prohibits commercial use, while Section 2.2 separately prohibits selling, licensing, publishing, copying, or otherwise distributing any part of the Fastcase data without written consent.

Alexi's illusory-contract argument is a strawman. Alexi Mot. at 25–26. Fastcase does not read the Agreement to prohibit Alexi from selling the product the parties contemplated. The Agreement allowed Alexi to use Fastcase data internally to prepare legal memos and sell those memos to customers. What it did not allow was something materially different: turning Fastcase's licensed data feed into a paid, customer-facing legal research platform. That reading gives effect to all of Section 1.7—the "Purpose" limitation, as well as the commercial-use and competitive-use restrictions. Alexi's reading would erase those limitations by converting a restricted internal research license into a license for any commercial AI product Alexi later chose to build.

**E. ALR Uses Fastcase Data for a Purpose Competitive with Fastcase.**

Alexi also violates Section 1.7's prohibition on using Fastcase data "for any purpose which is competitive with Fastcase." Agreement § 1.7. Fastcase is a legal research technology company that provides an online legal research system over a database of primary law. Agreement, Recital 1. Alexi now uses Fastcase data to sell what it markets as legal research software.

Alexi's own words establish the competitive purpose. [redacted]

[redacted]

Alexi offers four responses. None defeats summary judgment for Fastcase, and none supports summary judgment for Alexi.

First, it does not matter whether Fastcase itself offered an AI chatbot. *See* Alexi Mot. at 28. Section 1.7 bars use of Fastcase data for any purpose "competitive with Fastcase," not merely use of the data in a product with the same interface. Agreement § 1.7. Fastcase's relevant business is legal research. [redacted] ALR therefore competes with Fastcase in functional terms, even if it uses a chat interface rather than a traditional search box.[6]

Second, Alexi's reliance on testimony that Fastcase personnel did not historically view Alexi as a competitor is misplaced. Alexi Mot. at 5–6. [redacted] The Agreement bars competitive use of Fastcase data, not merely successful competitive use.

Third, [redacted]

[6] In any event, Alexi is wrong on the facts. [redacted]

[redacted] Alexi was using Fastcase data to sell a legal research platform in the same product category as Fastcase.

Fourth, Alexi's "self-defeating" argument is a strawman. Alexi Mot. at 27–28. Fastcase does not contend that Alexi's original memo service was prohibited competition. Nor does Fastcase read the competitive-use restriction to swallow the license. The provisions work together. Alexi could use Fastcase data internally to prepare and sell legal memos—the product the parties contemplated—but could not turn the licensed data feed into a customer-facing legal research platform that competes with Fastcase's core business. That reading gives effect to both the license grant and the competitive-use restriction. Alexi's reading would erase the latter by treating the memo as permission to use Fastcase data in any AI product Alexi later chose to build.[7]

The record confirms that ALR performs those legal research functions. [redacted]

[7] Alexi also argues that generative AI may increase use of traditional databases and therefore may be complementary rather than competitive. Alexi Mot. at 6, 28. But Mr. Walters's testimony on that point was expressly speculative. Counterstatement ¶ 98. And speculation about generative AI generally does not answer the contractual question here: whether Alexi used Fastcase data "for any purpose which is competitive with Fastcase." Agreement § 1.7. Alexi did. Its own marketing, internal documents, and decision to stop linking to Fastcase because vLex was "a competitor" establish the point. Any claimed incidental benefit to Fastcase is irrelevant to liability.

[redacted] That violates Section 1.7.

### F. Alexi's Waiver, Acquiescence, and Course-of-Dealing Arguments Fail.

Alexi's course-of-dealing theory does not change the result. Alexi Mot. at 34. Extrinsic evidence cannot contradict the Agreement's unambiguous restrictions. *See Capital River Enters., LLC v. Abod*, 301 A.3d 1234, 1240 (D.C. 2023) (extrinsic evidence may not be used to contradict unambiguous contractual language); *2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 86–88 (D.C. 2019) (declining to look outside the four corners of an agreement to interpret unambiguous contractual language). And even if the Court considers course of dealing, the evidence confirms Fastcase's reading. For years, Fastcase understood Alexi to be using Fastcase data with internal technology to help produce legal memoranda. Counterstatement ¶¶ 26–29, 34, 46-50, 102–13. That is the use the Agreement permitted.

The key distinction is simple: Fastcase knew Alexi used AI as an internal tool to help prepare legal memos. Fastcase did not know or approve that Alexi was using Fastcase data to power a customer-facing legal research platform. Alexi's waiver theory treats those different uses as though they were the same.

The contemporaneous record tracks the same distinction. [redacted]

[redacted]

Alexi's contrary evidence has the same timing problem. Alexi points to statements that it made to Fastcase about AI, internal Fastcase/vLex communications discussing Alexi's AI technology, Doble's 2023 "Fastcase 50" award, and a September 2023 sample memo requested by vLex executive Robin Chesterman. Alexi Mot. at 9–10, 13, 33–34. Those materials concern the product Fastcase knew about: Alexi's AI-assisted memo service. Fastcase does not allege that Alexi's original memo service was the breach. Compl. ¶ 50. At the time of the award and sample memo, Alexi had not yet launched ALR and had not yet pushed Sources-in-Chat to production in the United States. Counterstatement ¶¶ 110, 208. Chesterman requested a memo and received a standalone, 29-page memo several hours later after human review by an Alexi researcher. *Id.* ¶ 135. Nothing in those materials disclosed that Alexi was using Fastcase data to power a real-time, user-directed legal research platform.

The timeline confirms the point. [redacted]

Alexi also argues that Fastcase was on "inquiry notice" because Alexi publicly announced product developments, including Instant Memo and ALR. Alexi Mot. at 34. That argument fails for several reasons. As an initial matter, inquiry notice is a fact-intensive question ill-suited to

resolution on summary judgment. *See Chandler v. Berlin*, 998 F.3d 965, 972 (D.C. Cir. 2021) (inquiry notice requires a "highly factual analysis"); *FDIC v. Bank of Am., N.A.*, 783 F. Supp. 3d 1, 37 (D.D.C. 2025) (a duty of inquiry arises only once the plaintiff is on notice that it might have a claim). More fundamentally, Alexi's public marketing did not disclose the critical fact: that Alexi was using Fastcase data to power a customer-facing research platform in violation of the Agreement. Alexi could develop AI tools, and Alexi could even compete with Fastcase, so long as it did not use Fastcase data to do so. Public announcements about AI products therefore did not put Fastcase on notice that Alexi was using licensed Fastcase data in a prohibited way.

The record also explains why Fastcase did not learn of the breach earlier. [redacted]

In all events, inquiry notice is beside the point. Fastcase communicated no approval of Alexi's post-pivot conduct, and Alexi identifies nothing that could have led it to reasonably believe Fastcase endorsed or accepted that conduct. Silence is not waiver—especially where Alexi's own documents show that it was trying to avoid scrutiny. Fastcase's approval of Alexi's pre-pivot memo service could not reasonably be understood as approval of a customer-facing legal research platform that Fastcase had never seen and Alexi had not disclosed.[8]

[8] Alexi also invokes equitable estoppel, claiming it relied on Fastcase's supposed acquiescence [redacted] But estoppel requires reasonable reliance. *See SJ Enters., LLC v. Quander*, 207 A.3d 1179, 1184 (D.C. 2019). Alexi cannot show reasonable reliance on

## II. THE UNDISPUTED EVIDENCE SUPPORTS FASTCASE'S BREACH-OF-CONTRACT CLAIM UNDER SECTION 2.2.

Alexi's breach of Section 2.2 independently defeats its Motion. Section 2.2 is broad and unambiguous. It provides that Alexi "will not use the Fastcase Data at any time in a way which is inconsistent with the Purpose." Agreement § 2.2. It also provides that Alexi may not "sell, license, publish, copy, or otherwise distribute any part of the Fastcase Data," and may not permit any employee or third party to do so, "without written consent from Fastcase." *Id.* The undisputed record shows that Alexi violated each of those restrictions.

### A. Alexi Copied, Published, and Distributed Fastcase Data Without Written Consent.

Alexi made copies of Fastcase caselaw, hosted those copies on its own systems, displayed the full text of Fastcase opinions to end users, and allowed users—and anyone else with the URL—to access the full text of linked cases. Counterstatement ¶¶ 116, 126. That violates Section 2.2.

Alexi's response is largely semantic. It argues it did not "publish" or "distribute" Fastcase data because it "only displayed the (non-copyrightable) raw text of Fastcase cases within the Alexi platform." Alexi Mot. at 31. It also tries to narrow Fastcase's claim to the mere provision of hyperlinks. *Id.* at 30–32. The claim is broader and simpler: Alexi copied Fastcase data into Alexi-controlled systems and made full-text Fastcase opinions available through Alexi's product. That conduct violates Section 2.2 whether one labels it copying, publishing, distribution, or all three.

Alexi's own definitions do not help it. Alexi says "publishing" requires distributing copies "to the public," and "distributing" requires delivering or dispersing the data. Alexi Mot. at 31. But Alexi did exactly that. It made full-text Fastcase opinions available to paying subscribers

---

Fastcase's silence [redacted] Any prejudice from building a business around a use the Agreement did not permit is Alexi's licensing risk, not estoppel.

through Alexi-hosted links. [redacted]

In any event, Alexi cannot avoid Section 2.2 by focusing only on "publish" and "distribute." Section 2.2 also prohibits Alexi from "copy[ing]" "any part" of the Fastcase Data without written consent. Agreement § 2.2. [redacted]

Nor does it matter that judicial opinions are not copyrightable. Fastcase's claim is a contract claim, not a copyright claim. Alexi promised by contract not to copy, publish, or distribute "any part" of the Fastcase data without written consent. Agreement § 2.2. Having accepted the licensed data under those terms, Alexi cannot evade the contract by arguing that the underlying case text is not copyrightable.

**B. Alexi's Section 2.2 Waiver and Acquiescence Arguments Fail.**

Alexi next argues that Fastcase waived or acquiesced in Alexi's case-display practices. Alexi Mot. at 30–32. That argument fails for two independent reasons. First, Section 2.2 required "written consent" for the conduct at issue, and Alexi identifies none. Agreement § 2.2. Second, Fastcase did not discover the extent of Alexi's conduct—including that Alexi was copying and hosting full-text Fastcase opinions on its own systems—until this litigation. A party cannot knowingly waive a right based on conduct it did not know was occurring.

Alexi principally relies on an alleged phone call in which, according to Alexi, Fastcase employee Nina Jack said Fastcase had "no problem" with Alexi displaying the text of Fastcase cases cited in Alexi's memos. Alexi Mot. at 13. Jack denies giving that permission.

Counterstatement ¶¶ 121–24. And even if Alexi's version of the call were credited, it would not satisfy Section 2.2. The Agreement required written consent, not an alleged oral statement in a disputed phone call. At minimum, that dispute defeats Alexi's Motion. As a matter of law, it cannot establish that Alexi had the written consent Section 2.2 requires.

[redacted]

[redacted][9]

[9] Alexi also argues that Fastcase cannot rely on the case-display feature because the breach notice did not separately mention display or linking, and because Alexi supposedly could have "easily cured" by reverting to Fastcase public links. Alexi Mot. at 31. That argument fails for three reasons. First, the Agreement permitted termination upon any uncured material breach; Fastcase was not required to catalogue every additional violation in the breach notice. *See infra* Part III.A. The Section 1.7 breaches alone supplied cause, and Alexi's copying, hosting, and display of Fastcase cases provides an independent breach of Section 2.2 and, at minimum, a confirmatory ground defeating Alexi's Motion. Second, Alexi's proposed "easy cure" was not available. Fastcase never provided Alexi with public hyperlinks, and Alexi's self-hosting was a unilateral workaround adopted because Alexi could not generate public Fastcase links.

**C. Section 10 and Alexi's Removal of Fastcase Links Confirm the Practical Effect of Alexi's Conduct.**

Section 10 of the Agreement confirms why Alexi's misconduct matters. It provides that "any page or portal that allows access to the Fastcase Data will state in a clear, obvious, and unmistakable manner that the Fastcase Data is only available for internal purposes." Agreement § 10. That provision makes sense only because the Agreement treated access to Fastcase data as restricted. Yet Alexi displayed full-text Fastcase opinions to users through its own platform without that disclaimer at all. Counterstatement ¶ 128. That omission underscores that Alexi was not merely using Fastcase data internally; it was surfacing the data externally through an Alexi-controlled interface.

Alexi's later decision to stop linking users to Fastcase confirms the same. [redacted]

Section 2.2 therefore supplies an independent basis to deny Alexi's Motion and to grant Fastcase's cross-motion. Alexi copied Fastcase data, published and distributed full-text opinions through its own product, used the data inconsistently with the Agreement's Purpose, and did all of this without the written consent the Agreement required.

---

Counterstatement ¶¶ 117–18, 120. Alexi therefore was not proposing to revert to an authorized prior practice; it was describing a Fastcase-hosted feature it never had. Third, Fastcase did not discover that Alexi was hosting full-text Fastcase cases, or the full extent of Alexi's Section 2.2 violations, until discovery. Alexi cannot avoid liability for a breach by arguing that Fastcase failed to identify conduct Alexi had not disclosed.

## III. ALEXI'S CONTRACT COUNTERCLAIM FAILS AS A MATTER OF LAW.

Alexi's breach-of-contract counterclaim rests on the premise that Fastcase, not Alexi, breached the Agreement. Alexi contends that Fastcase "improperly terminated the Agreement based on a fabricated and generalized breach claim that failed to give Alexi the contractually required notice and opportunity to cure," and that Fastcase separately breached by "stop[ping] providing Alexi the daily caselaw updates that it was contractually obligated to provide." Alexi Mot. at 3. Both theories fail. Alexi materially breached first, failed to cure, and thereby excused Fastcase's further performance and authorized termination. And Alexi provided adequate notice that identified the challenged conduct, provided the full contractual cure period, and terminated only after Alexi denied breach and refused to change course.

### A. Alexi's Uncured Material Breach Excused Fastcase's Performance and Authorized Termination.

Under D.C. law, a material breach permits the non-breaching party to stop performing and terminate the agreement. *See Hto7, LLC v. Elevate, LLC*, 319 A.3d 368, 375–76 (D.C. 2024); *CorpCar Services Houston*, 325 A.3d at 1246–47. That rule disposes of Alexi's contract counterclaim. The undisputed record shows that Alexi used Fastcase data outside the Agreement's limited "Purpose" and copied, published, and distributed Fastcase data in violation of Section 2.2. *Supra* Parts I & II. Fastcase then sent a Notice of Material Breach on October 27, 2025; Alexi did not cure within the contractual 30-day cure period; and Fastcase terminated for cause on November 26, 2025. Counterstatement ¶¶ 53, 187.

Because Alexi materially breached first and refused to cure, Fastcase's further performance was excused. Alexi therefore cannot recover on a contract counterclaim premised on Fastcase's refusal to continue performing under the same license Alexi had already materially breached. That includes Alexi's daily-updates theory. A party in uncured material breach cannot insist that its

counterparty keep supplying the very data the breaching party is using outside the license. Alexi materially breached, refused to cure, and cannot recover from Fastcase for enforcing the Agreement's termination right.

**B. Fastcase's Notice Was Adequate and Alexi Refused to Cure.**

Alexi argues that Fastcase's notice was too vague and the cure period too short because Fastcase supposedly failed to identify the specific features at issue and demanded a response within five business days. Alexi Mot. at 36–37. The record refutes both points.

Fastcase's notice identified the breach: Alexi was "commercially offering a legal research product offering to customers" that "competes with Fastcase's products and services," in violation of Sections 1.7 and 2.2. Counterstatement ¶ 180. That was enough to tell Alexi what conduct had to stop. Alexi does not claim it misunderstood the product Fastcase was challenging. It simply denied that the challenged conduct breached the Agreement and refused to change course.

Nor did Fastcase truncate the cure period. Although Fastcase asked Alexi to provide an update on corrective action within five business days, it did not terminate after five days. It waited the full 30 days required by Section 5.2 and terminated only after Alexi made clear that it would not cure. *Id.* ¶ 181. Alexi's November 3 response denied breach, asserted waiver and estoppel, stated that "Alexi relies on the Fastcase Data to provide its products," and threatened to take steps to preserve its position. *Id.* ¶ 186. Alexi flatly refused to cure.

Alexi's authorities do not help. Alexi cites cases where the notice failed to identify the breach with enough specificity for the counterparty to know what to cure. In *IP Global Investments America, Inc. v. Body Glove IP Holdings, LP*, the notice said only that the licensee had failed to follow a broad product-approval process, without identifying the specific mark uses, products, or instances of noncompliance at issue. 2018 WL 5983550, at *5–6 (C.D. Cal. Nov. 14, 2018). The court held the notice deficient because it "fail[ed] to identify the specific breach," did not specify

a cure period, and left the licensee with "no way to begin to attempt to cure the breach." *Id.* at *6. *Deffenbaugh Industries, Inc. v. Unified Government of Wyandotte County* likewise involved a notice that described broad categories of disagreement but failed to tell the counterparty what specific conduct had to be corrected, leaving it to engage in a "meaningless guessing game" about how to cure. 2023 WL 4363439, at *19–20 (10th Cir. July 6, 2023). This case is different. Fastcase identified the challenged product, the prohibited use, and the contractual provisions violated; Alexi received the full contractual cure period; and Alexi responded by denying breach and refusing to change course.

Alexi also cannot defeat termination by pointing to additional breaches uncovered during discovery. Fastcase was not required to know or list every breach before terminating based on the material breach it did identify. Additional Section 2.2 violations do not restore Alexi's right to performance; they confirm the seriousness of Alexi's misuse of Fastcase data. [redacted]

## IV. ALEXI'S BAD FAITH COUNTERCLAIM FAILS AS A MATTER OF LAW.

Alexi's implied-covenant theory is that Fastcase "manufactured" a breach claim as a "pretext" to satisfy Clio's demand that Fastcase eliminate Alexi's backfile purchase option. Alexi Mot. at 3, 40–42. That theory does not work. The implied covenant does not prevent a party from exercising an express termination right after an uncured material breach. And the record does not support Alexi's single-motive narrative in any event.

First, Alexi's claim fails because Alexi materially breached the Agreement and Fastcase exercised an express contractual right. The implied covenant of good faith and fair dealing cannot "contradict, modify, negate, or override the express terms of a contract." *Africare, Inc. v. Xerox Complete Document Sols. Md., LLC*, 436 F. Supp. 3d 17, 33 (D.D.C. 2020) (citing *Billups v. Lab'y*

*Corp. of Am.*, 233 F. Supp. 3d 20, 26 (D.D.C. 2017)); *CorpCar Servs. Houston*, 325 A.3d at 1246–47. Nor does a party breach the implied covenant by doing what the contract permits. *Weatherly v. Second Nw. Coop. Homes Ass'n, Inc.*, 304 A.3d 590, 596 (D.C. 2023) (conduct that is "entirely consistent" with a party's rights under a contract does not violate the implied covenant).

That rule disposes of Alexi's claim. As shown above, Alexi used Fastcase data outside the Agreement's limited Purpose, used the data for commercial and competitive purposes, and copied, hosted, published, and distributed Fastcase data without written consent. *Supra* Parts I & II. Alexi then refused to cure. *Supra* Part III.B. Section 5.2 therefore authorized Fastcase to terminate for cause. Once Fastcase had cause to terminate, Alexi cannot recast the termination as bad faith merely by asserting that Fastcase also had commercial reasons to enforce its rights.

*CorpCar* is directly on point. There, the D.C. Court of Appeals held that a party's material breach supplied "sufficient cause" to invoke a contractual termination provision, rejecting the argument that the termination could be treated as wrongful because it was allegedly pretextual. 325 A.3d at 1246–47. The same principle controls here. Alexi's uncured material breach gave Fastcase cause to terminate. The implied covenant does not require Fastcase to keep supplying data to a licensee using that data outside the license, nor does it require Fastcase to keep performing merely because Alexi says termination affected the value of its backfile option.

Nor does it matter that the backfile issue gave Fastcase an additional commercial reason to enforce the Agreement. A party does not act in bad faith by enforcing an express contractual right merely because enforcement also serves its business interests. The dispositive point is that Alexi actually breached. Once that is true, Alexi cannot transform a valid termination into bad faith by pointing to Fastcase's additional reasons for insisting on compliance.

Second, Alexi's factual premise is wrong and, at minimum, genuinely disputed. Alexi asks

the Court to infer that Fastcase manufactured the breach claim to solve Clio's backfile concern. The chronology alone undercuts that theory. [redacted]

[redacted][10] *Anderson* 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … ."). At minimum, a reasonable factfinder could conclude that Fastcase pursued a genuine breach claim independent of any backfile issue. That alone defeats Alexi's Motion.

[10] Alexi's implied-covenant cases do not support summary judgment. *Allworth v. Howard University* affirmed summary judgment ***against*** the implied-covenant claim. 890 A.2d 194, 204 (D.C. 2006). *C & E Services, Inc. v. Ashland Inc.* followed a jury verdict and applied Rule 50 standards. 601 F. Supp. 2d 262, 265–67, 276 (D.D.C. 2009). Three of Alexi's cases were motion to dismiss decisions accepting allegations as true. *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 288 F. Supp. 3d 176, 180 (D.D.C. 2018); *Legion Sys., LLC v. Valiant Glob. Def. Servs., Inc.*, 2021 WL 3633592, at *1–2 (M.D. Fla. Aug. 17, 2021); *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 45 (D.D.C. 2014). And *Florence Urgent Care v. Healthspan, Inc.* denied summary judgment to both sides because disputed facts required a jury. 445 F. Supp. 2d 871, 878–2 (S.D. Ohio 2006). None supports entering summary judgment for Alexi on a disputed pretext theory—especially where Fastcase had contractual cause to terminate.

Third, the contemporaneous record defeats any claim of dishonest purpose. Bad faith requires conduct marked by "dishonest purpose," "malevolent intent," or something more than "an honest mistake as to one's rights or duties." *Himmelstein v. Comcast of the Dist., L.L.C.*, 908 F. Supp. 2d 49, 54 (D.D.C. 2012). The record here shows the opposite. Fastcase personnel investigated Alexi's product, concluded that Alexi was using Fastcase data outside the Agreement, and internally described Alexi as "very obviously in breach." Counterstatement ¶ 176. Fastcase then sent a breach notice, gave Alexi the contractual cure period, and terminated only after Alexi denied breach and refused to cure. *Supra* Part III.B. That is not "subterfuge" or evasion of the bargain. It is enforcement of the bargain.

Fourth, Alexi's allegations about statements to prospective acquirers do not support summary judgment either.[11] [redacted]

[11] Alexi's acquisition-and-damages narrative is improper in this expedited phase. Damages are outside the scope of this expedited, liability-focused discovery phase Alexi requested. ECF No. 55–1 ¶ 1(d). And the contemporaneous record undermines Alexi's causation story in any event: [redacted]

[redacted]

Alexi relies on internal Slack shorthand that can be read differently only when divorced from that context. [redacted] A truthful correction about scope of a claimed contractual asset is not bad faith. *Abdelrhman v. Ackerman*, 76 A.3d 883, 891–92 (D.C. 2013) (truthful representation about contractual rights or the meaning of a contract cannot be characterized as bad faith); *Weatherly v. Second Nw. Coop. Homes Ass'n, Inc.*, 304 A.3d 590, 596–97 (D.C. 2023) (conduct "entirely consistent with [a party's] rights under the contracts" does not breach the implied covenant). At minimum, the conflicting evidence about what Mr. Walters said and meant creates a credibility dispute that cannot be resolved in Alexi's favor on summary judgment. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013) ("we cannot resolve this credibility contest" on summary judgment).

Alexi's reliance on *United States v. Google LLC* does not change the summary judgment standard. *See* Alexi Mot. at 42 n.15. *Google* does not create a rule that contemporaneous documents automatically override sworn testimony at summary judgment. The statement Alexi quotes came after a nine-week bench trial, where the court heard live witnesses, admitted thousands of exhibits, received post-trial submissions, and then "carefully considered and weighed the witness testimony and evidence." 747 F. Supp. 3d 1, 32–34 (D.D.C. 2024). The cited footnote likewise concerned how the court weighed evidence "[i]n making [its] Findings of Fact" after trial.

*Id.* at 77 n.2. Here, by contrast, the Court is not sitting as factfinder on Alexi's Motion. It cannot resolve the dispute over what Mr. Walters said by crediting Alexi's preferred inference from an internal document over his sworn testimony. *See Anderson*, 477 U.S. at 249, 255 (at summary judgment, "the judge's function is not himself to weigh the evidence," and "[c]redibility determinations" and "drawing of legitimate inferences" are jury functions); *Ayissi-Etoh*, 712 F.3d at 576, 578 (reversing summary judgment where disputed statements created credibility contests because the court could not "resolve the dispute at the summary judgment stage against the non-moving party" or "resolve this credibility contest").

Alexi's implied-covenant counterclaim therefore fails. Fastcase had cause to terminate, gave the contractually required notice and cure period, and exercised an express contractual right after Alexi refused to cure. The implied covenant does not transform that authorized termination into bad faith.

## V. ALEXI'S TORTIOUS-INTERFERENCE COUNTERCLAIM FAILS AS A MATTER OF LAW.

Alexi's final counterclaim asserts that vLex and Clio tortiously interfered with the Agreement by "induc[ing] Fastcase to terminate (and thereby breach) the Agreement with Alexi." Alexi Mot. at 43. Alexi points to the merger agreement's "reasonable endeavors" clause, which it says required vLex "to try to eliminate Alexi's backfile purchase option and, failing that, terminate the Agreement," and contends that Clio and vLex "orchestrated that wrongful contract termination at every step." Alexi Mot. at 15, 44. The claim fails for the same reason Alexi's contract and implied-covenant counterclaims fail: Fastcase did not breach the Agreement by terminating after Alexi's uncured material breach.

To prevail on a tortious-interference claim, Alexi must prove "(1) [the] existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3)

intentional interference with that relationship by the defendant; and (4) resulting damages." *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (citation omitted). Where, as here, the claim is interference with an existing contract, Alexi must show that the defendant intentionally procured a breach of that contract. *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008). Alexi cannot make that showing.

First, Alexi cannot establish the predicate breach. Alexi's theory depends on the premise that Fastcase wrongfully terminated the Agreement. But as shown above, Alexi materially breached Sections 1.7 and 2.2, failed to cure, and thereby gave Fastcase cause to terminate under Section 5.2. *Supra* Parts I–III. Fastcase's termination was therefore an authorized exercise of a contractual right, not a breach.

That defeats the tort claim at the threshold. D.C. tortious-interference law follows the Restatement, which imposes liability only where the defendant improperly induces or causes the contracting party "not to perform [the] contract." *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345 (D.C. 2015); *see* Restatement (Second) of Torts § 766 (1979) (one who "intentionally and improperly interferes with the performance of a contract … between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability … for the pecuniary loss resulting … from the failure of the third person to perform the contract"). Because Alexi's breach excused Fastcase's further performance and authorized termination, Fastcase did not fail to perform. There was no improper contractual breach for vLex or Clio to procure.

Second, Alexi cannot establish improper interference. Even where a defendant intentionally causes a third party not to continue performance, D.C. law recognizes a privilege for actions taken in good faith to protect the defendant's own legally protected or economic interest.

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008) ("One who, by asserting in good faith a legally protected interest of his own … intentionally causes a third person not to perform an existing contract … does not interfere improperly … if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract."); *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991) ("[A] defendant is privileged if he acts in order to protect 'a present, existing economic interest.'") (quoting *Dresser v. Sunderland Apartment Tenants Ass'n*, 465 A.2d 835, 839 n.12 (D.C. 1983)).

That principle applies here. vLex was Fastcase's parent and had an obvious economic interest in Fastcase's licensed data and contractual rights. Clio likewise had a concrete economic interest arising from its acquisition agreement and the business it had agreed to purchase. Alexi's theory is that vLex and Clio encouraged Fastcase to enforce the Agreement's limits and protect the value of the Fastcase/vLex database. That is not improper interference. Inducing a contracting party to do what the contract permits—terminate after an uncured breach—is not tortious.[12]

Third, Alexi's causation and motive theory is disputed in any event. Alexi asks the Court to find that vLex and Clio "orchestrated" a wrongful termination to eliminate the backfile option. The record does not permit that finding, much less require it. The record may show that Fastcase,

[12] Alexi's reliance on *Close It! Title Services, Inc. v. Nadel* is misplaced. Alexi Mot. at 44. *Close It!* was a pleading-stage case about alleged interference with business relationships, not a summary judgment case about inducement of a contract breach. The court held that the plaintiff had adequately pleaded intent where an attorney's public statements allegedly caused realtors and lenders to stop doing business with a title company; the plaintiff did not also have to plead malice or independent wrongfulness to satisfy the intent element. 248 A.3d 132, 141 & n.28, 142 (D.C. 2021). Fastcase is not arguing otherwise. Alexi's claim fails for different reasons: Alexi's uncured material breach gave Fastcase cause to terminate, and the challenged conduct was directed at protecting legitimate contractual and economic interests. *Close It!* does not convert involvement in a lawful termination into tortious interference. Alexi's evidence that Clio and vLex discussed the Agreement, analyzed the backfile option, helped draft the notice, or funded litigation shows involvement. It does not show improper inducement of a breach.

vLex, and Clio discussed both Alexi's breach and the backfile issue. But it does not establish Alexi's stronger premise: that the breach claim was fabricated or that Clio and vLex procured a wrongful termination. To the contrary, the record supports the opposite inference. Contemporaneous documents described Alexi as "very obviously in breach" weeks before Clio became concerned about the backfile provision during diligence; Fastcase and vLex separately tracked Alexi's breach and the backfile issue; and Fastcase witnesses testified that the breach was a genuine concern. *Supra* Part IV; Counterstatement ¶¶ 148, 152, 157, 176. At minimum, that evidence forecloses summary judgment for Alexi. The Court cannot resolve disputed motive and causation evidence by accepting Alexi's preferred inference that the breach claim was fabricated.

Fourth, vLex's corporate relationship to Fastcase supplies an additional reason the claim fails as to vLex. A tortious-interference claim requires interference by a third party, not by the contracting party itself. *See Donohoe v. Watt*, 546 F. Supp. 753, 757 (D.D.C. 1982), *aff'd*, 713 F.2d 864 (D.C. Cir. 1983); *Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988) (university officials acting for the university could not interfere with the university's own contract). As Fastcase's parent, vLex was not a stranger meddling in an unrelated contract; it was acting to protect the corporate family's interest in Fastcase's contract and data by appropriately exercising termination rights given Alexi's breach. At minimum, vLex's economic interest privilege bars Alexi from converting parent-company oversight and legal enforcement into tortious interference.

Finally, to the extent Alexi's theory depends on alleged lost acquisition value or the claimed future value of the backfile option, that theory does not cure the liability defects. A plaintiff cannot use speculative downstream business consequences to convert an authorized contract termination into tortious interference. *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012) ("[I]magined economic gain from a nonexistent business is nothing but

speculation."). Any claimed acquisition value depended on Alexi's continued compliance with the Agreement. Once Alexi breached and failed to cure, Fastcase was entitled to terminate.

Alexi's tortious-interference counterclaim therefore fails. Fastcase did not breach the Agreement; vLex and Clio acted to protect legitimate contractual and economic interests; and, at minimum, disputed evidence forecloses Alexi's attempt to obtain summary judgment on its "orchestrated termination" theory.

## CONCLUSION

For the foregoing reasons, the undisputed record establishes that Alexi breached the Agreement, that Fastcase's termination for cause was proper, and that each of Alexi's contract-related counterclaims fails as a matter of law. Alexi's Motion for Partial Summary Judgment should be denied in its entirety.

DATED: June 22, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Paul J. Sampson*
Paul N. Harold (D.C. Bar No. 1032578)
Brendan J. Coffman (D.C. Bar No. 988370)
1700 K Street NW, Fifth Floor
Washington, DC 20006-3814
Telephone: (202) 973-8800
PHarold@wsgr.com
BCoffman@wsgr.com

Jess M. Krannich (*pro hac vice*)
Paul J. Sampson (D.C. Bar No. 1010457)
Rebecca J. Nelson (*pro hac vice*)
Andrew P. Follett (*pro hac vice*)
Isabella Ang (*pro hac vice*)
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
JKrannich@wsgr.com
PSampson@wsgr.com
RNelson@wsgr.com
AFollett@wsgr.com
IAng@wsgr.com

*Counsel for Plaintiff Fastcase Inc. and Counter-Defendants Fastcase Inc., vLex, LLC, and Themis Solutions Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, the foregoing was electronically filed through this Court's CM/ECF system and additionally all counsel of record were served via electronic mail.

Respectfully submitted,

*/s/ Paul J. Sampson*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
PSampson@wsgr.com

*Counsel for Plaintiff Fastcase Inc. and Counter-Defendants Fastcase Inc., vLex, LLC, and Themis Solutions Inc.*