**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FASTCASE, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALEXI TECHNOLOGIES INC., <br><br> Defendant. | C.A. No. 1:25-CV-04159-RJL |
| ALEXI TECHNOLOGIES INC. <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> FASTCASE, INC., VLEX, LLC, & THEMIS SOLUTIONS INC., <br><br> Counterclaim Defendants. | |

**ALEXI TECHNOLOGIES INC.'S OPPOSITION TO COUNTER-DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON FASTCASE'S BREACH-OF-
CONTRACT CLAIM AND ALEXI'S CONTRACT-RELATED COUNTERCLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 5

ARGUMENT ........................................................................................................................... 18

I.      Fastcase's Breach Claim Fails Because It Did Not Provide the Required Notice and Opportunity to Cure ....................................................................................................... 18

II.     Alexi Did Not Breach the Agreement as a Matter of Law and Based on the Undisputed Evidence .......................................................................................................................... 21

        A.      Alexi's Use of the Fastcase Caselaw Data for "Internal Research Purposes," as Permitted by Section 1.7 ................................................................. 22

        B.      Alexi's Use of the Fastcase Data is Consistent With Agreement's Commercial Purposes Limitations ................................................................... 25

        C.      Alexi's Does Not Use the Fastcase Data to Compete with Fastcase .................... 27

        D.      The Agreement's Plain Text Does Not Restrict Alexi to "Memos" or Any Other Particular Output Format ............................................................................. 30

III.    Alexi Did Not Copy, Publish, or Distribute the Fastcase Data in a Manner Inconsistent With the Agreement ......................................................................................................... 32

        A.      The Agreement Contemplated that Alexi Would Store the Fastcase Data on its Servers ........................................................................................................ 32

        B.      Alexi Did Not "Publish" or "Distribute" the Fastcase Data ................................ 34

        C.      Section 10 Does Not Support Fastcase's Section 2.2 Theories ............................ 35

IV.     Fastcase's Breach Claim is Barred by Waiver and Estoppel ............................................ 37

V.      Alexi's Contract-Related Counterclaims Survive Summary Judgment ............................ 38

        A.      Fastcase's Challenge to Alexi's Breach of Contract Counterclaims Is Entirely Derivative of Its Own Failed Breach Claim ............................................. 39

        B.      Fastcase's Implied-Covenant Defense Fails Because Fastcase Cannot Identify a Valid Termination ................................................................................. 40

        C.      Alexi's Tortious-Interference Claim Against Clio and vLex Is Established on the Undisputed Record .................................................................................... 42

CONCLUSION ........................................................................................................................ 43

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Africare, Inc. v. Xerox Complete Document Sols. Md., LLC,*
    436 F. Supp. 3d 17 (D.D.C. 2020) ...................................................................... 40

*Allworth v. Howard Univ.,*
    890 A.2d 194 (D.C. 2006) ................................................................................. 40

*Am. First Inv. Corp. v. Goland,*
    925 F.2d 1518 (D.C. Cir. 1991) ............................................................. 23, 28, 33

*Anderson v. Wachovia Mortgage Corp.,*
    621 F.3d 261 (3d Cir. 2010)............................................................................... 21

*Aziken v. D.C.,*
    70 A.3d 213 (D.C. 2013) .................................................................................. 23

*Bragdon v. Twenty-Five Twelve Assocs. L.P.,*
    865 A.2d 1165 (D.C. 2004) ............................................................................... 23

*Carome v. Carome,*
    293 A.3d 1122 (D.C. 2023) ............................................................................... 22

*Cedar Rapids Television Co. v. MCC Iowa LLC,*
    524 F. Supp. 2d 1127 (N.D. Iowa 2007)............................................................ 21

*Clark v. Bank of Am., N.A.,*
    561 F. Supp. 3d 542 (D. Md. 2021).................................................................... 32

*Close It! Title Servs., Inc. v. Nadel,*
    248 A.3d 132 (D.C. 2021) ................................................................................. 42

*Columbia Hosp. for Women & Lying-In Asylum v. U.S. Fid. & Guar. Co.,*
    188 F.2d 654 (D.C. Cir. 1951)........................................................................... 23

*CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.,*
    325 A.3d 1235 (D.C. 2024) ................................................. 18, 27, 31, 40, 41

*Daniels v. Specialized Loan Servicing, LLC,*
    2025 WL 576588 (C.D. Cal. Feb. 10, 2025)...................................................... 20

*Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty.,*
    2023 WL 4363439 (10th Cir. 2023) .................................................................. 32

*Grynberg v. FERC*,
    71 F.3d 413 (D.C. Cir. 1995) ....................................................................................... 31

*Hart v. Vermont Inv. Ltd. P'ship*,
    667 A.2d 578 (D.C. 1995) ........................................................................................... 23

*Hartford Cas. Ins. Co. v. Jenkins*,
    2010 WL 2348619 (S.D. Ala. June 9, 2010) ................................................................ 35

*Henok v. Chase Home Fin*,
    922 F. Supp. 2d 110 (D.D.C. 2013) ....................................................................... 19, 21

*Hto7, LLC v. Elevate, LLC*,
    319 A.3d 368 (D.C. 2024) ........................................................................................... 39

*Institute of Multidimensional Medicine v. Metagenics, Inc.*,
    635 F. Supp. 3d 6 (D.D.C. 2022) ................................................................................. 21

*James G. Davis Constr. Corp. v. HRGM Corp.*,
    147 A.3d 332 (D.C. 2016) ........................................................................................... 22

*LanQuest Corp. v. McManus & Darden LLP*,
    796 F. Supp. 2d 98 (D.D.C. 2011) ............................................................................... 37

*Lively v. Wayfarer Studios LLC*,
    2026 WL 905447 (S.D.N.Y. Apr. 2, 2026) ................................................................... 18

*McCoy v. SC Tiger Manor, LLC*,
    2022 WL 4492761 (M.D. La. Sept. 9, 2022) ................................................................ 21

*Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*,
    148 F. Supp. 2d 60 (D.D.C. 2001) ............................................................................... 38

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*,
    298 F. Supp. 2d 81 (D.D.C. 2004) .......................................................................... 35, 37

*Pigford v. Schafer*,
    536 F. Supp. 2d 1 (D.D.C. 2008) ................................................................................. 31

*Pivotal Colorado, II, LLC v. Triple M Beteiligungs-GMBH & Co KG*,
    2009 WL 1174463 (D. Colo. Apr. 29, 2009) ................................................................ 19

*Retail Clerks Int'l Ass'n Loc. No. 455 v. NLRB*,
    510 F.2d 802 (D.C. Cir. 1975) ..................................................................................... 26

*SJ Enters., LLC v. Quander*,
    207 A.3d 1179 (D.C. 2019) ............................................................................... 38

*Sun Secured Fin. LLC v. ARCS Com. Mortg. Co. LP*,
    730 F. Supp. 2d 132 (D.D.C. 2010) .................................................................. 18

*Trilon Plaza, Inc. v. Comptroller of State of New York*,
    788 A.2d 146 (D.C. 2001) ................................................................................. 31

*Ulla-Maija, Inc. v. Kivimaki*,
    2005 WL 2429490 (S.D.N.Y. Sept. 30, 2005).................................................. 21

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) .................................................................. 12

*Fed. Election Comm'n. v. v. Toledano*,
    317 F.3d 939 (9th Cir. 2002) ............................................................................ 35

*Whitt v. Am. Prop. Constr., P.C.*,
    157 A.3d 196 (D.C. 2017) ................................................................................. 42

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
    288 F. Supp. 3d 176 (D.D.C. 2018) .................................................................. 41

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024)................................................................ 32, 34

Merriam-Webster, www.merriam-webster.com/dictionary/......................................... 22

Federal Rule of Civil Procedure 30(b)(6) ........................................................ 10, 17, 24

**INTRODUCTION**

Counter-Defendants' motion for partial summary judgment is emblematic of the way they have treated their contract claim from the outset: a roving and undefined accusation of breach against Alexi Technologies Inc. ("Alexi") that has yet to find its target. Despite pointed document and written discovery, depositions, and access to the Alexi product itself, Counter-Defendants still cannot identify a single provision of the Data License Agreement ("Agreement") that Alexi actually violated based on the record in this case, the plain language of the contract, or the parties' undisputed course of dealing over the four-year period leading to the purported breach. Instead, Counter-Defendants' brief closes its eyes to the language of the Agreement—reading in words and limitations that do not exist by their terms, such as a "human research" requirement and an undefined "memo-only" output restriction that appear nowhere in the contract—while simultaneously ignoring the very clear language in the Clio-vLex Stock Purchase Agreement ("SPA") ██████████████████████████████████████ ████

The SPA unambiguously describes ██████████████████████████████ ██████████████████████████████████████████ Specifically, ████████████████████████████████████████████████ ████████████████████████████████████. And Fastcase ████████████████████████████████. Fastcase first sent Alexi a generic letter vaguely claiming breach—identifying no specific conduct or feature that supposedly violated the contract. And Fastcase then followed with this lawsuit. It did so after years of both privately and publicly cheering on the exact activity it now asserts is at the base of its breach claim: Alexi's use of AI to research the Fastcase database that Alexi pays to license and to draft legal memoranda for its paying clients. As a result, Alexi now finds itself defending its

product, at great expense to its business and reputation, because of claims that Counter-Defendants cannot win at any stage of the case, much less on summary judgment. The Court should reject Fastcase's motion for summary judgment and, instead, enter summary judgment in Alexi's favor.

Fastcase's motion fails at the threshold because Fastcase never provided a valid notice and opportunity to cure, which is a condition precedent to termination for cause under Section 5.2 of the Agreement. vLex's October 27, 2025, breach letter was deliberately vague—stating only that Alexi was ████████████████████████████████████" that "███████████████ ███████████████"—without identifying any specific product feature or any corrective action Alexi could take to cure. ███████████████████████████████████ ███████████████ A breach notice that provides no meaningful opportunity to understand or cure the alleged "breach" cannot serve as the foundation for a termination or this lawsuit. It is also independently a breach of contract or of the covenant of good faith and fair dealing, as described in Alexi's motion for partial summary judgment. *See* Dkt. 97, Alexi's Memorandum in Support of Motion for Partial Summary Judgment ("Alexi SJ Br.") at 40-43.

On the merits, every breach theory Fastcase advances fails as a matter of law and on the undisputed facts. The Agreement permits Alexi to use the Fastcase data for "internal research purposes"—and that is precisely what Alexi has always done. Research performed by Alexi's proprietary AI tools within Alexi's own systems, with no user ever accessing or querying the Fastcase database, is "internal" by any ordinary meaning of that word. The Agreement does not contain the word "human," does not require "manual" research, and does not restrict Alexi to any particular output format. ███████████████████████████████████ ███████████████████████████████████████████ And Alexi paid ███████ per year for raw XML data feeds designed for programmatic use by software.

That pricing structure that makes no sense whatsoever if Alexi's human employees—who could have paid $95 a month for a subscription to the Fastcase platform—were supposed to research those raw XML spreadsheets.

Counter-Defendants' "commercial purposes" theory is equally bankrupt. They argue that Alexi uses the data for impermissible "commercial purposes" by offering a "consumer-facing legal research platform," but Alexi has always been a for-profit company selling AI-generated legal analysis to paying clients, which Fastcase has known from day one. If the Agreement prohibited Alexi from using the data in its commercial products, it would serve no purpose at all—Alexi would have paid nearly ███████ to license data it was contractually barred from using. Even Clio's CEO conceded in his deposition that the Agreement was ████████████████████ ██████████████████████████████████████████ And vLex's CEO confirmed that selling memos to law firms was, ████████████ Counter-Defendants cannot have it both ways.

Their competition theory fares no better. Counter-Defendants claim Alexi uses the data for a purpose "competitive with Fastcase," but the undisputed evidence shows that the competitive-use restriction was designed to prevent Alexi from offering a traditional legal database where users conduct their own Boolean caselaw searches. Alexi has never offered such a product. Alexi provides AI-generated narrative analysis; Fastcase provides searchable access to raw caselaw. Fastcase has never offered AI-powered analysis, chatbot functionality, or memo-generation features. Fastcase has produced no evidence showing that it lost a single subscriber to Alexi. And its own CEO testified ████████████████████████████████████ ███████. Counter-Defendants' argument that Alexi is "competitive" with Fastcase depends entirely on describing legal research at such an abstract level of generality that *any* company providing

3

legal research services would be a competitor—a reading that would, once again, render the Agreement self-defeating.

Counter-Defendants' "memo" argument—that Alexi breached by using the data for outputs other than a "legal memo"—has no basis in the operative terms of the Agreement. The Agreement's recitals reference Alexi's "legal memos," but Section 1.7, the operative use-limitations clause, contains no restriction whatsoever on the format in which Alexi provides legal analysis to its customers. As the drafter, Fastcase could have included such a limitation. It did not. Nor can Counter-Defendants now define "memo" so narrowly as to exclude "arguments supported by case citations," which is the textbook definition of a legal memorandum.

Counter-Defendants' Section 2.2 theories—that Alexi impermissibly "copied, published, and distributed" the Fastcase data—were never even raised in the October 2025 breach letter and cannot serve as a basis for termination given the Agreement's notice-and-cure requirement. Regardless, these theories fail because (a) the Agreement itself requires Alexi to store the Fastcase data on its own servers, making the "copying" theory absurd on its face; (b) displaying the non-copyrightable text of cited cases within Alexi's proprietary legal analysis is not "publishing" or "distributing" Fastcase's caselaw data; and (c) Alexi received express permission from Fastcase's own executive to display case text, which Fastcase does not deny.

Even if Counter-Defendants could cobble together a breach claim (and they cannot), they waived it through years of deliberate inaction. Counter-Defendants had contemporaneous knowledge of every aspect of Alexi's products that it now challenges, even honoring Alexi's founder with a "Fastcase 50" award for his achievements in advancing AI technology in the legal sector. Throughout, Fastcase raised no objection, accepted nearly $███████ in licensing fees, delivered daily data updates, and internally and externally celebrated the very technology it now

4

attacks. A party cannot sit silently for years with full knowledge of the conduct it now claims is a breach, collect the benefits of the contract, and then manufacture a claim only when a subsequent corporate acquirer demands it. That is textbook waiver, and Counter-Defendants should be estopped from leveraging this litigation to rid itself of a viable competitor.

Finally, Counter-Defendants' challenge to Alexi's contract-related counterclaims adds nothing beyond their already-failed breach theory. Their opposition to Alexi's breach-of-contract, implied-covenant, and tortious-interference counterclaims rests entirely on the premise that Alexi materially breached and failed to cure. That is a house of cards that collapses for all the reasons stated above. The undisputed documentary record, drawn entirely from Counter-Defendants' own documents and deposition testimony, establishes that Clio and vLex orchestrated the termination ██████████████████████████████████████████████ ████████████—classic intentional interference with contract. Counter-Defendants have raised no independent defense to these claims.

For all these reasons, the Court should not only deny Counter-Defendants' motion for partial summary judgment in its entirety, it should grant Alexi's motion for partial summary judgment, enter judgment that Fastcase breached the Agreement by wrongfully terminating without cause and ceasing performance, and find that Alexi's contract-related counterclaims are established as a matter of law on the undisputed record.

## FACTUAL BACKGROUND

In its summary judgment motion, Alexi included a detailed factual background relevant to the parties' contract claims (and Alexi's contract-related counterclaims). Alexi SJ Br. at 4–20. Alexi will not repeat that factual background in full here and will, instead, briefly provide an overview of the facts relevant to addressing Fastcase's motion for summary judgment.

It is undisputed that when it agreed to license data to Alexi, Fastcase knew Alexi was a for-

profit company selling AI-generated legal memos to lawyers. Alexi's Response to Counter–Defendants' Statement of Material Facts Not in Genuine Dispute ("SUMF Resp.") (concurrently-filed) ¶ 37; Dkt. 98, Alexi's Statement of Undisputed Material Facts ("Alexi SUMF") ¶ 34.[1] Fastcase considered licensing its caselaw data to legal tech innovators like Alexi to be part of the company's "DNA" and entered dozens of such deals over the years. Alexi SUMF ¶ 15.

From the beginning, Fastcase "didn't consider Alexi to be a competitor" because Alexi's business ███████████████████████████ Alexi SUMF ¶ 64. Fastcase documents confirm that Alexi ███████████████████████ Alexi SUMF ¶ 96, ████████████████████████████████████████████████████ And unlike Alexi, Fastcase did not offer generative AI features, SUMF Resp. ¶ 321; Alexi SUMF ¶ 20, nor any features that provide users with memos or narrative analysis of caselaw, SUMF Resp. ¶ 321; Alexi SUMF ¶ 21. Instead, Fastcase's "flagship" product is its "commercial legal-research platform, which provides searchable access to caselaw, statutes, and regulations." Dkt. 94, Counter-Defendants' Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment ("Mem.") at 3.

Fastcase drafted the Agreement with Alexi, modeling it on a prior licensing deal with ████████████. Alexi SUMF ¶¶ 30–32. Fastcase removed references to "academic research" leftover from the ██████████, because Fastcase knew that Alexi was a for-profit tech startup looking to sell AI-generated legal memos to U.S. lawyers and law firms on a commercial basis. SUMF Resp. ¶ 37; Alexi SUMF ¶¶ 33–35.

---

[1] As noted in Alexi's Response to Counter-Defendants' Statement of Material Facts, Alexi has incorporated by reference the statement of undisputed facts submitted in support of its own motion for partial summary judgment to avoid burdening the Court with duplicative statements and exhibits. *See* SUMF Resp. at 3 n.1, 105.

Fastcase drafted every term of the Agreement. SUMF Resp. ¶ 24; Alexi SUMF ¶¶ 31, 38. Contrary to Fastcase's claims (at 5-6), the licensing fees that Fastcase charged Alexi—$███ in setup costs and $███ per year—were not a "discount" reflecting a limited "use case." On the contrary, ████████████████████████████ SUMF Resp. ¶ 34; Alexi SUMF ¶ 101. And Fastcase charged ███, among others, the same price as Alexi ($███ per year) for a far ***broader*** license—allowing ███ not to only use the Fastcase data to develop its ███ AI legal analysis product but to offer a competing traditional legal research platform. SUMF Resp. ¶¶ 12, 33. ████████████████████████████

████████████████████████████

███████. SUMF Resp. ¶ 12. Fastcase tellingly cited to no contemporaneous evidence to show that the price it charged to Alexi reflected any "discount" relative to the licensing prices it charged other third-party tech companies.[2]

Remarkably, Fastcase's motion for summary judgment barely mentions and does not dispute the extensive communications and course of dealing showing that Fastcase knew all along that Alexi was an AI startup with a single-minded mission to automate legal memos. *See, e.g.*, Alexi SUMF ¶ 28 (Mr. Doble wrote to Mr. Walters in October 2021 that Alexi was "an AI company fully automating the production of legal research memoranda"); *see also id.* ¶¶ 1, 2, 23,

---

[2] ████████████████████████████ ████████████████████████████ *See* SUMF Resp. ¶ 12 (Ms. Jack relayed the price quote to Ed Walters and stated that Mr. Doble and Alexi were "hoping to buy data from us" ████████ *id.* ████████████████ ████████████████████████████

Alexi's pricing from December 2021 reflects the fact that the data has become much more valuable in the intervening years because of advancements in LLM and AI tech, which was the "catalyst" for Clio's $1 billion purchase of vLex-Fastcase. Alexi SUMF ¶¶ 142–46.

26. Far from objecting to Alexi's advancements in legal AI technology, Fastcase cheered and celebrated them. *See, e.g.*, Alexi SUMF ¶ 40 (Fastcase COO Steve Errick in December 2021: ███ ███████████. As just one example, Fastcase's motion fails to even mention that it awarded Mr. Doble with a "Fastcase 50" award in 2023 for developing the very AI technology that it now challenges in this lawsuit. SUMF Resp. ¶ 125; Alexi SUMF ¶¶ 110–12.

Fastcase's narrative that Alexi pivoted from a human memo-writing service to an AI platform is foreclosed by the undisputed factual record (and is legally irrelevant in any event because the Agreement contains no limitation regarding human use, as described *infra*). As Fastcase's own factual background shows (at 6–7), Alexi always used AI to identify relevant cases and produce a narrative-style memo summarizing the law—with a "human in the loop" *reviewing* and (if necessary) supplementing those AI outputs for quality assurance. SUMF Resp. ¶¶ 43, 60; Alexi SUMF ¶ 74.

From the start of the Agreement, Alexi's AI ████████████████████████ identified relevant cases in response to a user's legal question, SUMF Resp. ¶ 52, and Alexi's AI models summarized those authorities and their key passages in memo format (with human lawyers overseeing the AI's outputs while the technology was in its nascent stages), SUMF Resp. ¶ 47 ██████████████████████████████████████████████ ████████); *id.* (Alexi's AI would "autonomously complete components of a memo" in 2022); SUMF Resp. ¶ 56 (███████████████████████████████ ████████████████████████████████); *id.* (████████████████ █████████████████████████████; *id.* (████████████████ ████████████████████████████████████); SUMF Resp. ¶ 80 (explaining how Alexi used AI and LLM technology in 2022). Even in the early days, Alexi's AI

could generate a legal memo—with human-in-the-loop quality assurance completed—within 30 minutes for memos on simple topics. SUMF Resp. ¶ 74.

Accordingly, Fastcase's claim that Alexi first launched "Consumer-Facing AI Products" (at 10) with its Instant Memos product in 2023 is wrong and wholly unsupported by the evidence. Alexi's system was always "consumer facing"—as a for-profit technology business, Alexi's whole purpose is selling its products to consumers, *see* Alexi SUMF ¶ 34—and it offered AI-generated memos from the beginning, SUMF Resp. ¶ 48 (Alexi's lead product developer, Patrick King, testifying that from the beginning, "[Alexi's] platform was self-serve in the sense that customers could log in, submit questions, view answers, download memos without any – in fully-automated fashion in terms of just using a web app.").

With Instant Memos, Alexi removed the "human-in-the-loop" review process on the back end and delivered memos to customers in minutes rather than hours. But Fastcase has not pointed to (and cannot point to) any change in ***how Alexi used the Fastcase data*** resulting from that innovation. Alexi's ███████████████████████████████ ███████████ Alexi SUMF ¶¶ 65–66. And customers still entered a legal research question into the Alexi platform and, in response, received a narrative-style answer reflecting Alexi's proprietary analysis of the relevant caselaw—not access to the caselaw database itself. SUMF Resp. ¶ 147; Alexi SUMF ¶ 77. Indeed, Fastcase admits that "Alexi customers could not directly ██████████████████████████████████████████ Mem. at 7; Dkt. 94-2, ("Fastcase SUMF") ¶¶ 54–55. Critically, that never changed. There is no evidence (because it never happened) that any Alexi user ever accessed Alexi's internal research agent.[3]        Alexi

---

[3] Alexi's Arguments was a standalone feature that Alexi offered for a short time (before being displaced by the ALR platform) that allowed customers to use AI to brainstorm potential legal arguments, typically in a bulleted list structure. SUMF Resp. ¶¶ 151–53. Like Alexi Memos,

chat interface—which it launched in early 2024, followed by the Advanced Legal Reasoning (ALR) platform in January 2025—is a similar story. Through ALR, Alexi now offers a unified search bar where users can enter any type of query—from general chat questions ("what is the weather?") to legal research questions that draw upon primary caselaw ("what are the leading merger cases under the theory of vertical foreclosure?"). Alexi SUMF ¶¶ 84–88. Although ALR modernized Alexi's chat interface, it did not change the fact that users cannot access or query the Fastcase caselaw data. *See, e.g.*, SUMF Resp. ¶¶ 193, 213, 222, 245, 260, 266-69, 291, 294, 335; Alexi SUMF ¶¶ 87–90. Only Alexi's internal AI tools can access the Fastcase data and conduct internal research, which is then an input to the narrative responses that Alexi provides to its customers (which reflect Alexi's proprietary analysis of the relevant source material, whether from the open web or caselaw data). SUMF Resp. ¶ 193. Importantly, all of this is undisputed. Fastcase has not identified any facts—much less raised a material dispute of fact—to show that users of Instant Memos or ALR somehow had access to search the Fastcase database. On the contrary, Fastcase's Rule 30(b)(6) witness Mr. Walters testified ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████). Mr. Walters and Clio's other witnesses similarly ███████████████████████████████████████████████ ████████████████████████████████████████████████████

---

Arguments provided responses to customers that drew from the internal caselaw research conducted by Alexi's PRS. SUMF Resp. ¶ 151. Alexi publicly announced Arguments on September 5, 2023, and executives at vLex/Fastcase knew about this product feature but chose not to inquire about it and never raised any issues with Alexi about the Arguments feature for the few months it was offered to U.S. consumers. SUMF Resp. ¶ 148.

10

████████████████████████████████████████████████████████████

███████.

The AI that can actually consult the Fastcase data "is relatively single purpose." SUMF Resp. ¶ 215; *see also id.* ¶¶ 244, 287–88. It is designed to generate a memo—a narrative style legal analysis with caselaw summaries in a predetermined format—and cannot access the Fastcase data in any other way. SUMF Resp. ¶¶ 193, 215, 261, 287, 294–98. To the extent other AI tools generate a letter, chart, or list, at the request of the user, it does so based on the already-generated legal memo answer, not by querying the Fastcase data again. SUMF Resp. ¶¶ 195, 197, 294–98.

During expedited discovery in this case, Alexi gave Fastcase's lawyers access to the Alexi platform—████████████████████████████████████████████. Even though Fastcase's lawyers were highly motivated to craft their queries to try to obtain direct access to the Fastcase data or get results resembling a traditional legal research platform, they could not do so. Instead, every query returned a narrative-style memo in the first instance. SUMF Resp. § IV.G & ¶¶ 366–67. ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[4] *See also* SUMF Resp. ¶ 358 ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

██████████████████████████████████████████████████████. SUMF Resp. § IV.G & ¶¶ 379–80.

That was no surprise: Alexi's AI system is designed to respond to users' legal research questions with a memo in the first instance. SUMF Resp. ¶¶ 193, 215, 244, 261, 287–88, 294–98. When Alexi's AI tools generate an answer in a slightly different format—such as a letter, chart, or list—it does so *after* generating a memo and then changing the format of that memo if requested by a user, not by querying the Fastcase data again. SUMF Resp. ¶¶ 195, 197, 294–98.

Fastcase's claims (at 17–18) that Alexi developed a "plan" to stay under "under the radar" with respect to its AI development is flatly contradicted by the objective evidence. Fastcase cites an offhand chat by Maggie Fish for this supposed "plan," but Ms. Fish was a quality-control attorney for Alexi and not in a policymaking position, and Alexi's CEO was unaware of any such conversations. SUMF Resp. ¶¶ 336-37 (Mr. Doble testified, "There's no plan to say under their radar. Definitely not."); *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 209 (D.D.C. 2018) (discounting testimony containing "informal speculation" or by individuals "who had no decision-making role or authority"). Regardless, Alexi and Mr. Doble repeatedly reached out to Fastcase and vLex about Alexi's product development, *see* Alexi SUMF ¶¶ 22–24, 26, 28, 106, 132; SUMF Resp. ¶¶ 10, 14, 16, 18, 201, 336–37, and heavily publicized all the technological advances that Fastcase now challenges, including Instant Memos and ALR, *see, e.g.*, Alexi SUMF ¶ 73 ("Alexi publicly announced Instant Memos"); Fastcase SUMF ¶ 206 ("In January 2025, Alexi announced the launch of Advanced Legal Reasoning, or ALR").[5] The full record thus plainly dispels any

---

[5] If anything, Alexi was overly forthcoming. In various partnership or acquisition discussions over the years, ████████████████████████████████████████████████████████ Alexi SUMF ¶¶ 166–68; SUMF Resp. ¶¶ 357, 381

suggestion that Alexi somehow had a "plan" to stay under the radar. *See* SUMF Resp. ¶¶ 336–37.[6]

Fastcase's claims (at 17–18) that Alexi developed a "plan" to stay under "under the radar" with respect to its AI development is flatly contradicted by the objective evidence. Fastcase cites an offhand chat by Maggie Fish for this supposed "plan," but Ms. Fish was a quality-control attorney for Alexi and not in a policymaking position, and Alexi's CEO was unaware of any such conversations. SUMF Resp. ¶¶ 336–37 (Mr. Doble testified, "There's no plan to say under their radar. Definitely not."); *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 209 (D.D.C. 2018) (discounting testimony containing "informal speculation" or by individuals "who had no decision-making role or authority"). Regardless, Alexi and Mr. Doble repeatedly reached out to Fastcase and vLex about Alexi's product development, *see* Alexi SUMF ¶¶ 22–24, 26, 28, 106, 132; SUMF Resp. ¶¶ 10, 14, 16, 18, 201, 336–37, and heavily publicized all the technological advances that Fastcase now challenges, including Instant Memos and ALR, *see, e.g.*, Alexi SUMF ¶ 73 ("Alexi publicly announced Instant Memos"); Fastcase SUMF ¶ 206 ("In January 2025, Alexi announced the launch of Advanced Legal Reasoning, or ALR").[7] The full record thus plainly dispels any suggestion that Alexi somehow had a "plan" to stay under the radar. *See* SUMF Resp. ¶¶ 336–37.

Fastcase's factual allegations that Alexi improperly displayed the text of Fastcase cases in

---

[6] Similarly, Fastcase cites (at 17, 25) ███████████████████████████████████████████████ SUMF Resp. ¶ 41. This document—which was written by an employee in the accounting department—just reflects the obvious fact that, in the intervening years between December 2021 and July 2025 (when the document was created), legal data became much more valuable because of advancements in LLM and AI technology. This should hardly be news to the Counter-Defendants: Clio paid $1 billion for the Fastcase/vLex "data moat." Alexi SUMF ¶¶ 142–46.

[7] If anything, Alexi was overly forthcoming. In various partnership or acquisition discussions over the years, Alexi gave Fastcase and Clio access to virtual data rooms or otherwise provided them with Alexi's confidential information on at least three occasions, in 2022, 2025, and 2026. Alexi SUMF ¶¶ 166–68; SUMF Resp. ¶¶ 357, 381

its memos are similarly foreclosed by the undisputed record evidence. Alexi initially linked to the public versions of Fastcase cases cited in Alexi's memos; Fastcase had no objection to this practice. SUMF Resp. ¶¶ 112–13, 261. But in 2022, after discovering that Fastcase's public links expired ███████████ (resulting in a poor user experience for users looking to review prior memos), Mr. Doble asked for and received permission from Fastcase's Ms. Steinbrecker Jack to display the (non-copyrightable) text of Fastcase cases within the Alexi platform. SUMF Resp. ¶¶ 107, 112, 115, 265; Alexi SUMF ¶¶ 120–29. Fastcase does not deny this conversation took place, SUMF Resp. ¶ 115, negating any material dispute of fact on this question. ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ Alexi SUMF ¶ 140; *id.* ██████████████████████████████████████████████████ ███████████████████████████████████

Finally, Fastcase's account of how and why it filed this lawsuit defies belief and lacks support in the ordinary-course documentary evidence.

There is no dispute that, for nearly four years (from January 2022 to late October 2025), Alexi and Fastcase performed without any dispute about Alexi's service or its use of the Fastcase data. Alexi SUMF ¶¶ 174-76. Alexi paid Fastcase nearly $████ in licensing fees and Fastcase delivered daily caselaw updates as required. Alexi SUMF ¶¶ 101, 189. Before sending its breach letter on October 27, 2025, Fastcase never raised any concern about Alexi's use of the data to power its AI-generated legal analysis. Alexi SUMF ¶¶ 174–76.

On June 30, 2025, Clio entered into a merger agreement to acquire vLex (which included Fastcase as its wholly owned subsidiary) for approximately $1 billion. Alexi SUMF ¶¶ 18–19; Fastcase SUMF ¶¶ 4, 6. On June 30, 2025, the same day the merger was announced, Mr. Walters

14

emailed Mr. Doble ███████████████████████████████████████████

███████████████████████████████████████████ Alexi SUMF ¶ 157.

But unbeknownst to Alexi, just days earlier, Clio had discovered in due diligence that the "data moat" it was paying $1 billion to acquire was in jeopardy when it found the Section 12.3 backfile purchase option in the Agreement. Alexi SUMF ¶ 147. ████████████

███████████████████████████████████████████

███████████████████████████████████ Alexi SUMF ¶ 148. ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ Alexi SUMF ¶¶ 149–52.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

On October 20, 2025, ███████████████████████████

█████████ Mr. Walters called Mr. Doble and asked him to surrender the backfile option for nothing in return. Alexi SUMF ¶¶ 160–62. When Mr. Doble asked what would happen if he refused, Mr. Walters warned there "would be trouble." Alexi SUMF ¶ 163. ██████████

15

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Alexi SUMF ¶ 164.

Two days later, Mr. Walters connected Mr. Doble with Clio's SVP for Corporate Development, describing Alexi as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ even though vLex was just five days from sending its breach letter. Alexi SUMF ¶¶ 166–67. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SUMF Resp. ¶ 341; Alexi SUMF ¶ 165—vLex's general counsel sent a "Notice of Material Breach" vaguely claiming that Alexi was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUMF Resp. ¶ 342; Alexi SUMF ¶ 180. The breach letter did not mention the automation of memos, the chat interface or ALR, or the display of the text of cases cited in the memos, which Fastcase now claims are the basis for its breach claim. *See* SUMF Resp. ¶ 342. vLex gave Alexi ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, further violating the Agreement (which provided for a 30-day cure period). Alexi SUMF ¶¶ 181-82. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. Alexi SUMF ¶ 185; SUMF Resp. ¶ 355. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Alexi SUMF ¶¶ 184–85.[8]

On November 26, 2025, Fastcase sent a termination letter and filed this lawsuit. SUMF Resp. ¶ 344; Alexi SUMF ¶ 187. ▮▮▮▮▮▮▮▮▮

Alexi SUMF ¶ 188. On December 3, 2025, Fastcase stopped providing daily caselaw updates despite its contractual obligation to continue them through at least December 31, 2026. Alexi SUMF ¶ 187.

---

[8] Notably, Mr. Walters—Fastcase's corporate designee—deferred entirely to counsel regarding the basis for the breach. SUMF Resp. ¶ 361 (Walters Tr. at 307:7–308:4.). It was thus not Fastcase but *Clio* that supplied the factual and legal substance that vLex incorporated into the October 27, 2025, breach notice, with top executives and attorneys at Clio and vLex jointly discussing and drafting that notice. SUMF Resp. ¶¶ 357–61.

16

Fastcase offers nothing more than lip service to this undisputed series of events, which is drawn entirely from Counterclaim Defendants' own documents and deposition admissions. Tellingly, there is **no** documentary evidence of anyone at Fastcase raising a concern that Alexi breached the Agreement before Clio raised the backfile issue days before the merger agreement was signed in late June 2025. At his Rule 30(b)(6) deposition, Mr. Walters testified ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ SUMF Resp. ¶ 324. Instead, the only ordinary-course document that Fastcase can point to (Mem. at 16–17) is an April 2025 chat between Ms. Jack and Fastcase sales reps that does not discuss any alleged breached of the Agreement by Alexi. SUMF Resp. ¶ 323.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████ *Id.*

Clio's lawsuit has had the intended effect—devastating Alexi's business, with Alexi having laid off most of its staff and cut expenses down to the bone to try to withstand Clio's campaign.

After filing this lawsuit, Clio and Fastcase have weaponized the litigation to scuttle Alexi's business prospects and ability to attract an acquirer. Shortly after the lawsuit was filed in early December 2025, Mr. Walters had separate conversations with the CEOs of ████████████—two leading AI legal-analysis companies that were considering acquiring Alexi at the time. As he reported those conversations to his new boss, Clio's CEO Mr. Newton, Mr. Walters warned both ████████████ that Fastcase had terminated the Agreement for cause and that Alexi did not

17

have the contractual right to purchase the backfile, Alexi SUMF ¶¶ 222–24—which was a false representation, as Fastcase now admits that the backfile purchase option survives termination. SUMF Resp. ¶¶ 359–60. As Mr. Walters reporting having told ███ CEO ███████ ██████████████████████████████████████████████ and that acquiring Alexi ████████████████████████████████ Alexi SUMF ¶¶ 222–24. Mr. Walters reported that ████████████████████████████████████. *Id.*

**ARGUMENT**

**I.      FASTCASE'S BREACH CLAIM FAILS BECAUSE IT DID NOT PROVIDE THE REQUIRED NOTICE AND OPPORTUNITY TO CURE**

As an initial matter, the Court need not reach Fastcase's substantiative breach arguments (which all fail in any event, as described *infra* Sections II–IV) because Fastcase did not comply with the Agreement's notice and cure provisions. Providing an adequate notice and reasonable opportunity to cure is a condition precedent Fastcase's purported termination for cause and negates Fastcase's breach claim as a matter of law.

When, as here, the termination of a contract is "contingent on the breaching party's opportunity" to cure, that "provision of an opportunity to cure [is] a condition precedent to termination of the agreement" and thus filing a breach lawsuit. *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1250 (D.C. 2024); *Sun Secured Fin. LLC v. ARCS Com. Mortg. Co. LP*, 730 F. Supp. 2d 132, 139 (D.D.C. 2010) ("[N]otice provisions are generally understood to be conditions precedent to the exercise of power about which notice is being given"); *Lively v. Wayfarer Studios LLC*, 2026 WL 905447, at *18 (S.D.N.Y. Apr. 2, 2026) ("[C]ourts have held that notice and an opportunity to cure is an element of performance that the plaintiff must satisfy before bringing a claim for breach of contract.").

Here, Section 5.2 of the Agreement provides that, before either party can terminate, they

18

must provide "30 days written notice to the other party of a material breach of any term or condition" and allow the other party an opportunity to cure within that 30-day period. *See* SUMF ¶ 53 (citing Agreement § 5.2). For the reasons stated in Alexi's motion for summary judgment (Alexi SJ Br. at 32–39), the vague breach notice that Fastcase (through vLex) sent to Alexi on October 27, 2025, did not satisfy the notice-and-cure condition precedent, because Fastcase did not provide Alexi with a "viable opportunity" to understand how it could "take action" to cure the alleged breach. *Henok v. Chase Home Fin*, 922 F. Supp. 2d 110, 118-19 (D.D.C. 2013).

Specifically, the breach letter stated vaguely that Alexi was ███████████████████ ███████████████████████████████████████████ Alexi SUMF ¶ 180; SUMF Resp. ¶ 342. But as described further below (*see infra* Section II.B), Fastcase's top executives now admit that Alexi is entitled to offer commercial products using the Fastcase data (or else the Agreement would have no purpose at all). vLex's letter did not identify any product features or changes that, in their view, transformed Alexi's service from non-commercial to commercial or non-competitive to competitive, which Alexi could have sought to address during the 30-day cure period.[9] Notably. vLex's breach notice identified ***none*** of product features that Fastcase now cites as the basis for the breach claim, including the full automation of legal memos, Alexi's chat interface, or its display of Fastcase cases cited in memos. Alexi SJ Br. at 37–39 (citing cases); *Pivotal Colorado, II, LLC v. Triple M Beteiligungs-GMBH & Co KG*, 2009 WL 1174463,

---

[9] For example, although Fastcase's witnesses gave conflicting testimony on whether and how much "human" review of Alexi's AI outputs was required under the contract, vLex CEO Lluis Faus (who signed the breach letter) ███████████████████████████████████ ███████████████████████████████ SUMF Resp. ¶ 356; *but see id.* (later in his deposition, ███████████████████████████████████████████ ██████). Notwithstanding that the human involvement limitation has no basis in the Agreement's text, if Fastcase had explained in the breach letter what it believed the contract required in this regard, Alexi could have considered that during the 30-day cure period.

at *4 (D. Colo. Apr. 29, 2009) (holding that, even where the "contract does not prescribe the content of the notice of breach," the contract party has duty to "make the opportunity to cure a meaningful contract right").

Separate and apart from the lack of specificity, vLex's breach notice also failed to provide Alexi with the required 30-day cure period. vLex's breach letter demanded that Alexi ███████████████████████████████████████████████████████████████████ ████████████████████████████████████ SUMF Resp. ¶ 365. vLex's wholly deficient breach notice was no accident: ██████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████ *See supra* at 14.[10]

Because Fastcase failed to provide Alexi with a valid notice and opportunity to cure, Fastcase did not satisfy the condition precedent to terminating for cause and its breach claim fails as a matter of law. *Daniels v. Specialized Loan Servicing, LLC*, 2025 WL 576588, at *6 (C.D. Cal. Feb. 10, 2025) (granting summary judgment to defendant where a plaintiff's failure to provide notice and opportunity to cure meant that the plaintiff could not "prove an essential element of these breach claims").

Fastcase's failure not only dooms its own contract claim, it is also a breach of the contract in its own right or, in the alternative, a breach of the implied covenant of good faith and fair dealing. As Alexi has set forth in its own motion for partial summary judgment, the contract requires Fastcase—either by its express terms or in its implied duty of good faith and fair dealing—to

---

[10] ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████. SUMF Resp. ¶ 383.

provide Alexi with actual, specific notice of any purported breach and a viable opportunity to cure. *See* Alexi SJ Br. at 35–39, 42 (citing, *e.g.*, Alexi SUMF ¶¶ 53, 180; *Henok v. Chase Home Fin*, 922 F. Supp. 2d 110, 118-19 (D.D.C. 2013); *Cedar Rapids Television Co. v. MCC Iowa LLC*, 524 F. Supp. 2d 1127, 1136 (N.D. Iowa 2007); *Ulla-Maija, Inc. v. Kivimaki*, 2005 WL 2429490, at *4 (S.D.N.Y. Sept. 30, 2005)). Fastcase failed to do so, and summary judgment should be denied to Fastcase and granted to Alexi on this basis.

## II.    ALEXI DID NOT BREACH THE AGREEMENT AS A MATTER OF LAW AND BASED ON THE UNDISPUTED EVIDENCE

For the reasons stated in Alexi's summary judgment brief (Alexi SJ Br. at 22–29), Alexi complied with the Agreement at all times. The Court should find that Fastcase—not Alexi— breached the Agreement and enter summary judgment in Alexi's favor on the contract claims (Fastcase Complaint Count I, Dkt. 1; Alexi's Revised Amended Counterclaims Count I, Dkt. 84).

As an initial matter, Fastcase's summary judgment brief (at 23–25) suggests the wrong analytical approach by mashing together the various contractual provisions and arguing that Alexi's service violated them in totality. To prove a contract breach, Fastcase must show that Alexi breached a specific contractual obligation, not that Alexi's service somehow ran afoul of the Agreement "as a whole" (at 24); *McCoy v. SC Tiger Manor, LLC*, 2022 WL 4492761, at *7 (M.D. La. Sept. 9, 2022) ("It is black-letter law in Louisiana that a party asserting a breach of contract must prove a breach of a specific contractual provision."); *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261 (3d Cir. 2010) (contract plaintiff must identify "express contract provision that was breached"); *Institute of Multidimensional Medicine v. Metagenics, Inc.*, 635 F. Supp. 3d 6 (D.D.C. 2022) (dismissing contract claim that did not identify specific provision).

Turning to the specific restrictions in the Agreement, Alexi did not violate any of them and, instead, used the Fastcase caselaw data exactly as permitted—as an internal input to the AI-

generated legal answers that Alexi has always provided to its customers. Alexi complied with Agreement because (A) the undisputed evidence shows that Alexi used the data for internal research that, in turn, powered its proprietary AI-generated memos; (B) never commercialized the data by selling or sub-licensing it to third parties; and (C) never offered a traditional legal database service that would compete against Fastcase. Moreover, Fastcase's argument (D) that Alexi violated the Agreement by producing consumer outputs that were not in a narrowly defined formal "memo" format has no support in the text and is wrong as a matter of law.

### A. Alexi's Use of the Fastcase Caselaw Data for "Internal Research Purposes," as Permitted by Section 1.7

Fastcase's central argument is that Alexi's use of the Fastcase caselaw data cannot constitute "internal research" because that research is performed by AI software rather than by Alexi's "internal lawyers and researchers." Mem. at 26–28. That argument fails under the plain language of the Agreement and based on the undisputed record evidence.

Courts give contract terms their "ordinary and accepted" meaning, *Carome v. Carome*, 293 A.3d 1122, 1127 (D.C. 2023) (quoting *James G. Davis Constr. Corp. v. HRGM Corp.*, 147 A.3d 332, 340 (D.C. 2016), and the ordinary meaning of "internal" is "occurring on the inside of an organized structure," Merriam-Webster, *Internal*, www.merriam-webster.com/dictionary/internal. Alexi's use of the Fastcase data is "internal" under this ordinary meaning. Whether performed by human lawyers or by Alexi's proprietary AI research agent, the research occurs entirely within Alexi's own system—with users never having the ability to access or query the Fastcase caselaw database themselves. SUMF Resp. ¶¶ 28, 272.

Section 1.7 restricts Alexi to using the Fastcase caselaw data for "internal research purposes," SUMF Resp. ¶ 28; Alexi SUMF ¶¶ 47–48, not "internal *human* research purposes." The contract simply does not say that Alexi's internal research of the Fastcase data must be

performed by humans rather than software; indeed, the word "human" (or any analogue) does not appear anywhere in the contract. Fastcase cannot create an after-the-fact limitation that is "plainly not there," *Aziken v. D.C.*, 70 A.3d 213, 220 (D.C. 2013) (quoting *Bragdon v. Twenty-Five Twelve Assocs. L.P.*, 865 A.2d 1165, 1170 (D.C. 2004), particularly for a contract that Fastcase drafted in its entirety, *see, e.g.*, *Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 584 (D.C. 1995) ("[W]e know of no legal authority permitting the court to rewrite the contract by inserting a limitation which does not appear therein."); *Columbia Hosp. for Women & Lying-In Asylum v. U.S. Fid. & Guar. Co.*, 188 F.2d 654, 659 (D.C. Cir. 1951) ("[C]ourts are not free to rewrite a commercial contract entered into at arm's length by fully competent parties.").

Moreover, inserting a "human" requirement would produce absurd results, because the entire purpose of Alexi licensing Fastcase's raw caselaw data was for Alexi's software to programmatically research that data. *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (courts avoid interpretations that "produce an absurd result"). Alexi licensed raw caselaw data from Fastcase that was delivered in XML spreadsheets designed for programmatic use by software, not humans. Alexi SUMF ¶ 63. And Alexi paid $240,000 a year to license that raw caselaw data. Alexi SUMF ¶ 37. If "Alexi employees" (Mem. at 25) were supposed to research the XML files (which makes no sense to start with), the Agreement's pricing structure would be entirely nonsensical—those same lawyers could have purchased credentials to the Fastcase platform for $95 a month each. SUMF Resp. ¶ 346.

In any event, Fastcase's theory cannot be correct because Alexi's human researchers ***never*** researched the raw data fees that Fastcase licensed to Alexi. From the start, Alexi's internal AI software researched the licensed data feed, SUMF Resp. ¶¶ 89, 92-93, which Fastcase knew

23



. SUMF Resp. ¶ 111. And putting the nail in the coffin, Fastcase's top executives testified in their depositions that ▐

▐

▐ SUMF Resp. ¶ 347.[11]

Fastcase's argument that Alexi started using the Fastcase data for internal research purposes when it added a chat interface to its consumer platform likewise fails. The chat feature that Alexi introduced in early 2024 (followed by ALR in January 2025) only streamlined the user interface—it did not change how Alexi researched the Fastcase data. Both before and after Alexi released the chat interface, only Alexi's internal AI tools had access to and could query the Fastcase database (which in turn has always been used as an input to the proprietary memos that Alexi provides to its customers). SUMF Resp. ¶ 191. Fastcase has produced no evidence to the contrary and, in fact, its executives disclaimed any knowledge about Alexi's use of the Fastcase data shifting from internal to external over time. SUMF Resp. ¶ 349 (

).

Fastcase's argument (at 26–27) that offering a "consumer-facing legal research platform" transforms the use of the Fastcase data from internal to external fundamentally conflates Alexi's *consumer interface* with Alexi's *use of the Fastcase data*, which are separate issues. As described,

---

[11] Notably, Fastcase's founder and Rule 30(b)(6) witness, Mr. Walters, refused to answer a direct and repeated question about whether human review was required under the Agreement. SUMF Resp. ¶ 356.

ALR provides a streamlined interface for customers to enter their legal research questions but did not give those users the ability to conduct their own caselaw searches nor change how Alexi uses the Fastcase data within Alexi's internal systems. ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████ SUMF Resp. ¶¶ 269, 280, 287, 367.

### B.    Alexi's Use of the Fastcase Data is Consistent With Agreement's Commercial Purposes Limitations

Fastcase's argument (at 31–32) that Alexi used the data for improper "commercial purposes" fares no better. As Alexi showed in its summary judgment brief (at 26), Fastcase designed the commercial use limitation to prevent Alexi from commercializing the Fastcase data through a "bulk sale" or making the content "available through traditional legal research product like Fastcase." Alexi SUMF ¶¶ 38–39; SUMF Resp. ¶¶ 33–34. Fastcase has produced no evidence that Alexi did anything of the sort.

To begin, Fastcase has continually flip-flopped on its argument that Alexi used the Fastcase for improperly "commercial" purposes. In October 2025, vLex's breach letter asserted that Alexi breached the Agreement by ████████████████████████ using Fastcase data. SUMF Resp. ¶ 342. That position made no sense, because it is undisputed that Alexi was always a for-profit company that licensed the data for use with its commercial offerings to U.S. lawyers and law firms (as Fastcase knew all along). *See supra* Factual Background; SUMF Resp. ¶ 33-35.[12]

---

[12] As one illustration of the game of whack-a-mole Alexi has had to play with Fastcase's constantly shifting breach theories, Fastcase's complaint alleged that Alexi was an academic "research



Now, however, Fastcase's summary judgment brief has reverted to the theory from the October 2025 breach letter—arguing that Alexi breached the Agreement by offering a "consumer-facing legal research platform" (at 31) and a "paid" "consumer-facing software product" (at 32). That argument must be rejected for the same reason Clio's executives refused to defend it at their depositions: If the Agreement prohibited Alexi from using the data in its commercial products, it would serve no purpose at all. *Retail Clerks Int'l Ass'n Loc. No. 455 v. NLRB*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless.").

At bottom, Fastcase's commercial-use theory fails as a matter of law because Fastcase cannot identify any change in the Alexi product that transformed it from non-commercial to commercial in nature. The ALR chat interface is no more "commercial" than the application and memos that Alexi sold to U.S. lawyers and law firms before January 2025. Similarly, Fastcase's

---

institution" affiliated with the University of Toronto, that "rel[ied] on human 'research lawyers,'" and only later "began incorporating artificial intelligence" into its work. Dkt. 1, Compl. ¶¶ 2, 22–23, 56. That allegation was completely false (a visit to the University's website shows that in 2019 to 2020 Alexi participated in the Creative Destruction Lab program for for-profit AI companies), collapsed in discovery, and Fastcase has abandoned that argument. Alexi SUMF ¶¶ 33, 35; SUMF Resp. ¶¶ 346–53.

argument (at 26-28) that Alexi shifted from charging law firms per memo to a subscription model makes no difference. Whether Alexi sells memos individually or on a subscription basis, it is a commercial offering either way. (Indeed, the subscription model means that follow-up questions and their answers are provided at no additional cost.) And the contract says nothing about *how* Alexi sells its memos nor does it restrict Alexi to an a-la-carte sales method.

Fastcase's argument (at 25) that the Agreement "was not a forward-looking license to use Fastcase data in any future customer-facing legal-research product Alexi might develop" has contract law backwards. If Fastcase wanted to limit its license to Alexi's customer interface and human-in-the-loop memo process that existed in December 2021, Fastcase "could have contracted for exactly that." *CorpCar Servs.*, 325 A.3d at 1250. It did not. In any event, Fastcase knew all along that Alexi was a nascent technology company that was constantly innovating with AI technology, with the express goal to fully automate legal memos, *see, e.g.*, Alexi SUMF ¶¶ 22–40, 102–30, and Fastcase's core business model was licensing its data to such scrappy, fast-developing companies— █████████████████████████████████████████ SUMF Resp. ¶ 332. And, again, none of the improvements in Alexi's product and technology transformed a non-commercial service into a commercial service; it was commercial all along, as Fastcase knew.

### C.    Alexi's Does Not Use the Fastcase Data to Compete with Fastcase

Finally with respect to Section 1.7, Fastcase's argument that Alexi has developed a product that is "competitive with Fastcase" is wrong.

***First***, the undisputed evidence shows that the competitive-use restriction in Section 1.7 prevents Alexi from offering a traditional legal database service using the Fastcase data. █████ ████████████████████████████████████████████████████████████ ███████████████████████" Alexi SUMF ¶ 113, which is consistent with Fastcase's

ordinary-course documents  Alexi SUMF ¶ 113.; *see also* Alexi SUMF ¶ 64 ( ).

There is no evidence to show that Alexi competes against Fastcase's traditional legal database. Alexi provides AI-generated, narrative-style legal analysis. *See, e.g.*, Alexi SUMF ¶ 72–74, 93–94. Meanwhile, Fastcase has never offered AI-powered summary and analysis features, nor features providing users with memos or narrative analysis of caselaw. Alexi SUMF ¶¶ 20–21. For its part, Fastcase offers a traditional legal database where users can conduct their own caselaw research through Boolean searches, Alexi SUMF ¶¶ 8–15; SUMF Resp. ¶ 1, which is functionality that Alexi has never offered. *See, e.g.*, SUMF Resp. ¶¶ 33, 194, 334. Not surprisingly given their far different business models, Fastcase has produced no evidence that it lost even a single subscriber to Alexi, Alexi SUMF ¶ 97; SUMF Resp. ¶¶ 312, 315, 335, and . Alexi SUMF ¶ 98.

**Second,** Fastcase's argument (at 32, 34) that the competitive-use restriction prevents Alexi from using the Fastcase data to "build or supporting a competing legal-research service" or "sell[] legal research software to lawyers and law firms" must be rejected, because that reading (like Fastcase's reading of the "commercial purposes" provision) would render the Agreement self-defeating. Alexi has always been a "legal research service," as Fastcase knew even before the Agreement was signed. *E.g.*, Alexi SUMF ¶¶ 22–24. If Fastcase's warped reading was correct, the Agreement would require Alexi to pay nearly $1 million to license data that it was prohibited from using—an absurd interpretation if there ever was one. *See Am. First Inv. Corp.*, 925 F.2d at 1521.

28

Fastcase argues (32–34) that Alexi's ALR is unduly competitive because it offers "core legal research functionality" such as the ability to "ask legal research questions directly, receive caselaw answers, view cited authorities, [and] ask follow-up questions," among others. But this argument elides the dispositive differences between Alexi's AI service and Fastcase's traditional legal research platform by describing "legal research" at an abstract level of generality. Users always could ask legal research questions directly on the Alexi platform, but the key point is they get Alexi's narrative responses—not the ability to conduct their own caselaw research—in response to those questions. And tellingly, Fastcase says that Alexi offers "core legal research functionality" that Fastcase does not offer at all, like the ability to generate charts and summaries and legal documents. With respect to the ability to ask follow-up questions, Alexi's product has enabled greater real-time interaction as technology has advanced (though users always had the option to ask follow-up questions, SUMF Resp. ¶¶ 74, 77, 285), but Fastcase offers no basis for concluding this "iterative" functionality made Alexi competitive with Fastcase. Fastcase has never offered any chatbot functionality at all, SUMF Resp. ¶ 335, so why would Alexi's chat interface transform it into a Fastcase competitor? Fastcase never says.

In the end, Fastcase resorts to pointing to a few isolated documents and marketing materials (at 33–34) to argue that Alexi described itself as a competitor, mostly drafted by employees with no policymaking role at Alexi. SUMF Resp. ¶¶ 310-15. Regardless, these documents largely describe competition with *vLex*—which launched its Vincent AI legal research tool in late 2023 (around the time Alexi launched its Instant Memos product) after merging with Fastcase. In other words, Alexi did not transform to compete with Fastcase—it was the other way around, when Fastcase was acquired by companies (vLex and then Clio) that had competing AI tools. Competition between Alexi and Vincent AI is irrelevant to the contract claims here, because

29

Fastcase does not argue that Alexi breached the Agreement by competing with vLex or Clio's AI tools. SUMF Resp. ¶ 374.

Nor does Fastcase's citation (at 32) to a LinkedIn post by Mr. Doble—in which he described Alexi as "increasingly a legitimate alternative to incumbent legal research providers"— move the needle. Mr. Doble's aspirational post—which Fastcase did not even bother to ask him about during his eight-hour deposition—does not change the fact that there is no evidence that Alexi has displaced Fastcase (or WestLaw or Lexis) for even a single customer, SUMF Resp. ¶¶ 312, 315, 335; Alexi SUMF ¶ 97, or that Alexi's AI tool sand Fastcase's traditional legal research service serve fundamentally different purposes. SUMF Resp. ¶ 33. It is beyond dispute that lawyers ***cannot*** solely rely on Alexi (or any other AI tool) without conducting their own caselaw research consistent with their ethical obligations and their duty to clients. Alexi SUMF ¶ 98. And in any event, Alexi cannot breach the Agreement through verbiage on social media. The contract restricts *how Alexi uses the Fastcase data*—not how Mr. Doble describes the future potential for the company and AI technology in a post.

### D.    The Agreement's Plain Text Does Not Restrict Alexi to "Memos" or Any Other Particular Output Format

Finally, Fastcase's argument (at 28–31) that Alexi breached the Agreement because it used the Fastcase data for something other than a "memo" fails as a matter of law. The Agreement does not limit Alexi to producing answers in memo format.

The Agreement's recitals state that Fastcase wished to license the caselaw data "for Alexsei's legal memos." Alexi SUMF ¶ 44. But Section 1.7—which is the operative clause limiting how Alexi may use the licensed data—contains no restriction on the format in which Alexi may provide legal answers to customers. As the drafter of the Agreement, Fastcase could have included (or bargained for) such a limitation, but it did not. It cannot now insert that limitation into

the contract years after the fact. *See CorpCar*, 325 A.3d at 1250.

Fastcase relies on *Trilon Plaza, Inc. v. Comptroller of State of New York*, 788 A.2d 146 (D.C. 2001), but that case is inapposite. There, the court considered a recital clause in a deed as relevant evidence of the parties' intent, where the recital specifically cross-referenced obligations relating to the prepayment of a loan contained in an operative clause of the contract. *Id.* at 150–51. Here, by contrast, the "whereas" clause that references "Alexsei's legal memos" makes no reference to the operative terms of the Agreement. And Fastcase drafted a specific use limitations clause—Section 1.7—that says nothing about memos or the format of Alexi's answers. *Grynberg v. FERC*, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond those arising from the operative terms of the document.") (quotation omitted)); *Pigford v. Schafer*, 536 F. Supp. 2d 1, 11 (D.D.C. 2008) ("For better or worse, the parties bargained for the terms of the [agreement], and it therefore is those terms which the Court must enforce" over predicate language.").

In any case, Fastcase (at 29) bases this entire argument on the untenable position that a memo can only be "a finished legal research work product" in a non-iterative format and standalone document. But the Agreement does not define "memo" and imposes no restrictions as to what a memo can or cannot look like. SUMF Resp. ¶ 345. Fastcase's argument (at 29–30) that narrative formats including "summaries and tables of caselaw," "arguments supported by case citations," and "letter or other drafting outputs that incorporate legal research" are ***not*** memos cannot be squared with the ordinary meaning of that term. A memo is just a "written statement of [a party's] legal arguments," or a "written note or record" that "analyze[s] a legal issue and inform[s] the reader about possible approaches and outcomes." *Memorandum*, Black's Law Dictionary (12th ed. 2024). Alexi's answers fit well within that description. *See, e.g.*, SUMF Resp.

31

¶¶ 151, 247–51, 253, 298, 306.

### III.    ALEXI DID NOT COPY, PUBLISH, OR DISTRIBUTE THE FASTCASE DATA IN A MANNER INCONSISTENT WITH THE AGREEMENT

Fastcase now contends (at 34–40) that Alexi breached Section 2.2 by displaying the text of Fastcase cases within Alexi's platform. But this theory was never disclosed before Fastcase filed its lawsuit and cannot serve as a basis for termination. The October 27, 2025, breach letter alleged only that Alexi ███████████████████████████████████████████████ ███████████████████████████ SUMF Resp. ¶ 342. The breach letter said nothing about displaying case text or Alexi's purported copying, publication, or distribution of Fastcase data. SUMF Resp. ¶ 342. It was not until the Complaint that Fastcase raised the theory that "displaying Fastcase-sourced case law to Alexi's end users" constituted a breach. Alexi SUMF ¶ 207. For the reasons described above, *see supra* Section I, the failure to provide notice and an opportunity to cure related to the display allegations foreclose this breach theory—especially because this is a discrete issue that Alexi could easily have cured by reverting back to the public links that Alexi previously used (and which Fastcase does not object to). SUMF Resp. ¶ 101; *Clark v. Bank of Am., N.A.*, 561 F. Supp. 3d 542, 550 (D. Md. 2021) ("[W]hen claims arise from actions taken pursuant to the contract or agreement at issue, a valid notice and cure provision is a precondition to the suit."(citation modified)); *Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty.*, 2023 WL 4363439, at *19–21 (10th Cir. 2023) (cure provisions "contain an implicit requirement to give enough detail to allow cure," otherwise the opposing party is left to play a "meaningless guessing game").

#### A.    The Agreement Contemplated that Alexi Would Store the Fastcase Data on its Servers

Fastcase argues (at 22, 35–37)—for the first time in its summary judgment brief—that Alexi violated Section 2.2 because it "copied Fastcase caselaw into its systems and repositories."

32

As an initial matter, Fastcase did not claim that Alexi impermissibly copied the Fastcase data in its October 2025 breach letter, in its complaint, or even in the interrogatory responses that Fastcase amended two days before filing its summary judgment brief. This late-breaking litigation gambit thus was long ago waived (after *years* of Fastcase pumping its caselaw data into Alexi's systems) and not properly raised through the Agreement's notice-and-cure requirement in any case.

Regardless, Fastcase's copying argument fails as a matter of law because it ignores that the Agreement affirmatively requires Alexi to store the data on its servers. The Agreement requires that ███████████████████████████████████████████████ *see* SUMF Resp. ¶¶ 93–95, 277-78, which in turn requires Alexi to keep a copy of that data on its servers. In short, the very act Fastcase now characterizes as impermissible "copying" is something Fastcase, as the Agreement's drafter, compelled Alexi to do. Fastcase's argument that Alexi breached one provision of the Agreement it drafted by complying with another cannot survive scrutiny because it would make compliance impossible. *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (courts avoid interpretations that "produce an absurd result").

Moreover, Fastcase's argument would once again produce patently absurd results. Over nearly four years, Fastcase delivered to Alexi the text of millions of judicial opinions in raw XML spreadsheets for programmatic use by Alexi's software. *See supra* SUMF Resp. ¶¶ 94–95. Alexi could not use that data—which it has paid nearly ████████ to license—without creating an internal copy that Alexi's AI software could research, which was the point of the Agreement. Fastcase cannot argue with a straight face that the Agreement required Alexi to somehow read and immediately discard tens of millions of pages of caselaw text files, without creating an internal copy of that data that Alexi's internal AI tools could reference. Because Fastcase's 11th-hour copying theory would entirely strip Alexi of the benefit of the bargain, the Court should reject it

out of hand.

**B.    Alexi Did Not "Publish" or "Distribute" the Fastcase Data**

Fastcase's argument (at 37–38) that Alexi impermissibly "published" or "distributed" the Fastcase caselaw data by "making full-text Fastcase cases available to users through Alexi's own platform" fundamentally misconstrues Section 2.2 and ignores the context in which Alexi displays case text.

"Publishing" requires distributing copies to the public, *Publish*, Black's Law Dictionary (12th ed. 2024), and "distributes" similarly requires "deliver[ing]" data to others. *Distribute*, Black's Law Dictionary (12th ed. 2024). Alexi does neither: It only displays the non-copyrightable raw text of judicial opinions within its paywalled platform in the context of memos that cite those cases. *See* SUMF Resp. ¶¶ 103, 112; Alexi SUMF ¶ 127. Even then, the text of the opinion is only available to a user who has the memo and the case-specific URL, leaving each link with a "very limited audience." SUMF Resp. ¶¶ 267–68. Alexi displaying a cited authority in its memos so that users can verify the case for themselves is categorically different from "publishing" or "distributing" Fastcase's data to the public—and even further afield from selling the Fastcase data or making it available through a traditional legal research platform, which is what Section 2.2 was designed to prevent. Alexi SUMF ¶¶ 38–39 (████████████████████████████████████████████████████████████████████████████████; SUMF Resp. ¶¶ 33–34. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Alexi SUMF ¶ 116.

In any event, Fastcase has waived any claim that Alexi's display of case text constitutes impermissible "publication" or "distribution" under Section 2.2. Since 2022, Alexi has displayed

34

the text of cited cases within its platform, and the undisputed evidence reflects that Alexi's CEO Mr. Doble sought and received permission from Fastcase's Ms. Jack before enabling that feature. *See* Alexi SUMF ¶¶ 120–23; SUMF Response ¶¶ 103, 107, 115, 265, 289. Ms. Jack claimed to not remember that conversation, but feigning ignorance does not create a genuine dispute of material fact. *Fed. Election Comm'n. v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute."); *Hartford Cas. Ins. Co. v. Jenkins*, 2010 WL 2348619, at *1 n. 2 (S.D. Ala. June 9, 2010) ("Courts routinely hold that a party's lack of recollection cannot create a genuine issue of material fact") (collecting cases). Even after the conversation between Mr. Doble and Ms. Jack, Alexi delivered a memo to vLex/Fastcase in 2023 featuring the type of links that Fastcase now challenges (after a vLex executive signed up for a free trial subscription). Fastcase not only did not object to Alexi's linking at the time, the vLex executive who signed up for the trial subscription commented that the display was "beneficial" to Fastcase. Alexi SUMF ¶ 138. By knowingly acquiescing to the display feature for years while continuing to perform under the Agreement, Fastcase waived any right to now claim that the same feature violates the contract. *See Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004).

    **C.    Section 10 Does Not Support Fastcase's Section 2.2 Theories**

Fastcase's brand new, bootstrapped theory of breach under Section 10 fails as well. Prior to its Motion, Fastcase never raised Section 10 at all—not as an independent breach, not as support for any other breach, not even in passing—even as they updated their bases for breach on June 1, 2026, two nights before filing its Motion. Alexi SUMF ¶¶ 180, 201–12. This is quite literally the first Alexi is hearing of it.

Fastcase newly invokes Section 10 of the Agreement to purportedly bolster its Section 2.2 theories, arguing (at 39–40) that (1) the provision "confirms that Fastcase data was not to be

surfaced externally through an Alexi-controlled legal-research interface," and (2) Alexi's decision to stop linking to Fastcase's website "confirms the practical effect of Alexi's copying and distribution." Neither argument withstands scrutiny.

Section 10 is a security provision—not an access restriction. The provision requires that

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ SUMF Resp. ¶ 363-64. Fastcase now argues (at 39) that this provision "reinforces the Agreement's structure, which tied access to Fastcase data to internal purposes, not exposed to Alexi's customers." But that reading inverts the provision's purpose. Section 10 is titled "Security," and its operative text addresses labeling and notice requirements, not prohibitions on access. The provision presupposes that Alexi may have ████████████████████████████████████████ and requires only that such pages contain appropriate labeling. SUMF Resp. ¶ 363-67. If Fastcase intended to prohibit any external access entirely, it would not have drafted a provision specifying what notice must appear on access portals. Fastcase is now asking this Court to read into one provision a limitation that Alexi *could not* provide text of caselaw to users on the one hand, but on the other hand read a provision to provide that, if Alexi *did* provide caselaw to users, there had to be a disclaimer. This is just one more example of Fastcase's mental gymnastics to manufacture a breach theory.

That reading makes no sense with respect to the particular cases cited in Alexi's memos, anyway. The Section 10 labeling requirement applies to pages or portals "that allow[] access to the Fastcase Data" rather than to Alexi's proprietary legal analysis or the display of cited authorities within that analysis. SUMF Resp. ¶ 363-64. Alexi's platform does not provide users with direct access to the Fastcase database. *See supra* Background. Users can only view the text

36

of cases that have already been cited in Alexi's proprietary legal analysis. That is not a "page or portal that allows access to the Fastcase Data" contemplated by Section 10.

Finally, Fastcase's argument (at 39–40) that Alexi's decision to stop linking to Fastcase's website "confirms the practical effect of Alexi's copying and distribution" is a non sequitur. Fastcase does not argue that linking to the Fastcase website violated the Agreement. SUMF Resp. ¶ 101. The document Fastcase cites says that ███████████████████████████████ ████████████████████████████████████████ ██████████████████████████ SUMF Resp. ¶ 274. This document is consistent with the undisputed facts that Alexi has set forth in its briefing, Alexi SJ at 9-10, 27–28, not Fastcase's alternative and highly disputed version of events.

## IV.    FASTCASE'S BREACH CLAIM IS BARRED BY WAIVER AND ESTOPPEL

Even if this Court were to find some ambiguity as to whether Alexi complied with the Agreement (and there is none), Fastcase long ago waived its breach claim against Alexi. As detailed in Alexi's summary judgment motion, Fastcase had actual knowledge of all of the features that it now claims breached the Agreement. Alexi SJ Br. 32–35. Over the parties' nearly four-year course of dealing, Fastcase never raised a single objection to Alexi's AI-generated legal research services or its use of the licensed data. On the contrary, Fastcase endorsed, encouraged, and celebrated Alexi's AI capabilities for years—including by honoring Mr. Doble for his AI achievements with the "Fastcase 50" award and ████████████████████████ ████████ on the eve of sending the breach letter to Alexi. Alexi SUMF¶¶ 110–12, 167.

The mountain of course of conduct evidence in this case—which is derived entirely from Fastcase's own objective actions and ordinary-course documents—is "inconsistent with an intent to enforce" the Agreement's use restrictions against Alexi based on its provision of AI-generated legal analysis using the Fastcase data. *Nortel Networks*, 298 F. Supp. 2d at 88; *LanQuest Corp. v.*

*McManus & Darden LLP*, 796 F. Supp. 2d 98, 103 (D.D.C. 2011) ("[A] party's course of conduct can constitute a waiver of specific contractual provisions and be relied upon by the parties as a modification of any enforceable contract that exists between the parties."). Because the course of dealing here is shown through objective evidence that is beyond dispute, the Court should find that Fastcase has waived its breach claim as a matter of law. But at the very least, the overwhelming course of conduct evidence precludes summary judgment in Fastcase's favor. *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F. Supp. 2d 60, 66 (D.D.C. 2001) ("[W]hether waiver exists is generally a question for the trier of fact.").

In addition to waiver, equitable estoppel independently bars Fastcase's breach claim as well. *SJ Enters., LLC v. Quander*, 207 A.3d 1179, 1184 (D.C. 2019). Permitting Fastcase to reverse course and claim that Alexi's longstanding AI platform violates the Agreement—after Alexi invested years of effort and millions of dollars in capital—would inflict devastating prejudice, which is precisely the kind of disproportionate forfeiture that equitable estoppel is designed to prevent. *Nortel Networks*, 298 F. Supp. 2d at 88.

## V.    ALEXI'S CONTRACT-RELATED COUNTERCLAIMS SURVIVE SUMMARY JUDGMENT

Fastcase devotes just five pages to Alexi's contract-related counterclaims, and for good reason—its opposition to those claims is entirely derivative of its own breach theory. Fastcase contends that Alexi materially breached and failed to cure; that this excused Fastcase's performance; and that because Fastcase's termination was authorized, Alexi's counterclaims for breach of contract (Count I), breach of the implied covenant (Count II), and tortious interference (Counts IV and V) all fail. *See* Mem. at 40–45. The flip-side is straightforward: if Fastcase's breach theory fails—as it does—the entire edifice collapses.

As demonstrated above and in Alexi's motion for summary judgment (Alexi SJ Br. at 22–

35), Fastcase's breach claim fails as a matter of law. Because Fastcase raises no independent challenge to the counterclaims, this Court need only determine that Fastcase did not have cause to terminate the Agreement, which Alexi has already established. Once that threshold question is resolved in Alexi's favor, Fastcase's opposition to the counterclaims falls away entirely.

### A.     Fastcase's Challenge to Alexi's Breach of Contract Counterclaims Is Entirely Derivative of Its Own Failed Breach Claim

Fastcase's entire argument against Alexi's breach-of-contract counterclaim (Count I) rests on the premise that "Alexi materially breached Sections 1.7 and 2.2" and "failed to cure after notice," thereby excusing Fastcase's performance and authorizing termination under Section 5.2. Mem. at 41–42. But as demonstrated in Sections I and II above—and in Alexi's Motion for Partial Summary Judgment—Alexi did not breach. Because no breach occurred, Fastcase's "prior breach excuses performance" theory collapses. A party's obligation to continue performing is excused only when the other party commits a material breach. *See Hto7, LLC v. Elevate, LLC*, 319 A.3d 368, 375–76 (D.C. 2024). Fastcase has failed to establish a material breach and had no cause to terminate, so its unilateral non-performance is an independent breach. *See* Alexi SJ Br. at 35–40.

Indeed, Alexi independently established that Fastcase breached on two grounds: (1) wrongfully terminating after issuing a vague breach notice providing no meaningful opportunity to cure in violation of Section 5.2, *see* Alexi SJ Br. at 35–39; and (2) stopping the required daily caselaw updates on December 3, 2025, despite being obligated to provide them through at least December 31, 2026, *id.* at 39–41.

Fastcase's reliance (at 41-42) on *CorpCar* for the proposition that bringing a lawsuit based on a "pretext" does not defeat a contractually authorized termination is misplaced. First, *CorpCar* presupposes an "unforced material breach" by the non-terminating party, which is a predicate Fastcase cannot establish. In *CorpCar*, the licensee's breach was effectively conceded. *Id.* at 1243.

39

Here, by contrast, Alexi did *not* breach. *See supra* Sections IIA, IIB, IIC, IID; Alexi SJ Br. at 22–35. Second, *CorpCar* itself recognized that its holding does not apply where the licensor "induce[d] the breach or interfere[d] with [the licensee's] ability to perform." 325 A.3d at 1247. That exception applies here. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. Alexi SJ Br. at 43–44. ████████████

████████████████████████████████████████████████████████████

████████████████ *Id.* at 38. That is precisely the "purposeful sabotage" *CorpCar* identified as a distinguishing factor, rendering *CorpCar* inapplicable here.

### B. Fastcase's Implied-Covenant Defense Fails Because Fastcase Cannot Identify a Valid Termination

Fastcase argues that Alexi's implied-covenant counterclaim (Count II) fails because "the implied covenant of good faith and fair dealing cannot contradict, modify, negate, or override the express terms of a contract." Mem. at 42–43 (citing *Africare, Inc. v. Xerox Complete Document Sols. Md., LLC*, 436 F. Supp. 3d 17, 33 (D.D.C. 2020)). This mischaracterizes Alexi's claim. Alexi does not contend that Fastcase breached the implied covenant by exercising a legitimate contractual right. Rather, Alexi contends—and the undisputed evidence establishes—that Fastcase manufactured a pretextual breach claim to trigger a termination right that would not otherwise exist, then used that fabricated breach to destroy Alexi's business and thwart its acquisition opportunities. *Africare* does not immunize that conduct.

The implied covenant "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006). A party breaches when it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id.* Fastcase breached

by (1) manufacturing a pretextual breach allegation to satisfy its obligations to Clio under the merger agreement and realize its $1 billion acquisition; (2) sending a deliberately vague breach letter depriving Alexi of its opportunity to cure; and (3) making false representations to Alexi's prospective acquirers. *See* Alexi SJ Br. at 40–44.

Fastcase's reliance, once again, on *CorpCar* for its implied-covenant defense fares no better. *CorpCar* rejected the theory because the licensor had cause to terminate and "had not induced … or in any way interfered with [the licensee]'s ability to perform." 325 A.3d at 1247. Here, Fastcase did *not* have cause to terminate, and Clio and vLex affirmatively orchestrated the pretextual breach claim to effectuate Section 5.18(c) of the merger agreement. *See* Alexi SJ Br. at 43–45. Manufacturing a lawsuit under false pretenses to comply with a merger obligation and undermine a competitor, while falsely telling prospective acquirers that Alexi has no contractual rights to the Fastcase caselaw backfile, is a textbook violation of the duty of good faith and fair dealing. *See Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 288 F. Supp. 3d 176, 188 (D.D.C. 2018).

At the very least, the undisputed documentary record— ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████ *See* Alexi SJ Br. at 40–44; Alexi SUMF ¶¶ 149, 153, 222–24.

Finally, as described in Alexi's Motion for Partial Summary Judgment, Fastcase has breached its implied covenant of good faith and fair dealing on the additional grounds that it (1) willfully sent a vague breach letter that provided no notice to Alexi of what had done to breach the Agreement or what it could do to cure such a breach; and (2) made false or misleading statements

to prospective acquirers after sending the breach letter and filing this lawsuit in an attempt to deprive Alexis of the bargained-for rights under the Agreement. *See* Alexi SJ Br. at 42–43.

### C.     Alexi's Tortious-Interference Claim Against Clio and vLex Is Established on the Undisputed Record

Fastcase argues (at 43–45) that Alexi's tortious-interference counterclaims (Counts IV and V) fail because Alexi had "no valid entitlement" to continued performance after its supposed "uncured breach excused Fastcase's continued performance."

On the merits, all elements are established. Tortious interference requires: (1) the existence of a contract, (2) defendant's knowledge of the contract, (3) defendant's intentional procurement of the contract's breach, and (4) resulting damages. *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017). Interference is "intentional" if the defendant "knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Id.* at 203. Wrongful or malicious intent is not required. *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 141 n.28 (D.C. 2021); *see also* Alexi SJ Br. at 43–45.

The first two elements are undisputed. *See* Alexi SJ Br. at 44. As to intentional interference, the documentary record is dispositive. In their merger agreement, vLex and Clio agreed to force termination unless Alexi surrendered the backfile option. Alexi SUMF ¶¶153–54. When Alexi refused, Clio and vLex jointly authored the breach notice, and Mr. Newton ordered this lawsuit on Clio's dime. Alexi SUMF ¶¶ 183–85. These undisputed facts conclusively establish intentional interference. *See also* Alexi SJ Br. at 44–45.

Fastcase's sole response—that Alexi had "no valid entitlement" to continued performance—depends entirely on finding that Alexi materially breached and failed to cure, *and* that the interference by Clio and vLex in Fastcase's Agreement occurred only *after* the breach and failure to cure, which would have been the day before this lawsuit was filed. *Compare* Alexi SUMF

¶¶ 178 (breach letter sent October 27, 2025) *with* Dkt. 1 (Nov. 26, 2025). That is indisputably not the case ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*See* SUMF Resp. ¶¶ 368–73; Alexi SUMF ¶¶ 184–85, 188. The letter of breach and this lawsuit were not a coincidence████████████████████████████████████████████

████████████████████████████████████████ and demonstrate that Clio and vLex tortiously interfered with the Agreement between Fastcase and Alexi.[13] Alexi SUMF ¶¶ 53, 182.

Because Fastcase has failed to establish that predicate, its challenge to Alexi's tortious-interference claim fails, and Alexi is entitled to summary judgment. *See* Alexi SJ Br. at 43–45.

\* \* \*

In sum, Fastcase's challenges to Alexi's counterclaims add nothing beyond its already-failed breach theory. Because Alexi did not breach, Fastcase had no cause to terminate, its performance was not excused, and it cannot shield Clio and vLex from liability for their orchestrated interference. The Court should deny Fastcase's request for summary judgment on Alexi's counterclaims in their entirety and, instead, enter partial summary judgment in Alexi's favor on liability for those claims.

## CONCLUSION

For the foregoing reasons, the Court should deny Counter-Defendants' motion.

---

[13] Even if there was any dispute over whether Clio and vLex interfered in the Agreement after the breach was discovered, their argument is still entirely dependent on the breach claim and succeeds only if this Court concludes that Alexi materially breached and failed to cure. Because the Court cannot so conclude for the reasons set forth above and in Alexi's Motion for Partial Summary Judgment, the "no valid entitlement" defense fails.

Dated:  June 22, 2026

WINSTON TAYLOR LLP
By:  /s/ *Johanna Rae Hudgens*
Johanna Rae Hudgens (*pro hac vice*)
George Mastoris (*pro hac vice* forthcoming)
WINSTON TAYLOR LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
johanna.hudgens@winstontaylor.com
george.mastoris@winstontaylor.com

Benjamin L. Rudofsky (DC Bar No. 1029844)
Allie A. Dodd (*pro hac vice*)
Melissa A. Iannuzzi (*pro hac vice*)
WINSTON TAYLOR LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 282-5017
Fax: (202) 282-5100
ben.rudofsky@winstontaylor.com
allie.dodd@winstontaylor.com
melissa.iannuzzi@winstontaylor.com

Joshua Hafenbrack (D.C. Bar No. 1017128)
HAFENBRACK LAW
818 18th Street NW, Suite 810
Washington, DC 20006
jhafenbrack@hafenbracklaw.com

*Counsel for Defendant and Counterclaim-Plaintiff
Alexi Technologies Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 22nd day of June, 2026, a copy of the foregoing Alexi Technologies Inc.'s Opposition to Counter-Defendants' Motion for Partial Summary Judgment on Fastcase's Breach-of-Contract Claim and Alexi's Contract-Related Counterclaims was filed electronically with the Clerk of Court, using the CM/ECF system, which sent notification of the filing to counsel of record in this case.

/s/ *Johanna Rae Hudgens*

Johanna Rae Hudgens (*pro hac vice*)