**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ALEXI TECHNOLOGIES INC.,<br><br>Defendant. | C.A. No. 1:25-CV-04159-RJL |
| ALEXI TECHNOLOGIES INC.<br><br>Counterclaim Plaintiff,<br>v.<br><br>FASTCASE, INC., VLEX, LLC, &<br>THEMIS SOLUTIONS INC.,<br><br>Counterclaim Defendants. | |

**ALEXI'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' PARTIAL MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

I. BACKGROUND ..... 1

A. The Parties ..... 4

B. Alexi's AI-Powered Innovation ..... 4

C. The 2021 Data License Agreement ..... 5

D. Fastcase's Knowledge of and Support for Alexi's AI Services ..... 6

E. Clio Acquires vLex/Fastcase and Targets the Backfile Purchase Right ..... 7

F. Clio Orders Termination and Manufactures Breach Claims ..... 8

G. Fastcase Files Suit and Breaches the Agreement ..... 9

H. Clio Interferes with Alexi's Business Relationships ..... 9

I. Clio's Own Internal Analysis Confirms the Scheme ..... 10

J. Harm to Alexi and Competition ..... 10

K. Relevant Procedural History ..... 11

LEGAL STANDARD ..... 11

ARGUMENT ..... 12

I. ALEXI HAS ALLEGED A PLAUSIBLE SECTION 7 CLAIM ..... 12

A. Alexi Has Plausibly Alleged Relevant Antitrust Markets ..... 12

i. Alexi Has Plausibly Alleged the "Programmatically Licensable Comprehensive Legal Database Market" Is Properly Defined ..... 13

ii. The "AI Legal-Analysis Services Market" Is Properly Defined ..... 20

a. Alexi Has Plausibly Alleged That the Acquisition Will Substantially Lessen Competition ..... 21

i. Clio Has the Ability to Foreclose Competition ..... 22

ii. Clio Has the Incentive to Foreclose Competition ..... 24

iii. The Clio-vLex-Fastcase Merger Substantially Lessens Competition ........ 25

iv. Alternatively, Alexi Plausibly Alleges That the Acquisition Is Likely to Substantially Lessen Competition Under the *Brown Shoe* Factors ........ 27

b. Alexi's Allegations Regarding the 2023 vLex-Fastcase Transaction Are Properly Pled ........ 29

II. ALEXI'S GOOD-FAITH AND FAIR DEALING COUNTERCLAIM ........ 30

III. ALEXI STATES PLAUSIBLE COUNTERCLAIMS FOR TORTIOUS INTERFERENCE WITH CURRENT AND PROSPECTIVE BUSINESS RELATIONS ........ 34

a. Count Four: Tortious Interference with Current Business Relations—vLex and Clio Are Distinct Third Parties Who Induced Fastcase's Breach ........ 34

b. Count Five: Tortious Interference with Prospective Business Relations—Alexi Has Identified Specific Expectancies with Reasonable Probability ........ 36

CONCLUSION ........ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*,
809 F. Supp. 3d 371 (W.D.N.C. 2025) ....................18

*Allworth v. Howard Univ.*,
890 A.2d 194 (D.C. 2006) ....................30, 31

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) ....................12, 13, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................11

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) ....................14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ....................12, 13, 25, 27

*Brown v. Trinity Wash. Univ.*,
2023 WL 2571729 (D.D.C. Mar. 20, 2023) ....................33, 34

*C & E Servs., Inc. v. Ashland Inc.*,
601 F. Supp. 2d 262 (D.D.C. 2009) ....................31, 33

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) ....................21

*Close It! Title Servs., Inc. v. Nadel*,
248 A.3d 132 (D.C. Cir. 2021) ....................34, 37

*CollegeNet, Inc. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Or. 2018) ....................16

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
120 F. Supp. 2d 556 (E.D. Va. 2000) ....................19

*CorpCar Servs. Hous., Ltd. v. Carey Licensing, Inc.*,
325 A.3d 1235 (D.C. 2024) ....................17, 32

*In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016) ....................11, 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....................15, 18

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021)....................13, 21

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025) ....................22

*FTC v. Mylan Lab'ys, Inc.*,
62 F. Supp. 2d 25 (D.D.C. 1999)....................14

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020)....................13

*FTC v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997)....................13, 16

*FTC v. Surescripts, LLC*,
665 F. Supp. 3d 14 (D.D.C. 2023)....................16

*FTC v. Syngenta Crop Prot. AG*,
711 F. Supp. 3d 545 (M.D.N.C. 2024) ....................16

*FTC v. Tempur Sealy Int'l, Inc.*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ....................22, 27, 28

*FTC v. Tronox Ltd.*,
332 F. Supp. 3d 187 (D.D.C. 2018)....................24

*Feyko v. Yuhe Int'l, Inc.*,
2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ....................37

*Florence Urgent Care v. Healthspan, Inc.*,
445 F. Supp. 2d 871 (S.D. Ohio 2006) ....................32

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)....................27

*Fruehauf Corp. v. FTC*,
603 F.2d 345 (2d Cir. 1979)....................25

*Hamilton v. Geithner*,
743 F. Supp. 2d 1 (D.D.C. 2010)....................30

*Haymon v. District of Columbia*,
610 F. Supp. 3d 101 (D.D.C. 2022)....................37

*Hilska v. Jones*,
217 F.R.D. 16 (D.D.C. 2003)....17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020)....19, 20

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023)....22, 24, 27, 28

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
24 F. Supp. 3d 32 (D.D.C. 2014)....33

*L.A. Mem'l Coliseum Comm'n v. N.F.L.*,
726 F.2d 1381 (9th Cir. 1984)....18

*Legion Sys., LLC v. Valiant Glob. Def. Servs., Inc.*,
2021 WL 3633592 (M.D. Fla. Aug. 17, 2021)....31

*Lugo v. City of Troy, New York*,
114 F.4th 80 (2d Cir. 2024)....30

*Matiella v. Murdock St. LLC*,
2025 WL 3533454 (D.D.C. Dec. 10, 2025)....36

*Menominee Indian Tribe of Wisc. v. United States*,
614 F.3d 519 (D.C. Cir. 2010)....29

*Miller v. Lamanna*,
169 F.4th 118 (2d Cir. 2026)....30

*Nat'l Aviation Trades Ass'n v. C.A.B.*,
420 F.2d 209 (D.C. Cir. 1969)....12

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom*. *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023)....29

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....19

*Phila. World Hockey Club v. Phila. Hockey Club*,
351 F. Supp. 462 (E.D. Pa. 1972)....18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....18

*Raskauskas v. Temple Realty Co.*,
589 A.2d 17 (D.C. 1991)....34

*RealPage, Inc. v. Yardi Sys., Inc.*,
852 F. Supp. 2d 1215 (C.D. Cal. 2012) ....................16

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) ....................13, 14

*In re Se. Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008) ....................26

*Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads*,
565 A.2d 285 (D.C. 1989) ....................35

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
988 F.3d 690 (4th Cir. 2021) ....................26

*Sundberg v. TTR Realty*,
LLC, 109 A.3d 1123 (D.C. 2015) ....................31

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345
(D.C. Cir. 2017) ....................12, 13, 14, 21

*United States v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ....................25, 26

*United States v. Bertelsmann SE & Co. KGaA*,
646 F. Supp. 3d 1 (D.D.C. 2022) ....................19

*United States v. Dairy Farmers of Am., Inc.*,
426 F.3d 850 (6th Cir. 2005) ....................25

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ....................13, 18

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) ....................23

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ....................15

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ....................23

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974) ....................25

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................13

*United States v. UnitedHealth Grp. Inc.*,
630 F. Supp. 3d 118 (D.D.C. 2022)....................24

*United States v. Von's Grocery Co.*,
384 U.S. 270 (1966)....................27

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................25

*Whitt v. Am. Prop. Constr., P.C.*,
157 A.3d 196 (D.C. Cir. 2017)....................34

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
288 F. Supp. 3d 176 (D.D.C. 2018)....................31, 32

**Statutes**

Clayton Act § 7, 15 U.S.C. § 18....................*passim*

**Other Authorities**

Fed. R. Civ. P. 8(a)....................18

Fed. R. Civ. P. 8(d)(2)....................34

Fed. R. Civ. P. 12(b)(6)....................*passim*

Fed. R. Civ. P. 12(d)....................30

Restatement (Second) of Contracts § 205 cmts. a & d (Am. Law. Inst. 1981)....................32

Restatement (Second) of Torts § 8A, 776 cmt. j....................34

U.S. Dep't of Just. & FTC, *Merger Guidelines* § 2.5.A (2023)....................22

U.S. Dep't of Just. & FTC, *Merger Guidelines* § 2.7 (2023)....................29

**INTRODUCTION**

In acquiring Fastcase and vLex—a deal which cost it $1 billion—Clio gained a stranglehold over a critical input for AI-powered legal analysis: the only comprehensive database of judicial opinions available to tech innovators such as Alexi who require that information to offer a competitive product. Post-acquisition, Clio, which now offers its own AI tool, has the ability, incentive, and publicly announced intention to deprive its competitors of access to that information and thus create a "moat" around its own vertically integrated AI services. Alexi's antitrust and related counterclaims easily meet the Rule 12(b)(6) bar. Indeed, Alexi's counterclaims cite a mountain of party admissions from the Counterclaim Defendants themselves that corroborate every aspect of Alexi's Clayton Act and common law claims. Clio's motion to dismiss, meanwhile, asks this Court to credit its version of disputed facts, to weigh evidence, and to resolve contested questions of market definition—none of which is appropriate on a Rule 12(b)(6) motion. The motion should be denied.

As Clio itself acknowledges, only three companies in the world possess comprehensive primary-law databases of U.S. caselaw: Westlaw, LexisNexis, and Fastcase (now controlled by Clio). Neither Westlaw nor Lexis licenses its database for programmatic use by downstream AI legal analysis providers—a fact that Counterclaim Defendants' own documents confirm. Fastcase was, and remains, the only available source of that database, access to which is necessary to meaningfully participate in the marketplace for AI-driven legal analysis. [redacted] As Clio's own CFO candidly put it: "There's really three datasets like this on the planet. . . . We think a lot of competitors are going to find it increasingly difficult to compete against that database." [redacted]."

Alexi's counterclaims under Section 7 of the Clayton Act more than meet the Rule 12(b)(6) standard. Alexi has plausibly alleged—with extraordinary factual detail drawn from Counterclaim

Defendants' own ordinary-course business records—two relevant antitrust markets, Clio's ability and incentive to foreclose rivals from the critical upstream input, and a resulting substantial lessening of competition. Counterclaim Defendants' motion does not identify any "glaring deficiency" in Alexi's market definitions, as would be required to warrant the rare dismissal of an antitrust claim on market-definition grounds. Instead, Counterclaim Defendants invite the Court to resolve contested factual questions—such as whether particular databases are adequate substitutes, whether barriers to entry are truly high, whether Clio's foreclosure extends beyond Alexi—that cannot be decided on a motion to dismiss. This Court should decline that invitation.

In contrast to Clio's self-serving narrative, the facts—which have been confirmed during the first phase of discovery—tell a damning story. For nearly four years, Fastcase eagerly licensed its caselaw data to Alexi and celebrated Alexi's AI-powered innovations. It only changed course when it was forced to choose between complying with its contractual obligations or closing the lucrative Clio acquisition, which promised to make Fastcase's founders incredibly wealthy. The reason it was faced with that choice is simple: during diligence, Clio had discovered that Alexi's Data License Agreement (the "Agreement") contained a backfile purchase right, which guaranteed any Alexi acquirer the option to purchase the full Fastcase database without restrictions for [redacted]

The backfile purchase right gave anyone with the resources to buy Alexi a realistic foothold for a fourth comprehensive database, thus drastically altering the value proposition of the proposed Fastcase/vLex acquisition. Clio's CEO [redacted] When Alexi refused to surrender the backfile right for nothing in return—Fastcase's illusory attempt at a "compromise"—Clio manufactured a pretextual breach claim—citing the same AI technology it had championed—and weaponized this Court by filing litigation under Fastcase's name. The anticompetitive conduct here is written in plain language in the Stock Purchase Agreement itself, [redacted].

Counterclaim Defendants also breached their contractual duty of good faith and fair dealing in three independent ways, none of which overlap with Alexi's breach of contract claim. Specifically, Counterclaim Defendants manufactured a pretextual breach claim, sent a deficient breach notice that deprived Alexi of an opportunity to cure, and made false statements about Alexi's rights under the Data License Agreement to prospective acquirers—telling them that any purchase of Alexi [redacted] The evidentiary record now before the Court—as set forth in the parties' pending cross-motions for summary judgment—confirms each of these bases independently or as a combined basis for this claim, which is also appropriate as an alternative to Alexi's contract claim.

Alexi's tortious interference claims are equally well pled. Clio and vLex (which are separate entities from Fastcase and not parties to the Agreement) directed and induced Fastcase's termination of the Agreement, destroying Alexi's existing contractual relationship with Fastcase. Further still, they thwarted Alexi's acquisition prospects, with Fastcase CEO Ed Walters personally contacting the CEOs of known potential acquirers, [redacted], to spread false and damaging information about Alexi's contractual rights. The timing was surgical and devastating: [redacted] had just secured internal approvals for a letter of intent to acquire Alexi at a valuation exceeding $100 million, pending a board vote on December 1—the very day news of Clio's lawsuit surfaced. [redacted] never moved forward.

The harm to Alexi has been more than adequately alleged at this stage of the litigation. Clio's own internal analysis (ironically created with AI assistance) confirms Alexi's financial harm is [redacted] Customers canceled. Acquisition discussions collapsed. Alexi was forced to lay off two-thirds of its staff. But the harm extends far beyond one company. By foreclosing programmatic access to the only comprehensive caselaw database available to independent AI providers, Clio raises rivals' costs, deters entry, and stifles the very innovation that promises to make legal services faster, more reliable, and more affordable for millions of Americans. That is precisely the kind of harm that the Clayton Act exists to prevent.

The motion should be denied in its entirety.

# I. BACKGROUND

This case arises from Clio's calculated campaign to eliminate a formidable AI legal research competitor by manufacturing baseless litigation to deprive that competitor of the critical data input it needs to survive. (Dkt. No. 82, Revised Amended Counterclaims ("RAC") ¶ 1.) The allegations—which the Court must accept as true at this stage—establish anticompetitive conduct, bad faith, and intentional interference with Alexi's business.

## A. The Parties

Alexi Technologies Inc. ("Alexi") is a Canadian legal technology startup founded in 2017 that has spent nearly a decade developing proprietary AI models to produce high-quality legal research memoranda. (*Id.* ¶¶ 18, 33.) Over 500 law firms across the United States and Canada use Alexi's AI-powered legal memos. (*Id.* ¶¶ 3, 41.)

Fastcase, Inc. ("Fastcase") is a Delaware corporation headquartered in Washington, D.C. that provides legal research through its database of primary law, treatises, analytics, and legal news. (*Id.* ¶¶ 19, 123.) In 2023, vLex merged with Fastcase. (*Id.* ¶ 21.) Counterclaim Defendant Themis Solutions Inc., d/b/a "Clio," is a Canadian legal technology company that licenses cloud-based practice management software and has increasingly focused on AI tools and services. (*Id.* ¶ 22.) In June 2025, Clio announced its acquisition of vLex for $1 billion, completing the deal in November 2025. (*Id.* ¶ 23.)

## B. Alexi's AI-Powered Innovation

Since its inception, Alexi has focused on using AI to address inefficiencies in legal research. (*Id.* ¶ 33.) Users enter legal research questions into an intuitive interface, and Alexi's AI models summarize and synthesize legal principles and caselaw into comprehensive legal analysis, typically in memo format. (*Id.* ¶ 34.) By 2023, through continual investment and engineering, Alexi began offering fully automated, AI-generated memos delivered within minutes. (*Id.* ¶ 35.)

Unlike general-purpose AI chatbots prone to hallucination, Alexi grounds its analysis in comprehensive caselaw and a continuously fine-tuned model trained to deliver reliable, accurate legal analysis. (*Id.* ¶ 38.) Alexi also provides private, siloed-cloud environments for each law firm client, safeguarding confidentiality and attorney work product. (*Id.* ¶ 39.)

### C. The 2021 Data License Agreement

To provide AI services tailored to the legal sector, providers need programmatic access to comprehensive caselaw, including historical and unpublished decisions. (*Id.* ¶¶ 4, 42–43.) General-purpose AI chatbots lacking access to comprehensive primary-law data are prone to error and hallucination and are unreliable for legal research or drafting requiring U.S. caselaw analysis. (*Id.* ¶¶ 174, 176.) As one internal document stated: "[redacted]" (*Id.* ¶ 178.)

Only three companies have comprehensive primary-law databases of U.S. caselaw: Westlaw (Thomson Reuters), LexisNexis, and Fastcase/vLex (now Clio). (*Id.* ¶ 44.) Among these, only Fastcase (before the vLex and Clio mergers) licensed its caselaw data to third-party tech companies. (*Id.* ¶¶ 154–156.) In contrast to Westlaw and Lexis, Fastcase's core pre-merger business model was licensing its data to tech innovators like Alexi. (*Id.* ¶¶ 150, 152–53.) As Mr. Walters put it, "Our team at Fastcase has always said that law should be like electric power: nearly ubiquitous, inexpensive, reliable, and useful for powering other things." (*Id.* ¶ 49.) The Fastcase data—in the company's own words—was [redacted] (*Id.* ¶¶ 45, 178; *id.* ¶ 179 (vLex document describing that the data "[redacted]).)

When Alexi sought to expand into the United States, Alexi's CEO, Mark Doble, contacted all three comprehensive primary-law database providers. (*Id.* ¶¶ 56, 154.) Westlaw and Lexis both declined to license their databases for programmatic use, leaving Fastcase as the only available option. (*Id.* ¶¶ 56, 154-155.) As Clio stated internally: [redacted]

[redacted] (*Id.* ¶ 157.)

In October 2021, Mr. Doble contacted Mr. Walters, explaining that Alexi was "an AI company fully automating the production of legal research memoranda." (*Id.* ¶ 57.) Mr. Walters responded enthusiastically, emphasizing that "supporting the legal tech ecosystem is an important part of who [Fastcase is]." (*Id.* ¶ 57.) On December 6, 2021, the parties executed the Data License Agreement, under which Alexi received raw U.S. caselaw data from Fastcase, updated daily, in exchange for an [redacted]. (*Id.* ¶¶ 58–60.)

Critically, the Agreement also provided an acquirer safeguard: Upon an Alexi acquisition or change of control, the acquirer "will have the option to purchase the Fastcase backfile with no restrictions for [redacted]" (*Id.* ¶ 67.) The backfile is Fastcase's "comprehensive, historical caselaw corpus" of some 15 million U.S. judicial decisions dating back hundreds of years, compiled over decades. (*Id.* ¶¶ 7, 68–73.) If exercised, Alexi's backfile purchase right would provide a rare foothold for a competitor to access the comprehensive caselaw necessary to build legal AI analysis software or create a fourth database competitor to Westlaw, Lexis, and Fastcase. (*Id.* ¶ 73.)

**D. Fastcase's Knowledge of and Support for Alexi's AI Services**

For nearly four years, the parties operated without incident under their shared understanding of the Agreement. (*Id.* ¶ 74.) Fastcase provided daily caselaw updates, and Alexi used the licensed data for AI-generated legal analysis. (*Id.*) From the Agreement's signing in December 2021 through the Clio acquisition in late 2025, Fastcase never raised any concern that Alexi's AI-generated memos violated the Agreement. (*Id.* ¶ 75.)

Throughout the parties' course of dealing (until the Clio acquisition), Fastcase's knowledge of and support for Alexi's AI services were consistent and unambiguous. Among many other examples, on October 14, 2021, when the forthcoming deal was announced internally, Fastcase

COO Steve Errick reacted: [redacted] (*Id.* ¶ 77.) Most tellingly, in 2023, vLex and Fastcase honored Mr. Doble as among the "Fastcase 50 Honorees"—an award for "law's smartest, most courageous innovators." (*Id.* ¶ 90.) vLex gave Mr. Doble this award for creating the Alexi "AI tool" that is "trained on an extensive dataset of more than 30 million pairs of legal questions and answers" and "swiftly delivers answers in a clear, concise memo format"—the same technology Counterclaim Defendants now claim violates the Agreement. (*Id.* ¶ 90.)

**E. Clio Acquires vLex/Fastcase and Targets the Backfile Purchase Right**

In April 2023, Fastcase announced its merger with vLex to create "the world's most comprehensive global legal content collection." (*Id.* ¶ 81.) In October 2023, vLex launched Vincent AI—a legal research assistant providing AI-generated memos and caselaw analysis similar to Alexi's services, built using Fastcase data. (*Id.* ¶ 91.) After acquiring Fastcase, vLex—vertically integrated through Vincent AI—shifted away from Fastcase's widespread third-party licensing strategy but still showed some willingness to license caselaw data to downstream competitors in limited circumstances. (*Id.* ¶¶ 91–94.) For example, in November 2023, vLex entered into an agreement with AI-focused e-discovery provider DISCO after determining that [redacted]. (*Id.* ¶ 93.)

On June 30, 2025, Clio announced its $1 billion acquisition of vLex/Fastcase. (*Id.* ¶ 100.) Clio's CFO stated publicly, "There's really three datasets like this on the planet. It's what we have, what Thomson Reuters has, and what LexisNexis has. We think a lot of competitors are going to find it increasingly difficult to compete against that database." (*Id.* ¶¶ 45, 190.) Clio's CEO, Jack Newton, similarly boasted that Clio now controls "the world's largest global legal library"—giving Clio a "durable moat" around its vertically integrated AI service. (*Id.* ¶ 190.) Consistent with this strategy, Clio will no longer license the Fastcase data to rival AI legal analysis providers. (*Id.* ¶¶ 180–81, 190–91.)

During merger due diligence, Clio learned about Section 12.3 of the Agreement between Fastcase and Alexi—the provision guaranteeing any Alexi acquirer the right to purchase the Fastcase backfile for [redacted] without restrictions. (*Id.* ¶ 101.) [redacted]

Days before the merger announcement, [redacted]

### F. Clio Orders Termination and Manufactures Breach Claims

[redacted]

That same day, October 20, 2025, Mr. Walters called Mr. Doble and demanded that Alexi remove the backfile purchase right from Section 12.3 with no corresponding benefit to Alexi. (*Id.* ¶ 106.) When Mr. Doble asked what would happen if Alexi refused, Mr. Walters warned there "would be trouble." (*Id.*) Mr. Walters then sent a draft amendment seeking to remove the backfile purchase right with no other modifications. (*Id.* ¶ 107.) Alexi declined. (*Id.*)

On October 27, 2025—seven days after Alexi declined to relinquish the backfile right—vLex's CEO sent Alexi a notice claiming, for the first time in nearly four years, that Alexi's use of the Fastcase data violated the Agreement. (*Id.* ¶¶ 110–11.) Remarkably, vLex's breach letter cited the same Alexi AI tool that vLex had celebrated as a groundbreaking innovation just two years earlier—both the 2023 "Fastcase 50" award and vLex's 2025 breach letter cited identical facts about how Alexi's AI algorithms are "trained" on "30 million pairs of legal questions and answers" to deliver legal memos to clients. (*Id.* ¶ 112.)

### G. Fastcase Files Suit and Breaches the Agreement

On November 26, 2025, Fastcase purported to terminate the Agreement and filed this lawsuit, alleging breach of contract, trademark infringement, and misappropriation of trade secrets based on the same AI tool that Fastcase and vLex had celebrated. (*Id.* ¶¶ 113, 116.) On December 6, 2025, Fastcase stopped providing Alexi with daily U.S. caselaw data updates required under Section 3.1 of the Agreement—its core contractual obligation. (*Id.* ¶ 131.)

### H. Clio Interferes with Alexi's Business Relationships

At the same time it filed this lawsuit, Clio orchestrated a campaign to thwart Alexi's acquisition prospects. (*Id.* ¶ 138.) In the months leading up to this lawsuit, Alexi was in discussions with multiple prospective acquirers valuing the company at over $100 million. (*Id.* ¶ 133.) Third-party analysts specifically noted that the backfile purchase right would be valuable to prospective acquirers. (*Id.* ¶ 133.)

One potential acquirer, [redacted] had secured internal approvals to execute a letter of intent to acquire Alexi, pending a full board vote on December 1—the same day news about Clio's lawsuit surfaced. (*Id.* ¶ 136.) After the lawsuit became public [redacted] never proceeded with the letter of intent. (*Id.*)

The reason why is a clear-cut an example of interference. On December 8, 2025, Mr. Walters spoke to [redacted] (*Id.*

¶ 139.) This was false both because Clio's breach allegation is baseless and because the backfile purchase option in Section 12.3 survives termination (*id.*)—as Clio has since admitted. Nor was Clio finished [redacted]. The very next day, Mr. Walters similarly warned [redacted] (*Id.* ¶ 140.) Again, this directly contradicted Section 12.3. (*Id.*)

### I. Clio's Own Internal Analysis Confirms the Scheme

Clio's internal communications confirm the litigation was driven by the backfile purchase right—not any genuine concern about contract breach. (*Id.* ¶¶ 114–116.) [redacted]

### J. Harm to Alexi and Competition

Counterclaim Defendants' conduct has caused severe and accumulating harm to Alexi. (*Id.* ¶ 197.) Immediately after the litigation was filed, customers canceled or failed to renew subscriptions; acquisition discussions went cold; and Alexi's growth trajectory, revenue, fundraising prospects, and valuation were materially impaired. (*Id.* ¶ 14.) Since the lawsuit was filed, Alexi has been forced to lay off two-thirds of its staff because of the damage caused by Counterclaim Defendants' baseless claims. (*Id.* ¶ 143.)

The harm to competition is equally clear. Counterclaim Defendants' own business records show that, post-acquisition, Clio will be the sole gatekeeper controlling the key input for legal-focused AI tools—comprehensive caselaw data. (*Id.* ¶ 15.) [redacted] (*Id.* ¶ 179.) By foreclosing programmatic access to the only comprehensive database available to independent AI providers, Clio raises rivals' costs, deters entry, and stifles innovation—exactly as its executives anticipated when praising the leverage of controlling one of only three comprehensive datasets "on the planet." (*Id.* ¶¶ 16, 181, 190, 194.)

**K. Relevant Procedural History**

Fastcase filed the Complaint on November 26, 2025 (Dkt. No. 1). On January 16, 2026, Alexi filed its Answer and Counterclaims against Fastcase, vLex, and Clio (Dkt. No. 48). On January 29, 2026, Alexi withdrew its preliminary injunction motion (Dkt. No. 14) and instead proposed expedited and phased discovery directed to the parties' threshold contract claims. (Dkt.Nos. 55, 55-1.) On February 17, 2026, the Court granted Alexi's motion for expedited discovery into the contract-related claims. (Feb. 17, 2026 Minute Order.) On April 3, 2026, Alexi filed Amended Counterclaims (Dkt. Nos. 77, 78), later revised to remove a paragraph quoting material that Fastcase clawed back on privilege grounds. (Dkt. Nos. 82, 83.)[1] On April 27, 2026, Counterclaim Defendants filed the present renewed partial motion to dismiss Alexi's Revised Amended Counterclaims and a partial answer (Dkt, Nos. 84, 85, 85-1).

**LEGAL STANDARD**

To survive a motion under Rule 12(b)(6), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*,

[1] Alexi has since challenged those privilege assertions, along with other privilege assertions related to draft breach letters exchanged between Clio and vLex before the merger closed on November 5, 2025, based on Counterclaim Defendants' testimony. Dkt. 108.

550 U.S. 544, 555 (2007). So long as the complaint contains sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face," a motion to dismiss must be denied. *See id.* at 570. A court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pled factual allegations. *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54 (D.D.C. 2016).

## ARGUMENT

## I. ALEXI HAS ALLEGED A PLAUSIBLE SECTION 7 CLAIM

Alexi has pled a Section 7 claim by plausibly alleging a relevant market in which Clio's acquisition of vLex/Fastcase "may" "substantially lessen competition." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 192–93 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). Alexi has not only pled both elements under the permissive Rule 12(b)(6) standard—it has already amassed overwhelming evidence in support of its claim from Counterclaim Defendants' own documents (as gleaned from limited, expedited discovery into the parties' contract claims, which was not even tailored to Alexi's antitrust claim).

### A. Alexi Has Plausibly Alleged Two Relevant Antitrust Markets

To begin, Alexi plausibly defined two relevant product markets. ***First***, Alexi has plausibly alleged an upstream "Programmatically Licensable Comprehensive Legal Database Market," which consists of comprehensive legal databases of U.S. caselaw available for programmatic licensing by AI companies offering legal analysis. (RAC ¶¶ 146–49.) ***Second***, Alexi has plausibly alleged a downstream "AI Legal-Analysis Services Market," which consists of the sale of legal and caselaw analysis services to lawyers and law firms using AI and LLM algorithms. (*Id.* ¶¶ 167–68.) Neither of Alexi's defined markets suffers from any deficiency at all, much less the type of glaring deficiency that would warrant dismissal under Rule 12(b)(6).

"Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Anthem*, 236 F. Supp. 3d at 193 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)). Defining a relevant market "involves inquiry into

economic realities and industry practice" and thus "is predominantly a factual rather than a legal inquiry." *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022) (quoting *Nat'l Aviation Trades Ass'n v. C.A.B.*, 420 F.2d 209, 213–14 (D.C. Cir. 1969)). "For this reason, antitrust complaints generally are dismissed on market definition grounds only if they are 'glaringly deficient' and dismissals on such grounds are 'relatively rare.'" *Id.* (quoting *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 16 (D.D.C. 2021)).

A "relevant market must include all products 'reasonably *interchangeable by consumers for the same purposes*.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (emphasis added)). The proffered relevant market, however, "need not include all potential customers or participants" to constitute a relevant market for Section 7 purposes. *Anthem*, 236 F. Supp. 3d at 193. The factfinder may determine whether a relevant market exists by looking at either economic evidence or the *Brown Shoe* "practical indicia" described by the Supreme Court. 370 U.S. 294 at 325 (describing factors). A court need not address all of these "practical indicia" in determining whether an alleged market is plausible, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997), and the indicia are evidentiary proxies that "assist in predicting a firm's ability to restrict output and hence to harm consumers," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 (D.C. Cir. 1986).

#### *i.* ***Alexi Has Plausibly Alleged the "Programmatically Licensable Comprehensive Legal Database Market" Is Properly Defined***

Alexi has plausibly alleged an upstream market for Programmatically Licensable Comprehensive Legal Database services. Downstream AI legal analysis providers (which compete in the AI Legal-Analysis Services Market) need access to a comprehensive caselaw database to sell their services. (*See supra* Sections I.B–C; RAC ¶¶ 146, 177.) Alexi has alleged that, to provide accurate and trustworthy legal analysis, a downstream AI provider needs programmatic access to *all* cases from the relevant U.S. jurisdictions, or else the lawyer using the service cannot be certain

it did not miss a key case or cases. *hou* ("To be useful for use by an AI legal analysis service, a primary-law database must be comprehensive."); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) (product markets are defined by customers' ability and willingness to substitute from one product to another).

As Alexi has alleged, and Counterclaim Defendants' own documents confirm, only three firms have such comprehensive caselaw databases: Fastcase (now Clio), Westlaw, and Lexis. *See supra* Section I.J. And among those, only Fastcase (before the Clio and vLex mergers) in fact licensed its data to third-party legal tech companies like Alexi. Accordingly, Fastcase is the only available option for providers in the AI Legal-Analysis Services Market to obtain the critical input needed to offer their services in the United States.

Not only are Alexi's allegations in this regard plausible and adequately pled, they are confirmed by Counterclaim Defendants' *own documents*. Clio's CFO publicly stated that there are only three comprehensive U.S. caselaw databases "on the planet"—Fastcase/vLex, Westlaw, and Lexis. (RAC ¶¶ 45, 190; *see id.* ¶ 158.) And Clio's documents further recognize that, among the three firms that have comprehensive databases, Fastcase was the only available option for AI legal providers. (*Id.* ¶ 158 ("[redacted]."); *see also id.* ¶ 157.) Counterclaim Defendants' own admissions, standing alone, establish that the Programmatically Licensable Comprehensive Legal Database Market is plausible. *Anthem*, 236 F. Supp. 3d at 194 ("[B]usiness records are 'strong evidence' for defining the relevant product market."); (collecting cases); *accord Rothery*, 792 F.2d at 219 n.4 (maintaining that courts "assume that economic actors usually have accurate perceptions of economic realities").

Having plausibly alleged the relevant market, Alexi has satisfied its burden at the motion to dismiss stage. *FTC v. Mylan Lab'ys, Inc.*, 62 F. Supp. 2d 25, 54 (D.D.C. 1999) (where "it is entirely plausible that plaintiffs will prove a set of facts that supports those market definitions," the "definition is sufficient to survive a motion to dismiss"); *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 56 (D. Mass. 2020) ("Once a plaintiff plausibly alleges a

market, the determination whether the defined market is correct is a question of fact not suitable for dismissal under Rule 12(b)(6).”).

Notwithstanding that their own ordinary-course documents endorse Alexi’s view of the relevant marketplace, Counterclaim Defendants nevertheless content that the market is somehow implausible. (*See* Mem. at 14–15.) But rather than identify any actual legal deficiencies, they focus on the factual question as to whether particular products should be inside or outside the market. (*See id.* at 15–19.) The Court should decline Counterclaim Defendants’ premature invitation to weigh in on the merits of the fact-intensive market definition inquiry, which can only be resolved after discovery and trial. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (“The proper market definition in this case can be determined only after a factual inquiry into the ‘commercial realities’ faced by consumers.” (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966))).

**Nature of Caselaw Availability.** Clio’s argument (at 14) that the Programmatically Licensable Comprehensive Legal Database Market cannot be a relevant market because caselaw is part of the public domain and some caselaw is available from other sources simply ignores Alexi’s allegations about the market realities. The fact that judicial opinions exist in the public domain on an individual basis misses the point entirely. AI providers need access to *comprehensive* caselaw that is suitable for software systems to review on a programmatic basis in order to generate accurate and reliable AI legal memos and other analysis. (RAC ¶¶ 148, 177–79.) Clio—like anyone who has attempted to use a general purpose chatbot for legal research and seen the unreliable chaos that results—knows this. In Counterclaim Defendants’ ordinary course business documents, they recognize the Fastcase data is the [redacted] (*id.* ¶ 178), and that [redacted] (*id.* ¶ 158)—party admissions that plainly contradict their argument that an AI Legal-Analysis Services product could somehow be built using partial databases or individual judicial opinions cobbled together from the public domain. *Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 67 (denying motion to dismiss in part

because "Plaintiffs provided several examples of Defendants' own executives" endorsing the theory in the complaint).

Counterclaim Defendants' argument (at 17–18) that two other databases—CourtListener and Harvard's Caselaw Access Project—should be included in the upstream market because they "each contain millions of cases" likewise misses the mark. That argument both ignores Alexi's allegations (RAC ¶¶ 162–63) and invites the Court to decide a factual question that cannot be resolved on a motion to dismiss., *FTC v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 568 (M.D.N.C. 2024) (finding that analysis of whether particular alternatives should be included in market "is misguided on a motion to dismiss"). Alexi's allegations are more than sufficient to exclude CourtListener and the Caselaw Access Project from the market, especially at this stage. CourtListener has nine million cases, with spotty coverage of unpublished opinions. (RAC ¶ 162.) And Harvard's Caselaw Access Project contains 6.7 million published opinions and no unpublished opinions whatsoever. (*Id.* ¶ 163.)

The Fastcase database, on the other hand, contains over one *billion* legal documents (including more than 15 million U.S. judicial opinions)—including hundreds of thousands of unpublished opinions that are indispensable for comprehensively, correctly, and reliably analyzing the law applicable to legal questions. (*Id.* ¶¶ 47, 70, 163.) Alexi alleges that Fastcase's comprehensiveness is critical to downstream AI legal analysis services providers, which is more than sufficient to plausibly allege CourtListener and the Caselaw Access Project are not reasonable substitutes from the perspective of AI providers like Alexi. *See, e.g.*, *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1225 (C.D. Cal. 2012) (denying motion to dismiss where complaint explained in qualitative terms why certain "conceivably interchangeable substitutes" were not "specialized to the needs" of defendant's customers); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 958 (D. Or. 2018) (same where complaint alleged that product's "distinct features" made it such that customers "would not turn to [alternatives] in response to" price increase).

**Available Caselaw Databases.** Counterclaim Defendants' argument (at 15–16) that, because Alexi identified Westlaw and Lexis as firms that possess comprehensive primary-law databases, they are "[n]ecessarily" in the market, gets market-definition law entirely wrong. Market definition turns on the set of alternative products to which customers could turn in the event of a price increase. *Staples*, 970 F. Supp. at 1075 ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."); *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 35 (D.D.C. 2023) ("[N]ot every functionally interchangeable product should be included in the relevant market . . . . The proper test is to look to the ***availability of substitute commodities***.") (citation modified) (emphasis added). Alexi's allegations—which must be accepted as true at the Rule 12(b)(6) stage—show that Westlaw and Lexis are *completely unavailable* to downstream AI providers because they do not license their data on a programmatic basis to such companies. (RAC ¶¶ 151–58.)

Once again, Counterclaim Defendants' own documents recognize this market reality and belie the argument in their brief. (*Id.* ¶ 157 [redacted] *id.* ¶ 158 [redacted]

Counterclaim Defendants' argument (at 16) that Lexis is actually available for programmatic licensing because it entered into a strategic partnership with Harvey, the leading AI legal services provider in the United States, ignores Alexi's contrary allegations (RAC ¶ 153) and is wrong in any event. As Alexi explained, "Lexis acquired an equity ownership stake in Harvey" in "an exclusive arrangement not available to other market participants or potential market participants." (*Id.*) That is entirely different than Lexis *licensing* its database at arm's length, as a general business practice (like Fastcase's), to downstream AI Legal-Analysis Services providers.

If anything, Lexis's equity stake in Harvey further incentivizes Lexis to continue refusing to license its data to actual or potential competitors to its partially owned service.

Both Lexis and Westlaw refused to license their databases to Alexi, confirming their unavailability as alternatives. (*See id.* ¶¶ 154–55.) Counterclaim Defendants (at 16) argue that Alexi did not provide enough details about these refusals, but the point is whether they were available. Counterclaim Defendants cite no authority suggesting why such well-pled allegations should be discounted. After all, Alexi need only provide "fair notice of [its] claims," not every last detail about every conceivably relevant fact. *Hilska v. Jones*, 217 F.R.D. 16, 20 (D.D.C. 2003) ("Rule 8(a)'s simplified notice-pleading standard relies on the discovery process and summary-judgment practice to define the disputed facts in the case and to dispense with unmeritorious claims."). Indeed, Counterclaim Defendants ignore a number of relevant details that Alexi ***did*** provide, focusing on one communication from Lexis stating that the answer for licensing all U.S. caselaw is "probably no" (at 16), [redacted]. (RAC ¶ 155.) The simple fact remains that, consistent with Alexi's allegations, neither Lexis nor Westlaw licenses its database for programmatic use, and so both are properly excluded from the Programmatically Licensable Comprehensive Legal Database Market. (*Id.* ¶ 156.)

Counterclaim Defendants' argument (at 15) that the market is improperly a "market[] of one" fares no better. As the Supreme Court explained, it is incorrect "that this Court in *Du Pont* rejected the notion that a relevant market could be limited to one brand. The Court simply held in *Du Pont* that one brand does not *necessarily* constitute a relevant market if substitutes are available." *Eastman Kodak*, 504 U.S. at 482 n.30 (citation omitted). Where, as here, the plaintiff plausibly alleges that the relevant consumers (AI legal analysis providers) have only one available option to obtain the critical caselaw input for their product (Fastcase), the relevant market may plausibly be defined to include a single seller. *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 809 F. Supp. 3d 371, 380 (W.D.N.C. 2025) (finding a single-supplier market, where

"NASCAR effectively has a 100% market share," because premier stock car racing teams had no other available reasonable substitutes); *accord L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984); *Phila. World Hockey Club v. Phila. Hockey Club*, 351 F. Supp. 462, 502 (E.D. Pa. 1972).[2]

In any event, even if fact discovery somehow shows that Lexis and Westlaw ***should*** be included in the upstream market, the ultimate analysis remains unchanged. (RAC ¶ 160 (alleging market with all three comprehensive database providers in the alternative).) "[M]arket definition merely provides an analytical framework for assessing market power, which in turn is fundamental to the determination of whether the conduct in question can harm competition and consumers." *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 567 n.19 (E.D. Va. 2000); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 33 (D.D.C. 2022) ("Market definition is more art than science, and it is critical to remember that the goal of the exercise is to enable and facilitate the examination of competitive effects." (citation omitted)). As discussed below, as the owner of the only comprehensive caselaw database formerly available for third-party licensing, Clio possesses the unique ability to foreclose downstream rivals and substantially lessen competition—as its own documents confirm. (RAC ¶¶ 45, 190 ("We think a lot of competitors are going to find it increasingly difficult to compete against that database."); *id.* ¶ 179 ("[C]ompetitors will either license from us or face a garbage-in-garbage-out problem.").)

At bottom, there is nothing gerrymandered about the Programmatically Licensable Comprehensive Legal Database Market. That Clio possesses the only programmatically licensable

[2] Counterclaim Defendants' reliance (at 17) on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*—which is an aftermarket lock-in case (a doctrinal framework that is entirely inapplicable here)—gets the analysis backwards. In that case, the plaintiff sought to define a market based on certain contractual restrictions on ingredients, supplies, materials, and distribution services used in Domino's restaurants. 124 F.3d 430, 437 (3d Cir. 1997). The market definition failed because of the availability other ingredients, supplies, materials, and distribution services beyond those that the plaintiff had contractually agreed to use. *Id.* Here, there are no available alternatives or comprehensive programmatically licensable caselaw, and so *Queen City Pizza* does not apply.

database is not some artificial construct that Alexi conjured, but rather the reality of the market. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). Clio's citation to *hiQ Labs* illustrates why Alexi's market definition allegations are more than sufficient. As Counterclaim Defendants note, (at 18 n.14), the court there rejected an argument that, as a practical matter, the only place to get certain publicly available data was LinkedIn. *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020). But Clio fails to mention that the very next sentence explains the court's reasoning: "the [complaint] contains no specific allegations establishing such." *Id.* Here, by contrast, Alexi's counterclaims are filled with specific allegations explaining—often from Counterclaim Defendants' own mouths—why Fastcase is the only game in town for AI legal analysis providers to get the critical input required for their services.

***ii. The "AI Legal-Analysis Services Market" Is Properly Defined***

Alexi likewise adequately alleged defined the downstream market for AI Legal-Analysis Service Market. Specifically, this product market includes AI legal and caselaw analysis tools that streamline and improve the process of drafting legal documents, filings, and memos. (RAC ¶ 168.) The participants in this market rely on specialized vendors that supply programmatic access to a comprehensive caselaw database, and themselves offer specialized legal analysis services to a distinct set of customers (i.e., U.S. lawyers and law firms that need AI tools with a high degree of accuracy and reliability). (*Id.* ¶¶ 177, 179.) The counterclaims allege that general purpose LLMs such as ChatGPT and Google Gemini are ***not*** constraints on the market because U.S. lawyers cannot rely on them for caselaw-based legal research, as general chatbots are prone to error and hallucinations when attempting to analyze caselaw, among other reasons. (*Id.* ¶ 174.)

As with the upstream market, Counterclaim Defendants themselves recognize the AI Legal-Analysis Service Market as a distinct market. (*Id.* ¶¶ 170, 176.) Clio's own documents explain that "the legal industry is bound by more laws and regulations than many other industries," such that "AI legal writing isn't as 'fast and loose' as AI writing in other areas." (*Id.*) In light of that market reality, general purpose chatbots "aren't built to meet legal industry confidentiality

standards," may not have access to the right primary-law and jurisdictional data, and are prone to hallucination, and may expose lawyers to ethical violations. (*Id.*)

Having plausibly defined the boundaries of the AI Legal-Analysis Service Market, Alexi has satisfied its burden at the motion to dismiss stage. *Am. President Lines*, 633 F. Supp. at 222 ("Antitrust complaints generally are dismissed on market definition grounds only if they are 'glaringly deficient' and dismissals on such grounds are 'relatively rare.'").

Counterclaim Defendants again raise fact issues about which particular products should be included in the market and specifically quibble (at 20–21) that a source cited in counterclaims suggests that legal AI tools developed by general AI companies like OpenAI and Anthropic suggest that these products should be included in the market. This criticism misses the mark both factually and legally. Alexi alleged that *general* AI platforms like ChatGPT are outside the relevant market for the reasons described above. To the extent, for example, that Anthropic develops "new legal AI tools" that provide caselaw analysis (*see id.* at 21), those products can be identified during discovery and included in the market at that time (*see* RAC ¶ 169). Alexi was not required to "identify every alleged competitor in its pleadings." *Facebook,* 560 F. Supp. 3d at 20. Instead, it plausibly alleged the AI Legal-Analysis Service Market based on competitive realities of the marketplace and information available at the time it filed its Counterclaims.[3]

**a. Alexi Has Plausibly Alleged That the Acquisition Will Substantially Lessen Competition**

To plead a Section 7 claim under the Clayton Act, a plaintiff must allege that the effect of the merger "*may* be substantially to lessen competition," in at least one plausibly alleged relevant market. *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (quoting Clayton Act § 7, 15 U.S.C. § 18). "Congress used the words '*may* be substantially to lessen competition' . . . to indicate

[3] Clio's argument (at 19–20) that Alexi inconsistently defines the downstream AI Legal-Analysis Service Market is simply untrue. Contrary to Clio's argument, Alexi defines the market to include the downstream AI products offered by Lexis, Westlaw, and Clio. (RAC ¶¶ 169, 182).

that its concern was with probabilities, not certainties." *Anthem,* 236 F. Supp. 3d at 191 (citation modified).

In a vertical foreclosure case such as this one, "courts consider whether the merged firm will have the ability and incentive to foreclose rivals from sources of supply or distribution to determine whether the merger is likely to substantially lessen competition in the relevant market." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1051 (5th Cir. 2023); *accord* U.S. Dep't of Just. & FTC, Merger Guidelines § 2.5.A (2023).

Here, Alexi has plausibly alleged that Clio will have both the incentive and ability to foreclose or weaken rivals in the AI Legal-Analysis Service Market.

**i. Clio Has the Ability to Foreclose Competition**

Clio has the ability to foreclose rivals from effectively competing in the downstream market. As described above, Clio "now controls the only programmatically licensable comprehensive legal database on the market," RAC ¶ 189, and has the ability to refuse to license that data to rivals and would-be rivals in the downstream market for AI legal analysis services, *see supra* Section I.E; *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 831–32 (S.D. Tex. 2025) ("Courts have sensibly concluded that ownership and control over the acquired entity shows the ability to foreclose" access to the acquired entity's products); *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023), *aff'd*, 136 F.4th 954 (9th Cir. 2025) (similar). And here, Alexi alleges not only that Clio has the *ability* to foreclose competition, but that it *already has* foreclosed competition. (*See* RAC ¶¶ 191, 196, 217.)

Clio's argument (at 21–24) that the potential foreclosure here is only "*de minimis*" completely ignores Alexi's well-supported allegations—which specifically pled that Clio has the ability to enact a *complete* foreclosure, as Clio now controls the only licensable comprehensive database on the market. RAC ¶¶ 156–60, 189; *see Illumina*, 88 F.4th at 1051 (holding that the "monopoly supplier of a key input" had the ability to foreclose). The fact that a few vertically

integrated players (including Westlaw and Lexis) do not depend on Clio for database access is irrelevant: Clio has the ability to deny ***other*** existing and potential AI legal analysis providers with the critical input needed to compete in the downstream market, which in turn will deprive lawyers of the lower prices and increased quality that innovation and greater competition in the AI Legal-Analysis Services Market would bring. Clio doesn't have to destroy all competition in the downstream market for the merger to violate Section 7. *Illumina*, 88 F.4th at 1053 ("[T]here are myriad ways in which [the merged firm] could engage in foreclosing behavior . . . such as by making late deliveries or subtly reducing the level of support services.").

Clio's speculative argument (at 23) that its ability "to foreclose access to comprehensive legal databases would be undermined by the entry of additional competitors into the upstream market" ignores the allegations in the Complaint and raises, at best, a factual defense that cannot be considered at this stage. There are high barriers to entry into the Programmatically Licensable Comprehensive Legal Database Market, including the "many years of effort and a huge capital investment" required to build a comprehensive database and enter the market. (*See* RAC ¶ 164.) (There is a reason, after all, that only three such databases exist, all of which enjoyed a decades-long head start). New entry, by contrast, "must occur within approximately two years post-merger" to be a timely check on anticompetitive harm, *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 73 n.28 (D.D.C. 2011), which is far shorter than needed to build a new caselaw database, even if an entrant could overcome the capital investment hurdle. (*See* RAC ¶¶ 7, 72 (building new database "would require years or decades of manual effort").) Clio simply ignores those allegations and assumes that some unnamed competitor would overcome those barriers instantly and enter the market with a comprehensive database sufficient to negate Clio's market power, which is at most a factual (albeit far-fetched) defense that Clio could pursue in fact discovery.[4]

[4] Counterclaim Defendants' reliance on *United States v. Falstaff Brewing Corp.* for the proposition that the Court must consider whether there is some unidentified potential entrant perched on the

**ii. Clio Has the Incentive to Foreclose Competition**

Courts analyzing a merged firm's incentive to foreclose competition consider the pre-merger conduct and history, along with whether it would be profitable for the merged firm to foreclose competition. *See, e.g.*, *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 143 (D.D.C. 2022); *Illumina*, 88 F.4th at 1052–53. Here, Alexi's well-pled allegations show that Clio has a clear economic incentive to use the Fastcase data to power its own AI products: Clio, like many legal tech companies, has increasingly "pivoted toward and focused on building AI functionality in its products" (RAC ¶ 95) and views its AI tools, not third-party data licensing, as the future of the company. Clio's own executives say that, through the acquisition, they bought a $1 billion "data moat" that the company sees as a "durable" competitive advantage. (*Id.* ¶¶ 115, 190 & n.18, 196.) Those party admissions—even before fact discovery into Alexi's antitrust claims—are precisely the kinds of evidence that illustrate Clio's incentives to foreclose rivals. *See FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 208 (D.D.C. 2018) (considering "[s]tatements from [defendant's] executives" as "real-world proof" of incentives for anticompetitive conduct).

And beyond the stated intentions of Clio's top executives, Clio has already taken action to foreclose Alexi from competing in the downstream market. Before Clio entered the picture, Fastcase and Alexi had a mutually beneficial, four-year course of dealing—with Fastcase not only eagerly licensing its data to Alexi but celebrating Alexi's AI innovations. (*See supra* Section I.D.) Clio immediately changed course, [redacted] (RAC ¶ 108.) to Clio's AI offerings and expressing dismay that Alexi was [redacted]

edge of the market and waiting to enter the market is misplaced. There, the court erred because it "failed to give separate consideration to whether Falstaff"—the acquiring party—"was a potential competitor in the sense that it was so positioned on the edge of the market" and would have entered regardless of the merger. 410 U.S. 526, 532–33 (1973). The case does not stand for the broad proposition that unidentified hypothetical competitors sufficiently discipline a market such that competition is ensured.

[redacted] (*id.* ¶ 105.) Clio then manufactured a baseless contract breach claim to remove Alexi as a competitor and attempt to extinguish the backfile purchase option. (*See supra* Section I.F.)

Clio simply ignores all these well-pled factual allegations and argues (at 25) that it "would have strong economic incentives to continue profitably licensing the Fastcase database to downstream providers willing to provide appropriate compensation." That argument not only flies in the face of Alexi's polar-opposite allegations, it would require the Court to resolve a factual dispute at the motion-to-dismiss stage by granting unproven inferences in ***Clio's*** favor, which is wrong on both counts. The fact that Fastcase profitably licensed its data to third parties like Alexi for many years proves the point: Clio immediately reversed that profitable course of dealing with Alexi. *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, *LLP*, 540 U.S. 398, 409 (2004) ("The unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end.").

Finally, Clio seems to suggest it does not have an incentive to foreclose competition because Fastcase, it says, stopped providing data to Alexi "when it learned Alexi was breaching the parties' licensing agreement." (Mem. at 26.) Not only is this irrelevant to whether Counterclaim Defendants had the *incentive* to foreclose competition, but it is yet another inappropriate rejection of Alexi's well-pled allegations that Clio terminated the Agreement for anticompetitive reasons. (*See infra* Section I.F.)

**iii. The Clio-vLex-Fastcase Merger Substantially Lessens Competition**

Finally, Alexi has plausibly alleged that Clio's acquisition may substantially harm competition. Even at the merits stage (much less the pleading stage), "certainty of harm is not necessary to prove a Section 7 violation" so long as the ultimate proof is more probabilistic than the "mere possibility" of harm. *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). "And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before [Section] 7 can be called into play." *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 858 (6th Cir. 2005). Alexi

thus need only plausibly plead a "reasonable likelihood of a substantial lessening of competition." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622 (1974) (quotations omitted).

Alexi has easily met this threshold by plausibly alleging that Clio's acquisition will prevent existing and potential AI legal analysis companies from getting access to the critical input necessary to compete, thereby raising barriers to entry and reducing competition. RAC ¶¶ 179–81, 194, 196; *Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 (2d Cir. 1979) (describing how vertical merger may reduce competition by cutting off source of supply for competitors (citing *Brown Shoe*, 370 U.S. at 328)). Indeed, the acquisition has already harmed competition, because Clio terminated Alexi's license (RAC ¶¶ 113, 131) and will not renew DISCO's license (*id.* ¶ 64) pursuant to Clio's avowed strategy to use the Fastcase "data moat" to create a competitive advantage for its own vertically integrated service. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690 (4th Cir. 2021) (acquiring firm terminating supply agreement with a customer hindered the customer's access to other suppliers and weakened competitive pressures).

Clio's efficiencies defense (at 27–28)—that, as a vertically integrated company, it can better compete with Westlaw and Lexis—is an unproven and self-serving assertion that says nothing about whether the acquisition may harm competition by depriving ***other competitors*** of access to the critical caselaw data input. At most, this is yet another factual issue (that will require expert discovery) that Alexi need not preempt in its complaint and is entirely inapposite at the motion-to-dismiss stage. *See AT&T*, 310 F. Supp. 3d at 191 n.17 (expressing skepticism that, even at trial, the plaintiff "has the burden to account for all of defendants' proffered efficiencies as part of making its prima facie case" and citing cases describing the "efficiencies defense" as a component of the defendant's case).

Counterclaim Defendants pretend that Alexi has a "quasi-alleged" market for vertically integrated AI legal services providers (Lexis and Westlaw) so that they can argue that, after the merger, they are the third participant in this market. (Mem. at 28–30.) By increasing the participants in that market, the argument goes, the merger has increased competition. (*Id.*) But

Alexi alleges no such market. The cited paragraphs simply make the point that Lexis and Westlaw are unlikely to license their databases (RAC ¶ 159), and with Clio cutting off access to the Fastcase database, "actual and potential competitors in the AI Legal-Analysis Services Market that are not vertically integrated with a comprehensive database have nowhere to license that data" (*id.* ¶ 181). Those allegations do not allege a new market. And because any new market that Clio seeks to introduce at the motion to dismiss stage is "of no consequence," *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 946 (E.D. Tenn. 2008), all of its arguments about competition in this purported new "market" are of no consequence too.

Finally, Counterclaim Defendants' refrain that months have passed since the merger closed with no foreclosure (other than Alexi, of course) is legally irrelevant. (*See* Mem. at 10, 26, 27.) Section 7 "look[s] not merely to the actual present effect of a merger but instead to its effect upon future competition." *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966). As discussed above, Alexi has plausibly alleged that the future effect here is that Clio will no longer license the Fastcase data to other competitors (or potential competitors) in the downstream market.

**iv. Alternatively, Alexi Plausibly Alleges That the Acquisition Is Likely to Substantially Lessen Competition Under the *Brown Shoe* Factors**

In addition to the "ability and incentive" test, some courts consider whether a vertical merger will substantially lessen competition under the *Brown Shoe* factors.[5] *Tempur Sealy*, 768 F. Supp. 3d at 838. There is no precise formula when applying these factors, *Illumina*, 88 F.4th at 1055, and the Supreme Court has found a merger illegal by examining only three of the factors, *Ford Motor Co. v. United States*, 405 U.S. 562, 566 (1972) (considering the nature and purpose of the transaction, increased barriers to entry, and increased concentration).

---

[5] These factors are the (i) the nature and economic purpose of the arrangement, (ii) the likelihood and size of foreclosure, (iii) barriers to entry, (iv) any trend toward vertical concentration, (v) the elimination of a competitor, and (vi) market power. *Tempur Sealy*, 768 F. Supp. 3d at 838 (citing *Brown Shoe*, 370 U.S. at 328–34).

**Nature and Economic Purpose of the Arrangement.** Under this factor, courts examine whether the acquiring firm sought to gain control over a critical input in order to transform its business model and compete in the downstream market where it has the ability to foreclose rivals. *See Illumina*, 88 F.4th at 1054. Alexi alleges that Clio, a legal technology platform provider that has "increasingly pivoted toward and focused on building AI functionality in its products" (RAC ¶ 95), acquired vLex/Fastcase to gain control over the Fastcase database, a critical upstream input for AI Legal-Analysis Services (*id.* ¶¶ 100, 177), with Clio's CEO describing the database as giving Clio "the world's most powerful legal intelligence program" (*id.* ¶ 100), and its CFO touting that "competitors are going to find it increasingly difficult to compete against that database" (*id.* ¶ 45). That is, Clio's purpose was not merely to integrate vertically for efficiencies but to create a "data moat" around its own AI offerings (*id.* ¶ 196.), which are the future of the company. That is precisely the type of business-model transformation that makes it likely that Clio will foreclose downstream rivals and renders a vertical merger anticompetitive under this factor. *Illumina*, 88 F.4th at 1054 (holding that vertical merger will "fundamentally transform Illumina's business model such that it would be competing most intensely in the downstream market, *i.e.*, the same market in which it has the ability to foreclose").

**Likelihood and Size of Foreclosure.** This factor examines whether the merger is likely to foreclose a substantial share of the market. The foreclosure here is likely because Alexi has plausibly alleged that Clio has the ability and incentive to foreclose rivals. *Id.* And as to the size of the foreclosure, Clio controls 100% of the critical upstream input, such that foreclosed rivals "would have nowhere else to turn." *Tempur Sealy*, 768 F. Supp. 3d at 850.

**Barriers to Entry.** High barriers to entry enable the combined firm to engage in anticompetitive conduct and exclude rivals from the market. *See id.* at 841. As discussed above, both the Programmatically Licensable Comprehensive Legal Database Market and AI Legal-Analysis Service Market are characterized by high barriers to entry, including increased barriers to entry after Clio cuts off access to the essential caselaw input.

**Trend Toward Vertical Concentration.** Alexi alleges a clear trend toward vertical integration and oligopoly in the legal AI industry, [redacted] (RAC ¶ 170.)

**Market Power.** Finally, Alexi alleges that Clio now possesses monopoly or near-monopoly power in the upstream market because, with Westlaw and Lexis both refusing to license their databases for programmatic use, Clio controls the "only programmatically licensable comprehensive legal database on the market." (*Id.* ¶ 189; *see id.* ¶¶ 45, 158.) Clio's market power over the critical comprehensive caselaw input is effectively absolute.

In short, whether analyzed under the incentive-and-ability test or the *Brown Shoes* factors (or both), Alexi has plainly alleged—with enormous factual detail—that Clio's acquisition may substantially lessen competition in the market for AI legal analysis services.

**b. Alexi's Allegations Regarding the 2023 vLex-Fastcase Transaction Are Properly Pled**

Counterclaim Defendants argue that Alexi's allegations regarding the earlier merger between vLex and Fastcase should be "wholesale disregarded." (Mem. at 30). Not so.

The 2023 vLex-Fastcase merger is relevant context for understanding the cumulative anticompetitive effects of vertical integration in the alleged relevant markets. The trend towards consolidation of primary caselaw providers (*see* RAC ¶¶ 20–21, 44–50, 81–84) is relevant to the antitrust analysis. 2023 Merger Guidelines § 2.7.

Counterclaim Defendants' attempt to invoke laches as a basis for a motion to dismiss is likewise improper, as "a motion to dismiss generally is not a useful vehicle for raising the issue" unless the complaint itself discloses "undisputed facts clearly establishing the defense." *See Menominee Indian Tribe of Wisc. v. United States*, 614 F.3d 519, 532 (D.C. Cir. 2010). Alexi brought its Clayton Act counterclaim well within the four-year statute of limitation period with

respect to the vLex-Fastcase merger (and only a few months after Clio closed its acquisition of vLex/Fastcase). Counterclaim Defendants point only to Alexi's knowledge of the vLex-Fastcase merger, but Alexi had no knowledge of vLex's changed incentives at the time of the merger (RAC ¶¶ 81, 85–86, 90), and nothing in the counterclaims establishes prejudice to Fastcase or vLex by the allegedly unreasonable delay. (*Id.*) Fastcase's reliance on *New York v. Facebook*, which involved a delay of more than six years—longer than the Clayton Act's four-year statute of limitations—is likewise inapposite. (*See* Mem. at 30 (citing *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 48 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).)

## II. ALEXI'S GOOD-FAITH AND FAIR DEALING COUNTERCLAIM

Alexi's allegations that Fastcase breached the implied covenant of good faith and fair dealing—by, among other things, manufacturing a baseless lawsuit to satisfy a contractual obligation to Clio and eliminate competition from the market—easily surpasses the Rule 12(b)(6) notice pleading standard. Indeed, this claim has already proceeded to discovery and is pending before the court on Alexi's motion for summary judgment. (Dkt. No. 97.) As Alexi explained in its summary judgment briefing, Alexi is entitled to summary judgment as a matter of law on its implied covenant claim, or, at minimum, it must be submitted to the jury—it certainly cannot be dismissed on the pleadings. Both parties have "submitted briefs extensively discussing the materials facts and issues surrounding plaintiff's claims" and thus the Court should review the full evidentiary record when determining whether Alexi has presented sufficient evidence to proceed to a jury. *Hamilton v. Geithner*, 743 F. Supp. 2d 1, 8 (D.D.C. 2010) (Leon, J.) (treating motion to dismiss as one for summary judgment where parties are not taken by surprise and are not deprived of a reasonable opportunity to contest facts outside the pleadings); *Miller v. Lamanna*, 169 F.4th 118, 125 (2d Cir. 2026) (noting that, in addition to the waste created by a "reverse" Rule 12(d) conversion, dismissing the case based on pleading deficiencies in a complaint's factual allegations

would be "difficult to justify" since "discovery would have revealed that the pleading deficiency is curable." (quoting *Lugo v. City of Troy, New York*, 114 F.4th 80, 89 (2d Cir. 2024))).

Regardless, Alexi's claim easily survives based on the counterclaim allegations. "All contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (citation modified). The implied covenant "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (citation omitted). A party breaches this duty when it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id.* (citation omitted); *see also C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009). ("[B]ad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.")

Alexi has alleged Fastcase breached the covenant of good faith and fair dealing in at least three independent and mutually reinforcing ways: (1) by manufacturing this breach allegation and lawsuit to extinguish Alexi's bargained-for backfile purchase right (RAC ¶¶ 101–14, 135, 138–40); (2) by sending Alexi a breach letter that pointed only to conduct vLex had itself been aware of and celebrated for years, thereby depriving Alexi of any meaningful opportunity to cure (*see id.* ¶¶ 110–13); and (3) after the lawsuit was filed, by making false and misleading representations to prospective acquirers about Alexi's contractual rights to chill acquisition interest (*see id.* ¶¶ 138–40, 211). Whether taken separately or together, these allegations, taken as true, satisfy the requirement to plead that Fastcase's conduct was either in bad faith or arbitrary and capricious. *Sundberg v. TTR Realty*, LLC, 109 A.3d 1123, 1133 (D.C. 2015).

***First***, Alexi's allegations, taken as true, plausibly allege that Fastcase manufactured this lawsuit to resolve Clio's concerns about the post-acquisition backfile purchase option. (*See* RAC ¶¶ 101–02, 104, 106–14, 135–36.) The counterclaims plausibly plead that the backfile purchase option in Section 12.3 was the motivating force for this lawsuit, not any genuine dispute between

Fastcase and Alexi about Alexi's use of the caselaw data. (*Id.* ¶¶ 104, 106–14, 135–36.) As pled, Alexi and Fastcase enjoyed a long and mutually beneficial course of dealing, with no Fastcase or vLex executive raising any concern about Alexi's use of the data until after Clio identified Section 12.3's backfile purchase option as a diligence/closing problem. (*See id.* ¶¶ 8, 13, 74–80, 101–04, 109–14, 120). Manufacturing a lawsuit under false pretenses is clear bad-faith conduct and a textbook violation of the covenant of good faith and fair dealing. *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 288 F. Supp. 3d 176, 188 (D.D.C. 2018) (wrongful notice of default basis for breach of good faith and fair dealing); *Legion Sys., LLC v. Valiant Glob. Def. Servs., Inc.*, 2021 WL 3633592, at *6 (M.D. Fla. Aug. 17, 2021) (good faith and fair dealing claim based on improper contract termination invoked as a "pretext"); *accord Florence Urgent Care v. Healthspan, Inc.*, 445 F. Supp. 2d 871, 880 (S.D. Ohio 2006).

Counterclaim Defendants misplace reliance (at 35–36) on *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235 (D.C. 2024), for the proposition that a for-cause termination cannot constitute a violation of the implied covenant of good faith and fair dealing absent "purposeful sabotage." But in *CorpCar*, it was undisputed that the defendant had valid cause to terminate the contract, rendering its motives for doing so irrelevant. *Id.* at 1245. Here, by contrast, Alexi has plausibly alleged that Fastcase had no basis to terminate the contract and brought this breach allegation and lawsuit anyway for bad-faith reasons. *Whole Foods*, 288 F. Supp. 3d at 188 (holding that implied covenant claim was adequately pled where, "[d]espite not having breached the contract, Wical sent Whole Foods a notice of default, which Whole Foods alleges was done for the purpose of getting out of the lease and raising the rent").

***Second***, Fastcase's breach notice violated the duty of good faith and fair dealing by failing to provide, under the spirit of the Agreement, fair notice of the purported breach(es) and an opportunity to cure a breach within the allotted 30-day period. (*See, e.g.*, RAC ¶ 112 (breach letter citing only same conduct and features vLex had itself previously celebrated and which Fastcase has since abandoned as the basis for its breach allegation).) By intentionally providing a vague

cure notice, Fastcase interfered with Alexi's ability to render performance (i.e., cure any purported deficiency within the 30-day period) and thereby avoid Fastcase's wrongful termination and all the damage that termination has caused. *See* Dkt. No. 97 at 35–39 (describing invalid notice and opportunity to cure); *CorpCar*, 325 A.3d at 1247 (failing to provide contractually required cure opportunity can breach implied covenant of good faith and fair dealing, because the fair-dealing obligation "extends through the 'performance or enforcement of a contract' and can be violated through 'interference with or failure to cooperate in the other party's performance'" (quoting Restatement (Second) of Contracts § 205 cmts. a & d (Am. Law. Inst. 1981))).

***Third***, Fastcase violated the duty of good faith and fair dealing by making false statements directly to prospective acquirers of Alexi after sending the breach letter and filing this lawsuit. Mr. Walters reported to Clio's CEO making demonstrably false assertions [redacted] that Alexi did not have any rights to Fastcase caselaw data under the contract—despite the fact that the contract provides that an Alexi acquirer could obtain the Fastcase backfile for [redacted] "with no restrictions." (*See* RAC ¶¶ 139–41, 193). This scheme was designed to prevent Alexi from receiving the "fruits of the contract"—namely, the value of the backfile purchase right, which was a bargained-for provision that enhanced Alexi's enterprise value and attractiveness to acquirers. (*See, e.g.*, *id.* ¶ 193).

Fastcase's argument (at 38–39) that Mr. Walters's statements about the backfile purchase option were "substantially true" raises a factual question that cannot be resolved on the pleadings and, in any event, is patently untrue. The backfile purchase option survives termination under the Agreement (RAC ¶¶ 6, 139)—a fact Counterclaim Defendants have since admitted—which is directly contrary to Mr. Walters's statements [redacted] (*Id.* ¶¶ 139–140.)

***Finally***, Fastcase's argument that Alexi's implied covenant claim is duplicative of its other claims is incorrect. (Mem. at 36–37 (citing *Brown v. Trinity Wash. Univ.*, 2023 WL 2571729, at *10 (D.D.C. Mar. 20, 2023)).) Alexi's allegations that Fastcase manufactured this lawsuit under

false pretenses raises a distinct question that shows a violation of the duty of good faith and fair dealing, which is not required to prove any other claim. Courts dismiss such claims only where they are *entirely* duplicative—i.e., where "the allegations of bad faith are identical to a claim for relief under an established cause of action." *Brown*, 2023 WL 2571729, at *10; *C & E Servs.*, 601 F. Supp. 2d at 276–77 (permitting implied covenant claim to proceed where plaintiff alleged bad-faith conduct beyond the contract claim); *see also Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 45 (D.D.C. 2014) (same).

With respect to the purposefully vague breach notice that Fastcase issued to Alexi, Alexi is entitled, at the pleading stage, to plead in the alternative that the breach notice violated either the contract or the implied covenant. The same is true with respect to Clio's false statements to potential acquirers: The purposeful sabotage of Alexi's acquisition and investment opportunities is actionable under multiple theories, and Alexi is entitled to pursue them at the pleading stage. Fed. R. Civ. P. 8(d)(2) (allowing for alternative "statements of a claim or defense" at the pleading stage); *id.* 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

## III. ALEXI STATES PLAUSIBLE COUNTERCLAIMS FOR TORTIOUS INTERFERENCE WITH CURRENT AND PROSPECTIVE BUSINESS RELATIONS

### a. Count Four: Tortious Interference with Current Business Relations—vLex and Clio Are Distinct Third Parties Who Induced Fastcase's Breach

Tortious interference with business relations requires (1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages. *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. Cir. 2017).[6]

[6] Fastcase's reliance on the "hornbook rule" (at 41) that a defendant's breach of its own contract cannot support tortious interference is thus inapposite. That rule prevents a plaintiff from "convert[ing] a breach of contract claim into a claim for tortious interference" against the same

Interference is "intentional" if the defendant "knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Id.* at 203 (citing Restatement (Second) of Torts § 8A, 776 cmt. j). This element does not require a plaintiff to show the defendant acted wrongfully or maliciously. *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 141 n.28 (D.C. Cir. 2021).

Alexi's allegations readily satisfy the elements of tortious interference with current business relations. Neither party disputes that the Agreement between Alexi and Fastcase existed and was valid, at least until Fastcase purported to terminate it on November 26, 2025. (*See* RAC ¶ 78 (alleging the contract was valid and enforceable); Answer ¶ 78 (admitting same); RAC ¶ 221.) And Alexi has alleged that vLex and Clio knew about Alexi's agreement with Fastcase, as evidenced by the many pre-merger communications about that Agreement and the backfile purchase option it contained. (*See id.* ¶¶ 89, 101–07, 222.)

As to intentional interference, the allegations are equally sufficient. [redacted]

These allegations are drawn from Clio's and vLex's own documents and, in any event, must be taken as true. Together, they sufficiently allege that Clio and vLex—as third parties to the Agreement—intentionally induced Fastcase to terminate the Agreement. Fastcase's attempt (at 40–42) to recharacterize this third-party interference as a mere "repackaging" of the breach of contract claim ignores the fundamental distinction: The breach claim alleges that Fastcase wrongfully terminated the Agreement; the interference claim alleges that vLex and Clio caused

---

defendant. *Id.* (citing *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 26 (D.C. 1991)). It does not immunize third parties who induce the breach.

Fastcase to do so. *See Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads*, 565 A.2d 285, 290 (D.C. 1989) ("Because [non-alter ego employee of Defendant] Williams was not a party to the contract . . . she could be found liable for tortious interference with that contract.").

Fastcase's lead argument (at 40) against Count Four, that "a party cannot tortiously interfere with its own contract," fundamentally mischaracterizes Alexi's claim. Alexi does not allege that Fastcase interfered with the Agreement. Rather, Alexi alleges that vLex and Clio—entities that are formally and functionally distinct from Fastcase and are not parties to the Data License Agreement—induced and directed Fastcase to terminate (and thereby breach) the Agreement with Alexi.

Fastcase attempts to collapse these distinct entities into one by noting that Alexi "repeatedly treats [vLex and Clio] as interchangeable with Fastcase and as standing in Fastcase's shoes." (Mem. at 40.) But this argument confuses economic affiliation with legal identity. That Clio acquired vLex and vLex merged with Fastcase does not erase the formal corporate distinctions between these entities—distinctions that Fastcase itself maintains when it suits its purposes. Fastcase, Inc. filed this lawsuit, not vLex or Clio. (RAC ¶¶ 19–22.) The Agreement is between Alexi and Fastcase, Inc.—not vLex or Clio. (*Id.* ¶¶ 63–64.) And the interfering conduct alleged—[redacted] was undertaken by individuals acting on behalf of vLex and Clio, not Fastcase. (*Id.* ¶¶ 104, 106–10, 139–40.).

**b. Count Five: Tortious Interference with Prospective Business Relations—Alexi Has Identified Specific Expectancies with Reasonable Probability**

Fastcase devotes significant effort to arguing that Alexi "has not identified the specific customers, contracts, or prospective acquirers with which Fastcase allegedly interfered." (Mem. At 42.) This argument fails on multiple grounds. "[A] claim for tortious interference with prospective business opportunities has four elements: (1) the existence of a commercially reasonable business expectancy; (2) knowledge of the expectancy on the part of the interferer;

(3) intentional interference causing a termination of that expectancy; and (4) resulting damage." *Matiella v. Murdock St. LLC*, 2025 WL 3533454, at *8 (D.D.C. Dec. 10, 2025). Alexi has alleged every element.

Contrary to Fastcase's assertion (at 42) that Alexi relies on "unspecified relationships" or "hypothetical categories," Alexi has specifically identified by name the prospective acquirers at issue: [redacted]. (RAC ¶¶ 13, 136, 139–40.) Fastcase acknowledges this but then dismisses it as insufficient (at 43) because Alexi does not allege the precise "stage of acquisition negotiations" or "terms of any alleged letter of intent." No such granular detail is required at the pleading stage. Alexi has alleged that [redacted] "had secured internal approvals to execute a letter of intent to acquire Alexi, pending a full board vote on December 1" (RAC ¶ 136), and that the target valuation exceeded $100 million (*id.* ¶ 133). That is more than enough. These are concrete factual allegations, not "a mere possibility" or an "attenuated 'hope'" of acquisition (at 45). That alone is sufficient to sustain this element of the claim.[7]

Counterclaim Defendants were aware of Alexi's prospective business expectancies; indeed, Mr. Walters could not have known to reach out to [redacted] in the first place unless he knew they were considering acquiring Alexi. (RAC ¶¶ 138–140 (acquirers); *id.* ¶ 105 (customers).) And Clio's conduct was both intentional and wrongful; not only were Mr. Walters'

[7] Moreover, Fastcase's argument that Alexi fails to identify "prospective clients" (at 43) ignores that, under D.C. law, "plaintiffs need not identify specific business relationships or otherwise plead [tortious interference] with particularity." *Haymon v. District of Columbia*, 610 F. Supp. 3d 101, 119 (D.D.C. 2022) (quoting *Close It! Title Servs.*, 248 A.3d at 141). Alexi has alleged that, prior to the lawsuit, its "client base and revenues were increasing steadily," that "customers cancelled or failed to renew subscriptions" immediately after the litigation commenced, and that its "growth trajectory, revenue, fundraising prospects, and valuation" were materially impaired. (RAC ¶¶ 14, 41, 142.) Alexi has further alleged that Clio's own internal analysis confirmed that Alexi's customer losses were "[redacted]" (*Id.* ¶ 115.) These allegations are not conclusory, they are factual, and should be examined during discovery, and Counterclaim Defendants' attempt to shoehorn the far more demanding standard for emergency relief into an analysis under Rule 12(b)(6) (Mem. at 42 n.35, citing Dkt. No. 28 at 2), is misplaced.

statements clearly aimed at destroying any nascent transaction [redacted] Mr. Walters misrepresented Alexi's rights under the Agreement [redacted]

Finally, although Clio briefly challenges causation, that too is ill-founded: The counterclaims specifically allege that Mr. Walters's statements "caused . . . the loss of acquisition opportunities" (RAC ¶ 141), which was his obvious purpose in reaching out to them in the first place. Nothing more is required at the pleading stage, as causation is a fact-intensive inquiry that will turn on the evidence from discovery. *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *7 (C.D. Cal. Mar. 5, 2013) ("Because of the 'fact-intensive' nature of a causation analysis, it usually must be established in summary judgment or trial, not a motion to dismiss.").

## CONCLUSION

For the foregoing reasons, Alexi respectfully requests that the Court deny Counterclaim Defendants' motion to dismiss in its entirety.

Dated: July 13, 2026

**WINSTON TAYLOR LLP**

By: */s/ Johanna Rae Hudgens*

Johanna Rae Hudgens (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
johanna.hudgens@winstontaylor.com

Benjamin L. Rudofsky (D.C. Bar No. 1029844)
Melissa A. Iannuzzi (*pro hac vice*)
Allie A. Dodd (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, D.C. 20036
Telephone: (202) 282-5017
Fax: (202) 282-5100
ben.rudofsky@winstontaylor.com
melissa.iannuzzi@winstontaylor.com
allie.dodd@winston.com

Joshua Hafenbrack (D.C. Bar No. 1017128)
**HAFENBRACK LAW**
818 18th Street NW, Suite 810
Washington, D.C. 20006
jhafenbrack@hafenbracklaw.com

*Counsel for Defendant Counterclaim-Plaintiff Alexi Technologies Inc.*