**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC.<br><br>Plaintiff,<br><br>v.<br><br>ALEXI TECHNOLOGIES INC.<br><br>Defendant. | C.A. No. 1:25-CV-04159-RJL<br><br>Hon. Richard J. Leon |
| ALEXI TECHNOLOGIES INC.<br><br>Counter–Plaintiff,<br><br>v.<br><br>FASTCASE, INC., VLEX, LLC and THEMIS SOLUTIONS INC.<br><br>Counter–Defendants. | |

**COUNTERCLAIM DEFENDANTS' OPPOSITION TO**
**ALEXI'S MOTION TO COMPEL**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................1

BACKGROUND ....................3

ARGUMENT ....................5

I. The Challenged Documents Are Attorney Work Product, and Sharing Them with Clio Did Not Waive that Protection. ....................5

II. The Common-Interest Doctrine Also Preserves the Attorney-Client Privilege. ....................7

III. Alexi Has Not Established Subject-Matter Waiver. ....................10

IV. The Motion Is Moot as to CTRL0000000661, and *in Camera* Review Is the Proper Alternative to Compelled Disclosure. ....................12

CONCLUSION ....................13

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*10x Genomics, Inc. v. Celsee, Inc.*,
505 F. Supp. 3d 334 (D. Del. 2020) ..... 10

*Blanchard v. EdgeMark Financial Corp.*,
192 F.R.D. 233 (N.D. Ill. 2000) ..... 10

*Earthworks v. U.S. Dep't of the Interior*,
2013 U.S. Dist. LEXIS 49873 (D.D.C. Apr. 2, 2013) ..... 11

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
892 F.3d 1264 (D.C. Cir. 2018) ..... 9

**Georgia v. U.S. Dep't of Justice*,
148 F.4th 724 (D.C. Cir. 2025) ..... *passim*

*In re Kellogg Brown & Root*,
796 F.3d at 145–48 ..... 12

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) ..... 9

*In re Kellogg Brown & Root, Inc.*,
796 F.3d 137 (D.C. Cir. 2015) ..... 11

*In re Sealed Case*,
877 F.2d 976 (D.C. Cir. 1989) ..... 11, 12

*In re UMW*,
159 F.R.D. ..... 12

*In re United Mine Workers (UMW) of Am. Emp. Benefit Plans Litig.*,
159 F.R.D. 307 (D.D.C. 1994) ..... 7, 8

*N.L.R.B. v. Jackson Hosp. Corp.*,
257 F.R.D. 302 (D.D.C. 2009) ..... 7

*Nidec Corp. v. Victor Co. of Japan*,
249 F.R.D. 575 (N.D. Cal. 2007) ..... 10

*Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*,
2019 WL 1589974 (N.D. Cal. Apr. 11, 2019) ..... 10

*Trs. of the Elec. Workers Local No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*,
266 F.R.D. 1 (D.D.C. 2010) ..... 12

**United States v. Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) ..... *passim*

*United States v. Gulf Oil Corp.*,
760 F.2d 292 (Temp. Emer. Ct. App. 1985) ........ 8

## RULES

Fed. R. Civ. P. 26 ........ 5

Fed. R. Civ. P. 26(b)(3)(A) ........ 5

Fed. R. Evid. 502 ........ 11, 12

Fed. R. Evid. 502(a) ........ 7, 11, 12

## MISCELLANEOUS

Restatement (Third) of the Law Governing Lawyers § 76 cmt. e ........ 8

## INTRODUCTION

This dispute concerns communications among three entities involved in successive corporate combinations. Fastcase is the Plaintiff, the party to the December 2021 Data License Agreement with Alexi, and the entity whose contractual rights were being enforced. In 2023, Fastcase merged with vLex and became vLex's wholly owned subsidiary. Clio then executed a binding Stock Purchase Agreement on June 30, 2025, to acquire vLex and Fastcase, a transaction that closed on November 5, 2025. The challenged communications occurred during the period between signing and closing—including several exchanged only days before closing—after Clio and vLex/Fastcase had been parties to a definitive acquisition agreement for months and as they approached becoming part of the same corporate organization.

Alexi nevertheless asks the Court to compel seven documents that remain withheld, along with one document that Counterclaim Defendants have already produced. *See* ECF No. 108 (the "Motion" or "Mot."). The remaining documents are draft breach notices prepared by counsel and confidential communications among counsel and senior executives concerning legal advice, enforcement of the Alexi Agreement, and the litigation the parties reasonably anticipated would follow. Alexi does not meaningfully dispute that the documents were privileged or protected when created. Its argument is instead that disclosure to Clio before the acquisition formally closed waived all protection because Fastcase/vLex and Clio supposedly "were adversarial parties that were each pursuing commercial rather than legal objectives." Mot. at 3. Both premises are wrong.

First, Clio and Fastcase/vLex were not adversaries with respect to the legal issue addressed in the challenged communications. They had executed a binding acquisition agreement months earlier, were days or weeks from formally combining when most of the communications occurred, and shared an interest in evaluating and enforcing the contractual rights Clio was about to acquire. Whatever differing interests they may have retained on other aspects of the transaction, their

interests concerning Alexi's breach, the notice required by the Agreement, and the dispute expected to follow were aligned.

Second, Alexi's assertion that the parties were pursuing "commercial rather than legal objectives" is conjecture that mistakes commercial significance for absence of legal purpose. *Id.* The relevant question is not whether enforcement of the Agreement also had commercial consequences. Legal advice routinely informs business decisions. The question is whether the challenged communications were made to obtain, convey, or coordinate legal advice concerning a shared legal problem. They were. The documents concern counsel's analysis and drafting of a contractual breach notice, the requirements for enforcing the Agreement, and the anticipated litigation against Alexi. The fact that the Alexi Agreement also affected the value of the pending acquisition does not transform those legal communications into unprotected business discussions.

Binding D.C. Circuit authority confirms the governing principles. A common-interest arrangement may be inferred when parties are "clearly collaborating in advance of litigation," and their interests "need not be entirely congruent." *Georgia v. U.S. Dep't of Justice*, 148 F.4th 724, 740 (D.C. Cir. 2025) (internal quotation marks omitted). And disclosure of attorney work product to a third party does not waive protection unless the disclosure is inconsistent with maintaining secrecy from the disclosing party's adversary—as when the recipient is an adversary or a conduit to an adversary. *Id.* at 741; *United States v. Deloitte LLP*, 610 F.3d 129, 139–40 (D.C. Cir. 2010). Clio was neither an adversary nor a conduit to Alexi. The challenged documents were exchanged confidentially to coordinate legal advice and strategy concerning the anticipated dispute with Alexi. Exhibit A, Declaration of Octavia Radulescu ("Radulescu Decl."); Exhibit B, Declaration of Niamh Pollak ("Pollak Decl.").

Alexi's subject-matter-waiver theory fares no better. There was no initial waiver, and Counterclaim Defendants have neither selectively disclosed nor affirmatively relied on any privileged draft. Nothing about fairness requires disclosure of internal iterations that were never shared outside vLex. The Motion is also moot as to CTRL0000000661, which Counterclaim Defendants produced on June 15, 2026. The Court should deny the Motion. At minimum, if the Court has any doubt about the purpose or content of the seven remaining documents, it should review them *in camera* rather than order disclosure based on Alexi's characterization of materials it has never seen.

**BACKGROUND**

Fastcase/vLex began investigating Alexi's use of Fastcase data before the SPA was executed. In spring 2025, Fastcase's Nina Jack learned from the sales team that Alexi was being marketed as "a service that was competitive to Fastcase" and that Alexi representatives were telling prospects its product was "backed by the Fastcase database." ECF No. 94-8 at 39:1–6; ECF No. 94-61 at –118; ECF No. 94-62 at –133–34. Ms. Jack reviewed Alexi's public website and social media posts, confirming that Alexi had "legal research as a service on its website" and was promoting itself as competing with traditional legal research services such as Lexis and Westlaw. ECF No. 94-8 at 153:15–154:3. She raised the issue of Alexi's breach with vLex's legal team and senior management. ECF No. 94-8 at 153:13–14, 155:21–22.

Fastcase founder and subsequent vLex executive Ed Walters separately learned that Alexi had moved beyond lawyer prepared memoranda and was exposing Fastcase data through customer-facing, chat-based interfaces. ECF No. 94-4 at 79:22–80:3. By June 2025, counsel had reviewed the Agreement, management reviewed Alexi's product and public materials, and vLex had concluded that Alexi's use breached the Agreement. ECF No. 94-13 at 219:18.

On or around June 19, 2025, vLex's legal team prepared a draft notice of material breach, and on June 27, 2025, vLex's legal team further revised the draft notice. Radulescu Decl. ¶ 5. Three days later, on June 30, 2025, Clio executed the binding Sale and Purchase Agreement ("SPA") to acquire vLex, which owned Fastcase. ECF No. 94-5 at 15:17–16:12. The SPA made the Alexi Agreement relevant to the transaction, but it did not erase the separate legal issue created by Alexi's use of Fastcase data. The witnesses consistently testified that the backfile provision and Alexi's breach were distinct workstreams. ECF No. 94-13 at 217:2–218:4; ECF No. 98-13 at 161:2–24; ECF No. 94-4 at 76:6–77:1.

After the SPA was signed, Clio's and vLex's legal teams coordinated concerning the asserted breach, the notice required by Section 5.2 of the Agreement, and the anticipated dispute with Alexi. ECF No. 94-13 at 271:11–14, 272:19–273:13; ECF No. 94-64 at –512. Those communications were treated as confidential and were limited to the personnel necessary to obtain and implement legal advice. Radulescu Decl. ¶¶ 10–12; Pollak Decl. ¶¶ 5–6, 9–12; *see also* ECF No. 98-18 at –510 (SPA §§ 18.2, 18.3). vLex sent the notice on October 27, 2025. ECF No. 94-64. Alexi denied the breach, the acquisition closed on November 5, and Fastcase terminated the Agreement and filed this action after the cure period expired on November 26. ECF No. 15-11; ECF No. 94-5 at 10:6–17; ECF No. 1.

The Motion concerns a narrow set of documents identified on Fastcase's privilege log, which was served on Alexi on March 27, 2026: (1) correspondence related to revisions to the June 2025 counsel-prepared notice of breach draft, CTRL0000000273 and CTRL0000000730, and a cover email attaching the draft to vLex's outside counsel and to its controlling investor, CTRL0000000715; (2) C2051288_SLACK00025271, an August 26, 2025 communication transmitting a copy of that draft to Clio's general counsel for legal advice; (3) an October 21, 2025

Slack thread, C2051288_SLACK00025281, and two associated images, C2051288_SLACK00025282 and C2051288_SLACK00025283, assembled and transmitted to counsel in connection with advice concerning the breach notice. *See* Fastcase Privilege Log, attached as Ex. 1 to Exhibit C, Declaration of Rebecca Nelson ("Nelson Decl."); *see also* Nelson Decl. ¶ 3. Alexi also lists CTRL0000000661, but Counterclaim Defendants re-reviewed and produced that document before Alexi filed the Motion. Nelson Decl. ¶¶ 4–5.

## ARGUMENT

Alexi's Motion fails at every step of the privilege analysis. Counterclaim Defendants have established the asserted protections through their privilege log, the undisputed chronology, and the accompanying declarations. Alexi's contrary argument collapses three distinct questions: whether the documents were prepared to obtain legal advice or in anticipation of litigation; whether limited disclosure to Clio waived any protection; and whether any waiver would extend to internal drafts never shared with Clio. The record resolves each question in Counterclaim Defendants' favor.

### I. The Challenged Documents Are Attorney Work Product, and Sharing Them with Clio Did Not Waive that Protection.

Rule 26 protects documents prepared "in anticipation of litigation or for trial" by or for a party or its representative. Fed. R. Civ. P. 26(b)(3)(A). In this Circuit, the question is whether, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Deloitte*, 610 F.3d at 137 (citation omitted). A document may satisfy that test even when it also serves a business purpose. *Id.* at 138 ("[A] document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation.").

The challenged draft notices and related communications satisfy that standard. They were prepared by counsel or at counsel's direction to analyze an asserted contractual breach, formulate the notice required to preserve Fastcase's termination rights, and prepare for the dispute expected to follow. Radulescu Decl. ¶¶ 3–8, 13–14; Pollak Decl. ¶¶ 5–6, 8–11. They are not ordinary deal-diligence materials or drafts of the SPA. Pollak Decl. ¶ 7. They reflect counsel's analysis of the Agreement, selection of facts bearing on breach, and strategy for enforcing Fastcase's contractual rights against Alexi. The fact that enforcement also mattered commercially to the acquisition does not alter why counsel prepared these particular materials. *See Deloitte*, 610 F.3d at 138.

Nor did the limited disclosure to Clio waive work-product protection. Unlike attorney-client privilege, work-product protection is not necessarily waived merely because protected material is voluntarily shared with a third party. *Id.* at 139–40. Disclosure results in waiver when, under the circumstances, it is "inconsistent with the maintenance of secrecy from the disclosing party's adversary"—as when the recipient is an adversary or a conduit to an adversary. *Id.* at 140. The D.C. Circuit recently reaffirmed that rule, holding that sharing work product confidentially with aligned parties under a common-interest arrangement does not waive protection. *Georgia*, 148 F.4th at 740–41.

Clio was neither Fastcase/vLex's adversary with respect to the anticipated Alexi dispute nor a conduit to Alexi. *Deloitte* makes clear that the question is not whether the recipient could be adverse to the disclosing party in some conceivable dispute, but whether the recipient was an adversary "in the sort of litigation the [documents] address." 610 F.3d at 140. After signing the SPA, Clio stood to acquire control of vLex and Fastcase and shared their interest in enforcing the Agreement and managing the anticipated dispute arising from Alexi's breach. The communications were exchanged confidentially through the parties' legal teams and were not

disclosed to Alexi or any other potential adversary. Radulescu Decl. ¶¶ 8–9, 11–12, 15; Pollak Decl. ¶¶ 5–6, 8–12. Whatever transaction-related interests Clio and vLex may have retained on other subjects, the confidential disclosure of legal strategy to Clio was consistent with maintaining secrecy from Alexi and did not increase the likelihood that Alexi would obtain the materials. There was no work-product waiver under *Deloitte*.

The three internal June 2025 drafts present an even simpler issue. Alexi identifies no disclosure of CTRL0000000273, CTRL0000000730, or CTRL0000000715 to Clio or anyone else. Its theory depends entirely on treating the later sharing of a version of the draft with Clio as a waiver. Because that confidential sharing did not waive work-product protection, it supplies no basis to compel the internal drafts. Alexi's alternative effort to extend any supposed waiver across related internal drafts also fails under Rule 502(a), as explained below.

**II. The Common-Interest Doctrine Also Preserves the Attorney-Client Privilege.**

The common-interest doctrine is an exception to waiver, not an independent privilege. It permits parties whose legal interests coincide to share otherwise privileged communications confidentially in furtherance of their common legal effort without waiving the attorney-client privilege. *Georgia*, 148 F.4th at 733, 741; *N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 312 (D.D.C. 2009). The doctrine applies when disclosure is made in connection with actual or anticipated litigation, furthers a common legal interest, and remains consistent with maintaining confidentiality against adverse parties. *In re United Mine Workers (UMW) of Am. Emp. Benefit Plans Litig.*, 159 F.R.D. 307, 313–14 (D.D.C. 1994); *Jackson Hosp.*, 257 F.R.D. at 312. A written agreement is not indispensable: a common-interest arrangement may be inferred when parties are "clearly collaborating in advance of litigation." *Georgia*, 148 F.4th at 740. And their interests "need not be entirely congruent"; common interests may be legal, factual, or strategic in character. *Id.* (quoting Restatement (Third) of the Law Governing Lawyers § 76 cmt. e).

Those requirements are satisfied here. The challenged communications were made after execution of the binding SPA, between or at the direction of vLex and Clio counsel, to obtain and coordinate legal advice concerning Alexi's breach, the contractual notice, and the anticipated dispute with Alexi. Radulescu Decl. ¶¶ 10–14; Pollak Decl. ¶¶ 3–6, 8–10. Clio's interest was not the generalized hope of a financier or supporter that vLex would succeed. Clio had bound itself to acquire the corporate group whose contractual rights and litigation exposure were at stake and would acquire control of that group at closing. It therefore shared vLex's legal and strategic interest in preserving Fastcase's enforcement rights under the Agreement and preparing for Alexi's expected challenge.

Alexi is wrong to treat Clio and vLex as categorically adverse until the moment of closing (Mot. at 8–10). The doctrine examines the parties' relationship at the time of disclosure and their alignment on the particular legal matter for which advice was shared—not whether their interests were identical across every aspect of their relationship. *In re UMW*, 159 F.R.D. at 314; *Georgia*, 148 F.4th at 740. Indeed, *United States v. Gulf Oil Corp.* found no work-product waiver where parties to an executed merger agreement were "obviously not adversaries at the time of the disclosure," but instead "in the initial stages of becoming parent and subsidiary," and exchanged the materials under confidentiality protections. 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985); *see also In re UMW*, 159 F.R.D. at 314 (citing *Gulf Oil*). Clio and vLex likewise could remain separately represented transaction parties while sharing a common legal interest in the distinct dispute with Alexi. And *Georgia* rejected the argument that variations in aligned parties' claims defeated the doctrine because their overlapping interests on the relevant issues against a common adversary were sufficient. 148 F.4th at 740.

Alexi's emphasis on commercial motive (Mot. at 8–9) likewise asks the wrong question. A communication does not lose privilege merely because the legal advice bears on a business decision. The D.C. Circuit asks whether obtaining or providing legal advice was one of the communication's significant purposes. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014); *FTC v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267–68 (D.C. Cir. 2018). Here, the subject matter, participants, and content all point to legal advice: counsel analyzed a contractual breach, drafted a formal notice invoking contractual remedies, and coordinated strategy for the dispute expected to result. The SPA's treatment of the Alexi Agreement may explain why the issue mattered commercially to Clio, but it does not transform counsel's breach analysis into merger negotiations.

The SPA itself also confirms both the contemplated cooperation and the parties' expectation of confidentiality. It required vLex to provide Clio and its advisers information reasonably necessary to implement the transaction and specifically contemplated the sharing of information that "is or may be subject to legal professional privilege," provided that any such sharing occur "in a manner . . . . reasonably designed to preserve … confidentiality and legal professional privilege." ECF No. 98-18 at –479–80 (SPA §§ 5.6, 5.7). The SPA separately required the parties to treat transaction-related information and information concerning any claim as "strictly confidential," with those obligations continuing indefinitely after closing or termination. *Id.* at –510 (SPA §§ 18.2, 18.3). Those provisions reinforce that the challenged communications were exchanged pursuant to an express expectation of confidentiality and without any expectation that Clio would disclose them to Alexi.

The cases Alexi cites involved materially different circumstances and disclosures. In *10x Genomics, Inc. v. Celsee, Inc.*, the parties had signed only a non-binding letter of intent and

remained on "opposite sides of a bargaining table" negotiating whether and on what terms to consummate an acquisition. 505 F. Supp. 3d 334, 338–40 (D. Del. 2020). The court also applied a Third Circuit formulation requiring "identical" legal interests, *id.* at 337–38, whereas the D.C. Circuit has since confirmed that common interests "need not be entirely congruent," *Georgia*, 148 F.4th at 740. In *Nidec Corp. v. Victor Co. of Japan*, a litigation abstract was provided to potential bidders to facilitate their commercial decision whether to purchase a majority interest, not to formulate or advance a common legal strategy. 249 F.R.D. 575, 579–80 (N.D. Cal. 2007). *Blanchard v. EdgeMark Financial Corp.* involved disclosure to an investment banker whose interest in threatened litigation was merely financial and who was not participating in any joint legal effort. 192 F.R.D. 233, 237 (N.D. Ill. 2000). And *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress* rejected common-interest protection for donors who merely supported the defendant and desired its success, while distinguishing the narrow situation in which a buyer would step into the seller's shoes and face the same anticipated litigation. 2019 WL 1589974, at *9–10 (N.D. Cal. Apr. 11, 2019).

Here, by contrast, every challenged disclosure occurred after Clio and vLex executed the binding SPA, and the communications were exchanged confidentially to obtain and coordinate legal advice concerning a concrete contractual dispute with Alexi. They were not ordinary due-diligence materials transmitted merely to facilitate Clio's commercial decision whether to proceed with the acquisition. Radulescu Decl. ¶¶ 10–11; Pollak Decl. ¶ 7. Those facts place the communications within the common-interest doctrine, not the commercial due-diligence cases on which Alexi relies.

### III. Alexi Has Not Established Subject-Matter Waiver.

Alexi's request for every internal draft depends on an initial waiver. There was none. The August and October communications were protected by the common-interest doctrine, and the

work product they conveyed was not disclosed to an adversary or conduit to an adversary. Without waiver as to the shared communications, there is no basis for extending any waiver to the internal drafts.

Even assuming for argument's sake that sharing one draft with Clio waived attorney-client privilege, that would not establish waiver of the independent work-product protection covering the internal drafts. Waiver of attorney-client privilege and waiver of work product must be analyzed separately because the protections serve different purposes and are governed by different waiver rules. *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 144 (D.C. Cir. 2015); *Deloitte*, 610 F.3d at 139–40. Alexi's reliance on *In re Sealed Case*, 877 F.2d 976, 980–81 (D.C. Cir. 1989), therefore cannot carry its argument. That case addressed the scope of attorney-client waiver after a privileged memorandum was disclosed to a government auditor; it did not address whether confidential sharing with an aligned party waived work-product protection for related, undisclosed drafts.

To the extent Alexi relies on any disclosure made in this litigation, Federal Rule of Evidence 502(a) independently forecloses its subject-matter-waiver theory. Under that Rule, a waiver extends to undisclosed communications or information only if the initial waiver was intentional, the disclosed and undisclosed materials concern the same subject matter, and they "ought in fairness be considered together." Fed. R. Evid. 502(a). Subject-matter waiver is thus reserved for the unusual case in which a party intentionally presents protected information in a selective and misleading manner. Fed. R. Evid. 502 advisory committee's note to subdiv. (a); *see also Earthworks v. U.S. Dep't of the Interior*, 2013 U.S. Dist. LEXIS 49873, at *7–8 (D.D.C. Apr. 2, 2013); *Trs. of the Elec. Workers Local No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*, 266 F.R.D. 1, 10–11 (D.D.C. 2010). The Advisory Committee expressly rejected *In re Sealed Case*'s

contrary result insofar as it permitted an inadvertent disclosure to produce an automatic subject-matter waiver. Fed. R. Evid. 502 advisory committee's note to subdiv. (a).

Nothing resembling the selective and misleading use contemplated by Rule 502(a) occurred here. Counterclaim Defendants have not disclosed to Alexi the privileged drafting process or counsel's internal analysis, quoted the drafts to the Court, or affirmatively relied on their contents to obtain a tactical advantage. They have produced the final breach notice and the nonprivileged factual record concerning Fastcase's conclusion that Alexi was in breach, while consistently maintaining the confidentiality of counsel's drafting process. The internal drafts are not needed to understand any disclosure Counterclaim Defendants have made. Producing them would simply expose counsel's protected analysis and strategy to Alexi. *See In re Kellogg Brown & Root*, 796 F.3d at 145–48.

Broad subject-matter waiver is particularly disfavored for work product. *In re UMW*, 159 F.R.D. at 310–12. Because work-product protection safeguards the adversary process rather than merely the confidentiality of a particular relationship, extending waiver to undisclosed work product may confer an unwarranted strategic windfall and undermine the purpose of the protection. *Id.* at 312; *see also Deloitte*, 610 F.3d at 139–40. Alexi identifies no intentional disclosure, selective reliance, or other fairness concern that would justify that exceptional result here.

### IV. The Motion Is Moot as to CTRL0000000661, and *in Camera* Review Is the Proper Alternative to Compelled Disclosure.

Counterclaim Defendants advised Alexi on June 12, 2026 that, after re-review, they had determined CTRL0000000661 was not privileged and would produce it. Nelson Decl. ¶ 4. They produced the document on June 15, 2026. *Id.* ¶ 5. Alexi nevertheless included it in the Motion and proposed order. The Motion should be denied as moot as to that document.

As to the seven remaining documents, the Court need not accept either side's characterization of unseen materials. If the Court concludes that the privilege log and declarations leave any genuine uncertainty, Counterclaim Defendants respectfully request *in camera* review. The small number of documents makes that review straightforward, and it would allow the Court to assess whether the materials reflect legal advice and litigation strategy without inflicting the irreversible harm that compelled disclosure would cause.

**CONCLUSION**

For the foregoing reasons, Counterclaim Defendants respectfully request that the Court deny Alexi's Motion to Compel. In the alternative, Counterclaim Defendants request that the Court review the seven remaining documents *in camera* before ordering any disclosure.

DATED: July 21, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Paul J. Sampson*
Paul N. Harold (D.C. Bar No. 1032578)
Brendan J. Coffman (D.C. Bar No. 988370)
1700 K Street NW, Fifth Floor
Washington, DC 20006-3814
Telephone: (202) 973-8800
PHarold@wsgr.com
BCoffman@wsgr.com

Jess M. Krannich (*pro hac vice*)
Paul J. Sampson (D.C. Bar No. 1010457)
Rebecca J. Nelson (*pro hac vice*)
Andrew P. Follett (*pro hac vice*)
Isabella Ang (*pro hac vice*)
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
JKrannich@wsgr.com
PSampson@wsgr.com
RNelson@wsgr.com
AFollett@wsgr.com
IAng@wsgr.com

*Counsel for Plaintiff Fastcase Inc. and Counter-Defendants Fastcase Inc., vLex, LLC, and Themis Solutions Inc*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2026, I caused the foregoing to be electronically filed through this Court's CM/ECF system and additionally that all counsel of record were served via electronic mail.

*/s/ Jessica M. Johnsen*