**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FASTCASE, INC.<br><br>Plaintiff,<br><br>v.<br><br>ALEXI TECHNOLOGIES INC.<br><br>Defendant. | C.A. No. 1:25-CV-04159-RJL<br><br>Hon. Richard J. Leon<br><br>**(CORRECTED REDACTION)** |
| ALEXI TECHNOLOGIES INC.<br><br>Counter-Plaintiff,<br><br>v.<br><br>FASTCASE, INC., VLEX, LLC and THEMIS SOLUTIONS INC.<br><br>Counter-Defendants. | |

**COUNTERCLAIM DEFENDANTS' REPLY IN SUPPORT OF THEIR RENEWED PARTIAL MOTION TO DISMISS ALEXI'S REVISED AMENDED COUNTERCLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................1

ARGUMENT ....................3

I. ALEXI FAILS TO PLAUSIBLY ALLEGE A CLAYTON ACT § 7 CLAIM. ....................3

A. Alexi Fails to Plausibly Allege that Clio's Acquisitions Have or Will Result in Foreclosure that May Substantially Lessen Competition. ....................4

B. Alexi Does Not Plausibly Allege that the Combined Entity Can Foreclose Downstream Competitors' Access to Existing Caselaw Databases. ....................6

C. Alexi Does Not Plausibly Allege that High Barriers to Entry Prevent the Emergence of Upstream Caselaw Suppliers. ....................8

D. Alexi's Failure to Plausibly Allege Relevant Antitrust Markets Warrants Dismissal of Its Clayton Act Claim. ....................10

E. Alexi Fails to Plausibly Allege that the 2023 vLex-Fastcase Transaction Violates the Clayton Act. ....................13

II. ALEXI'S BAD FAITH COUNTERCLAIM RUNS HEADLONG INTO WELL-SETTLED D.C. LAW ....................14

A. The Implied-Covenant Counterclaim Duplicates Alexi's Contract and Tort Theories ....................15

B. Alleged Collateral Motive Does Not Create an Independent Covenant Claim. ....................17

C. Alexi Does Not Plead an Independent Violation of Its Cure Right. ....................18

D. Alexi Does Not Allege that Fastcase Deprived It of a Contractual Benefit. ....................19

III. ALEXI'S TORTIOUS-INTERFERENCE COUNTERCLAIMS SHOULD BE DISMISSED. ....................21

A. Count Four Does Not Plausibly Allege Interference by a Stranger to Fastcase's Contractual Performance. ....................21

B. Count Five Does Not Plausibly Allege a Probable Business Expectancy or Causation. ....................23

CONCLUSION ....................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

* *Abdelrhman v. Ackerman*,
76 A.3d 883 (D.C. 2013) ....................20

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) ....................11

*Ashbourne v. Hansberry*,
245 F. Supp. 3d 99 (D.D.C. 2017) ....................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................3, 4, 23, 25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................4, 8

*Brink v. Xe Holding, LLC*,
2022 WL 3334503 (D.D.C. May 19, 2022) ....................21

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ....................4, 6

*Brown v. Trinity Wash. Univ.*,
2023 WL 2571729 (D.D.C. Mar. 20, 2023) ....................15

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ....................11

*Close It! Title Servs., Inc. v. Nadel*,
248 A.3d 132 (D.C. Cir. 2021) ....................23

* *CorpCar Services Houston, Ltd. v. Carey Licensing, Inc.*,
325 A.3d 1235 (D.C. 2024) ....................17, 18, 19

*Dean v. Walker*,
876 F. Supp. 2d 10 (D.D.C. 2012) ....................22

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996) ....................4

*Florence Urgent Care v. Healthspan, Inc.*,
445 F. Supp. 2d 871 (S.D. Ohio 2006) ....................18

*FTC v. Tempur Sealy Int'l*,
768 F. Supp. 3d 787 (S.D. Tex. 2025) ............................................................6, 8

*Hamilton v. Geithner*,
743 F. Supp. 2d 1 (D.D.C. 2010) ............................................................15

*Haymon v. District of Columbia*,
610 F. Supp. 3d 101 (D.D.C. 2002) ............................................................23, 24

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ............................................................11, 12

*HiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) ............................................................12

*Ihebereme v. Capital One, N.A.*,
730 F. Supp. 2d 40 (D.D.C. 2010) ............................................................22

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) ............................................................6, 8

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
24 F. Supp. 3d 32 (D.D.C. 2014) ............................................................16

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) ............................................................15

*Koker v. Aurora Loan Serv.*,
915 F. Supp. 2d 51 (D.D.C. 2013) ............................................................23

*Legion Systems, LLC v. Valiant Global Defense Services, Inc.*,
2021 WL 3633592 (M.D. Fla. Aug. 17, 2021) ............................................................18

*Lugo v. City of Troy*,
114 F.4th 80 (2d Cir. 2024) ............................................................15

*Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*,
979 F. Supp. 2d 26 (D.D.C. 2013) ............................................................19

*Miller v. Lamanna*,
169 F.4th 118 (2d Cir. 2026) ............................................................15

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
791 F. Supp. 2d 33 (D.D.C. 2011) ............................................................23

*Ohio v. Am. Express*,
585 U.S. 529 (2018) ............................................................5

* *PhantomALERT Inc. v. Apple, Inc.*,
762 F. Supp. 3d 8 (D.D.C. 2025),
*aff'd* 2026 WL 2131786 (D.C. Cir. July 24, 2026) .................................................. *passim*

*Press v. Howard University*,
540 A.2d 733 (D.C. 1988) ....................................................................................21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....................................................................................11

* *Raskauskas v. Temple Realty Co.*,
589 A.2d 17 (D.C. 1991) ....................................................................................21, 23

*Rivera v. Rosenberg & Assocs., LLC*,
142 F. Supp. 3d 149 (D.D.C. 2015) ........................................................................10

*Robertson v. Cartinhour*,
867 F. Supp. 2d 37 (D.D.C. 2012) ..........................................................................23

*Sibley v. St. Albans Sch.*,
134 A.3d 789 (D.C. 2016) ....................................................................................20

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
947 F. Supp. 2d 88 (D.D.C. 2013) ..........................................................................10

*Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*,
565 A.2d 285 (D.C. 1989) ....................................................................................21

*Sundberg v. TTR Realty, LLC*,
109 A.3d 1123 (D.C. 2015) ....................................................................................19, 20

*United States v. AT&T*,
310 F. Supp. 3d 161 (D.D.C. 2018) (Leon, J.),
*aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ..................................................................5

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................................................8

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
382 U.S. 172 (1965)....................................................................................................5

*Weatherly v. Second Nw. Coop. Homes Ass'n*,
304 A.3d 590 (D.C. 2023) ....................................................................................17

*Weaver v. Gross*,
605 F. Supp. 210 (D.D.C. 1985) ............................................................................22

*Whole Foods Market Group, Inc. v. Wical Limited Partnership*,
288 F. Supp. 3d 176 (D.D.C. 2018) ........ 18

*Wright v. Howard Univ.*,
60 A.3d 749 (D.C. 2013) ........ 21

**STATUTES**

15 U.S.C. § 18 ........ 4

Clayton Act ........ *passim*

Sherman Act ........ 4, 10

**RULES**

Rule 8 ........ 16

Rule 12 ........ 14

Rule 12(b)(6) ........ 3, 14, 15

Rule 12(d) ........ 14, 15

**INTRODUCTION**

This case arises from a contract dispute. Fastcase licensed its collection of U.S. caselaw to Alexi for "internal research" while expressly prohibiting "commercial" or "competitive" use. Agreement § 1.7. Whether Alexi exceeded that license is the subject of the parties' contract claims and expedited summary judgment proceedings. This Motion presents a different question: whether Alexi may repackage the same events as claims for violation of the Clayton Act, breach of the implied covenant, and tortious interference. Those claims fail for legal defects apparent on the face of the Revised Amended Counterclaims and the Agreement they incorporate, without resolving the contract dispute or weighing competing evidence.

Alexi's counterclaims—particularly its antitrust claim—seek to transform an ordinary dispute over the scope and termination of a data license into sprawling extracontractual liability. The practical objective is apparent: by attaching an antitrust label and claims against additional corporate defendants to the parties' contract dispute, Alexi attempts to manufacture litigation exposure and settlement leverage that the Agreement itself does not provide. But federal antitrust law, the implied covenant, and tort law are not vehicles for avoiding contractual limitations or increasing the stakes of a licensing dispute. Each claim must stand on its own elements, and Alexi's allegations do not satisfy them.

Alexi's Clayton Act claim (Count Three) demonstrates the problem most clearly. Alexi alleges that Clio's acquisition of vLex—and thus Fastcase—will allow Clio to foreclose downstream AI competitors from access to "comprehensive U.S. caselaw." But Clio does not control access to comprehensive U.S. caselaw or possess market power over the data needed to provide AI-assisted legal services. Caselaw is available from numerous independent sources, including Lexis, Harvard's Caselaw Access Project ("HCAP"), the Free Law Project, and other

online repositories. Incumbents and startups alike—including Harvey, Midpage, Descrybe, Claude Legal, Luminance, and others—maintain, use, or can obtain caselaw data without relying on Fastcase. Alexi's own allegations thus describe a competitive environment in which downstream providers have multiple paths to the allegedly critical input, not a market in which Clio can foreclose competition by controlling a single indispensable database. Alexi's proposed markets nevertheless exclude these acknowledged alternatives, and its allegations regarding entry barriers are difficult to reconcile with both [redacted] and the emergence of numerous additional providers. Alexi's reliance on the 2023 vLex-Fastcase transaction fares no better: Alexi alleges that vLex continued licensing Fastcase data to Alexi and others for years after that transaction.

The implied-covenant claim (Count Two) fails regardless of how the underlying contract dispute is resolved. Alexi's theory rests on Fastcase's alleged motive for terminating the Agreement—namely, that Fastcase sought to benefit Clio and vLex or eliminate Alexi as a competitive threat. But the implied covenant does not convert an otherwise contractually authorized termination into a breach merely because the terminating party allegedly acted with a collateral business motive. If Alexi's conduct supplied cause for termination, Fastcase was entitled to exercise its express contractual right to terminate, absent allegations that Fastcase purposefully sabotaged Alexi's performance or otherwise prevented Alexi from obtaining the benefit of the bargain. Alexi alleges no such conduct. If, by contrast, Alexi's conduct did not supply cause for termination, then Fastcase's termination breached the Agreement itself, and the implied-covenant claim simply duplicates Alexi's express breach theory. Alexi identifies no distinct contractual benefit that Fastcase denied it, no contractual gap that the implied covenant must fill, and no injury

separate from the alleged wrongful termination. Under either version of Alexi's own theory, Count Two fails.

The tortious-interference claims (Counts Four and Five) are likewise deficient. Alexi's own allegations place Clio, vLex, and Fastcase within the same corporate family, rather than describing strangers meddling in an unrelated contract. And Alexi does not plausibly allege interference with a specific prospective relationship likely to produce future economic benefit. Its principal example is undermined by the chronology alleged in its own pleading.

The Court should dismiss Counts Two through Five.

## ARGUMENT

### I. ALEXI FAILS TO PLAUSIBLY ALLEGE A CLAYTON ACT § 7 CLAIM.

At bottom, Alexi's defense of its Clayton Act § 7 claim is a plea to the Court for extreme deference to its allegations, in contravention of both the purpose and requirements of Rule 12(b)(6). Alexi's core allegation that, post-merger, "Clio controls 100% of the critical upstream input" of comprehensive caselaw, Alexi's Opp'n to Counter-Defs.' Partial Mot. to Dismiss ("Alexi Opp'n") at 28, ECF No. 110-1, is impossible to reconcile with its acknowledgment of comprehensive databases maintained by Westlaw and Lexis, public caselaw sources such as CourtListener and Harvard's Caselaw Access Project ("HCAP"), and emerging providers such as Midpage. Alexi's allegations also identify several downstream competitors whose access to caselaw does not depend on Fastcase. And [redacted] undercutting Alexi's allegation that doing so would require "years or decades."

Supreme Court precedent makes clear that pleading-stage deference has limits. Rule 12(b)(6) empowers courts to act as gatekeepers, determining whether the pleaded facts plausibly support relief, rather than merely permit the possibility of it. *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009). That inquiry is particularly important in antitrust cases, where discovery can be extraordinarily expensive and the resulting pressure can induce defendants to settle even weak claims before their merits are tested. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007) (warning that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases"). Alexi's antitrust counterclaim seeks to exploit precisely that dynamic by transforming a narrow licensing dispute into sprawling antitrust litigation whose costs themselves create settlement leverage untethered to the merits. Determining plausibility is therefore "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. And the D.C. Circuit recently confirmed that, although market definition is often fact-intensive, dismissal is appropriate where the proposed markets rest on allegations that are "imprecise and self-contradictory" or fail to account for potential substitutes. *PhantomALERT Inc. v. Apple Inc.*, 2026 WL 2131786, at *7–9 (D.C. Cir. July 24, 2026) (affirming dismissal of Sherman Act claims for failure to plausibly allege relevant markets).

The defects in Alexi's Clayton Act claim appear on the face of its contradictory and implausible Revised Amended Counterclaims and the materials properly considered with them. The Court can therefore dismiss the claim without adjudicating disputed evidence.[1]

**A. Alexi Fails to Plausibly Allege that Clio's Acquisitions Have or Will Result in Foreclosure that May Substantially Lessen Competition.**

To proceed on its Clayton Act claim, Alexi must plausibly allege the transaction may substantially lessen competition in a relevant antitrust market. 15 U.S.C. § 18; *Brown Shoe Co. v.*

[1] This is Alexi's second attempt to plead the claim, after Fastcase identified substantially the same deficiencies in response to Alexi's original counterclaims. *See generally* Counter-Defs.' Mem. of P. & A. in Supp. of Partial Mot. to Dismiss Alexi's Countercls., ECF No. 72-1. Dismissal should therefore be with prejudice. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("repeated failure to cure deficiencies by [previous] amendments" may warrant denying further leave to amend); *see* Counter-Defs.' Mem. of P. & A. in Supp. of Renewed Partial Mot. to Dismiss Alexi's Revised Amended Countercls. ("Mot.") at 11, ECF No. 86-1.

*United States*, 370 U.S. 294, 368 (1962) (explaining that defining the relevant market is a "necessary predicate" to a Clayton Act violation). The Act requires more than a "mere possibility" of harm to competition. *United States v. AT&T*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018) (Leon, J.), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). Alexi must plausibly allege that this consummated, vertical merger will have "a probable anticompetitive effect." *Brown Shoe*, 370 U.S. at 323.

Here, Alexi challenges Clio's acquisition of Fastcase as a vertical merger combining an "upstream (input)" provider (Fastcase) with a "downstream (output)" provider of "AI Legal-Analysis Services" (Clio). Rev. Am. Counterclaims (ECF 82-1) ¶ 187; Alexi Opp'n at 22. Alexi alleges that the downstream market includes "at least" Westlaw, Lexis, Clio, Harvey, Alexi, DISCO, and Legora, all of which require access to upstream "comprehensive U.S. caselaw." Rev. Am. Counterclaims ¶¶ 167–69, 177. Because Fastcase is allegedly the only upstream provider, Alexi claims the merger gives Clio the ability and incentive to foreclose its downstream rivals' access to that input. *Id.* ¶¶ 187–90.

To survive a motion to dismiss, Alexi must plausibly allege relevant upstream and downstream markets and that the transaction will enable Clio to foreclose the upstream input in a manner likely to substantially lessen downstream competition. Failure to plausibly allege either market can be fatal. *See Ohio v. Am. Express*, 585 U.S. 529, 543 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'" (alterations in original) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965))); *PhantomALERT Inc. v. Apple, Inc.*, 762 F. Supp. 3d 8, 17 (D.D.C. 2025), *aff'd* 2026 WL 2131786 (D.C. Cir. July 24, 2026) ("Without an understanding of the bounds of the relevant market, a court cannot determine whether the defendant has unlawfully 'lessen[ed] or destroy[ed] competition.'"). An implausibly narrow upstream market excludes alternatives

available to downstream participants; an implausibly narrow downstream market omits unaffected competitors and exaggerates competitive harm. And even if both markets are adequately pleaded, Alexi must still allege that the merger will likely substantially lessen competition.

Alexi's allegations are deficient as to each component of its claim: the upstream market, the downstream market, and the likelihood and extent of foreclosure. Fastcase's Motion identified the internal inconsistencies in those allegations. *See* Mot. at 9–34. Alexi's Opposition either ignores them or offers explanations absent from the Revised Amended Counterclaims. As discussed below, the pleaded facts do not plausibly support Alexi's proposed markets or a likelihood that the transaction may substantially lessen competition.

### B. Alexi Does Not Plausibly Allege that the Combined Entity Can Foreclose Downstream Competitors' Access to Existing Caselaw Databases.

Alexi alleges "at least" seven downstream competitors: "Clio, Alexi, Westlaw, Lexis, Harvey, C.S. Disco, and Legora." Mot. at 12. It must plausibly allege that Clio can foreclose more than a *de minimis* share of that downstream market. *Brown Shoe*, 370 U.S. at 329 ("[F]oreclosure of a *de minimis* share of the market will not tend 'substantially to lessen competition'"); *FTC v. Tempur Sealy Int'l*, 768 F. Supp. 3d 787, 848 (S.D. Tex. 2025) ("It cannot be emphasized too strongly that 'small' foreclosures cannot impair competition." (quoting Phillip E. Areeda & Herbert Hovenkamp, 4A *Antirust Law*, ¶ 1004f at 172 (5th ed. 2022))).[2]

Alexi's own allegations negate its theory of harm: Westlaw and Lexis are included in the alleged downstream market, yet each owns a comprehensive caselaw database. Alexi Opp'n at 21

[2] Alexi principally argues that the question is whether Clio has "the ability and incentive to foreclose rivals from sources of supply or distribution to determine whether the merger is likely to substantially lessen competition in the relevant market." Alexi Opp'n at 22 (quoting *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1051 (5th Cir. 2023)). Alternatively, it invokes the *Brown Shoe* factors. *Id.* at 27–29. But those arguments merely repackage its "ability and incentive" theory, and the claim fails for the same reasons under either test. *See* Mot. at 26 n.21.

n.3 ("Alexi defines the market to include the downstream AI products offered by Lexis, Westlaw, and Clio."); Rev. Am. Counterclaims ¶¶ 147, 169. Clio therefore cannot foreclose these "larger," "established" players[3] from the allegedly critical input or plausibly impair the downstream competition they provide. *See also* Mot. at 20.

Nor can Alexi plausibly allege that Clio can foreclose Harvey, "the leading AI platform for large law firms in the United States," from comprehensive caselaw. Rev. Am. Counterclaims ¶¶ 153, 169. Alexi alleges that Harvey has access to Lexis's comprehensive database through a "strategic partnership." *Id.* ¶ 154. It now says that this partnership does not count because it is not an "arm's length" license. Alexi Opp'n at 17. But Alexi's test is whether a downstream rival has "access to comprehensive U.S. caselaw," not the contractual form providing it. Rev. Am. Counterclaims ¶ 177.[4] Because Harvey has access to Lexis's database, Clio cannot foreclose it from the allegedly critical input, and Harvey's competition remains unchanged post-merger.

Alexi alleges that DISCO currently licenses Fastcase's caselaw database, undercutting its immediate-foreclosure theory. *Id.* ¶ 150. It alleges only "[o]n information and belief" that Clio "is unlikely to renew" that license when it expires in two years. *Id.* ¶ 94. Yet its Opposition converts that speculative prediction into the assertion that Clio "*will not* renew DISCO's license."

[3] Josh Scott, *Clio Secures $500-million USD Series G as it Completes vLex Acquisition*, Beta Kit (Nov. 10, 2025), https://perma.cc/U8BP-D7U9 (cited in Rev. Am. Counterclaims ¶ 45 n.1).

[4] This illustrates the gap between Alexi's firm-specific allegations and the market-wide inquiry. Alexi says Lexis and Westlaw "refused to license" to Alexi, proving their "unavailability." Alexi Opp'n at 18. At most, that suggests they were unavailable on Alexi's proposed terms. Rev. Am. Counterclaims ¶ 155 (alleging that [redacted] (emphasis added)); Mot. at 16. It says nothing about Lexis's availability to existing licensees such as Harvey or prospective licensees offering different terms, such as Luminance, which also has licensed the Lexis database for AI applications. *See* LexisNexis and Luminance Announce Strategic Alliance to Extend Authoritative Legal AI Content and Technology into Enterprise Contract Workflows, LexisNexis (April 21, 2026), https://perma.cc/5427-PRML.

Alexi Opp'n at 26 (emphasis added). Alexi cannot amend its factual allegations through briefing, particularly where its only cited support says the opposite. *See id.*

Finally, Alexi does not allege that downstream player Legora has ever licensed Fastcase data, yet it claims Clio can "enact a *complete* foreclosure" of downstream competition. Alexi Opp'n at 22 (emphasis in original). That omission further undermines its foreclosure theory.

Alexi's response that "Clio doesn't have to destroy all competition in the downstream market" is unavailing. Alexi Opp'n at 23.[5] Section 7 still requires a likely, more-than-*de-minimis* lessening of competition. *Brown Shoe*, 370 U.S. at 329; *Tempur Sealy Int'l*, 768 F. Supp. 3d at 848; *see also* Mot. at 22. Yet Alexi does not plausibly allege that Clio can foreclose most of its six identified downstream rivals—including Westlaw, Lexis, and Harvey—from the allegedly critical input. Rev. Am. Counterclaims ¶ 167. It therefore cannot allege a substantial lessening of competition, much less the "*complete* foreclosure" it claims. Alexi Opp'n at 22.

### C. Alexi Does Not Plausibly Allege that High Barriers to Entry Prevent the Emergence of Upstream Caselaw Suppliers.

Alexi does not dispute that ease of entry reduces foreclosure concerns. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1001 (5th ed. 2025) ("Significant anticompetitive effects are unlikely to occur unless … entry barriers … are substantial in at least one market, and probably in both."); Mot. at 23. Alexi merely asserts that "[t]here are high barriers to entry." Alexi Opp'n at 23. That formulaic allegation does not suffice; Alexi must plead "enough factual matter" to support it. *Twombly*, 550 U.S. at 555. Its own allegations render substantial entry barriers implausible.

Alexi concedes that entry "within two years post-merger" may provide "a timely check on

[5] Alexi's cited language from the Fifth Circuit's decision in *Illumina* addressed possible methods of foreclosure, not whether the degree of foreclosure would substantially lessen competition. Alexi Opp'n at 23 (citing *Illumina*, 88 F.4th at 1053).

anticompetitive harm." Alexi Opp'n at 23 (quoting *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 73 n.28 (D.D.C. 2011)). It asserts that building a caselaw database would take "years or decades of manual effort." Rev. Am. Counterclaims ¶ 7. But that assertion is difficult to reconcile with [redacted][6]

Such entry is already occurring. As Fastcase explained, publicly available information about recent upstream and downstream entry undermines Alexi's theory but is absent from the Revised Amended Counterclaims. Mot. at 32–34. For example, Midpage reportedly has built a database containing all federal caselaw, caselaw from all 50 states and D.C., and unpublished opinions using PACER, state-court websites, and government publishers. *Id.* at 32 n.26 (citing Coverage, Midpage, https://www.midpage.ai/data-for-lawyers (last accessed July 19, 2026)).

Alexi does not respond to Fastcase's request that the Court take judicial notice of this public information. *See id.* at 33–34.[7] Nor does it address that, after Fastcase moved to dismiss, Thomson Reuters and Anthropic announced a partnership combining Westlaw and Practical Law content with Claude to provide AI-assisted legal research and drafting. *Thomson Reuters and Anthropic*

---

[6] The Court may take judicial notice [redacted] *See Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017). Fastcase does not ask the Court to resolve disputed evidentiary facts [redacted]

[7] Alexi did not respond to Fastcase's request for judicial notice of Midpage's partnership with Claude, which "combines Midpage's 'comprehensive, up-to-date dataset of case law' with Claude's AI capabilities." Mot. at 32 (quoting *Release: Midpage MCP Integration for Claude*, Accordingly by midpage (Feb. 2, 2026), https://blog.midpage.ai/p/release-midpage-mcp-integration-for.). That publicly reported partnership undercuts Alexi's theory: new upstream and downstream entrants are combining to provide the very service Alexi claims the merger will stifle. And although Alexi invokes the "information available at the time it filed its Counterclaims," Alexi Opp'n at 21, the partnership was announced *months* before its April 23, 2026 Revised Amended Counterclaims. Any plausible theory must account for Midpage.

*Expand Partnership to Connect Claude with CoCounsel Legal*, Thomson Reuters (May 12, 2026), https://www.thomsonreuters.com/en/press-releases/2026/may/thomson-reuters-and-anthropic-expand-partnership-to-connect-claude-with-cocounsel-legal (last accessed July 20, 2026). That development further shows that the downstream market continues to evolve through partnerships involving caselaw providers other than Fastcase. The Court may take judicial notice of this public information. *See Rivera v. Rosenberg & Assocs., LLC*, 142 F. Supp. 3d 149, 161 (D.D.C. 2015).

Entry is central to whether Clio has the ability and incentive to foreclose competition. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1001 (5th ed. 2025). Alexi's cited caselaw, [redacted], and public information render its high-barriers-to-entry allegations implausible.

**D. Alexi's Failure to Plausibly Allege Relevant Antitrust Markets Warrants Dismissal of Its Clayton Act Claim.**

Alexi's failure to plausibly allege relevant markets independently warrants dismissal. *See PhantomALERT Inc.*, 2026 WL 2131786, at *9 (affirming dismissal because the complaint "d[id] not plausibly allege the product markets on which its Sherman Act counts [were] premised"); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 103 (D.D.C. 2013) (dismissing claim for insufficient product-market allegations).

A relevant product market must include "all products reasonably interchangeable by consumers for the same purposes," and its boundaries must bear "a rational relation" to interchangeability or cross-elasticity of demand. *PhantomALERT*, 2026 WL 2131786, at *5–6. Although market definition is often fact-intensive, *PhantomALERT* confirms that dismissal is appropriate where the allegations are "imprecise and self-contradictory" or fail to account for potential substitutes. *Id.* at *7–9. There, the plaintiff repeatedly confused a market for "access" to apps with a market for the apps themselves, and therefore failed to "adequately draw the

boundaries of the proposed market." *Id.* at *8.

Alexi's allegations suffer the same defect. It begins with its desired conclusion—that Fastcase is the sole upstream source of a critical input—and then shifts the proposed market's boundaries depending on which sources and competitors it needs to exclude. Those internally inconsistent markets cannot sustain its Clayton Act claim.[8]

***First, Alexi cannot coherently exclude Westlaw and Lexis from the upstream market***. Alexi claims that post-merger "Clio controls 100% of the critical upstream input," Alexi Opp'n at 28, yet identifies Westlaw, Lexis, and Fastcase as the three "comprehensive, historical primary-law databases," Rev. Am. Counterclaims ¶ 4; *id.* ¶¶ 44, 56, 147. Clio's downstream rivals could therefore use the "larger," "established" Westlaw and Lexis databases if denied access to Fastcase.[9]

Alexi attempts to avoid that contradiction by excluding Westlaw and Lexis because their databases are not "available" to downstream participants. *Id.* ¶¶ 149, 151, 156. But Alexi also alleges that those databases are available to Westlaw's and Lexis's own downstream AI services and that Lexis provides Harvey access through a strategic partnership. *Id.* ¶¶ 153, 169, 173. Alexi's Opposition further narrows the market to databases "available for *third-party licensing*," Alexi Opp'n at 19 (emphasis added), a limitation absent from the Revised Amended

---

[8] Alexi argues dismissal on market-definition grounds is "relatively rare." Alexi Opp'n at 13 (quoting *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022)). But *PhantomALERT* and other cases confirm dismissal is appropriate where the alleged market omits interchangeable substitutes or is tailored to the litigation. *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237–38 (2d Cir. 2008) (affirming dismissal where the proposed market omitted "interchangeable substitute products"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) (holding a proposed market legally insufficient where it excluded "all interchangeable substitute products," even accepting all factual inferences in the plaintiff's favor); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (affirming dismissal where the proposed markets were "artificial" and "contorted to meet [the plaintiffs'] litigation needs").

[9] Josh Scott, *Clio Secures $500-million USD Series G as it Completes vLex Acquisition*, Beta Kit (Nov. 10, 2025), https://perma.cc/U8BP-D7U9 (cited in Rev. Am. Counterclaims ¶ 45 n.1).

Counterclaims. Alexi's "availability" limitation thus makes the market depend on the particular downstream participant: Westlaw's database is available to Westlaw, while Lexis's is available to Lexis and Harvey.[10] That shifting definition resembles the confusion between "access" to apps and the apps themselves that required dismissal in *PhantomALERT*. 2026 WL 2131786, at *8.

Alexi's approach also divorces market definition from its alleged harm to competition. Alexi alleges that "[p]rogrammatic access to a comprehensive legal data database is a critical input" for downstream AI providers and that Clio will foreclose that input, harming downstream competition. Rev. Am. Counterclaims ¶ 177. Competition from every downstream participant is therefore relevant. *See supra* § I.B. Yet Alexi defines upstream market from its own perspective, alleging at most harm to Alexi rather than harm to competition. That "artificial" market, "contorted to meet [Alexi's] litigation needs," warrants dismissal. *Hicks*, 897 F.3d at 1121.

***Second, Alexi's definition of a "comprehensive" database is a moving target***. At times, Alexi alleges that caselaw alone is the critical input—and all it licensed from Fastcase. Rev. Am. Counterclaims ¶¶ 60–61, 146; Alexi Opp'n at 15. Yet it excludes CourtListener and HCAP, despite their millions of cases, because they lack the same non-case "legal documents" as Fastcase, emphasizing that Fastcase contains more than one billion legal documents but only 15 million judicial opinions. Rev. Am. Counterclaims ¶¶ 161–63, 177; Alexi Opp'n at 16.[11] Under Alexi's

---

[10] Alexi's Opposition highlights the mismatch. Although Alexi alleges that Westlaw and Lexis have their own databases and that Lexis partners with Harvey, it now claims both databases are "*completely unavailable* to downstream providers." Alexi Opp'n at 17 (emphasis original). That cannot be true for Westlaw, Lexis, or Harvey. Nor does Alexi allege that Westlaw or Lexis refused to license Clio, DISCO, or Legora, or that Clio refused to license Harvey, DISCO, or Legora.

[11] Alexi's exclusion of public caselaw sources CourtListener and HCAP resembles the arbitrary market definition rejected in *HiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020). There, the court found a LinkedIn-only market implausible because the relevant data could "be gleaned from other sources such as Google and Facebook or other industry directories and sources." *Id*. at 1148–49; *see also* Mot. at 18 n.14.

own theory, however, the remaining 98.5% of Fastcase's "legal documents" are irrelevant to the critical input and cannot justify excluding CourtListener and HCAP from the upstream market.[12]

Alexi's varying definitions of "available" and "comprehensive" leave the proposed upstream market without coherent boundaries. As in *PhantomALERT*, those "imprecise and self-contradictory" allegations do not plausibly allege a relevant antitrust market. *See PhantomALERT*, 2026 WL 2131786, at *8–9.

### E. Alexi Fails to Plausibly Allege that the 2023 vLex-Fastcase Transaction Violates the Clayton Act.

Alexi's Revised Amended Counterclaims briefly assert that "vLex's 2023 acquisition of Fastcase was anticompetitive and violated Section 7 of the Clayton Act in its own right." Rev. Am. Counterclaims ¶¶ 195–96. Yet Alexi pleads no separate claim based on that transaction and now characterizes it only as "relevant context" for the alleged effects of the 2025 Clio-vLex merger. Alexi Opp'n at 29.

Whether framed as a separate violation or "relevant context,"[13] the 2023 merger does not plausibly support Alexi's foreclosure theory. Alexi alleges that vLex continued licensing Fastcase caselaw to Alexi after the merger and entered a new license with DISCO. Rev. Am. Counterclaims ¶¶ 8, 74–75, 87, 92, 195. Those allegations do not support a reasonable inference that the transaction enabled, incentivized, or produced foreclosure of Fastcase data. *See* Mot. at 30–31.

* * *

[12] Alexi's shifting definition of "comprehensive" is also evident in its reliance on statements about the entire vLex/Fastcase library to establish Clio's "incentive" to foreclose competition. Alexi Opp'n at 24; Rev. Am. Counterclaims ¶ 190. The alleged "data moat," however, concerns the full post-merger legal library, not the narrower caselaw database Alexi identifies as the critical input. Mot. at 25 n.19; Rev. Am. Counterclaims ¶¶ 60–61, 146. Indeed, Alexi alleges that caselaw comprises only 1.5% of the Clio database. Alexi Opp'n at 16. Labeling those statements "party admissions" does not cure that mismatch or make Alexi's market allegations plausible.

[13] Alexi did not respond to Fastcase's argument that Alexi fails to allege any of the necessary elements of a Clayton Act § 7 claim, including relevant markets. Mot. at 30–31.

Alexi's attempt to recast the parties' business dispute as a Clayton Act violation is not a genuine antitrust grievance. Alexi asserted this theory only after Fastcase brought its contract claims. The counterclaim instead appears designed to transform a discrete licensing dispute into costly antitrust litigation and thereby manufacture settlement leverage unrelated to the merits of the underlying contract dispute. But the tactic cannot survive Rule 12(b)(6). Alexi's claim rests on internally inconsistent market allegations and a foreclosure theory that does not plausibly account for the alternatives available to most of the alleged downstream competitors. Because those defects are apparent on the face of Alexi's pleading, the Court may reject the theory as legally groundless and dismiss the Clayton Act claim with prejudice.

## II. ALEXI'S BAD FAITH COUNTERCLAIM RUNS HEADLONG INTO WELL-SETTLED D.C. LAW.

Alexi largely avoids defending its implied-covenant counterclaim and instead asks the Court to convert the Motion into one for summary judgment and consider the expedited-discovery record. Alexi Opp'n at 30–31. That request is particularly anomalous in light of the proceedings Alexi initiated. Alexi moved for limited expedited discovery and an accelerated summary-judgment process. ECF No. 55; ECF No. 55-1 ¶ 6(a); Minute Order, 1:25-CV-04159-RJL (Feb. 17, 2026). The parties then incurred substantial expense conducting expedited discovery and fully briefing cross-motions for summary judgment on the limited record that process produced. ECF Nos. 95, 100 (cross-motions for summary judgment); ECF Nos. 102, 104 (oppositions). But after reviewing those submissions, the Court vacated the scheduled hearing and declined to resolve the motions because, in the Court's view, the briefs did not present a dispute susceptible of summary adjudication. Five days later, Alexi filed its Opposition asking the Court to convert a Rule 12 motion into another summary-judgment proceeding based on the same limited record. Having already determined that the expedited summary-judgment submissions did not present a resolvable

dispute, the Court has no reason to revisit that record indirectly through Rule 12(d).

The Court can instead decide the legal sufficiency of Count Three on the Revised Amended Counterclaims, the Agreement they incorporate, and matters properly subject to judicial notice. Rule 12(d) permits the Court simply to exclude materials outside the pleadings. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

Alexi's cases address materially different procedural circumstances. *Hamilton v. Geithner* involved a factual record that both sides had presented and briefed, after discovery, without either side being "taken by surprise" or deprived of an opportunity to respond. 743 F. Supp. 2d 1, 8 (D.D.C. 2010) (Leon, J.). *Miller v. Lamanna* and *Lugo v. City of Troy* likewise involved completed discovery and actual summary judgment motions supported by extensive evidentiary records; the error in each case was the district court's decision to disregard that record and decide the case as though it remained at the pleading stage. *See Miller*, 169 F.4th 118, 120–25 (2d Cir. 2026); *Lugo*, 114 F.4th 80, 83–90 (2d Cir. 2024). Here, by contrast, the parties developed a deliberately limited record through the expedited process Alexi requested, over Counterclaim Defendants' objection, and the Court has already reviewed the resulting submissions and declined to resolve the cross-motions because they did not present a dispute susceptible of summary adjudication. Those decisions do not require the Court to convert a properly presented Rule 12(b)(6) motion so that Alexi may renew its request for factual adjudication on the same limited record. The legal sufficiency of Count Three can and should be decided on the pleading Alexi chose to file.

### A. The Implied-Covenant Counterclaim Duplicates Alexi's Contract and Tort Theories.

A party "is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action." *Brown v. Trinity Wash. Univ.*, 2023 WL 2571729, at *10 (D.D.C. Mar. 20, 2023). Count Three

presents precisely that problem.

Alexi's Opposition identifies two categories of supposed bad faith. First, it alleges that Fastcase purported to terminate the Agreement "under false pretenses" and "manufactur[ed] a baseless lawsuit." Alexi Opp'n at 30–32. But whether Fastcase had contractual cause to terminate is the central issue presented by the parties' competing contract claims. Calling Fastcase's asserted basis "false" or "baseless" may characterize Fastcase's alleged breach in more pejorative terms, but it does not identify different conduct or a different contractual obligation.

Second, Alexi alleges that Fastcase acted in bad faith "by making false and misleading representations to prospective acquirers" about the backfile option. *Id.* at 31, 33. Those same statements underlie Alexi's tortious-interference claim, which alleges that Counterclaim Defendants intentionally impaired Alexi's prospective acquisition relationships by communicating with [redacted] *Id.* ¶¶ 226–29. Again, Count Three adds no distinct conduct or injury.

Alexi's authorities reinforce the distinction. In *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, the court allowed portions of an implied-covenant claim to proceed because the claimant alleged conduct beyond the asserted contractual breach, including post-contract efforts to claw back customer relationships that had been transferred under the parties' agreement. 24 F. Supp. 3d 32, 44–45 (D.D.C. 2014). Here, by contrast, the supposed bad-faith acts are the very acts already challenged through Alexi's contract and interference claims. And unlike the contractual benefits allegedly clawed back in *Intelsat*, Alexi affirmatively alleges that the backfile option remains effective notwithstanding termination. Rev. Am. Counterclaims ¶¶ 6, 139.

Rule 8 permits alternative theories when governing facts or legal relationship is uncertain. *See* Alexi Opp'n at 34. It does not preserve a redundant count that identifies no independent implied obligation, no distinct conduct, and no separate deprivation of a contractual benefit.

### B. Alleged Collateral Motive Does Not Create an Independent Covenant Claim.

Alexi's principal theory is that Fastcase invoked the Agreement's termination provision not because of Alexi's misuse of Fastcase data, but to impair the backfile option and facilitate Clio's acquisition of vLex. Rev. Am. Counterclaims ¶¶ 101–16, 212; Alexi Opp'n at 30. That alleged motive does not independently state an implied-covenant claim.

Fastcase brought this breach-of-contract suit on the merits and has not raised the so-called "backfile option" in this case. The Agreement expressly authorizes termination for cause if Alexi uses Fastcase data outside the contractually defined "Purpose" and fails to cure after notice. Agreement §§ 1.2, 5.2. But even if Fastcase had acted with an ulterior motive, under District of Columbia law, exercising an express contractual right does not violate the implied covenant merely because the party allegedly acted with an additional or collateral motive. *See Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 596 (D.C. 2023) (rejecting covenant claim where the challenged conduct was "entirely consistent with [the defendant's] rights under the contract").

*CorpCar Services Houston, Ltd. v. Carey Licensing, Inc.* is directly instructive. There, the licensor allegedly invoked a contractual breach as pretext for terminating the licensee and entering the market itself. 325 A.3d 1235, 1247 (D.C. 2024). The D.C. Court of Appeals nevertheless held, "[a]bsent … purposeful sabotage, … a termination for cause cannot breach the implied covenant, even if motivated by reasons unrelated to cause. *Id.* at 1247 (quotation omitted). Because the licensee had independently committed a material breach, the licensor could invoke that breach as cause even if its motive was pretextual. *Id.* The critical distinction was whether the licensor manufactured the breach by interfering with or compelling the licensee's nonperformance. *Id.*

Alexi alleges no comparable sabotage here. It does not allege that Fastcase caused Alexi to train its models on Fastcase data, display Fastcase-sourced decisions to users, or use the data in the disputed manner. To the contrary, Alexi alleges that it "performed all of its obligations" and

that its uses were permitted by the Agreement. Rev. Am. Counterclaims ¶ 210. That presents a dispute over what the Agreement allowed, not a claim that Fastcase compelled Alexi to violate it.

Alexi's attempt to distinguish *CorpCar* on the ground that cause there was "undisputed," Alexi Opp'n at 32, only exposes the problem with its claim. If Alexi's conduct supplied cause under the Agreement, *CorpCar* forecloses an implied-covenant claim based merely on Fastcase's alleged collateral motive. If it did not, Alexi has a wrongful-termination theory under the Agreement—but not a separate implied-covenant claim arising from the same termination. Either way, the covenant count adds nothing. And whether Fastcase had cause is the merits question presented by the parties' contract claims, not a reason to preserve a duplicative covenant count.

*Whole Foods Market Group, Inc. v. Wical Limited Partnership* does not suggest otherwise. There, the court determined from the lease that the tenant had not defaulted; the landlord therefore lacked a contractual basis to issue the challenged default notice. 288 F. Supp. 3d 176, 185–88 (D.D.C. 2018). The court noted that the declaratory and covenant counts sought different relief. *Id.* at 187. Here, Alexi's nonbreach has not been established from the Agreement or the face of the pleadings. It is the merits question the parties' contract claims place before the Court.[14]

### C. Alexi Does Not Plead an Independent Violation of Its Cure Right.

Alexi separately argues that Fastcase's notice was vague and prevented Alexi from curing, invoking *CorpCar*'s discussion of the implied duty to cooperate with contractual performance.

[14] Alexi's other pretext cases are likewise inapposite. *Legion Systems, LLC v. Valiant Global Defense Services, Inc.*, 2021 WL 3633592, at *5–6 (M.D. Fla. Aug. 17, 2021), applied California law and involved repudiation of a three-percent work-share guarantee, diversion of the promised work, and use of a termination-for-convenience clause to avoid those obligations. *Florence Urgent Care v. Healthspan, Inc.*, 445 F. Supp. 2d 871, 879–80 (S.D. Ohio 2006), applied Ohio law at summary judgment and involved an admitted false reason for termination, evidence of racial discrimination, and conduct contrary to public policy; it distinguished those circumstances from "mere termination without cause." Neither case displaces *CorpCar*'s controlling statement of D.C. law that, absent purposeful sabotage, a termination supported by cause does not breach the implied covenant merely because it was motivated by unrelated reasons. *See* 325 A.3d at 1247.

Alexi Opp'n at 32–33. That theory appears nowhere in Count Three and is instead lifted from Alexi's summary-judgment brief. Even so, the arguments advanced in Alexi's Opposition do not support an independent covenant claim.

*CorpCar* involved evidence that the licensor declared the breach incurable, treated termination as irrevocable from the outset, and refused to consider the licensee's proposed remedial measures despite an express contractual cure period. 325 A.3d at 1242–43, 1247–50. The court accordingly found a factual dispute over whether the licensor had repudiated the cure right and rendered compliance futile. *Id.* at 1250–52.

Alexi alleges no comparable repudiation. It alleges that Fastcase issued a notice invoking Section 5.2 and afforded the contractually specified 30-day period. Rev. Am. Counterclaims ¶ 110. Alexi then denied that it had breached, maintained that its existing use of the data was contractually authorized, and did not propose a cure that Fastcase rejected as futile or unavailable. *Id.* ¶¶ 110, 113. Alexi's assertion that the notice inadequately identified the breach thus raises the same question presented by the express contract: whether Fastcase complied with Section 5.2's notice-and-cure requirements. Recasting that alleged noncompliance as a failure of fair dealing does not create a second cause of action coextensive with the express provision.

**D. Alexi Does Not Allege that Fastcase Deprived It of a Contractual Benefit.**

The implied covenant protects a party's right "to receive the fruits of the contract." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015) (quotation omitted). The relevant "fruits" are benefits the party actually contracted to receive—not every commercial advantage the party hoped the agreement would produce. *See Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 979 F. Supp. 2d 26, 32–33 (D.D.C. 2013).

Alexi identifies the backfile option and the resulting enhancement of its "enterprise value and attractiveness to acquirers." Alexi Opp'n at 33. But Alexi alleges that the backfile option

"survives termination." Rev. Am. Counterclaims ¶¶ 6, 139. According to Alexi, then, Fastcase's termination therefore did not eliminate the option or relieve Fastcase of the obligation to honor it if an acquisition occurs and the contractual conditions are satisfied.

Alexi may believe that the existence of the option made Alexi more valuable to potential purchasers. But the Agreement does not promise that Alexi will retain a particular valuation, remain attractive to acquirers, or complete an acquisition. Nor does the implied covenant require Fastcase to enlarge the option or protect Alexi against every market consequence of the parties' dispute. *See Sibley v. St. Albans Sch.*, 134 A.3d 789, 806 (D.C. 2016) (the covenant does not require a party to "waive or rewrite the terms of the contract"); *Sundberg*, 109 A.3d at 1134 (rejecting covenant theory untethered to an obligation imposed by the agreement).

Alexi's contention that Mr. Walters lied to acquirers about the option, Rev. Am. Counterclaims ¶¶ 139–40, does not alter that conclusion. To begin, Mr. Walters's essential point was correct: acquiring Alexi would not itself transfer the Fastcase data or entitle the acquirer to use it for free; it would give "the acquiring party" an option to purchase the backfile for [redacted]. Agreement §§ 2.3, 12.3. A representation that conforms to the contract cannot constitute bad faith. *See Abdelrhman v. Ackerman*, 76 A.3d 883, 892 (D.C. 2013) ("A truthful representation regarding the meaning of the contract could not frustrate appellants' enjoyment of the benefits of the contract, nor could it fairly be characterized as arbitrary or capricious or made in bad faith."). But even accepting Alexi's allegation that Mr. Walters misstated the option, Alexi does not allege that Fastcase amended, repudiated, or refused to perform Section 12.3. It alleges that his statements injured Alexi's acquisition prospects—the precise theory asserted in Count Five. Rev. Am. Counterclaims ¶¶ 226–29. That alleged tort injury is not also a deprivation of a contractual benefit, particularly where Alexi maintains that the option remains fully enforceable. Nor do Alexi's

labels—"false pretenses," "objectively baseless," and "under false pretenses"—supply an independent covenant claim. *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013) (requiring bad faith or arbitrary and capricious conduct); *Brink v. Xe Holding, LLC*, 2022 WL 3334503, at *6 (D.D.C. May 19, 2022) (recommending dismissal where allegations of "deception," "obfuscation," and "denial" were vague and conclusory and merely restated the alleged breach).

Count Three identifies no independent bad-faith conduct, implied obligation distinct from the Agreement's express terms, or contractual fruit that Fastcase withheld. It should be dismissed.

## III. ALEXI'S TORTIOUS-INTERFERENCE COUNTERCLAIMS SHOULD BE DISMISSED.

Alexi's fourth and fifth counterclaims fail for distinct reasons. Count Four does not plausibly allege interference by an actor legally separate from Fastcase's performance of the Agreement. Count Five does not allege facts supporting a commercially reasonable business expectancy and, as to Alexi's principal example, fails to plausibly allege causation.

### A. Count Four Does Not Plausibly Allege Interference by a Stranger to Fastcase's Contractual Performance.

D.C. law does not permit a plaintiff to convert the contracting party's alleged breach into tortious interference. It is "hornbook" law that "a defendant's breach of his own contract with the plaintiff is … not a basis for the tort of interference." *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 26 (D.C. 1991). The same principle extends to officers and agents who exercise the contracting party's authority on its behalf. *Press v. Howard University* affirmed dismissal where university officers acted "as agents of the other party to the contract," because the university "through their actions could not tortiously interfere with its own contract." 540 A.2d 733, 736 (D.C. 1988).

Alexi's reliance on *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, confirms the distinction. *Sorrells* permitted a claim against a supervisor who was not an officer, lacked termination authority, and maliciously induced the authorized officer to act. 565 A.2d 285,

290–91 (D.C. 1989). The court contrasted *Press*, where officers acting within their authority "served as the alter ego of the university and had the power to bind the university." *Id.* at 290. Thus, the question is not merely whether the alleged interferer bears a formally distinct name, but whether it acted as an outside intermeddler or instead exercised the contracting party's authority as its officer or agent. *Dean v. Walker*, 876 F. Supp. 2d 10, 15 (D.D.C. 2012), as amended (July 10, 2012) (holding that a corporate officer "cannot be liable for inducing the company to breach the contract as long as he was acting within the scope of his employment"); *Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 48 (D.D.C. 2010) (dismissing interference claim against corporate vice president because she was "an officer acting as an agent of the party to the contract"); *Weaver v. Gross*, 605 F. Supp. 210, 216 (D.D.C. 1985) ("Because a corporation cannot act other than through its officers and agents, a corporate officer is an implied party to the contract and, therefore, does not have the third-party status necessary to be liable for tortious interference with contract.").

Alexi's allegations place vLex and Clio on the *Press* side of that line. Alexi alleges that vLex merged with Fastcase, operated the combined enterprise, and transmitted the breach notice on Fastcase's behalf. Rev. Am. Counterclaims ¶¶ 21, 110. It likewise alleges that, when Fastcase terminated the Agreement, withheld daily updates, and filed this action, Clio had acquired Fastcase and was exercising control over its "wholly owned subsidiary." *Id.* ¶¶ 23, 29, 113, 137. And the conduct Count Four identifies consists entirely of that internal corporate decision making: vLex and Clio allegedly "direct[ed] Fastcase to withhold data," terminate the Agreement, and file suit. *Id.* ¶ 223. Those allegations describe entities exercising authority over Fastcase's performance of its own contract—not outsiders inducing an otherwise independent contracting party to breach.

Alexi cannot avoid that result by labeling vLex and Clio "third parties to the Alexi-Fastcase contract." *Id.* ¶ 223. That legal conclusion is not entitled to the assumption of truth, particularly

where the pleaded facts describe vLex and Clio as directing and implementing Fastcase's contractual decisions. *See Iqbal*, 556 U.S. at 678. Nor does Alexi allege that either entity acted as a rogue employee pursuing some personal objective outside the corporate enterprise, as in *Sorrells*. Its theory is precisely the opposite: vLex and Clio allegedly acted to protect the combined enterprise's economic and competitive interests in the Fastcase data and the Clio acquisition. Rev. Am. Counterclaims ¶¶ 101–16. Whatever those allegations may mean for Alexi's contract claim, they do not transform Fastcase's alleged nonperformance into interference by a stranger. *Koker v. Aurora Loan Serv.*, 915 F. Supp. 2d 51, 65 (D.D.C. 2013) (dismissing tortious-interference claim because allegations that the contracting party breached its own obligations could not "convert a breach of contract claim into a claim for tortious interference" (quoting *Raskauskas*, 589 A.2d at 26)).

**B. Count Five Does Not Plausibly Allege a Probable Business Expectancy or Causation.**

Alexi is correct that District of Columbia law does not invariably require a plaintiff to identify every affected customer or counterparty by name. *See Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 141 (D.C. Cir. 2021). But that does not eliminate the requirement that the pleaded facts establish a valid, commercially reasonable expectancy rather than a hoped-for transaction. A valid expectancy requires "a probability of future contractual or economic relationship and not a mere possibility." *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012) (quotation omitted); *see also Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56–57 (D.D.C. 2011) (requiring a "reasonable likelihood" grounded in facts from which the anticipated relationship could be estimated).

*Close It!* and *Haymon v. District of Columbia*, 610 F. Supp. 3d 101 (D.D.C. 2002)— cited by Alexi (at 37 n.7)—illustrate the difference. *Close It!* involved an operating title company's 20-

year relationships with lenders, insurers, brokers, and real-estate customers, together with allegations that the challenged statements caused identifiable lost revenue. 248 A.3d at 141–42. *Haymon* involved revocation of a commission legally required for the plaintiff to work as a special police officer, which necessarily precluded him from obtaining future employment in that profession. 610 F. Supp. 3d at 119–20. Neither case held that a plaintiff may substitute the labels "prospective clients" or "potential acquirers" for facts showing a probable future relationship.

Alexi alleges two categories of prospective relationships: prospective clients interested in purchasing its legal-AI services and prospective acquirers interested in purchasing the company. Rev. Am. Counterclaims ¶ 226. Neither category is adequately pleaded.

As to prospective clients, Alexi alleges only that unnamed entities were engaged in "serious discussions" about purchasing Alexi's services. *Id.* It alleges no facts concerning the stage of those discussions, the services under consideration, anticipated terms, timing, or any other circumstance supporting an inference that a client relationship was probable rather than merely possible. Nor does Alexi identify any communication by Counterclaim Defendants to a prospective client or plead facts showing that Counterclaim Defendants knew of any particular prospective-client relationship. Paragraph 227 merely recites, in conclusory terms, that they possessed such knowledge. Those allegations do not establish a commercially reasonable expectancy involving prospective clients.

Alexi's prospective-acquisition theory rests principally on [redacted] is insufficiently pleaded. Alexi alleges only that [redacted] had expressed "serious interest" in acquiring Alexi and Mr. Walters later made one statement to [redacted] president. *Id.* ¶¶ 136, 140. Although paragraph 226 generally alleges that prospective acquirers had taken "concrete steps" toward an acquisition, Alexi pleads no such steps by [redacted]—no proposed terms, internal approval, letter of

intent, scheduled decision, or other concrete development. And although Alexi alleges that [redacted] "stopped" its discussions "after interference by Clio," *id.* ¶ 136, it pleads no facts connecting that decision to Mr. Walters's statement rather than merely placing the events in sequence.

[redacted] comes closest to alleging a probable acquisition expectancy, but the pleaded chronology defeats Alexi's principal causation theory. Alexi alleges "on information and belief" that [redacted] had obtained internal approvals for a proposed letter of intent, subject to a board vote scheduled for December 1. *Id.* ¶ 136. The only direct communication Alexi identifies between Counterclaim Defendants and [redacted] occurred one week later, when [redacted] CEO contacted Mr. Walters on December 8. *Id.* ¶ 139. That communication could not have caused the anticipated December 1 vote not to occur.

And to the extent Alexi attributes [redacted] decision to publicity surrounding this lawsuit, the pleading again supplies only temporal sequence: news of the lawsuit "surfaced" on December 1, and [redacted] thereafter did not proceed. *Id.* ¶ 136. Alexi does not allege when [redacted] learned of the suit, what effect the suit had on its internal process, whether its board considered the proposed letter of intent, or that anyone at [redacted] attributed the decision not to proceed to the litigation. The grouped conclusion that Counterclaim Defendants' conduct "caused the termination, reduction, or material impairment" of Alexi's opportunities does not supply the missing causal facts. *Id.* ¶ 229; *see Iqbal*, 556 U.S. at 678.

Because Count Five does not plausibly allege a probable prospective relationship or facts connecting Counterclaim Defendants' conduct to the loss of a relationship, it should be dismissed.

## CONCLUSION

For the foregoing reasons, Alexi's second, third, fourth, and fifth counterclaims should be dismissed with prejudice.

DATED: July 28, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Paul J. Sampson*

Paul N. Harold (D.C. Bar No. 1032578)
Brendan J. Coffman (D.C. Bar No. 988370)
1700 K Street NW, Fifth Floor
Washington, DC 20006-3814
Telephone: (202) 973-8800
PHarold@wsgr.com
BCoffman@wsgr.com

Jess M. Krannich (*pro hac vice*)
Paul J. Sampson (D.C. Bar No. 1010457)
Rebecca J. Nelson (*pro hac vice*)
Andrew P. Follett (*pro hac vice*)
Isabella Ang (*pro hac vice*)
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
JKrannich@wsgr.com
PSampson@wsgr.com
RNelson@wsgr.com
AFollett@wsgr.com
IAng@wsgr.com

*Counsel for Plaintiff Fastcase Inc. and Counter-Defendants Fastcase Inc., vLex, LLC, and Themis Solutions Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2026, the foregoing was electronically filed through this Court's CM/ECF system and additionally all counsel of record were served via electronic mail.

Respectfully submitted,

*/s/ Paul J. Sampson*